**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LIYU WANG, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | **CLASS ACTION** |
| STMICROELECTRONICS N.V., JEAN-MARC CHERY, and LORENZO GRANDI | <u>Demand for Jury Trial</u> |
| Defendants | |

Plaintiff Liyu Wang ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by STMicroelectronics N.V. ("STM" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of STM's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired STM securities between January 25, 2024 to July 24, 2024, inclusive (the

"Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning STM's expected revenue for the fiscal year 2024. Defendants' statements included, among other things, confidence in the Company's understanding of the industrial and automotive sectors' recovery paths, repeated indications that they had hit the proverbial "bottom" of these trends, and continued claims that the low points of their original and updated guides factored in the risks associated with these macro trends.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of STM's forecasting ability; notably, that the Company did not truly have appropriate visibility to generate the guidance it put forth, failed to appropriately analyze the visibility it did have, or otherwise the Company was simply not truly equipped to handle the ongoing challenges in its end-market industries as they had projected. Such statements absent these material facts caused Plaintiff and other shareholders to purchase STM's securities at artificially inflated prices.

4.      The truth emerged on July 25, 2024, when STM announced its financial results for the second quarter of fiscal 2024 and reduced its revenue guidance for the full fiscal year 2024. The Company attributed their results and lowered guidance as, "contrary to our prior expectations, customer orders for Industrial did not improve and Automotive demand declined."

5.      Investors and analysts reacted immediately to STM's revelation. The price of STM's common stock declined dramatically. From a closing market price of $39.54 per share on

July 24, 2024, STM's stock price fell to $33.47 per share on July 25, 2024, a decline of more than 15.3% in the span of one day.

## JURISDICTION AND VENUE

6.     Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of Defendant STM's business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.    Plaintiff purchased STM common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in STM is attached hereto.

12.    STMicroelectronics N.V. is an international corporation with its principal executive offices located at Chemin du Champ-des-Filles 39, 1228 Plan-les-Ouates, Switzerland. During the

Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "STM."

13.     Defendant Jean-Marc Chery ("Chery") was, at all relevant times, the Chairman of the Managing Board, President, and CEO of STM.

14.     Defendant Lorenzo Grandi ("Grandi") was, at all relevant times, the President of Finance, Purchasing, ERM and Resilience CFO, and Member of the Managing Board of STM.

15.     Defendants Chery and Grandi are sometimes referred to herein as the "Individual Defendants." STM together with the Individual Defendants are referred to herein as the "Defendants."

16.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of STM's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17.    STM is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to STM under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

19.    STM is a global company that designs, develops, manufactures, and sells semiconductor products around the world.

20.    STM tailors its products to four end-markets: automotive, industrial, personal electronics, and communications equipment, computers and peripherals.

### *The Defendants Materially Misled Investors Concerning*

### *STM's Revenue Outlook for Fiscal Year 2024*

#### *January 25, 2024*

21.    On January 25, 2024, Defendants issued a press release announcing fiscal 2024 guidance, with "a plan for FY24 revenues in the range of $15.9 billion to $16.9 billion. Within this plan, we expect a gross margin in the low to mid-40's."

22.    During the same-day earnings call, Defendants elaborated on the FY24 guidance, stating, in pertinent part, the following:

> For the full year 2024, it will be impacted in the first half by this significant inventory correction in Industrial with an expected significant sequential revenue growth in the second half. We expect this will be driven by a strong rebound in Industrial and in Computer Peripherals; continued growth in Automotive and in Communication Equipment and the usual seasonality in Personal Electronics
>
> . . .

At the midpoint of our full year 2024 revenue indications, we expect mid-single-digit year-over-year growth in Automotive. Excluding the impact of capacity reservation fees and a specific customer 2023 inventory replenishment effect, this would correspond to low double-digit year growth.

We expect Industrial to return to high single-digit year-over-year growth in the second half of 2024 after a significant decline in the first half. In Personal Electronics, we expect to grow revenues sequentially in the second half, in line with the usual seasonality. In Communication Equipment & Computer Peripherals, we expect to grow revenues both sequentially and year-over-year in the second half, driven by our engaged customer programs in both the communication and computer markets.

