**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE STMICROELECTRONICS N.V. SECURITIES LITIGATION | Case No.: 1:24-cv-06370-AKH |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE AMENDED COMPLAINT**

Robert J. Giuffra, Jr.
David M.J. Rein
Julia A. Malkina
Maxwell F. Gottschall
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
giuffrar@sullcrom.com
reind@sullcrom.com
malkinaj@sullcrom.com
gottschallm@sullcrom.com

*Counsel for Defendants*

March 24, 2025

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ..........................................................................................................................5

      A.    The Parties ...............................................................................................................5

      B.    ST's Business............................................................................................................5

      C.    Following The Global Pandemic, Automotive Demand For Chips
           Fluctuates ................................................................................................................6

      D.    ST Faces Unexpectedly Reduced Customer Demand .............................................8

      E.    Plaintiffs' Claims ...................................................................................................10

ARGUMENT ..............................................................................................................................10

I.      PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE MISSTATEMENTS
        AS A MATTER OF LAW ...................................................................................10

      A.    ST's Projections Of Future Performance, Which Were Coupled With
           Detailed Risk Warnings, Are Not Actionable.........................................................11

      B.    Many Of ST's Challenged Statements Are Inactionable Opinions Or Lack
           Sufficient Specificity For A Reasonable Investor To Rely On..............................16

      C.    Plaintiffs Cannot Save Their Legally Flawed Claims By Transforming
           Defendants' Projections Into Omissions Of Purported "Channel Stuffing"..........18

      D.    Plaintiffs' Other Confidential Witness Allegations Do Not Support Their
           Legally Flawed Fraud Claims................................................................................21

II.     PLAINTIFFS DO NOT PLEAD FRAUDULENT INTENT AS A MATTER
        OF LAW ...............................................................................................................23

      A.    Plaintiffs Do Not Allege Motive Or Opportunity For Securities Fraud ................24

      B.    Plaintiffs Do Not Allege Intentional Misconduct Or Severe Recklessness...........29

III.    PLAINTIFFS' CONTROL-PERSON CLAIM ALSO MUST BE
        DISMISSED..........................................................................................................32

CONCLUSION ...........................................................................................................................33

**TABLE OF AUTHORITIES**

*Page(s)*

**Cases**

*Acito* v. *IMCERA Group, Inc.*,
  47 F.3d 47 (2d Cir. 1995) ...................................................................................24

*Aini* v. *Sun Taiying Co.*,
  1997 WL 375735 (S.D.N.Y. July 7, 1997) ............................................................5

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009).............................................................................................5

*ATSI Communications, Inc.* v. *Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...............................................................................3, 24

*Bell Atlantic Corp.* v. *Twombly*,
  550 U.S. 544 (2007)............................................................................................5, 10

*Building Trades Pension Fund of Western Pennsylvania* v. *Insperity, Inc.*,
  2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) .......................................................17

*Cement Masons & Plasterers Joint Pension Trust* v. *Equinix, Inc.*,
  2012 WL 685344 (N.D. Cal. Mar. 2, 2012)................................................. 17-18

*Chapman* v. *Mueller Water Products, Inc.*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020)..............................................................15, 26

*City of Omaha Police & Fire Retirement System* v. *Evoqua Water Technologies
  Corp.*,
  450 F. Supp. 3d 379 (S.D.N.Y. 2020)................................................................12

*City of Pontiac Policeman's & Firemen's Retirement System* v. *UBS AG*,
  752 F.3d 173 (2d Cir. 2014)...............................................................................3, 18

*City of Sunrise Firefighters' Pension Fund* v. *Oracle Corp.*,
  2019 WL 6877195 (N.D. Cal. Dec. 17, 2019).....................................................17

*Credit Suisse Securities (USA) LLC* v. *Billing*,
  551 U.S. 264 (2007)............................................................................................10

*Damri* v. *LivePerson, Inc.*,
  2025 WL 863322 (S.D.N.Y. Mar. 19, 2025) .......................................................27

*Das* v. *Rio Tinto PLC*,
  332 F. Supp. 3d 786 (S.D.N.Y. 2018)...............................................................31, 32

*Decker* v. *Massey-Ferguson, Ltd.*,
    681 F.2d 111 (2d Cir. 1982)......................................................................................4, 11

*Duncan* v. *Pencer*,
    1996 WL 19043 (S.D.N.Y. Jan. 18, 1996) ................................................................4, 30

*Fernandes* v. *Centessa Pharmaceuticals PLC*,
    2024 WL 3638254 (S.D.N.Y. Aug. 2, 2024)....................................................................16

*Fishbaum* v. *Liz Claiborne, Inc.*,
    1999 WL 568023 (2d Cir. July 27, 1999) ......................................................................26

*Francisco* v. *Abengoa, S.A.*,
    481 F. Supp. 3d 179 (S.D.N.Y. 2020)....................................................................21, 23, 33

*Gamm* v. *Sanderson Farms, Inc.*,
    944 F.3d 455 (2d Cir. 2019)............................................................................................18

*Garfield* v. *NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) .....................................................................................19

*Gissin* v. *Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010)......................................................................11, 15

*Glaser* v. *The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)............................................................................32

*Gray* v. *Wesco Aircraft Holdings, Inc.*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020)............................................................................15

*Greebel* v. *FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999)....................................................................................18, 26

*Gregory* v. *ProNAi Therapeutics Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y. 2018)........................................................................ 11-12

*Hou Liu* v. *Intercept Pharmaceuticals, Inc.*,
    2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) ................................................................15

*In re Anheuser-Busch InBev SA/NV Securities Litigation*,
    2020 WL 5819558 (S.D.N.Y. Sept. 29, 2020) ...............................................................12

*In re AppHarvest Securities Litigation*,
    684 F. Supp. 3d 201 (S.D.N.Y. 2023)......................................................................14, 15

*In re Aratana Therapeutics Inc. Securities Litigation*,
    315 F. Supp. 3d 737 (S.D.N.Y. 2018) ......................................................................26, 27

*In re BISYS Securities Litigation*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005)........................................................................25, 26

*In re Donnkenny Inc. Securities Litigation*,
    171 F.R.D. 156 (S.D.N.Y. 1997) ....................................................................................5

*In re DraftKings Inc. Securities Litigation*,
    650 F. Supp. 3d 120 (S.D.N.Y. 2023)...........................................................................27

*In re Dura Pharmaceuticals, Inc. Securities Litigation*,
    452 F. Supp. 2d 1005 (S.D. Cal. 2006).........................................................................19

*In re Dynagas LNG Partners LP Securities Litigation*,
    504 F. Supp. 3d 289 (S.D.N.Y. 2020)...........................................................................14

*In re eSpeed, Inc. Securities Litigation*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)...........................................................................11

*In re FuboTV Inc. Securities Litigation*,
    2023 WL 2711826 (S.D.N.Y. Mar. 30, 2023) ...........................................................21

*In re Gildan Activewear, Inc. Securities Litigation*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009)....................................................4, 24, 25, 26

*In re Impac Mortgage Holdings, Inc. Securities Litigation*,
    554 F. Supp. 2d 1083 (C.D. Cal. 2008) ................................................................ 17-18

*In re JP Morgan Chase Securities Litigation*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)...........................................................................28

*In re Keyspan Corp. Securities Litigation*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ..........................................................................26

*In re Liberty Tax, Inc. Securities Litigation*,
    435 F. Supp. 3d 457 (E.D.N.Y. 2020) ..........................................................................15

*In re Lululemon Securities Litigation*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014).............................................................................21

*In re Merrill Lynch & Co.*,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003)............................................................................5

*In re Nokia Oyj (Nokia Corp.) Securities Litigation*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006)...........................................................................14

*In re NVIDIA Corp. Securities Litigation*,
    768 F.3d 1046 (9th Cir. 2014) ......................................................................................19

*In re Philip Morris International Inc. Securities Litigation*,
    89 F.4th 408 (2d Cir. 2023) ...................................................................................16

*In re Plug Power, Inc. Securities Litigation*,
    2023 WL 5577276 (S.D.N.Y. Aug. 29, 2023) ........................................................31

*In re Pretium Resources Inc. Securities Litigation*,
    2020 WL 953609 (S.D.N.Y. Feb. 27, 2020) ...........................................................16

*In re PXRE Group, Ltd., Securities Litigation*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) ....................................................................28

*In re Rockwell Medical, Inc. Securities Litigation*,
    2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ...................................................30, 31

*In re Sina Corp. Securities Litigation*,
    2006 WL 2742048 (S.D.N.Y. Sept. 26, 2006) ........................................................25

*In re Splash Technology Holdings, Inc. Securities Litigation*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) .................................................................17

*In re SunPower Corp. Securities Litigation*,
    2018 WL 4904904 (N.D. Cal. Oct. 9, 2018) ...........................................................17

*In re Synovis Life Technologies, Inc. Securities Litigation*,
    2005 WL 2063870 (D. Minn. Aug. 25, 2005) .........................................................19

*Jackson* v. *Abernathy*,
    960 F.3d 94 (2d Cir. 2020) ........................................................................23, 24, 31

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2009) .............................................................................4, 27, 28

*Leadersel Innotech ESG* v. *Teladoc Health, Inc.*,
    2024 WL 4274362 (2d Cir. Sept. 24, 2024) .....................................................15, 17

*Long Miao* v. *Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020) ............................................21, 22, 30, 32

*Lopez* v. *Ctpartners Executive Search Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016) ...................................................................2, 12

*Malin* v. *XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007) ....................................................................32

*Menora Mivtachim Insurance Ltd.* v. *International Flavors & Fragrances Inc.*,
    2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ........................................................21

*Micholle* v. *Ophthotech Corp.*,
  2019 WL 4464802 (S.D.N.Y. Sept. 17, 2019)...........................................................................26