23.    The question-and-answer portion of the call following during which Defendants defended their projections, responding, in pertinent part, as follows:

<Q: Francois-Xavier Bouvignies – USB Investment Bank – Technology Analyst> I have 2 quick questions, if I may. The first one is on Automotive. You mentioned that you expect mid-single-digit growth for the full year versus production flattish and versus 3 months ago, Jean-Marc, I think you were forecasting high single digit or significant growth for Automotive. So it seems that you see some sort of deterioration on the Automotive side.

My question is, what kind of inventory correction do you assume in this plus 5% number -- 5% or mid-single digit because when we look at Kia 2 days ago or yesterday, they were talking about correction in Automotive with no growth basically in -- or even negative in 2024. We had Tesla last night not giving guidance for 2024. And we had Mobileye, obviously, with a significant inventory correction.

So in other words, is it conservative, this plus 5% or the inventory correction could be more as we look into 2024? And the second question is on the silicon carbide. Could you provide some guidance for 2024 by any chance in terms of revenues? What you ended up in 2023 and what you expect for '24 would be very helpful.

<A: Jean-Marc Chery> Change, okay, between October and January for automotive is about one important customer communicating about inventory in ADAS. So this is a change. ***That's the reason why, okay, to give color on Automotive, I really would like to confirm that we have to read the 2024 year, let's say, cleaning from this effect of, let's say, inventory replenishment we had in 2023 in ADAS and the capacity fee reservation.***

Because in automotive, yes, I confirm to you that year '24, year '23 as reported, we will grow mid-single digit, but clean from this effect of strong inventory replenishment for ADAS in 2023. ***And the capacity reservation fee that are decreasing in '24 because, okay, we are exiting capacity overloading, the growth***

***on Automotive will be low double digit***, which is basically consistent with the indication we have about production of light vehicle, which are slightly above 90 million vehicles in 2024, which is consistent with the number of electrical vehicle worldwide that will be produced in the range of 14 million to 15 million vehicles.

And of course, okay, the continuous pervasion of, let's say, semiconductor electronics. But this in a year where, clearly, we have no more boost linked to inventory replenishment or capacity fee reservation. Again, I would like to repeat that for ST the only difference we see October, January is related to ADAS. Then about silicon carbide, okay, our plan will drive ourselves in 2024 is between $1.5 billion to $1.6 billion revenues.

<Q: Francois-Xavier Bouvignies> That's great, Jean-Marc. Just a quick follow-up, if I may, on the -- when you laid out the underlying growth of the Automotive, which is really well understood. But isn't it like -- don't you think to have an inventory correction buffer would make sense at this point of time. I'm talking about inventory correction at the semiconductor level, for example, because obviously, last year, they all wanted to increase inventory significantly from a low base. So obviously, it makes the base effect technically negative from a semiconductor inventory point of view. Do you see what I mean?

<A: Jean-Marc Chery> Yes, yes, I exactly know. We absolutely don't see on Automotive what we are seeing on Industrial because on Industrial, this is what is happening. ***Again, on Automotive, where we see a pocket of inventory corrected is on ADAS. That has been pretty well communicated. And I have to confirm to you that we have a very solid backlog covering the plan I mentioned to you on Automotive.***

. . .

<Q: Joshua Louis Buchalter – TD Cowen – Director> I was hoping you could maybe expand on your visibility into the back half ramp. I mean in particular, in Industrial. Generally, when you're in an inventory correction and lead times are coming down, it's hard to get a great grasp. So maybe you could provide some anecdotes of what you're seeing that's driving the sharp rebound in Industrial in the back half. Maybe any details on how cancellations or bookings are trending underneath in the near term?

<A: Jean-Marc Chery> Clearly, the signal now we see after having seen in 2023 in the first half, as I mentioned, the acknowledgment of customers that the lead time of semiconductor are reducing clearly, and in October, we shared with you that when we have seen September bookings not at the expected level, we discuss with our customers and all of them say, well, we are revisiting our sales and operating plan because our own end demand is weakening, except power energy for infrastructure.