*NECA-IBEW Health & Welfare Fund* v. *Pitney Bowes Inc.*,
  2013 WL 1188050 (D. Conn. Mar. 23, 2013) ......................................................................12, 22

*New England Carpenters Guaranteed Annuity & Pension Funds* v. *DeCarlo*,
  122 F.4th 28 (2d Cir. 2023) ..................................................................................... 2-3, 16, 17

*Novak* v. *Kasaks*,
  216 F.3d 300 (2d Cir. 2000)........................................................................................... *passim*

*Oklahoma Law Enforcement Retirement System* v. *Telefonaktiebolaget LM
  Ericsson*,
  2020 WL127546 (S.D.N.Y. Jan. 10, 2020) ...........................................................................31

*Olkey* v. *Hyperion 1999 Term Trust, Inc.*,
  98 F.3d 2 (2d Cir. 1996).........................................................................................................14

*Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*,
  575 U.S. 175 (2015)...............................................................................................................16

*Ong* v. *Chipotle Mexican Grill, Inc.*,
  2017 WL 933108 (S.D.N.Y. Mar. 8, 2017) ...........................................................................29

*Police & Fire Retirement System City of Detroit* v. *Argo Group International
  Holdings, Ltd.*,
  2024 WL 5089970 (S.D.N.Y. Dec. 12, 2024) ........................................................................19

*Robeco Capital Growth Funds* v. *Peloton Interactive, Inc.*,
  2024 WL 4362747 (S.D.N.Y. Sept. 30, 2024).........................................................................12

*Rombach* v. *Chang*,
  355 F.3d 164 (2d Cir. 2004)...............................................................................................2, 17

*South Cherry Street, LLC* v. *Hennessee Group LLC*,
  573 F.3d 98 (2d Cir. 2009)................................................................................................28, 29

*San Leandro Emergency Medical Group Profit Sharing Plan* v. *Philip Morris
  Cos., Inc.*,
  75 F.3d 801 (2d Cir. 1996)......................................................................................................12

*Schiro* v. *Cemex, S.A.B. de C.V.*,
  438 F. Supp. 3d 194 (S.D.N.Y. 2020).............................................................................. 18-19

*Slayton* v. *American Express Co.*,
  604 F.3d 758 (2d Cir. 2010).............................................................................................12, 13, 29

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................................ *passim*

*Tongue* v. *Sanofi*,
  816 F.3d 199 (2d Cir. 2016)....................................................................................17

*Woodley* v. *Wood*,
  2022 WL 103563 (S.D.N.Y. Jan. 11, 2022) ...........................................................28

*Woolgar* v. *Kingstone Cos., Inc.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2010)........................................................21, 31, 32

**Statutes and Rules**

15 U.S.C. § 78j...........................................................................................................10

15 U.S.C. § 78t...........................................................................................................10

15 U.S.C. § 78u-4 ................................................................................................ 10-11

15 U.S.C. § 78u-5 .............................................................................................2, 3, 12

Fed. R. Civ. P. 8........................................................................................................19

Fed. R. Civ. P. 9............................................................................................. *passim*

**PRELIMINARY STATEMENT**

Plaintiffs have brought a legally flawed fraud-by-hindsight complaint. STMicroelectronics N.V., or "ST," produces semiconductor chips used in electronics, including cars.[1]  Plaintiffs try to allege securities fraud because ST's leadership did not perfectly predict market demand following the COVID-19 pandemic and its aftermath.  Based on its strong backlog of long-term contracts with car manufacturers and suppliers, and the fast-growing market for electric vehicles ("EVs"), ST predicted moderate revenue growth into 2023 and 2024 for its automotive segment.  But ST expressly warned investors that the pandemic had created "substantial economic uncertainty and volatility," and that "increased demand" for its semiconductor chips "may not continue as the pandemic progresses or subsides."  (Ex. D at 10.)[2]  That is precisely what happened.  Following a decline in demand and challenges at some large customers, ST reduced its automotive revenue projections twice in early 2024.  After each reduced projection, ST's stock price predictably fell.

Trying to capitalize on both stock drops, Plaintiffs—individual, not institutional, investors—filed this putative class action alleging securities fraud against ST, its Chief Executive Officer Jean-Marc Chery, and its Chief Financial Officer Lorenzo Grandi.  But "[c]orporate officials need not be clairvoyant," particularly in response to an unprecedented global pandemic, nor must they present "an overly gloomy or cautious picture of current performance and future prospects." *Novak* v. *Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).  Thus, "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did

---

[1]      STMicroelectronics N.V. is the parent company and securities issuer. STMicroelectronics N.V. "conduct[s] [its] global business through STMicroelectronics International N.V.," and also "conduct[s] its operations through service activities from [its] subsidiaries." (Ex. L at 38.)  This brief uses "ST" to refer to the parent and its subsidiaries.

[2]      Exhibit letters refer to exhibits appended to the Declaration of David M.J. Rein, dated March 24, 2025.

do not suffice to make out a claim of securities fraud." *Id.* Applying that settled law, and the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b)'s exacting pleading rules, this Court should dismiss the Amended Complaint ("Complaint" or "AC") with prejudice for two independent reasons.

*First*, Plaintiffs do not plead with the required particularity that Defendants made any actionable misstatements. Nearly all the statements that Plaintiffs challenge were predictions of ST's future performance in the automotive market following the unprecedented pandemic. "As the Second Circuit has explained," such "forward-looking statement[s] accompanied by sufficient cautionary language [are] not actionable because no reasonable investor could have found [them] materially misleading." *Lopez* v. *Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 39 (S.D.N.Y. 2016). Defendants' challenged statements were accompanied by repeated warnings that ST's post-pandemic automotive "backlog" was "subject to variations" and "cancellation due to changes in customer needs or industry conditions," and that a resulting "downturn[]" could "negatively affect [ST's] results." (Ex. B at 3, 7, 14, 16, 19; Ex. L at 9, 12, 37.) For the same reasons, the PSLRA's safe harbor for "forward-looking statements" also protects those projections. 15 U.S.C. § 78u-5(c)(1), (i)(1).

Beyond this, most of the challenged statements were either inactionable opinion statements or "expressions of puffery and corporate optimism" that cannot "give rise to securities violations." *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004). No reasonable investor would have relied on Defendants' vague statements that ST's future order pipeline was "very solid," "pretty good," and "stable." (*See, e.g.*, AC ¶¶ 58, 72, 92.) And Defendants' predictions of future demand in uncharted post-pandemic markets were precisely the kind of "exercise[s] of subjective judgment" that cannot support fraud liability unless truly "baseless" given the "information in [their]

possession at the time." *New England Carpenters Guar. Annuity & Pension Funds* v. *DeCarlo*, 122 F.4th 28, 41 (2d Cir. 2023). But Plaintiffs plead no particularized facts supporting that conclusion, and their confidential witnesses ("CWs") do not help them. In fact, most of the CWs left ST before or early in the putative class period, and none speak to overall market demand because of their narrow roles at ST.

Nor can Plaintiffs convert their allegations into something more than impermissible 20/20 hindsight by alleging that ST failed to disclose so-called "channel stuffing"—supposedly offering deep discounts to pull forward current sales at the expense of sales later. For one thing, "companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'" *City of Pontiac Policeman's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). And in any event, Plaintiffs do not plausibly allege any "channel stuffing," let alone do so with the particularity that the PSLRA and Rule 9(b) require. Plaintiffs rest entirely on CW1, who provides no particularized details supporting channel stuffing. Indeed, the other CWs and judicially noticeable facts directly contradict the few vague statements that CW1 makes.

*Second*, Plaintiffs fail to plead particularized facts giving rise to the required "strong inference" that either CEO Chery or CFO Grandi ("Individual Defendants") acted with an "intent to deceive, manipulate, or defraud" investors. *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 321 (2007). Plaintiffs do not allege that either Individual Defendant had "both motive and opportunity to commit fraud," or provide "strong circumstantial evidence of conscious misbehavior or recklessness" as to the truth. *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). And for the forward-looking statements covered by the PSLRA safe harbor—nearly all of the challenged statements—Plaintiffs do not allege, as they must, Mr. Chery's or Mr. Grandi's "actual knowledge" of falsity. 15 U.S.C. § 78u-5(c)(1)(B).

To try to plead the requisite strong inference of fraudulent intent, Plaintiffs point to Messrs. Chery's and Grandi's alleged sales of ST stock. But Plaintiffs do not plead that those supposed sales were *either* "out of line with [the Individual Defendants'] prior trading practices," *or* that they were timed "to maximize personal benefit from undisclosed inside information," and the law requires both. *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009). Plaintiffs also claim that Mr. Chery was motivated to commit fraud because he hoped to be reappointed CEO. But CEOs are always under pressure to keep their jobs. Merely identifying that "executives aim to prolong the benefits of the positions they hold" does not allege scienter. *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2009).

Plaintiffs likewise cannot plead scienter by alleging that Messrs. Chery and Grandi "paid close attention to detail and information" about ST's performance. (AC ¶ 104.) Accepting that vague theory, "virtually every company . . . that experiences a downturn in stock price could be forced to defend securities fraud actions" past the pleading stage. *Duncan* v. *Pencer*, 1996 WL 19043, at *14 (S.D.N.Y. Jan. 18, 1996). Plaintiffs fall back on CW allegations, but only CW1 alleges any contact with either Mr. Chery or Mr. Grandi during the putative class period, and CW1 never claims to have said anything to them that would contradict any challenged statement.