But what was related construction, residential, including factory automation, robotics and of course, what is consumer, all the customer and distributor were really assessing their end demand that was weakening and their inventory level. ***Well, clearly, the signal of Q4 booking show that we are in the inventory correction mode.***

By experience, inventory correction, last 4 to 5 quarters, we can say that it has started in Q3, end of Q3, that's the reason why we expect that this inventory correction will end, end of Q2. Could be slightly extending Q3, let's monitor it, it's possible. ***But we are convinced discussing with our customers that this inventory correction will end, end of Q2.***

***So that's the reason why we have built a plan that is backloaded for Industrial, H2 versus H1. And that's the reason why also today, our backlog visibility on Industrial is pretty low***. And that's the reason why we have given a range of $1 billion, between $15.9 billion to $16.9 billion. ***But at the end, the feedback we are receiving that we are facing an inventory correction that should end in Q2 and expecting a rebound in H2.***

<Q: Joshua Louis Buchalter> And I guess as we go through this period of digestion, any way to quantify where the channel is at and where it needs to be? And any changes in the pricing environment with your customers as you go through the digestion?

<A: Jean-Marc Chery> No, pricing is going back to what we classify normal, is low single digit, okay? We don't see price pressure especially going back to normal. No, it's an inventory correction. I think we can classify that many customers in the field of Industrial market have overestimated in a certain extent their end demand dynamic in 2023 and restart in 2024.

They continue to order at the level of the backlog we received end of '22 and first half for 2023. ***And now they acknowledge that they have to adjust because the end demand is not at the expected level. This kind of adjustment again last 3, 4 quarters, started in Q3 should end in Q2***.

(Emphasis added).

*<u>March 12, 2024</u>*

24.     On March 12, 2024, STM presented at Citi Technology, Media & Telecom Conference where the Company further discussed their full-year 2024 guidance.

25.    CEO Chery, in particular, spoke at length about STM's confidence in its projections ability to encapsulate the risk associated with potential macroeconomic headwinds.  In pertinent part, CEO Chery provided the following responses to questions from the analysts:

<Q: Andrew Michael Gardiner – Citigroup Inc. – Research Analyst> … Could we start then on your 2024 outlook? You've guided the market between $15.9 billion and $16.9 billion in revenue. Can you just walk us again through the different drivers of what's going to get you within that range?

<A: Jean-Marc Chery> Well, I think I have to come back by a vertical view. So first of all, clearly, Automotive that is representing about 41% of ST revenue, so we see in 2024, a growth about a mid-single digit. Well, we feel important that we have, let's say, to disclose a like-for-like growth of Automotive because if you remember what I said during our Q4 earnings announcement that in 2023, we have taken benefits for Automotive revenues, about 2 points.

Point number one is what we call capacity reservation fees from a carmaker that touch as a peak in 2023. And the second, let's say, nonrecurring event was an important inventory buildup, agreed, because contractual inventory buildup from one important customer that will not occur again in 2024. So if we clean from these 2 elements, so capacity reservation fee and inventory buildups, very specific, the growth we expect on Automotive in 2024 is, I have to say, let's say, above 10% -- slightly above 10%.

*We have a good confidence level because the coverage we have in terms of backlog is, let's say, about 85% and for the time being, we don't see any massive, let's say, inventory corrected here and there, for sure. The customers are, let's say, tuning their inventory, depending the mix of the end customer demand, but we don't see a massive correction. So for Automotive we expect like-for-like slightly above 10%. Everything reported, let's say, mid-single-digit growth.*

Well, the second important vertical for ST is clearly industrial that is representing 30%. Well, clearly, here, at the midpoint of what we indicated, we see a mid-teens decrease. It is mainly related to a strong inventory correction, which is amplified by weakened demand. And at this stage, it is a mid-teens correction for the full year, decrease, but unbalance means as a correction is planned to happen mainly in H1, and we are expecting at the midpoint of what we have indicated to come back to, let's say, mid-single-digit growth year-over-year H2 '24 versus H2 2023 on this market.

*Today, there is no sign that this scenario is realistic but there is not yet sign that this scenario is fool-proof. So that's the reason why we have given this low head, let's say, forecast at 15.9%. And if it would happen, it would be mainly driven by a delay in the recovery of the industrial market and of the inventory correction.*

. . .

***So at the end, at the midpoint of our guidance, is minus 5% for ST, I guess. So Automotive, about mid-single-digit growth like-for-like slightly above 10%, good confidence level because backlog coverage. Industrial, mid-teens decline, could be worse. But at this stage, the mid-teens decline, no sign that it will not happen. Is it fool-proof? Not yet because lead times are very short, so order will come late.*** Personal Electronics, about minus 5%, but we know exactly what like-for-like is flattish. Good confidence level. And communication equipment and computer peripheral flattish and good confidence level as well. So this is what all I can classify our outlook for '24.