At bottom, the Complaint fails to tell a "cogent" or "compelling" story—or indeed, any story at all—of intentional fraud by ST and its CEO and CFO. *Tellabs*, 551 U.S. at 314. The "plausible, nonculpable explanation[]" is that ST made optimistic projections that were not quite achieved during unprecedented post-pandemic market conditions. *Id.* at 324. Such "[e]conomic prognostication, though faulty, does not, without more, amount to fraud," *Decker* v. *Massey-Ferguson, Ltd.*, 681 F.2d 111, 117 (2d Cir. 1982), and Plaintiffs offer nothing "more." This Court should dismiss the Complaint with prejudice.

## BACKGROUND

### A. The Parties

STMicroelectronics N.V. is organized under the laws of The Netherlands and has its corporate legal seat in The Netherlands. (Ex. L at 26.) The company's headquarters and operational offices are managed through its wholly owned subsidiary, STMicroelectronics International N.V., located in Switzerland. (Ex. L at 26.) ST designs, develops, manufactures, and markets semiconductors, also called "chips." (AC ¶¶ 19-20.)[3] Chips are complex integrated circuits used in many electronic devices. (AC ¶ 20.) ST's stock trades on the New York Stock Exchange, Euronext Paris, and Borsa Italiana. (AC ¶¶ 14, 19.) Mr. Chery is the company's President and CEO. (AC ¶ 15.) Mr. Grandi is CFO. (AC ¶ 16.) Lead Plaintiffs Faith Close, Hassan Ibrahim, and Aya Zalat claim to have collectively purchased 500 shares of ST stock. (Dkt. 18 at 7-8.) They allege a combined loss of $7,013. (Dkt. 18 at 8.)[4]

### B. ST's Business

More than 200,000 customers around the world purchase chips from ST. (Ex. Q at 30.) ST has three types of customers: (1) original equipment manufacturers ("OEMs"), who manufacture devices that use chips; (2) tier-1 distributors, who supply OEMs with component

---

[3]   On this motion to dismiss, the Court may accept as true only Plaintiffs' "well-pleaded facts," *Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009), and should not credit "naked assertion[s]" of wrongdoing, *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 557 (2007). The Court may consider "facts of which judicial notice may properly be taken," documents "incorporated in [the complaint] by reference," "documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint," and documents "filed with the [SEC]." *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003). The Court may also take "judicial notice [of] the [euro]-dollar exchange rate as of" a given date. *Aini* v. *Sun Taiying Co.*, 1997 WL 375735, at *1 (S.D.N.Y. July 7, 1997).

[4]   The PSLRA was enacted to "ensure that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers." *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157 (S.D.N.Y. 1997). Notably, none of the Lead Plaintiffs here is an institutional investor with a meaningful stake in ST.

parts; and (3) tier-2 distributors, who supply tier-1 distributors.  (AC ¶ 21; Ex. L at 32.)  Those customers are spread across four key end markets:  (1) automotive; (2) industrial; (3) personal electronics; and (4) communications equipment, computers, and computer peripherals (such as monitors, mice, and keyboards).  (AC ¶ 22.)

Until year-end 2023, ST was organized into three product groups, including the Automotive & Discrete Group ("ADG").  (AC ¶ 24.)  ADG primarily served customers in the automotive industry, providing chips that helped power things like advanced driver assistance systems.  (AC ¶ 24.)  To improve efficiency and accelerate product development, ST reorganized into two product groups in 2024; both produce chips for automotive customers.  (Ex. L at 28.)

**C.      Following The Global Pandemic, Automotive Demand For Chips Fluctuates**

At the start of the COVID-19 pandemic, semiconductor demand dropped precipitously worldwide.  (AC ¶ 28.)  Many ST customers delayed and canceled their chip orders.  (AC ¶ 28.)  But as the pandemic began to recede in 2021 and 2022, low interest rates spiked consumer demand for cars, particularly EVs, which require more chips than gas vehicles.  (AC ¶ 28.)  Without the chips needed to meet the demand surge, car manufacturers and their suppliers scrambled to buy up available inventory.  (AC ¶ 28.)  During this unprecedented period, ST faced such high demand that its "fabrication capacity" was "not sufficient to meet" it.  (Ex. D at 10; *see* AC ¶ 28.)  To manage order volume, ST implemented two new measures.  (AC ¶ 29.)  The first was a capacity reservation fee, where customers paid upfront to guarantee their chips.  (AC ¶ 29.)  The second was a non-cancelable order policy.  (AC ¶ 29.)  Non-cancelable orders were prioritized over cancelable orders, but customers who placed them were committed to pay regardless of later needs.  (AC ¶ 29.)  Those two measures helped ST better manage the demand influx.  But even as business boomed, ST warned investors that the post-pandemic "supply imbalance" had created a "high level of profitability and gross margins" that "may not be sustainable."  (Ex. D at 10.)

Because of the bespoke nature of ST's products, many of which it designs for specific car manufacturers or suppliers, ST normally has visibility into its order pipeline. ST relies heavily on frame contracts, "annual contracts with customers setting forth quantities and prices on specific products that may be ordered in the future," as well as "standard purchase orders . . . booked from one to twelve months in advance of delivery." (Ex. L at 37.) But as ST warned, outside non-cancelable orders, frame contracts are "subject to a high degree of volatility," including "price reduction, order cancellation and modifications as to quantities." (Ex. L at 38.) Similarly, ST cautioned that standard purchase orders "are subject to variations between booking and delivery and, in some cases, to cancellation." (Ex. L at 37.) "If customers do not purchase products made specifically for them," ST warned, it cannot "resell such products to other customers." (Ex. D at 14.) ST also cautioned that the "high level of profitability and gross margins" brought on by the post-pandemic "supply imbalance" "may not be sustainable." (Ex. L at 13.)

By early 2023, as the semiconductor market began to cool and ST ended its non-cancelable orders, ST believed that its order backlog appeared "solid." (Ex. E at 2.) At the same time, ST warned that COVID-19 had created "substantial economic uncertainty and volatility," and that "increased demand" for some products "may not continue as the pandemic progresses or subsides." (Ex. D at 10.) On its April 27, 2023, earnings call that began with the warning that "results" could "differ materially" from the "forward-looking statements on the call," CEO Chery explained that ST's automotive "backlog" represented "about 6 quarters of revenue," compared to a declining backlog in other products. (Ex. F at 2, 13.) Similarly, a few months later, Mr. Chery reported that the automotive backlog was full through 2024, and that the "market dynamic" appeared "very, very solid." (Ex. G at 1.) But Mr. Chery cautioned that major customers did "have the capability to adjust," as ST had repeatedly warned. (Ex. G at 12; *see* Ex. L at 37; Ex. D at 32.)

### D. ST Faces Unexpectedly Reduced Customer Demand

As 2024 began, ST's customer demand became more unpredictable. As ST had repeatedly cautioned, a "substantial portion" of its revenue "derived from a limited number of customers." (Ex. D at 14; Ex. L at 17.) If those key customers "were to increase product returns or fail to meet payment obligations," ST's results "could be materially adversely affected." (Ex. D at 14; Ex. L at 17.) And with non-cancelable orders gone, "demand that differ[ed] from [ST's] projections" could significantly reduce orders and have a "material adverse effect" on ST's financial results. (Ex. D at 4-5; Ex. L at 4, 6.) This is a particular risk, ST warned, when "key customers encounter difficulties in their end-markets or product ramps," causing "cancellations, reductions, price renegotiation or postponements," and limiting ST's "ability to forecast the next quarter or full year." (Ex. L at 15.) Toward the end of 2023, that warned-of scenario happened, when for example, Mobileye Global Inc. ("Mobileye"), a major auto supplier and one of ST's biggest customers (AC ¶ 23; Ex. L at 32), faced decreasing demand (Ex. K at 6; AC ¶ 33).

On January 25, 2024, ST projected that the "Automotive vertical w[ould] grow mid-single digit" given its still "very solid backlog." (Ex. K at 7, 12.) But Mr. Chery warned that ST expected results to not match 2023's, now that ST lacked the "boost" from "inventory replenishment or capacity fee reservation." (Ex. K at 6.)

On March 12, 2024, after noting reduced EV demand, Mr. Chery projected slightly lower annual revenue, explaining that "customers [were], let's say, tuning their inventory, depending [on] the mix of the end customer demand, but we don't see a massive correction." (Ex. M at 2.) Mr. Chery also reported that there was still "no inventory replenishment"—that is, customers were no longer buying chips from ST as aggressively. (Ex. M at 9.) And after repeating ST's prior warnings that, "at a certain moment, the automotive industry will change our behavior which was, I buy, I buy, I buy," he warned that "now" it was happening "and they start to adjust." (Ex. M

at 9.) Given overall anticipated car production levels, ST remained "confident" in its plan to grow automotive revenues in 2024 (Ex. M at 6), but cautioned that its business is "dependent in large part on continued growth in the industries and segments" it serves (Ex. L at 10).

By its April 25, 2024, earnings call, ST's "lead silicon carbide customer" (an EV-maker) had announced a significant production decrease. (Ex. N at 5.) On this call, Mr. Chery predicted automotive would "decrease five percent," down from the modest growth estimated a month earlier. (Ex. N at 6.) He explained that half of the decrease was due to this customer's reduced production, while the other half was "more related to . . . inventory control and tuning from OEM, which are adapting themselves to mix change between battery-based electrical vehicles, hybrid vehicle and thermal combustion engine." (Ex. N at 5.) The next day, the company's stock price fell from $42.60 to $41.33, declining to $39.56 on April 30. (AC ¶ 97.)