<Q: Andrew Michael Gardner> Okay. Thank you. So I think that gives us a clearer view on 2024. In terms of the near term, I mean you've touched on the relative lack of visibility. Would you say that anything has really changed over the last 2 months since you first provided that guidance? Have things got any better or any worse?

<A: Jean-Marc Chery> ***Better, although, clearly -- I think no, we are entering, let's say, in a rather different market cycle than the past 3 years***. I think it's a very simple, let's say, statement and very obvious statement. ***I think, yes, '24 is certainly a year of transition, mainly linked to the fact that there is this correction on the industrial market.*** Why? Because in 2022, 2023, certainly forecast of the end demand linked to the carbonation industry overall and consumer, let's say, spending were overestimated.

On top of that, after the trauma of 2021 shortage for sure customer order a lot, and the industry has been capable to supply. So at the end a weakened demand versus adequate supply has created what we can classify a kind of bubble for 2024. That's the reason why 2024 is a transition year. When we see the activity on this industrial market from the 1 million developers we have on microcontroller. When we see the number of new products that we have introduced in 2023 that we will introduce in 2024 that are demanded by our customers, we don't see absolutely any structural issue that don't make us confident that ST as a broad range player on the industrial market capable to offer orbital processing solution capable to offer the full range of power device and power driver with the right analog sensing when we did, we don't see a structural issue, okay?

. . .

<Q: Unknown Analyst> t wasn't so much on the high-level financial guidance, but just more on the sort of environment. We've had one of your peers in the U.S. use the term green shoots a few days ago, which got people excited. So maybe you could sort of either corroborate or not corroborate find where you might be seeing or not be seeing green shoots in the business. That's the first question. And then secondly, another one of your U.S. peers kind of attempted to say, the bottoms end

one quarter from now. Like how do you feel about that kind of statement as it pertains to your business?

<A: Jean-Marc Chery> On industrial market specifically on general-purpose microcontroller, we are not close to the correction. Is the backlog stabilized now and POS versus POP, so means from this orbital case who out, who in, stabilize? Yes, but speed of inventory correction accelerating? No. Inventory corrected, whatever is a channel, I repeat, whatever is a channel. So OEM, small OEM, EMS or distributor, not yet because, again, the end demand is not at the expected level compared with 6 months ago. ***So it will take more time. Yes, we can expect that end of Q2 early Q3. We see a restart of the growth sequentially. We can feel confident about that.***

The key question is what will be the magnitude of the acceleration? Is it mid-single-digit sequential growth? Is it low single digit? Honestly, it's too early to say. Why? For a single reason that the lead time offer by semiconductor are very short. And the inventory situation is still high. And then people, they have their own uncertainty still related to the economy, the interest rate and so on and so forth.

***So that's the reason why we have been not cautious, but we have been, let's say, pragmatic when we provided our guidance in January for the year, our indication for the year that at this stage we can confirm it. But okay, everything is possible on industrial market***

(Emphasis added).

<u>*April 25, 2024*</u>

26.     On April 25, 2024, STM reported Q1 FY24 results, announcing "Q1 net revenues $3.47 billion; gross margin 41.7%; operating margin 15.9%; net income $513 million."

27.     On the release, CEO Chery specified that "Q1 net revenues and gross margin both came in below the midpoint of our business outlook range, driven by lower revenues in Automotive and Industrial, partially offset by higher revenues in Personal Electronics," and then announced the Company's reduced guidance for the full year 2024 as follows: "We will now drive the Company based on a revised plan for FY24 revenues in the range of $14 billion to $15 billion. Within this plan, we expect a gross margin in the low 40s."

28.     During the same-day earnings call, CEO Chery further elaborated on their poor

performance in the first quarter, stating, in pertinent part:

> For the full year 2024, compared with our January expectations, the market
> environment has further deteriorated with an even stronger inventory correction in
> Industrial slowing the expected growth in the second half of the year compared to
> our previous expectations. Automotive has entered a deceleration phase with
> demand slowing down compared to our January expectations.