With the benefit of hindsight, this revised projection turned out to be overly optimistic. On July 25, 2024, ST reported a 15% decline in automotive revenue. (Ex. O at 3.) Mr. Chery attributed the drop to three factors: (1) overall demand fell; (2) gas car manufacturers moved away from long-term frame contracts in favor of short-term orders of consignment stock, which reduced ST's visibility into future orders; and (3) Mobileye's inventory adjustment continued to worsen. (Ex. O at 8.) Following those setbacks, the company adjusted its projected 2024 revenue downward, to between $13.2 and $13.7 billion. (AC ¶ 98.) The following day, ST's stock price fell from $39.54 to $33.47. (AC ¶ 99.) On October 31, ST further refined its prior estimate, stating that it expected to finish 2024 with $13.27 billion in revenue, within its prior range. (AC ¶ 101.) The next day, ST's stock fell from $27.55 to $27.14, declining to $25.96 by November 4. (AC ¶ 102.)

#### E.    Plaintiffs' Claims

The Complaint alleges that 18 statements made by Defendants describing ST's "solid" backlog or visibility into future orders were misleading.  (*See* AC ¶¶ 58-95.)  Without offering any specifics, Plaintiffs claim that the Individual Defendants knew their "solid" backlog was illusory because they had engaged in "channel stuffing"—that is, offering excessive discounts to encourage customers to buy more than needed.  Those conclusory allegations rest entirely on the purported statements of CW1, a former executive who was separated from ST during its 2024 reorganization, and who claims to have reported his concern *in 2023* to ST Chief Operating Officer Alain Dutheil.  (AC ¶ 39.)  Notably, Mr. Dutheil retired from ST *in 2010.*  (Ex. C at 1.)  CW1's speculation is further contradicted by other CWs who assert that ST was in fact slower than competitors to reduce prices—the *opposite* of flooding the market with discounted product.  (AC ¶¶ 46, 53-54.)

Plaintiffs assert (AC ¶ 1) two Exchange Act claims on behalf of a putative class of all persons who acquired ST shares on the New York Stock Exchange between March 14, 2023, and October 30, 2024 ("Class Period"):  (i) a securities fraud claim under Section 10(b); and (ii) a "control person" claim under Section 20(a).  15 U.S.C. §§ 78j(b), 78t(a).

### ARGUMENT

### I.    PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE MISSTATEMENTS AS A MATTER OF LAW.

Securities fraud claims face higher pleading hurdles than the usual "plausib[ility]" requirement.  *Twombly*, 550 U.S. at 570.  "[I]n an effort to weed out unmeritorious securities lawsuits," Congress enacted the PSLRA to "tighten[] the procedural requirements that plaintiffs must satisfy" to allege securities fraud.  *Credit Suisse Sec. (USA) LLC* v. *Billing*, 551 U.S. 264, 284 (2007).  Plaintiffs must plead "each statement alleged to have been misleading" and the

"reasons why."  15 U.S.C. § 78u-4(b)(1)(B).  And under Rule 9(b), Plaintiffs must plead "with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).

### A.    ST's Projections Of Future Performance, Which Were Coupled With Detailed Risk Warnings, Are Not Actionable.

"[E]conomic prognostication, though faulty, does not, without more, amount to fraud." *Decker*, 681 F.2d at 117.  Any other rule would allow "investors to use the federal securities laws as a 'scheme of investor's insurance.'"  *In re eSpeed, Inc.*, *Sec. Litig.*, 457 F. Supp. 2d 266, 269 (S.D.N.Y. 2006).  The crux of Plaintiffs' allegations is that following the pandemic, Defendants incorrectly projected future "demand for STM's products" in the automotive segment.  (AC ¶ 2.)[5] Plaintiffs assert that ST misleadingly "cast itself as the exception" to an acknowledged overall industry downturn in 2023 and 2024.  (AC ¶ 30.)  Almost all the statements Plaintiffs challenge were statements about anticipated post-pandemic future demand.  Many were expressly framed as projections, such as, "Auto will be clearly the growth driver of ST next year."  (AC ¶ 66; *see, e.g.*, AC ¶ 70 ("We will grow significantly, but not at 28%.").)[6]

Those forward-looking projections of demand for ST's chips are not actionable.[7]  A "forward-looking statement accompanied by sufficient cautionary language is not actionable

---

[5]    Although Plaintiffs offhandedly claim that some of ST's statements were misleading as to its performance in the industrial segment (*see* AC ¶¶ 59, 61, 98), the Complaint pleads no facts— let alone particularized facts—to support that assertion.  Indeed, Plaintiffs try to use ST's acknowledgement of weakened demand in industrial (*see* AC ¶¶ 76, 92) to bolster their claims with respect to the automotive segment.

[6]    To the extent some challenged statements "refer to the present," they do so "only as a means of gauging future possibilities and, 'when read in context, cannot meaningfully be distinguished from the future projection of which they are a part.'"  *Gissin* v. *Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010).  For example, Mr. Chery's statement that "the automotive market . . . [was] very solid" (AC ¶ 58) responded to a question about "the broader [market] cycle," and Mr. Chery gave that description as "the reason why" ST had made a certain revenue "indication for the year" ahead. (Ex. E at 2.)  Such statements are not "guarantees about the present," but mere "educated guess[es] about . . . the Company's future."  *Gissin*, 739 F. Supp. 2d at 506.

[7]    The arguments in this Section I.A apply to Statements Nos. 1-7 and 9-18.

because no reasonable investor could have found [it] materially misleading." *Gregory* v. *ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018); *see San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) ("[F]orward-looking statements regarding [future returns] . . . adequately tinged with caution . . . cannot reasonably be found to be misleading."). Courts in this Circuit have repeatedly dismissed similar claims predicated on projections that turned out to be incorrect. *See, e.g.*, *City of Omaha Police & Fire Ret. Sys.* v. *Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 397-99 (S.D.N.Y. 2020) (statements that company "expect[ed] to . . . accelerate our sales and profit growth rates" not "misleading to a reasonable investor"); *Lopez*, 173 F. Supp. 3d at 38-39 (disclosure of "expected" positive net income not actionable despite losses one week later).[8]

Plaintiffs' claims should also be dismissed under the PSLRA's safe harbor for forward-looking statements. 15 U.S.C. § 78u-5. Forward-looking statements include "statement[s] containing a projection of revenues" and "statement[s] of future economic performance." *Id.* § 78u-5(i). Such statements often have "linguistic cues like 'we expect' or 'we believe,'" and typically "project[] results in the future." *Slayton* v. *Am. Exp. Co.*, 604 F.3d 758, 769 (2d Cir. 2010). "[D]iscussions of projected performance and dividends, even mixed with statements about current progress, are forward-looking statements" protected by the PSLRA. *In re Anheuser-Busch InBev SA/NV Sec. Litig.*, 2020 WL 5819558, at *4 (S.D.N.Y. Sept. 29, 2020) (Hellerstein, J.). Nearly all the challenged statements are textbook non-actionable forward-looking statements.

---

[8]      *See also Robeco Cap. Growth Funds* v. *Peloton Interactive, Inc.*, 2024 WL 4362747, at *4 (S.D.N.Y. Sept. 30, 2024) ("[w]e are entering . . . with a normalized backlog" and "expect[] continued strong demand" not actionable), *appeal docketed*, No. 24-2803 (2d Cir.); *NECA-IBEW Health & Welfare Fund* v. *Pitney Bowes Inc.*, 2013 WL 1188050, at *17 (D. Conn. Mar. 23, 2013) ("we expect improving trends for the balance of the year" not actionable).

(*E.g.*, AC ¶ 88 ("So for Automotive we expect like-for-like [growth] slightly above 10%."); AC ¶ 94 ("[W]e do believe that, okay, we will deliver about $1.3 billion on ASIC.").)

Under the PSLRA, a forward-looking statement is not actionable if it is "accompanied by meaningful cautionary language *or . . .* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton*, 604 F.3d at 766 ("safe harbor is written in the disjunctive"). Here, Defendants' statements are protected under both prongs.

***ST Provided Extensive Risk Warnings With Each Challenged Statement***. On each earnings call, ST cautioned:

> This call will include forward-looking statements that *involve risk factors that could cause ST results to differ materially from management expectations and plans*. We encourage you to review the safe harbor statement contained in the press release that was issued with the results this morning and also in ST's most recent regulatory filings for a full description of these risk factors.

(Ex. K at 2 (emphasis added); *see* Exs. N; O.) ST's press releases announcing quarterly or annual earnings contained the same warning. (*See, e.g.*, Ex. J.) The relevant risk factors section of ST's SEC filings, in turn, warned investors that (i) "downturns in the semiconductor industry can negatively affect our results . . . and financial condition"; (ii) "results may . . . differ significantly from our expectations or guidance"; (iii) "[d]isruptions in our relationships with any one of our key customers or distributors, and/or material changes in their strategy or financial condition or business prospects, could adversely affect our results"; (iv) "business is dependent in large part on continued growth in the industries and segments into which our products are sold"; and (v) "customer demand for our products which differs from our projections[] could have a material adverse effect on our results." (Ex. D at 9-16; Ex. L at 9-10; Ex. Q at 9-10.)