29.     During the question-and-answer portion of the call, Defendants were adamant that

the issues would bottom out in Q2:

> <Q: Joshua Louis Buchalter – TD Cowen – Director> I guess to start, obviously,
> we see the numbers coming down a little bit, but I wanted to try to break that up a
> little bit. And obviously, there have been some headlines at your lead silicon carbide
> customer. Could you maybe spend a minute or two walking us through how much
> of the lowered outlook in particular in auto is related to that lead customer and
> maybe update us on your silicon carbide outlook for 2024.
>
> <A: Jean-Marc Chery> I will take the question. Yes, in Automotive, okay,
> compared to our, let's say, January expectation for the full year, we have
> acknowledged a decrease. Half of the decrease is related to electrical vehicle
> production decrease from an important customer. And half of the decrease in
> Automotive is more related to what we say, some inventory control and tuning from
> OEM, which are adapting themselves to mix change between battery-based
> electrical vehicles, hybrid vehicle and thermal combustion engine 1. So the
> decrease -- the deceleration phase means okay, what we have announced today in
> Automotive. ***As a takeaway, half is linked to an adjustment, okay, of the forecast
> because production decreased from one important customer. And the other one
> is more inventory control and mix adjustment*** because now it's well known that
> carmaker -- the change [indiscernible] between electrical car, hybrid car and
> thermal combustion engine 1.
>
> <Q: Joshua Louis Buchalter> Got it. I appreciate the color. As a follow-up,
> obviously, you understand again, numbers are coming down and you mentioned
> that industrial weakness is expected to last into the second half. Maybe you can
> give us sort of your -- some of the assumptions that are underlying the back half
> ramp and firstly, there's some seasonality at your lead customer. Maybe you could
> help us give us some clues on how much of that is driving sort of the back half
> ramp? And then also big picture, how is your comfort level with where you expect
> your industrial customers' inventory levels to be coming out of the second quarter?
>
> <A: Jean-Marc Chery> Well, overall, yes, ***we believe that Q2 is a bottom point,
> within the range we have indicated***. Clearly, we expect a growth in H2. This

growth will, let's say, overall enable ST to come back 2023 revenue run rate between Q4 2024 and Q1. Automotive, let's say, will increase in H2. Personal Electronics will increase in H2 related to our engaged customer program. And Industrial will start to smoothly increase in Q3 and accelerate in Q4.

***Of course, we have a pretty good visibility on backlog in Automotive, Personal Electronics and Computer Equipment and Computer Peripheral. We know that the visibility on Industrial is shorter*** because again, there is a important distraction related to inventory level, both at OEM level and in the channel. ***However, we see some, let's say, kind of green spot that makes us thinking that order will come back in Q2 for additional billings in Q3 smoothly and acceleration in Q4. The risk is embedded in the range of what we have indicated***.

. . .

<Q: Jerome Ramel – BNP Paribas Exane – IT hardware and Semiconductor Analyst> Yes. Quick two questions. The first one would be, where are the lead times currently? And what is the loading of your front-end fabs. And then I have a quick follow-up.

<A: Jean-Marc Chery> Lead time with average of below 3 months, is very short. And taking into account the inventory level we have, we are also capable to capture some spot term business within the quarter quite easily. Front-end loading...

<A: Lorenzo Grandi> Front-end loading, let's say, ***Q2 is really the bottom***, I would say, because in Q2, we see a front-loading of 72% for our fabs. With a significant impact in terms of loading charges. They will be in the range of 300 basis points on our gross margin in this quarter. So it's an important impact. Notwithstanding this, with this level of revenues, we see our inventory increase in terms of value because we were launching our production with a different expectation for the evolution of the second half. But the number of days will increase. We will continue to keep under control our inventory. So in the second part of the year, the unloading charges, which continue to be material and the level of saturation of our fab will increase, but not so much. We will remain in the range of 77%. So similar to the one of Q1, if you want.

At the end, we do expect that our inventory exiting -- our inventory [indiscernible] 115 days. That is a little bit higher in respect to our model, if you wanted, but for year like 2024, I think control is the right level.

(Emphasis added).

30.    The above statements in Paragraphs 21 to 29 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information

pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, STM's optimistic claims of understanding the industrial and automotive sectors' recovery paths, repeated indications that they had hit the proverbial "bottom" of these trends, and continued claims that the low points of their original and updated guides factored in the risks associated with these macro trends all ultimately fell well short of reality; the Company simply did not have the visibility it claimed to have to predict recovery in its core segments.