ST repeatedly cautioned that the pandemic had created potentially unsustainable "supply imbalance": "The global supply of semiconductor industry fabrication capacity is currently not

sufficient to meet the demand for semiconductor products. . . . [A]s a result of this supply imbalance, the industry in general has experienced a high level of profitability and gross margins, which may not be sustainable over the long-term." (Ex. D at 10; *see* Ex. L at 13.) ST warned when it began to observe the market "exiting" that period of "capacity overloading." (Ex. K at 6; *see, e.g.*, Ex. I at 10 (car manufacturers "reducing" "lead time" and no longer buying "18 months in advance"); Ex. M at 9 (ST no longer saw "inventory replenishment" as industry "start[ed] to adjust"); Ex. N at 5 (ST saw "inventory control and tuning from OEM").) ST was also consistently forthright that its order "backlog" faced risks of "cancellation due to changes in customer needs or industry conditions," and that "the loss of key customers . . . could have an adverse effect on our results." (Ex. D at 14, 16, 32; Ex. L at 17, 19, 37.) ST even provided warnings about specific customers; for example, it warned in June 2023 that although "Apple [had] give[n]" the company "visibility up to [the] end of '24," "they ha[d] the capability to adjust." (Ex. G at 12.) In sum, ST repeatedly and specifically "warn[ed] investors of exactly the risk the [P]laintiffs claim was not disclosed." *Olkey* v. *Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996).[9]

Plaintiffs try to end-run the PSLRA's safe harbor by claiming that "the risks portrayed as hypothetical" "were then actually occurring." (AC ¶¶ 78-87.) But "not every . . . risk disclosure[] necessarily implies that the event which could create a risk has not occurred to any extent." *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 267 (S.D.N.Y. 2023). Thus, courts routinely reject attempts like Plaintiffs' to turn risk warnings into securities fraud claims. Where, as here, risk warnings lack "specificity" and make no "implied representation of fact," they are not actionable.

---

[9]      *See also In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 319 (S.D.N.Y. 2020) ("Courts in this Circuit routinely find that references to SEC filings that expound more fully on the risks suffice" for "the PSLRA 'safe harbor.'"); *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 402 (S.D.N.Y. 2006) (statement of "cautiously hopeful outlook for Nokia's projected market share" not "actionable because [of] its accompanying cautionary language, identified in Nokia's 2002 Form 20-F").

-14-

*Id.* at 268; *see Chapman* v. *Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 405-06 (S.D.N.Y. 2020) (statement that "new products *may* have quality or other defects" not actionable where "failures associated with new products were already occurring," because language "was generic" and defendant "was not warranting that every one of its newer technologies was defect-free"); *Hou Liu* v. *Intercept Pharms., Inc.*, 2020 WL 1489831, at *12 (S.D.N.Y. Mar. 26, 2020) ("caution that 'input prices may rise next quarter' would not cause a reasonable investor to conclude that the prices of all inputs had remained flat or declined in the previous quarter").

ST also warned that there could "be no assurance that our customers or distributors will continue to book the same level of sales with us" (AC ¶ 82), that "[c]hanges in [its] customers' markets . . . could result in slower growth and a decline in demand" (AC ¶ 84), and that there could "be no assurance that [ST] will be successful in . . . adequately projecting customer demand" (AC ¶ 84). Plaintiffs identify nothing specific about any statement that is misleading, let alone an "implied representation of fact." *AppHarvest*, 684 F. Supp. 3d at 268. These kinds of "general risk disclosures . . . do not support a plausible fraud claim with the requisite specificity." *Leadersel Innotech ESG* v. *Teladoc Health, Inc.*, 2024 WL 4274362, at *3 (2d Cir. Sept. 24, 2024); *see In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 466 (E.D.N.Y. 2020) (no claim where "risk disclosures [were] too general for an investor to reasonably rely upon").

***Plaintiffs Have Not Alleged Defendants' Actual Knowledge of Falsity***. "Liability under the actual knowledge prong of the safe harbor 'attaches only upon proof of knowing falsity'—a showing of recklessness is insufficient." *Gissin*, 739 F. Supp. 2d at 502. As shown in Section II below, Plaintiffs fail to plead particularized facts that would "surmount the high bar of actual knowledge." *Gray* v. *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 395 (S.D.N.Y. 2020).

**B.     Many Of ST's Challenged Statements Are Inactionable Opinions Or Lack Sufficient Specificity For A Reasonable Investor To Rely On.**

***Inactionable Opinions***.  Many challenged statements are textbook examples of statements of opinion, not fact.[10]  Because opinions are "inherently subjective and uncertain assessments," they are actionable only if the "opinion expressed was not sincerely held" or contains "embedded statements of untrue facts."  *Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176, 186 (2015).  Absent such allegations, courts dismiss claims based on opinions. *See, e.g.*, *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 420 (2d Cir. 2023); *Fernandes* v. *Centessa Pharms. PLC*, 2024 WL 3638254, at *19 (S.D.N.Y. Aug. 2, 2024); *In re Pretium Res. Inc. Sec. Litig.*, 2020 WL 953609, at *5 (S.D.N.Y. Feb. 27, 2020).

"Statements of opinion often include qualifying language (like 'I believe' or 'I think') that conveys a lack of certainty."  *DeCarlo*, 122 F.4th at 41.  Plaintiffs challenge exactly such statements.  (*E.g.*, AC ¶ 94 ("[W]e do believe that if it is confirmed, the inventory adjustment is basically done.").)  Any statement that "turns on the exercise of subjective judgment" qualifies as an opinion, *DeCarlo*, 122 F.4th at 41, encompassing nearly all the challenged statements here, including, for example, Mr. Chery's statements that the automotive "market dynamic [was] very, very solid" (AC ¶ 62); his views on the "solid" backlog (AC ¶¶ 62, 64, 68, 76, 92); and that ST did not "see a massive correction" ahead (AC ¶ 88).

As shown in Section II *infra*, Plaintiffs do not allege with particularity that any opinion was not "honestly held."  *Omnicare*, 575 U.S. at 186.  Nor do they identify any "embedded statements of untrue facts."  *Id.* at 176.  Instead, Plaintiffs point to CW allegations that "demand was poised to decline" because, for example, "orders had softened" or "sales personnel failed to meet targets."  (*E.g.*, AC ¶ 59.)  But merely alleging facts that cut against ST's post-pandemic

---

[10]     The arguments in this Section apply to Statements Nos. 1-7, 9-11, 13, and 15-18.

outlook is insufficient.  "If a statement turns on the exercise of subjective judgment, a plaintiff will be unable to establish that it is false merely by showing that other reasonable alternative views exist. . . .  [T]he speaker making the statement (expressing an opinion) can choose among them without running afoul of the federal securities" laws, "even if most of the existing facts cut against the statement."  *DeCarlo*, 122 F.4th at 41.  "[R]easonable investors understand that opinions sometimes rest on a weighing of competing facts," and do "not expect that *every* fact known to [a company] supports its opinion statement."  *Tongue* v. *Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).

***Inactionable Vague and Optimistic Statements***.  Plaintiffs challenge the Individual Defendants' post-pandemic descriptions of automotive demand and backlog as "very clear" (AC ¶ 64); "solid" or "very solid" (AC ¶¶ 58, 62, 76, 90); "very strong" (AC ¶ 60); "good," "pretty good," or "very good" (AC ¶¶ 64, 68, 88, 92); "big" (AC ¶ 70); and "stable" (AC ¶ 72).[11]  All of those statements are inactionable "expressions of puffery and corporate optimism" that "do not give rise to securities violations," *Rombach*, 355 F.3d at 174, because they are "too general to cause a reasonable investor to rely upon them," *Teladoc Health*, 2024 WL 4274362, at *3.  Courts routinely dismiss claims based on similarly "[v]ague positive statements," explaining that reasonable investors "expect[]" corporate leaders "to be confident about their stewardship and the prospects of the business that they manage."  *Id.* at *2; *see, e.g.*, *Bldg. Trades Pension Fund of W. Pa.* v. *Insperity, Inc.*, 2022 WL 784017, at *13 (S.D.N.Y. Mar. 15, 2022) ("biggest pipeline we've had"); *In re SunPower Corp. Sec. Litig.*, 2018 WL 4904904, at *4 (N.D. Cal. Oct. 9, 2018) ("very, very strong demand"); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001) ("strong" and "solid" demand).[12]  As such cases make clear, "the word[s]

---

[11]    The arguments in this Section apply to Statements Nos. 1-18.

[12]    *See also City of Sunrise Firefighters' Pension Fund* v. *Oracle Corp.*, 2019 WL 6877195, at *9 (N.D. Cal. Dec. 17, 2019) ("[c]ustomer adoption . . . continues to be very strong"); *Cement*

'solid,'" "robust," "strong," and the like are "vague expression[s] of optimism that . . . do not convey[] a misleading impression of the future on which a reasonable investor would rely." *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1097 (C.D. Cal. 2008).

**C.     Plaintiffs Cannot Save Their Legally Flawed Claims By Transforming Defendants' Projections Into Omissions Of Purported "Channel Stuffing."**

To try to end-run the PSLRA's bar on challenging projections, Plaintiffs assert that Defendants' projections "omitted to disclose that . . . [ST] had pulled forward demand by channel stuffing, including by providing discounts to drive bookings and inflate sales in the short term." (AC ¶ 59.)  Plaintiffs' theory fails for multiple reasons.  As an initial matter, Plaintiffs have not pled any unlawful conduct, as "[t]here is nothing inherently improper in pressing for sales to be made earlier than in the normal course." *Greebel* v. *FTP Software, Inc.*, 194 F.3d 185, 202 (1st Cir. 1999).  ST's independent auditor opined that the company's financial statements for both FY 2023 and 2024 were accurate "in all material respects."  (Ex. Q at 162.)  Moreover, companies have no "duty to disclose uncharged, unadjudicated wrongdoing."  *UBS*, 752 F.3d at 184.  For example, in *UBS*, the Second Circuit held that a bank was not required to disclose "an ongoing tax evasion scheme" for which it was later fined $780 million, explaining that disclosure under the securities laws "is not a rite of confession."  *Id.* at 179, 184.