### *The Truth Emerges during STM's Second Quarter Earnings Report*

### *July 25, 2024*

31.     In the morning of July 25, 2024, Defendants released their Q2FY24 results in line with expectations: "Q2 net revenues $3.23 billion; gross margin 40.1%; operating margin 11.6%; net income $353million." Further, while "Q2 net revenues were above the midpoint" they were "driven by higher revenues in Personal Electronics, partially offset by lower than expected revenues in Automotive."

32.     Yet again, the Company lowered their full year projections.  CEO Chery noted that "[d]uring the quarter, contrary to our prior expectations, customer orders for Industrial did not improve and Automotive demand declined.  We will now drive the Company based on a plan for FY24 revenues in the range of $13.2 billion to $13.7 billion. Within this plan, we expect a gross margin of about 40%."

33.     An earnings call was again held the same day during which CEO Chery further detailed the guidance setback, stating, in pertinent part:

> For 2024, entering the second half with our current Q3 and year-end backlog and with ongoing market dynamics, we have further revised our plan for 2024 revenues.

. . .

As we have pointed to in our strategy, both of these markets [Automotive and Industrial] are undergoing a deep transformation, also driven by a number of megatrends. This, coupled with the current cycle dynamics I have just mentioned, is brining both opportunities and challenges in the short, medium and longer term for ST and for our customers equally

34.    The subsequent question-and-answer portion of the call focused largely on

Defendants' justifications for the guide down and their future expectations.  In pertinent part, CEO

Chery provided the following responses to the questions presented:

<Q: Francois-Xavier Bouvignies – UBS Investment Bank – Technology Analyst> My first question is on the Industrial and Microcontroller, general purpose mainly. Obviously, it's sharply down, and I think there is kind of this destocking happening. However, there is this, I mean, discussion in the market that maybe you would have much higher inventories that maybe to peers, when you listen to peers, I mean, Renesas, Microchip and TI, they said they are through the worst and that they are proactively -- or they did proactively manage inventories in the channel.

So my question is like, I would explain why you saw a bit later than everybody else, the Industrial downturn and maybe why it's sharper in terms of downside. So my question is, do you -- what's your view on this comment that maybe you have higher inventory than relative to peers that would explain this sharper decline? And more importantly, how it plays out for the rest of the year? How long this understocking would last for you? That would be my first question.

<A: Jean-Marc Chery> Okay. Thank you. Well, I will not comment the benchmark with our competitors. Well, first of all, TI has had a different go-to-market approach with the distribution, and they have much more inventory in home. About Microchip, I invite to check the number in detail. And for the other competitor, I will not comment.

No, we -- let's say -- first of all, okay, we have the widest product portfolio on microcontroller. And again, we are addressing all the regions of the world. And as I mentioned in my speech, we are really addressing as well short-cycle business and more long-cycle business. On the short-cycle business, in fact, the end demand fluctuated a lot during the recent quarter for different reason. And the inventory is not only at our distribution channel and not only at EMS, is in the value chain at system maker and including at the end customer.

**So that's the reason why, first of all, it has taken much longer than the other, okay, to first absorb the excess of inventory at the end customer or system maker.** And now, yes, there is still, let's say, some excess of inventory at distributor in EMS.

. . .

***The fact that in '22, '23, up to March, we have non-cancelable order policy that
increased the inventory for sure that now we have to digest***. Unfortunately, in '24,
this business is -- has a problem of demand -- end demand. That's the reason why
it takes longer. For the rest, okay, we behave very similarly, our competitor, and
they have a similar profile in terms of business recovery for this year. While for the
benchmark, we would be careful of the Renault.

<Q: Francois-Xavier Bouvignies> Right. And maybe my follow-up, if I may, is on
the Automotive. You mentioned that it weakened. I mean maybe you could explain
a bit in details what exactly is happening in terms of Automotive? And if you could
remind us what you expect for Automotive, Industrial for the full year? What your
full year is based on for GP generally would be great. And I will leave it there.

<A: Jean-Marc Chery> ***On Automotive, there is, let's say, 3 points. But the point
number one, let's classify on legacy. On legacy, starting in May, we have seen
our main Tier 1, let's say, pulling out the consignment stock, less pieces***, because
you know the Tier 1 now, they came back with carmaker with 2-week call off. So
they have a very short-term visibility.