In any event, Plaintiffs do not allege "channel stuffing" with the required particularity.  "[W]hen a complaint claims that statements were rendered false" through "nondisclosure," the PSLRA and Rule 9(b) require that "the facts of th[e] underlying" undisclosed events "also be pleaded with particularity."  *Gamm* v. *Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019).  "Plaintiffs must plead the 'who, what, when, where, and how' of" the channel stuffing allegations,

---

*Masons & Plasterers Joint Pension Tr.* v. *Equinix, Inc.*, 2012 WL 685344, at *6 (N.D. Cal. Mar. 2, 2012) ("exceptional visibility").

but fall far short. *Schiro* v. *Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 198 (S.D.N.Y. 2020); *see Garfield* v. *NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (affirming dismissal where "allegations of channel stuffing . . . were not pled with sufficient detail").

Plaintiffs' channel stuffing theory rests solely on CW1, who purportedly "explained" that "excessive sales incentives were offered to direct OEM customers as well as distributors" to "stuff the Company's distribution channels" and "hide the declining financial performance in 2023." (AC ¶¶ 39, 41.) But, fatally for Plaintiffs, CW1's conclusory claims do not "state with particularity when the alleged practice occurred" (other than some time "in 2023"), and say nothing about "what amount of product was 'stuffed.'" *In re Synovis Life Techs., Inc. Sec. Litig.*, 2005 WL 2063870, at *8 (D. Minn. Aug. 25, 2005). Nor does CW1 say whether the supposed "stuffing" involved the automotive market or give any details sufficient to justify the inference that it affected the company's stock price. In other words, CW1 "do[es] not provide the 'who, what, where, when, and how' required under Rule 9(b) and the PSLRA." *Id.*; *compare In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1028-29 (S.D. Cal. 2006) (complaint sufficiently pled "details" of alleged "'fire sale' or 'load-in' scheme" to "ship excess" product by identifying "participants," exact dates, what was said at meetings, and "terms that were typically offered").

There is more. CW1's vague description of the supposed "channel stuffing" would not even state a claim under the more lax Rule 8 pleading standards, as it starkly "conflicts with" the rest of the cognizable facts. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1057-58 (9th Cir. 2014) (declining to credit CW allegations given "implausibility of the timing in CW1's account"); *see, e.g.*, *Police & Fire Ret. Sys. City of Detroit* v. *Argo Grp. Int'l Holdings, Ltd.*, 2024 WL 5089970, at *7 (S.D.N.Y. Dec. 12, 2024) (rejecting "confidential witness allegations" that "not only are uncorroborated, but . . . actually are *contradicted* by" other judicially noticeable facts).

-19-

CW1 claims to have "complained to CEO Chery and Chief Operating Officer Alain Dutheil in writing after CW1 discovered that STM's salesforce offered excessive discounts." (AC ¶ 39.) But Mr. Dutheil retired *in 2010*, over a decade before CW1 made this supposed complaint; he therefore was not the Chief Operating Officer at any relevant time. (Ex. C at 1.) Nor do any other members of "STM's [automotive] salesforce" whom Plaintiffs cite as CWs (such as CW3, CW4, and CW5) allege anything about channel stuffing.[13] Indeed, CW5 alleges that "in 2023 . . . STM *was much slower than its competitors in adjusting prices downwards*." (AC ¶ 53 (emphasis added).) Keeping prices too high is the exact opposite of "offer[ing] excessive *discounts*" to customers, which is what CW1 claims happened (AC ¶ 39).

Plaintiffs say that CW1's account "is corroborated by objective data," because the "most obvious indicator of channel stuffing is an unusual increase in inventory levels at the distributors' end," and in Q3 2024, "revenue from [ST's] Distributor Channel imploded 50% year-over-year while revenue from the OEM Channel decreased by about 20%." (AC ¶¶ 43-44.) None of that is right. For one thing, Plaintiffs mistakenly rely on ST's Q3 2024 revenue figures for OEMs and distributors *across the entire* company's various verticals (Ex. P at 2); ST did not report year-over-year revenues for OEMs and distributors only within the automotive segment. In any event, Plaintiffs' economic analysis makes no sense. Plaintiffs' theory is that channel stuffing shows up in extra distributor inventory because end-user customers have all the supply they need. (AC ¶ 43.) But that theory adds up only if the products in both channels are the same. That is not the case for ST, which sells *different* products to its automotive distributor customers than to its automotive OEM customers. ST often works directly with OEMs to design the "specific solutions they

---

[13]    Again, because the Complaint pleads no facts to support a claim of fraud with respect to ST's industrial segment, any supposed "channel stuffing" would only be relevant to the extent it affected the automotive segment.

require" and "provide direct marketing application engineering support" (Ex. L at 32, 61); in other words, to build bespoke products for each OEM. ST also sells bespoke products to other suppliers, who build "application specific products" for end-user OEMs. (Ex. L at 33.) By contrast, ST sells more "mass market" chips through its various "distribution channel[s]." (Ex. L at 32.) In reality, what Plaintiffs try to frame as evidence of "channel stuffing" was nothing more than an ordinary downturn in demand that naturally followed the pandemic-related spike.

### D. Plaintiffs' Other Confidential Witness Allegations Do Not Support Their Legally Flawed Fraud Claims.

Because Plaintiffs do not "establish how any of the CWs' allegations are inconsistent with the challenged statements," those allegations do not remedy Plaintiffs' failure to plead any material misstatement. *Woolgar* v. *Kingstone Cos.*, 477 F. Supp. 3d 193, 221 (S.D.N.Y. 2010). For starters, the allegations from CWs 2, 4, 5, 7, and 8 cannot "support an inference of 'contemporaneous falsity'" because those CWs left ST well before most—and in the cases of CWs 7 and 8, before any—of the challenged statements were made. *In re FuboTV Inc. Sec. Litig.*, 2023 WL 2711826, at *11 (S.D.N.Y. Mar. 30, 2023); *see Francisco* v. *Abengoa, S.A.*, 481 F. Supp. 3d 179, 209 (S.D.N.Y. 2020) ("[C]ourts have rejected confidential witness allegations where" CWs "left the company before the class period."); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (Section 10(b) requires "an alleged material misstatement" to have been "false *at the time it was made*"). CWs 2, 4, and 5 had departed ST by July 2023 (AC ¶¶ 45, 50-51), before all but four challenged statements. CW7 left in 2022, over a year before the Class Period. (AC ¶ 56.) CW8 left in 2018. (AC ¶ 113.) Moreover, to the extent those CWs allege developments at ST after their departures, their assertions rely on "hearsay that [is] sourced second- or even thirdhand" and should not be credited. *Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *12 (S.D.N.Y. Mar. 30, 2021), *aff'd*, 54 F.4th 82 (2d Cir. 2022); *see Long Miao* v.

*Fanhua, Inc.*, 442 F. Supp. 3d 774, 800 (S.D.N.Y. 2020) ("courts have tended not to credit uncorroborated statements of CWs who are sourced secondhand").  For example, CW4 alleges he or she "was informed by coworkers" that ST "struggled in sales because the Defendants over-anticipated demand."  (AC ¶ 50.)

Like with CW1, not one of the supposed assertions from CWs 2 through 8 actually contradicts any challenged statement:

- CW2 states that "by early 2023," "orders declined" and "customers could no longer provide accurate estimates" of their orders beyond "12 weeks in advance."  (AC ¶ 46.)  But CW2 "primarily managed *Industrial* customer accounts" (AC ¶ 45 (emphasis added)), so CW2's statements do not speak to demand in ST's *automotive* segment.  To the extent CW2 purports to opine on the "Automotive end market[]" (AC ¶ 46), CW2's position "doe[s] not suggest that [he] had been in position to know the facts attributed to [him]."  *Long Miao*, 442 F. Supp. 3d at 799.  Moreover, CW2's statements concern only an unspecified window in "early 2023," which at most covers only a small part of the Class Period.

- CW3's statement that "Automotive demand decreased by 50%" in Q1 2023 does not contradict any challenged statement.  (AC ¶ 47.)  The first challenged statement was made on March 14, 2023, near the end of Q1 2023, and discussed only ST's current backlog and expectations for future demand.  (*See* AC ¶ 58.)  Moreover, given CW3's role as account manager for only a handful of automotive customers, Plaintiffs have not pled facts "to support the probability that a person in [CW3's] position . . . would possess the information alleged" about *overall* automotive demand.  *Novak*, 216 F.3d at 314; *see Pitney Bowes*, 2013 WL 1188050, at \*35 (discounting account of CWs who had no "direct or meaningful role in the company-wide financial forecasting or reporting process").

- CW4's claim that "sales personnel failed to meet their targets in 2023"—presumably, up until June 2023, when CW4 left ST—offers no details at all about what those targets were, how badly they were missed, which sales personnel were affected, who their customers were, and so on.  (AC ¶ 50.)  Nor does CW4 allege anything specific about automotive

sales. Such "generalities" from a CW are "insufficient to meet the pleading standard for fraud." *Francisco*, 481 F. Supp. 3d at 209.

- CW5 alleges no decrease at all in automotive demand during the Class Period. (*See* AC ¶¶ 51-54.) Indeed, CW5 states that ST's "forecasts" in 2023 "*did not match* the downward trends that sales personnel on the ground had observed." (AC ¶ 54 (emphasis added).) Nothing about vague "trends" that unnamed "sales personnel" purportedly observed on unidentified "ground" is sufficiently specific to render any challenged statement false.

- CW6 alleges that ST "instituted a hiring freeze for employees in the Texas office for all of 2024" and was purportedly "told that the reason . . . was that the Automotive market was struggling." (AC ¶ 55.) But the fact of a hiring freeze for a single regional office does not contradict any challenged statement or imply anything about overall automotive demand. And even if it did, CW6 provides no details regarding when in 2024 the freeze occurred.

- CW7 alleges, based entirely on hearsay from "former colleagues," that "STM faced a whiplash in demand starting in 2023." (AC ¶ 56.) That statement offers no specifics on timing, provides no concrete details, and says nothing about *automotive* demand.