***And starting end of May, there's a start for us, okay, to pull out from our
consignment stock less pieces. So as a consequence, they can sell some frame
order.*** So already in Q2, we have been impacted about less revenue than the forecast
that was based on our backlog, about $100 million, is point number one.

***The point number two, still on this legacy business and, let's say, usual
application in the Automotive, they have declined***, okay, their forecast for H2. ***So
that's the reason why we have been obliged to revise down the forecast for
Automotive legacy, already impacted in Q2, about, let's say, $100 million and,
let's say, about $350 million, $400 million for H2.***

The second point is the growth for what is related electrical vehicle. We will grow
in H2 all of our components related to electrical vehicle, but less than forecasted.
And you know why? Because the ***production of electrical vehicle in the world has
been adjusted*** now below 13 million of cars.

However, I confirm that H2 will be a growth driver for ST for all the components
related to electrical vehicle, particularly for silicon carbide and particularly
everywhere, okay, in China and also with our main customer. That's the reason why
we confirm our silicon carbide revenue about $1.3 billion this year.

Well, then the third element is what we already mentioned that is a little bit, let's
say, increasing. You know that last year, ***one of our main customers for ADAS,
built a certain level of inventory, is adjusting in Q3 a little bit more the inventory***

16

***with us.*** So all in all, the Automotive for ST will grow in H2. I have to say 4% versus H1, about $100 million with a growth on electrical vehicle with silicon carbide, offsetted by the adjustment of the legacy from our Tier 1 and some inventory adjustment from our main customer in ADAS. So this is what we face in H2 in Automotive.

. . .

<Q: Sandeep Sudhir Deshpande – JPMorgan Chase & Co – Research Analyst> I'd like to actually go into -- you've reduced your full-year guidance by about $1.5 billion for the full year now again. How does that divide up into Automotive, Industrial? And you said in the quarter that you saw some weakness in the automotive market. Can you quantify how much weakness you saw? And do you see that continuing into the current quarter?

<A: Jean-Marc Chery> The Pareto of the variance between the 2 guidance, the famous $1 billion delta is ***about 40% Automotive, 60% Industrial***. I repeat, on Automotive, already in Q2, about $100 million. The rest is on H2 and mainly on what we call legacy business and partially on ADAS, ASICs. Again, I repeat what is related to silicon carbide, okay, we will go, but at a lower pace than what was expected.

On Industrial, which is about 60%, no impact in -- on Q2. On Q2, we have done an execution consistent with our forecast. ***The point is that in Q2, we didn't enter booking for Industrial billable for 2024 at the expected level. So that's the reason why we have cut our forecast by about USD 600 million***. And also, we exceed the POS of our distributor, let's say, decreasing.

And taking into account the feedback they gave to us, we don't expect now to increase our POP in Q3. On contrary, we will continue to decrease the POP on Q3 on Industrial to decrease the inventory at distribution level, but we expect our POP to increase in Q4. So this is the dynamics.

So the takeaway is about 40% of the $1 billion Automotive, already about $100 million in Q2 and about USD 600 million for Industrial. ***Why? Because, okay, no order in Q2 and POS still decreasing in Q2, so postponing in Q4, the restart of the distribution queue.***

<Q: Sandeep Sudhir Despande> Understood. And follow-up question is on Automotive. We are hearing from many automotive companies that they are seeing weakness in the market. So do you think that the orders more than the revenue, now you gave me this view on the revenue, will continue to be weak in autos for the next few quarters?

<A: Jean-Marc Chery> We receive from the Tier 1, what they say, delivery forecast, okay? Now, with the delivery forecast they gave to us, it's encompassing, okay? All

the adjustments we have already seen in Q1 that has been a bit amplified in Q2. Now we have our backlog. We -- as I said, the Tier 1 they are working with 2 weeks call-off from carmaker. Of course, okay, this is something that we have to put under a strict scrutiny. And we monitor, okay, with all our customers, okay, is a dynamic of the treatment and the orders they put on us.

On electrical vehicle, I think it's a different story. Here now, adjustment has been done. And we do believe that, okay, we will deliver our -- about $1.3 billion on SiC. But yes, on automotive, the market is dynamic. It's more on an inventory adjustment. But according to some, let's say, analysts for the automotive industry, looks like the production of vehicles is confirmed around 90 million vehicle. ***Now, we do believe that if it is confirmed, the inventory adjustment is basically done. So the backlog we have in front of us is variable***. However, we have to monitor the situation on a very dynamic way.