- CW8 alleges only that Mr. Chery faced opposition to his reappointment as CEO in 2024, and makes no allegations relevant to the falsity of any challenged statement. (AC ¶ 113.)

Simply put, not one of the above CWs contradicts any challenged statement.

## II.    PLAINTIFFS DO NOT PLEAD FRAUDULENT INTENT AS A MATTER OF LAW.

Under the PSLRA, Plaintiffs must allege a "strong inference" of scienter, *i.e.*, an "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 308, 319. "Where a defendant is a corporation," the plaintiff must "plead[] facts that give rise to 'a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'" *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). An employee's scienter can be imputed to the corporation only if the employee "made," "craft[ed]," or "review[ed]" the alleged misstatements

or otherwise was "involved in the[ir] dissemination." *Id.* at 98-99. Here, Plaintiffs seek to impute scienter to ST only from CEO Chery and CFO Grandi.

To allege a strong inference of scienter, Plaintiffs must plead particularized facts showing either (i) "both motive and opportunity to commit [] fraud," or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. The inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Thus, in evaluating the Complaint, "the Court must take into account plausible opposing inferences" and "consider plausible, nonculpable explanations for the defendant's conduct." *Id.* at 310.

## A. Plaintiffs Do Not Allege Motive Or Opportunity For Securities Fraud.

To plead motive and opportunity, Plaintiffs must allege that either Mr. Chery or Mr. Grandi "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08. Plaintiffs advance two flawed theories. *First*, they allege that Messrs. Chery and Grandi engaged in suspicious sales of ST stock during the Class Period. (AC ¶ 110.) *Second*, they speculate that Mr. Chery had to commit fraud to "report positive results" to "keep his position." (AC ¶¶ 111-15.) Neither theory works.

***Stock Sales***. Plaintiffs allege that Messrs. Chery and Grandi "collectively reap[ed] almost $8 million in insider sales." (AC ¶ 110.) But "[t]he mere fact that insider stock sales occurred does not suffice." *Gildan*, 636 F. Supp. 2d at 270. Rather, Plaintiffs must show "*unusual* insider trading activity during the class period." *Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (emphasis added). "Insider stock sales are unusual where" the trading was (1) "in amounts dramatically out of line with prior trading practices" ***and*** (2) "at times calculated to maximize personal benefit from undisclosed inside information." *Gildan*, 636 F. Supp. 2d at 270.

-24-

Messrs. Chery's and Grandi's alleged stock sales check neither box, let alone both. According to the "[t]rading data" source, TipRanks.com, that the Complaint relies on (AC ¶ 110 n.9), Mr. Chery made three sales during the 19.5-month Class Period for a total of $4.1 million, and Mr. Grandi made four sales for a total of $3.7 million. (Ex. S.) Both those alleged frequencies and amounts were *not* "dramatically out of line with prior trading practices," *Gildan*, 636 F. Supp. 2d at 270; indeed, they were not out of line *at all*. According to TipRanks.com, from July 2018 through May 2024, Mr. Chery sold stock 27 times, including 7 times in 2021. (Ex. S.) Over that same period, Mr. Grandi sold stock 19 times, including 6 times in 2020. (Ex. S.) As to the amount, from May 2021 through May 2022, Mr. Chery sold over $4.3 million in stock—more than he sold during the 19.5-month Class Period. (Ex. S.) From June 2021 through July 2022, Mr. Grandi sold over $3.1 million in stock—close to the amount he sold during the Class Period. (Ex. S.)

Plaintiffs try to paint a misleading picture with arbitrary comparisons, such as the "19.5-month period prior to the Class Period," which starts in July 2021. (AC ¶ 110.) But TipRanks.com shows that in *June* 2021 alone, Mr. Chery sold over $1.8 million worth of stock, and Mr. Grandi sold over $1.4 million. (Ex. S.) Simply put, Messrs. Chery's and Grandi's activity was no different during the Class Period than before it. The Court need go no further to reject Plaintiffs' theory. *See, e.g.*, *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 444 (S.D.N.Y. 2005) (sales "distributed fairly evenly throughout the Class Period" not suspicious); *In re Sina Corp. Sec. Litig.*, 2006 WL 2742048, at *11-12 (S.D.N.Y. Sept. 26, 2006) (sales "consistent with . . . sales in prior years" "not at all unusual" and thus do not "reflect[] a desire to personally benefit" from alleged fraud).

Messrs. Chery's and Grandi's trades also were not plausibly "calculated to maximize [their] personal benefit from" the purported fraud—an independent reason to discount Plaintiffs' argument. *Gildan*, 636 F. Supp. 2d at 270. Five of the seven alleged stock sales were not even

close to the end of the Class Period, "when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted." *BISYS*, 397 F. Supp. 2d at 444-45. Instead, those five trades were in June or August 2023, months before most of the challenged statements were made and even longer before the first stock drop Plaintiffs allege in April 2024. (Ex. S; *see* AC ¶¶ 96-97.)  Courts routinely decline to draw any inference of scienter from sales made "weeks before the [alleged] material misstatement" "and many months before the release of any negative information" that allegedly "caused [the defendant company's] stock price" to fall. *Gildan*, 636 F. Supp. 2d at 271.[14]

As to the other two alleged sales, both were executed in May 2024 (Ex. S)—*after* the first profit warning and stock drop in April.  *See Chapman*, 466 F. Supp. 3d at 412 ("nothing about" such post-drop "timing" of insider sales "suggests [they] were calculated to maximize the personal benefit from undisclosed inside information").[15]  Mr. Chery's post-stock-drop sale was also by far his largest of the Class Period.  Selling the most stock in May 2024, *after* the purported fraud was revealed and the stock price dropped, contradicts Plaintiffs' theory that Mr. Chery intended to personally profit from his supposed fraudulent statements made as early as March 2023.  That is because both Mr. Chery and Mr. Grandi had no such intent—their May 2024 stock sales were

---

[14]    *See also Fishbaum* v. *Liz Claiborne, Inc.*, 1999 WL 568023, at *5 (2d Cir. July 27, 1999) (stock sales not suspicious when they "pre-dated or post-dated most of the allegedly fraudulent misstatements by months"); *Micholle* v. *Ophthotech Corp.*, 2019 WL 4464802, at *15 (S.D.N.Y. Sept. 17, 2019) (sales not suspicious when not "timed to occur soon after the allegedly misleading statements were made or shortly before any corrective disclosure"); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 384-85 (E.D.N.Y. 2003) ("[T]he long lapse of time between the sales and the alleged ultimate disclosures suggests that one or more other factors, unrelated to the alleged fraud, led to defendants' decision to make the sales.").

[15]    *See also In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 764 (S.D.N.Y. 2018) (sale "after defendants' August 5, 2016 disclosure" not suspicious); *Greebel*, 194 F.3d at 207 ("Selling after delivering news that causes a company's stock price to go down is not suggestive of withholding information.").

"sell-to-cover" transactions in which their shares were "sold automatically" "to pay the taxes related to their vesting" (Ex. Q at 100). In other words, all of the proceeds went to the taxing authorities, not to Mr. Chery or Mr. Grandi. *See Damri* v. *LivePerson, Inc.*, 2025 WL 863322, at *25 (S.D.N.Y. Mar. 19, 2025) ("automatic" sales "made to cover . . . tax liabilities upon acquisition of shares upon vesting of options" "do not support an inference of scienter") (collecting cases). Because Plaintiffs' "view of the facts defies economic reason," it "does not yield a reasonable inference of fraudulent intent." *Kalnit*, 264 F.3d at 140-41.

Further negating scienter, Messrs. Chery and Grandi were subject to ST's insider trading policy that imposed blackout periods prohibiting trading and, even during "open window" periods, required pre-clearance by ST's Chief Compliance Officer ("CCO"). (Ex. R at 8-9, 14; *see* Ex. L at F-40; Ex. D at F-39.) Messrs. Chery and Grandi were not allowed to trade "during the period starting thirty days prior to the end of each fiscal quarter" and "ending after the first business day following the publication by ST of its quarterly and annual results." (Ex. R at 8.) And the CCO could refuse pre-clearance at any time if "the timing of the proposed Trading is inappropriate in light of this Policy and/or Insider Trading Laws." (Ex. R at 9.) Courts in this Circuit recognize that stock trading plans with similar guardrails—like Rule 10b5-1 trading plans—cut against any inference of scienter. *See Aratana Therapeutics*, 315 F. Supp. 3d at 764 ("[T]rades made pursuant to a Rule 10b5-1 trading plan do not give rise to a strong inference of scienter."); *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 176 (S.D.N.Y. 2023) (existence of trading plans cut against inference of scienter when plaintiff "does not plead any facts about the trading plans").

***Mr. Chery's Personal Motives***. Plaintiffs also speculate that Mr. Chery had "additional motive to commit fraud" because he "needed to report positive results" to "keep his position" as CEO. (AC ¶ 111.) "Motives that are generally possessed by most corporate directors and officers

-27-

do not suffice"; "a plaintiff must do more than merely charge that executives aim to prolong the benefits they hold." *Kalnit*, 264 F.3d at 139.  Plaintiffs claim that Mr. Chery's term as CEO "was set to expire following the Company's annual shareholder meeting in 2024." (AC ¶¶ 111-15.)  But "virtually all corporate insiders" are strongly incentivized at all times to "sustain the appearance of corporate profitability." *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).  Plaintiffs do not allege that Mr. Chery was somehow more insulated from negative financial results after his reelection than before or that he could not be removed.  "It is hard to see what benefits" would have "accrue[d]" to Mr. Chery "from a short respite from an inevitable day of reckoning" following revelation of a purported fraud.  *Shields*, 25 F.3d at 1130.