(Emphasis added).

35.    The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the January 25, 2024 and April 25, 2024 earnings calls, as well as during the March 12, 2024 conference call.  On those calls, Defendants continually praised the Company's ability to prepare for and navigate the turbulent landscape, repeatedly emphasizing that the macro recovery risks in the industrial and automotive end-markets were factored into the low-end of their guides, while continually minimizing additional risks associated with seasonality and the impact of the macro environment on the SYM's future profitability.

36.    Investors and analysts reacted immediately to STM's revelation. The price of STM's common stock declined dramatically. From a closing market price of $39.54 per share on July 24, 2024, STM's stock price fell to $33.47 per share on July 25, 2024, a decline of more than 15.3% in the span of just a single day.

37.    A number of well-known analysts who had been following STM lowered their price targets in response to STM's disclosures. For example, J.P. Morgan highlighted that "STMicro's results were shocking because of the very significant two consecutive quarters of reduction in

FY24 guidance … equivalent to cutting 18% from the original guidance given at the beginning of the year. It was clear from the conference call that there is channel inventory and there is inventory at end customers that was not taken into account while giving this guidance and creates an impression that the co. was 'flying blind' without understanding its channel or its customers.  The analyst further cautioned that the "worrying part of STMicro's report was the indication that the co. cut expectations for what they called the legacy automotive business. Autos is an end market which has not seen a substantial inventory correction this cycle and if this is the start of an inventory correction, however small, it could indicate weak trends in the market through 1H25."

38.    Similarly, William Blair noted that "ST called the second quarter the bottom," but now "management highlighted that inventory levels remained high, especially in industrial end-markets that work through distributors with lower visibility.  The company also acknowledged weaker-than-expected auto demand."  The analyst further noted that investors were not prepared for the magnitude of the guide down, stating, in pertinent part:

> Investors may have been braced for another notch lower, but breaking the 40% margin floor for the third-quarter guide was unexpected.  This was a strong message from management last quarter, emphasizing that the new ST has shifted the business to higher and more stable margins during downturns.  The consecutive guide-downs and the 300-basis-point miss has investors concerns about visibility in the business.

39.    The fact that these analysts, and others, discussed STM's shortfall and further reduced projections suggests the public placed significant weight on STM's statements of prior confidence in their new growth plans. The frequent, in-depth discussion of STM's guidance confirms that Defendants' statements during the Class Period were material.

### *Loss Causation and Economic Loss*

40.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that

artificially inflated the price of STM's common stock and operated as a fraud or deceit on Class Period purchasers of STM's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of STM's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of STM's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

41.    STM's stock price fell in response to the corrective event on July 25, 2024, as alleged *supra*. On July 25, 2024, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning STM's forecasting processes and growth guidance.

### Presumption of Reliance; Fraud-On-The-Market

42.    At all relevant times, the market for STM's common stock was an efficient market for the following reasons, among others:

(a)    STM's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)    STM communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    STM was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their

respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about STM was reflected in and incorporated into the Company's stock price during the Class Period.

43.     As a result of the foregoing, the market for STM's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in STM's stock price. Under these circumstances, all purchasers of STM's common stock during the Class Period suffered similar injury through their purchase of STM's common stock at artificially inflated prices, and a presumption of reliance applies.

44.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

45.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

46.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

47.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of STM who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired STM's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

49.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, STM's common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by STM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of December 31, 2023, there were 902 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

50.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of STM;

(c)      whether the Individual Defendants caused STM to issue false and misleading financial statements during the Class Period;

(d)      whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)      whether the prices of STM's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

53.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

56.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of STM common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire STM's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

57.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for STM's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

58.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

59.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of STM's internal affairs.

60.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to STM's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of

STM's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired STM's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

61.     During the Class Period, STM's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of STM's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of STM's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of STM's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

62.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the

disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

64.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about STM's misstatements.

66.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by STM which had become materially false or misleading.

67.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which STM disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause STM to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of STM's common stock.

68.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause STM to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

69.     By reason of the above conduct, the Individual Defendants and/or STM are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 23, 2024          Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*