Plaintiffs also invoke hearsay allegations from CW8, who left ST *nearly seven years ago*, but supposedly heard from former colleagues that Mr. Chery faced opposition "from the Company's Italian shareholder constituents."  (AC ¶¶ 111-15.)  But all CEOs face similar pressures, and courts in this Circuit consistently hold that generic motives to maintain profitability are insufficient.  *See Woodley* v. *Wood*, 2022 WL 103563, at *6 (S.D.N.Y. Jan. 11, 2022) ("pressure from shareholders to improve . . . financial results and thereby protect [defendants'] positions" do not "create a unique motive significant enough to satisfy the high PSLRA threshold for scienter"), *aff'd*, 2022 WL 14997930 (2d Cir. Oct. 27, 2022).[16]  Moreover, CW8's allegations contradict Plaintiffs' own theory.  CW8 claims that Mr. Chery was under pressure from the Italian government—one of ST's largest shareholders—because he "reorganized ST[] by eliminating [the] ADG [product group], which was based primarily in Italy."  (AC ¶ 113.)  Yet elsewhere,

---

[16]    *See also In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 620 (S.D.N.Y. 2005) (pressure to "inflate [] stock price in anticipation of stock-for-stock acquisitions of other financial institutions" insufficient for scienter); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 530-32 (S.D.N.Y. 2009) (pressure to raise capital even when failure would "essentially put the Company out of business" insufficient for scienter).

Plaintiffs allege that the reason Mr. Chery reorganized ST was to "mask the scale and extent of the deterioration in the Company's business by mixing profitable offerings with unprofitable ones." (AC ¶ 27.) Thus, combining Plaintiffs' overall account with CW8's claims, Mr. Chery apparently reorganized ST to further a fraud in response to the pressure he felt from the Italian government—pressure largely due to the fact that he reorganized ST in the first place. That dizzying narrative is nowhere near "cogent," let alone "compelling." *Tellabs*, 551 U.S. at 324.

### B.    Plaintiffs Do Not Allege Intentional Misconduct Or Severe Recklessness.

"In the absence of a showing of motive," "the strength of the circumstantial allegations" "of conscious misbehavior or recklessness" "must be correspondingly greater." *Ong* v. *Chipotle Mexican Grill, Inc.*, 2017 WL 933108, at *14 (S.D.N.Y. Mar. 8, 2017). For "conscious misbehavior," Plaintiffs must plead "[i]ntentional misconduct" targeted at stockholders that is "deliberate illegal behavior." *Novak*, 216 F.3d at 308. And alleging "conscious recklessness" requires pleading conduct that was "highly unreasonable" and "an extreme departure from the standards of ordinary care"—*i.e.*, that Defendants showed "[a]n *egregious* refusal to see the *obvious*." *S. Cherry St.*, 573 F.3d at 109. For forward-looking statements that fall within the PSLRA safe harbor, Plaintiffs must plead that the statement "was made with actual knowledge that it was false or misleading." *Slayton*, 604 F.3d at 766.

***Defendants' Supposed "Admissions."*** To begin, Plaintiffs emphasize the Complaint's allegation that ST did not disclose until November 20, 2024, that its non-cancelable order program was discontinued in March 2023. (AC ¶¶ 29, 103; *see* AC ¶ 109 (Individual Defendants could not have been "unaware of . . . changes in the Company's cancellation policies").) That is wrong. In fact, Mr. Chery told investors on September 6, 2023—over a year before Plaintiffs allege, and before all but four challenged statements—that the "noncancelable order approach" ST had "negotiated . . . during the shortage period in 2022" was "now normally over," because the market

dynamics had "come back [to a] normal situation." (Ex. H at 6.) Indeed, Mr. Chery's forthright disclosure in September 2023 is consistent with the Individual Defendants' repeatedly candid remarks about negative market developments as they unfolded, often in unquoted parts of the same statements Plaintiffs challenge. (*See* Ex. B.) The Complaint pleads no particularized facts explaining why ST's leaders would have been so consistently upfront with bad news while, at the same time, knowingly or recklessly misleading investors about ST's prospects in the automotive market. The far more cogent and compelling inference is that Defendants were sharing their honest view of the automotive market as well, which, in hindsight, turned out to be too optimistic.

*Defendants' Statements*. Plaintiffs also allege that the Individual Defendants' statements show that they "paid close attention to detail and information" about ST's performance and "sought to portray themselves as knowledgeable . . . about demand, backlog, and distributor/customer inventories." (AC ¶¶ 104-08.) Those allegations merely restate the truism that senior executives have at least some "knowledge of the details" of a company's operations. *Long Miao*, 442 F. Supp. 3d at 806. "But it is practically hornbook law that accusations such as these, which are founded on nothing more" particularized "than a defendant's corporate position, are entitled to no weight." *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (collecting cases).[17] If "scienter could be pleaded on that basis [senior executive positions] alone, virtually every company . . . that experiences a downturn in stock price could be forced to defend securities fraud actions." *Duncan*, 1996 WL 19043, at *14.

*Core Operations*. "As a variant on their arguments based on corporate position," Plaintiffs also "rely on the so-called 'core operations doctrine.'" *Rockwell*, 2018 WL 1725553, at *14.

---

[17]    Plaintiffs' boilerplate allegation that the Individual Defendants knew their statements were false "[b]ecause of their roles and responsibilities" and "access to material information available to them but not to the public" fails for the same reason. (AC ¶ 18.)

According to Plaintiffs, because "STM derives . . . the overwhelming majority of [its] revenue" from the "Automotive and Industrial" markets, "it would be absurd to assume that the Individual Defendants were unaware of the [purportedly] massive decline in demand and the inventory glut." (AC ¶ 109.)  As an initial matter, the validity of the core operations doctrine in this Circuit is in doubt.  *See, e.g.*, *Okla. Law Enf't Ret. Sys.* v. *Telefonaktiebolaget LM Ericsson*, 2020 WL127546, at *7 (S.D.N.Y. Jan. 10, 2020) (expressing "considerable doubt" that the doctrine survived the PSLRA); *Jackson*, 960 F.3d at 99 ("naked assertion" that product "was of such core importance" that "senior officers must have known that the challenged statements were false" was "plainly insufficient" for scienter).  Regardless, courts consistently limit the doctrine to where the cited "operations truly constituted nearly all of the company's business."  *In re Plug Power, Inc. Sec. Litig.*, 2023 WL 5577276, at *22 (S.D.N.Y. Aug. 29, 2023) (collecting cases).  ST's automotive segment, while significant, does not make up even a majority of its total revenues.  (AC ¶ 23.)

   ***Confidential Witnesses***.  Finally, to the extent that Plaintiffs rely on the purported CWs to allege that either Mr. Chery or Mr. Grandi had "knowledge of facts or access to information contradicting their public statements," *Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 813 (S.D.N.Y. 2018), those allegations fail as well.  With the exception of CW1, no supposed CW is "alleged to have had any direct contact with the Individual Defendants at all" during the Class Period, "let alone know what information they possessed."  *Woolgar*, 477 F. Supp. 3d at 220.  The closest is CW5's allegation that Messrs. "Grandi and Chery attended" monthly meetings at which ST's "forecasts, backlog," and "inventory" were discussed.  (AC ¶ 54.)  But generic "references" to "'monthly reports' and 'meetings'"—meetings CW5 is not even alleged to have attended—are insufficient where, as here, they do not "plausibly allege what information was actually . . . discussed at those meetings."  *Woolgar*, 477 F. Supp. 3d at 238.

As for CW1, there is no allegation that CW1 ever "communicated any" information regarding supposed channel stuffing "to any of the Individual Defendants or that the Individual Defendants otherwise knew about th[at] issue[]." *Malin* v. *XL Cap. Ltd.*, 499 F. Supp. 2d 117, 141 (D. Conn. 2007). CW1 claims that "channel inventory" and "inventory levels for customers were known" "to the Company" (AC ¶ 39), *not* Mr. Chery or Mr. Grandi in particular, and regardless, "conclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge[,] [are] insufficient." *Glaser* v. *The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011).

Plaintiffs allege that CW1 "warned Chery not to mispresent that the Company was immune from the overall decline" in the "semiconductor market," and that "commitments STM publicly made to investors in the third and fourth quarters of 2023 could not be kept." (AC ¶ 38.) But those assertions fall well short of identifying what "*specific* contradictory information" CW1 made known to Mr. Chery that was inconsistent with his "public statements." *Das*, 332 F. Supp. 3d at 813. Put another way, although Plaintiffs plead the "who" (CW1), they studiously omit the "what," "where," "when," and "how." They do not allege that CW1 warned Mr. Chery about demand in the automotive segment, but rather the "semiconductor market at large." (AC ¶ 38.) They do not specify what "commitments . . . to investors" "could not be kept," or what "information known to" ST made that so. (AC ¶ 38.) And they do not allege when or where CW1 contacted Mr. Chery other than the vague "[t]hroughout 2023." (AC ¶ 38.) None of this is remotely sufficient to give rise to the necessary "*strong* inference of scienter." *Long Miao*, 442 F. Supp. 3d at 808.

## III.    PLAINTIFFS' CONTROL-PERSON CLAIM ALSO MUST BE DISMISSED.

Because Plaintiffs fail to allege a primary violation of the securities laws, they also do not plead control-person liability under Section 20(a). *See Francisco*, 481 F. Supp. 3d at 215.

## CONCLUSION

The Complaint should be dismissed with prejudice.

Respectfully submitted,

/s/ *Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
David M.J. Rein
Julia A. Malkina
Maxwell F. Gottschall
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
giuffrar@sullcrom.com
reind@sullcrom.com
malkinaj@sullcrom.com
gottschallm@sullcrom.com

*Counsel for Defendants*

March 24, 2025