**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE STMICROELECTRONICS N.V. SECURITIES LITIGATION | Case No. 1:24-cv-06370-AKH |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

Omar Jafri
Joshua B. Silverman
Brian P. O'Connell
Diego Martinez-Krippner
Jianan Jiang
POMERANTZ LLP
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Tel.: (312) 377-1181
Fax: (312) 377-1184
ojafri@pomlaw.com
jbsilverman@pomlaw.com
boconnell@pomlaw.com
dmartinezk@pomlaw.com
ajiang@pomlaw.com

*Lead Counsel for Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

      A.      STM and Covid-19.................................................................................. 2

      B.      Defendants' Fraudulent Statements.......................................................3

      C.      Investors Suffer Large Losses as the Truth Begins to Emerge ............ 6

LEGAL STANDARD.......................................................................................................... 7

ARGUMENT ..................................................................................................................... 7

      A.      The Complaint Adequately Pleads Material Misstatements ................. 7

            1.      Chery Repeatedly Made Misrepresentations About Demand..................... 8

            2.      STM's FY 2023 Annual Report Concealed Declining Demand and Excess Inventory ............................................................... 16

      B.      The Complaint Pleads a Strong Inference of Scienter ....................................... 21

      C.      Defendants Are Liable as "Control Persons" of STM under Section 20(a) of the Exchange Act.......................................................................29

CONCLUSION................................................................................................................. 29

i

## TABLE OF AUTHORITIES

**Cases**

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*,
  19 F.4th 145 (2d Cir. 2021) .................................................................... 1, 7, 10, 24, 29

*ATSI Communs., Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).................................................................................... 7

*Baena v. Woori Bank*,
  515 F. Supp. 2d 414 (S.D.N.Y. 2007).............................................................. 28, 29

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................ 7

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
  556 F. Supp. 3d 100 (D. Conn. 2021)................................................................. 26

*Caiola v. Citibank, N.A.*,
  295 F.3d 312 (2d Cir. 2002)................................................................................ 18

*Chapman v. Mueller Water Prods., Inc.*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020)................................................................. 19

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
  450 F. Supp. 3d 379 (S.D.N.Y. 2020)............................................................. 13, 18

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012)................................................................. 27

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
  477 F. Supp. 3d 123 (S.D.N.Y. 2020)................................................................. 9

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012)................................................................. 17

*Employees' Ret. Sys. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) ....................................................................... 7, 22, 24

*Frank v. Dana Corp.*,
  646 F.3d 954 (6th Cir. 2011) ............................................................................. 28

*Fresno Cnty. Emples. Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017)................................................................. 11

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000)........................................................................... 7, 20

*Gauquie v. Albany Molecular Rsch., Inc.*,
  No. 14 CV 6637 (FB) (SMG), 2016 U.S. Dist. LEXIS 97295 (E.D.N.Y. July 26, 2016)........ 26

*Guozhang Wang v. Cloopen Grp. Holding Ltd.*,
   661 F. Supp. 3d 208 (S.D.N.Y. 2023)................................................................... 10, 18, 23

*Heller v. Goldin Restructuring Fund, L.P.*,
   590 F. Supp. 2d 603 (S.D.N.Y. 2008)................................................................. 22

*In re AppHarvest Sec. Litig.*,
   684 F. Supp. 3d 201 (S.D.N.Y. 2023)................................................................. 19

*In re Avon Sec. Litig.*,
   No. 19 Civ. 01420 (CM), 2019 U.S. Dist. LEXIS 200816 (S.D.N.Y. Nov. 18, 2019) ...... 25, 27

*In re Axsome Therapeutics, Inc. Sec. Litig.*,
   No. 22 Civ. 3925 (LGS), 2025 U.S. Dist. LEXIS 61068 (S.D.N.Y. Mar. 31, 2025) .............. 16

*In re Dentsply Sirona, Inc. Sec. Litig.*,
   665 F. Supp. 3d 255 (E.D.N.Y. 2023) ................................................. 10, 11, 20, 23

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013)................................................................. 16, 18

*In re Gilead Scis. Sec. Litig.*,
   No. C 03-4999 SI, 2009 U.S. Dist. LEXIS 46751 (N.D. Cal. June 3, 2009)........................... 25

*In re Guilford Mills, Inc. Sec. Litig.*,
   No. 98 Civ. 7739 (CLB), 1999 U.S. Dist. LEXIS 21690 (S.D.N.Y. July 21, 1999) ............... 28

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
   20 F.4th 131 (2d Cir. 2021) ................................................................................. 20

*In re MBIA, Inc., Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010)................................................................. 26

*In re MF Glob. Holdings Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013)................................................................. 12

*In re Mobileye Glob. Sec. Litig.*,
   No. 24cv310 (DLC), 2025 U.S. Dist. LEXIS 71923 (S.D.N.Y. Apr. 15, 2025) ..................... 15

*In re Nature's Sunshine Prods. Sec. Litig.*,
   486 F. Supp. 2d 1301 (D. Utah. 2007)................................................................. 29

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ......................................................................... 28

*In re Prudential Secs. Inc. P'ships Litig.*,
   930 F. Supp. 68 (S.D.N.Y. 1996) ......................................................................... 17

*In re Salix Pharms., Ltd.*,
   No. 14-CV-8925 (KMW), 2016 U.S. Dist. LEXIS 54202 (S.D.N.Y. Apr. 22, 2016)........ 11, 14

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001).............................................................................. 7, 9, 28

iii

*In re Solaredge Techs., Inc. Sec. Litig.*,
No. 1:23-cv-9748-GHW, 2025 U.S. Dist. LEXIS 65381 (S.D.N.Y. Apr. 6, 2025) ....... 9, 10, 23

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021)............................................................................................. 24, 25

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005)..................................................................................... 17

*In re Vivendi Universal, S.A. Sec. Litig.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003).................................................................................. 7, 12

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016).................................................................................... 13, 14, 15

*In re Weight Watchers Int'l Inc. Sec. Litig*
504 F. Supp. 3d 224 (S.D.N.Y. 2020)..................................................................................... 21

*Karimi v. Deutsche Bank Aktiengesellschaft*,
607 F. Supp. 3d 381 (S.D.N.Y. 2022)..................................................................................... 12

*Liu v. Intercept Pharms., Inc.*,
No. 17-cv-7371 (LAK), 2020 U.S. Dist. LEXIS 53252 (S.D.N.Y. Mar. 26, 2020) ................. 19

*Lopez v. CTPartners Exec. Search, Inc.*,
173 F. Supp. 3d 12 (S.D.N.Y. 2016)....................................................................................... 14

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015).................................................................................................... 29

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ................................................................................................. 13

*Meyer v. JinkoSolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014).................................................................................................... 18

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).................................................................................. 9, 21, 22, 24

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019)............................................................................. 10, 20, 23

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*,
58 F.4th 195 (5th Cir. 2023) .................................................................................................. 25

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)................................................................................................................. 11

*Robeco Capital Growth Funds v. Peloton Interactive, Inc.*,
No. 21-cv-9582 (ALC)(OTW), 2024 U.S. Dist. LEXIS 180065 (S.D.N.Y. Sept. 30, 2024)... 14

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004).................................................................................................... 15

iv

*Senn v. Hickey*,
   No. 03-CV-4372 (DMC), 2005 U.S. Dist. LEXIS 33814 (D.N.J. Dec. 14, 2005) ................... 28

*Serabian v. Amoskeag Bank Shares*,
   24 F.3d 357 (1st Cir. 1994) ...................................................................................................... 28

*Setzer v. Omega Healthcare Inv'rs, Inc.*,
   968 F.3d 204 (2d Cir. 2020)............................................................................................... 18, 21

*Sharette v. Credit Suisse Int'l*,
   127 F. Supp. 3d 60 (S.D.N.Y. 2015).................................................................................... 7, 8

*Skiadas v. Acer Therapeutics Inc.*,
   No. 1:19-cv-6137-GHW, 2020 U.S. Dist. LEXIS 105814 (S.D.N.Y. June 16, 2020) ............. 27

*Speakes v. Taro Pharm. Indus.*,
   No. 16-cv-08318 (ALC), 2018 U.S. Dist. LEXIS 163281 (S.D.N.Y. Sept. 24, 2018)............. 26

*Strougo v. Barclays PLC*,
   105 F. Supp. 3d 330 (S.D.N.Y. 2015).................................................................................... 26

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
   531 F.3d 190 (2d Cir. 2008).................................................................................................... 29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..................................................................................................... 21, 22, 24

*Yannes v. SCWorx Corp.*,
   No. 20-cv-03349 (JGK), 2021 U.S. Dist. LEXIS 116330 (S.D.N.Y. June 21, 2021) ............. 26

**Statutes**

15 U.S.C. §78u-4 ................................................................................................................................ 1

**Regulations**

17 C.F.R. §240.10b-5(b) ................................................................................................................... 18

**Rules**

Federal Rule of Civil Procedure 9(b)................................................................................................ 7

Federal Rule of Civil Procedure 12(b)(6) ...................................................................................... 28

## PRELIMINARY STATEMENT

The Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4 ("PSLRA")'s pleading standards are meant to weed out only vague and unsupported claims, not to prevent meritorious claims like this. The Second Circuit instructs that courts "must be careful not to mistake heightened pleading standards for impossible ones." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 150 (2d Cir. 2021).[1] As with any case, all well-pleaded factual allegations must be accepted as true, and common-sense inferences should not be disregarded. *Id.* When the correct standards are applied, there can be no doubt that Plaintiffs have adequately stated a claim for relief under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5(b).

Plaintiffs bring this securities fraud class action to hold STMicroelectronics N.V. ("STM" or the "Company"), its CEO Jean-Marc Chery ("Chery"), and CFO Lorenzo Grandi ("Grandi") accountable for deceiving investors about STM's market demand and customer inventory levels during the Class Period (March 14, 2023 to October 30, 2024). Plaintiffs' complaint meticulously alleges how Defendants created a false impression of operational strength in 2023 and 2024 even as STM and the rest of the semiconductor industry fell into a state of decline. Defendants' misrepresentations led STM's stock to trade at prices above $50 per share before crashing down to nearly $25 per share, as the truth about its declining sales emerged through weak earnings reports and lowered guidance targets. Defendants' deception and reckless disregard for the truth caused investors to sustain significant losses.

Defendants take the remarkable position that even though the most senior executive in the

---

[1] All internal quotation marks and citations are omitted, and all emphasis is added unless otherwise noted. ¶__ and ¶¶__ citations are to the Second Amended Complaint (the "Complaint" or the "SAC") filed at ECF No. 42.

Company's Automotive segment directly and repeatedly told them that investors were being misled by Chery's inflated descriptions of demand in that segment, such deceit cannot be actionable. This position defies common sense. Defendants fail to identify any *pleading* defect. Plaintiffs' allegations are well-sourced from SEC filings, analyst reports, and over a half dozen former STM employees including the President of STM's Automotive division (referred to as the "Automotive & Discrete Group" or "ADG"), who explicitly told Defendant Chery in executive management meetings that Chery was misleading public investors by providing them with false statements about the state of the semiconductor market and the demand that supposedly existed for STM's automotive products. These allegations, which must be accepted as true, show that Defendants materially misrepresented the state of STM's business during the Class Period. Nor is this a case about failure to predict the future as Defendants erroneously contend. Notwithstanding Defendants' attempt to attack a strawman argument rather than fairly addressing the Complaint's allegations, this case is entirely about Defendants' decision to conceal then-known adverse conditions, and to portray as hypothetical risks that were already materializing.

For these reasons and the additional reasons identified below, Defendants' motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

### A.  STM and Covid-19

STM manufactures and sells semiconductor chips. ¶¶19-20. Historically, the automotive industry has been the Company's largest customer, generating nearly 45% of total annual revenue. ¶23. ADG handled the Company's automotive sales. ¶24. Other segments within STM, such as the Analog, MEMS & Sensors Group ("AMS") and the Microcontrollers & Digital ICs Group ("MDG"), sold chips to industrial and electronic clients as well as general non-automotive microprocessor customers. ¶¶24-25.

2

Covid-19 heavily impacted STM's operations and earnings in the years preceding the Class Period. Demand initially slowed in response to widespread shutdowns but then bounced back sharply as businesses started to resume normal operations. ¶28. STM's revenue followed the same trajectory. Revenue declined to $10.2 billion in 2020 but grew to $12.8 billion in 2021 and $16.1 billion in 2022. ¶28. STM's revenue growth coming out of the pandemic was due in part to customers over-ordering chips to avoid potential supply chain disruptions as the economy stabilized. ¶28.

B.      **Defendants' Fraudulent Statements**

By 2023, Covid-19 had largely subsided and major economies around the world had already stabilized. Excess ordering of semiconductors was no longer necessary, and many supply chain disruptions were resolved. Consequently, automotive and industrial semiconductor demand started to decline. ¶30. Nevertheless, Defendants told investors that STM stood apart from its industry peers and that STM's revenues would continue to climb because of its then-existing backlog and incoming orders. ¶¶31-32.

At the start of the Class Period on March 14, 2023, Defendant Chery told analysts at an investor conference that he had "additional visibility" from meeting with customers in both Asia and the United States, and could confirm that the "automotive market" was "very solid" based on "[STM's] backlog . . . representing 6 to 8 [quarters] of revenue and capacity." ¶58. On April 27, 2023, while discussing STM's financial earnings for the first quarter of 2023, Chery again touted having "well above . . . six quarters" of revenue in STM's backlog and, importantly, claimed that ADG was not experiencing the "weak end demand" that existed in the personal electronics segment, *i.e.*, MDG. ¶60. On June 6, 2023, during an analyst conference hosted by BNP Paribas, Chery once again affirmed the strength of STM's backlog, telling attendees that STM's backlog was "full up to 2024," that he "[did] not detect . . . excess inventory in the supply chain," and that

3

the automotive market was "very, very solid." ¶62. On July 17, 2023, during the earnings announcement for the following quarter, Chery reiterated his positive growth statements, reported 34% year-over-year growth for the ADG segment, and claimed that STM would generate $17.4 billion in revenue for fiscal 2023. ¶30.

This pattern continued over the course of the Class Period, with Chery repeatedly affirming and reaffirming STM's backlog and revenue targets, and describing ADG as the driving force (or, in Chery's words, the "growth driver") behind STM's results. *See*, *e.g.*, ¶66 (Sep. 6, 2023 Citi Global Technology Conference), ¶72 (Jan. 25, 2024 Earnings Call), ¶88 (Mar. 12, 2024 Citi TMT Conference), ¶92 (Apr. 25, 2024 Earnings Call). Unbeknownst to shareholders and contrary to what Chery was saying publicly, Defendants then knew that reported revenues were the direct result of pulling forward Automotive demand, making such gains unsustainable. *See* ¶¶32-34.

Even more problematic though was the fact that Automotive sales were declining, making it even more difficult for STM to grow sales to replace the revenue it had previously pulled forward. CW1, STM's President of ADG, repeatedly told Chery in monthly staff meetings that his public forecasts were materially misleading. ¶38. According to CW1, the Automotive semiconductor market started to decline in early- to mid-2023 and Automotive orders immediately started to decrease. ¶37. Consequently, CW1 told Chery that STM should be reporting a slowdown instead of increased growth and that the commitments he had made to shareholders publicly were contradicted by the information in hand at that time. ¶38. This downward trend in revenue and demand continued throughout 2023 and into 2024. *Id.*

Excess inventory exacerbated the issues created by STM's declining demand. CW1 discovered in 2023 that STM's sales team had been issuing excessive discounts to ADG customers in order to drive sales. ¶39. CW1 complained in writing to Chery and Grandi and explained that

the excessive discounts were causing an inventory glut. *Id.* This created a false appearance of positive financial performance but one that could not be sustained, resulting in a known revenue gap for coming quarters. *Id.* According to CW1, internal inventory reports showed that STM forestalled the known demand cliff in the second half of 2023 only through heavy discounting. ¶41.

CW1's account is corroborated by several other former employees. CW2, a Global Account Manager at STM, similarly described a decline in demand in both the Industrial and Automotive markets in 2023 that was at least for some time concealed by excess ordering. ¶¶45-46. CW3, another Global Account Manager at STM, further described that Automotive demand in particular started to decrease in 2023 following elevated orders in 2022 and that the decline in demand was evidenced by orders in weekly Electronic Data Interchange ("EDI") reports. ¶¶47-49. CW4, a Manager for Sales and Marketing Commissions and Incentives, likewise reported that STM's finances started to decline in 2023 due to decreased demand after strong years in 2020, 2021, and 2022. ¶50. CW5, a member of STM's Market Development team, stated that the market contracted in 2023 and that the marketing forecasts he prepared for monthly regional budget meetings attended by Chery and Grandi were presented alongside forecasts and inventory reports showing downward trends observed by sales personnel. ¶¶51-54. Additional former employees further substantiated that problems in STM's business existed and were known internally in 2023 and early 2024. *See* ¶¶55-57 (discussing hiring freezes, contracting demand, and inflated orders). For instance, CW7 confirmed that market studies showed demand whiplash in 2023, and a former Global Account Manager at STM confirmed in an interview the existence of excess demand with often three different distributors placing orders with STM for the same end customer. *Id.*

5

C.      **Investors Suffer Large Losses as the Truth Begins to Emerge**

Defendants were unable to conceal STM's declining demand for long. Without new revenue to replace the revenue that had been pulled forward, STM was left with a gaping shortfall. Investors caught their first glimpse of the demand shortfall that had long been known internally on April 25, 2024, when the Company disclosed its financial results for the first quarter of 2024. In pertinent part, STM reported a year-over-year revenue decline of 18% due to declining demand in Automotive and Industrial, and began to disclose that demand for chips in ADG declined. ¶96. STM also lowered its revenue guidance for fiscal 2024 from a range of $15.9 billion to $16.9 billion to a range of $14 billion to $15 billion. *Id.* On this news, STM's share price fell by approximately 7% over the next few trading sessions to close at $39.56 per share, as analysts reported on the Company's financial results and the market absorbed the news. ¶¶96-97.

Investors learned more about the demand shortfall as the year progressed. On July 25, 2024, STM announced financial results for the second quarter of 2024, reporting lower than expected revenue due to declining sales in Automotive and further deterioration in Industrial. ¶98. STM also lowered annual revenue guidance to a range of $13.2 to $13.7 billion. *Id.* STM's share price dropped sharply in response, falling over 15% in just one day. ¶99. Analysts did not hold back. TD Cowen reported surprise over the "magnitude" of STM's inventory problems. ¶100. Morgan Stanley and Jeffries published similar notes attributing the poor performance to excessive inventory among customers. *Id.*

Finally, on October 31, 2024, STM released its financial results for the third quarter of 2024. It told investors it expected to finish fiscal year 2024 at the low end of its revenue guidance ($13.27 billion) and was forecasting below-consensus revenue for the fourth quarter. ¶101. In response, STM's share price fell another 5% over the next few trading sessions to close at $25.96 per share on November 4, 2024. ¶102.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Employees' Ret. Sys. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015). When evaluating the complaint, the court must "draw[] all reasonable inferences in the plaintiff's favor." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). The allegations in the complaint, along with the inferences drawn therefrom, need only "'raise a right to relief above the speculative level.'" *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

As the Supreme Court has cautioned, "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the fact finder." *Twombly*, 550 U.S. at 563 n.8. This rule applies equally to securities fraud actions. *See Altimeo*, 19 F.4th at 151 (holding that "even securities plaintiffs need not prove their entire case within the confines of the complaint."); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("Even with the heightened pleading standard under Rule 9(b) and the Securities Reform Act we do not require the pleading of detailed evidentiary matter in securities litigation.").

## ARGUMENT

### A.    The Complaint Adequately Pleads Material Misstatements

Under Rule 9(b) and the PSLRA, a plaintiff must specify the alleged statements, "identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 184 (S.D.N.Y. 2003). To do this, a plaintiff need only plead facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d

60, 89 (S.D.N.Y. 2015). As explained below, Plaintiffs readily satisfy this standard.

### 1.    Chery Repeatedly Made Misrepresentations About Demand

Chery consistently misrepresented to investors that STM then possessed a six-to-eight quarter Automotive revenue backlog, that Automotive demand and backlog remained "very solid," that the Company saw no signs of excess inventory in the customers' supply chains, that end-demand remained "stable," and that the ADG unit was then capable of continuing to be a revenue "growth driver." For example, Chery made the following statements during analyst conferences and earnings calls:

- "It is clear that the automotive market . . . is very solid. ***This is confirm[ed] by our backlog, which is still representing 6 to 8 [quarters] of revenue and capacity***." ¶58 (Chery, Citi Conference, Mar. 14, 2023).

- "***We do not detect, okay overall excess inventory in the supply chain***. . . . The book to bill is below one. Why? Because, okay we are reducing the lead time, ***not because, okay we are facing a bad market condition, it's exactly what we have predicted***." ¶¶62, 64 (Chery, BNP Paribas Conference, June 6, 2023).

- "Auto will be clearly the ***growth driver*** of [STM] next year. Yes." ¶66 (Chery, Citi Conference, Sept. 6, 2023).

- "***We continued to see stable end-demand in Automotive***, no significant increase in Personal Electronics, and further deterioration in Industrial. . . . ***We absolutely don't see on Automotive what we are seeing on Industrial*** . . . " ¶¶72, 76 (Chery, Earnings Call, Jan. 25, 2024).

- " . . . the growth we expect on Automotive in 2024 is . . . slightly above 10%. . . . we don't see a massive correction. . . . ***demand is solid and the backlog is solid***." ¶¶88, 90 (Chery, Citi Conference, Mar. 12, 2024).

Chery made these statements publicly even though he was being told internally that Automotive demand was contracting and did not support his descriptions of the backlog or targets for year-end revenue. *See* ¶¶35-42. CW1, STM's President of ADG, told Chery in monthly staff meetings (with approximately 25 other high-level managers in attendance) that the forecasts he was providing to investors contradicted internal reports showing a slowdown in ADG. ¶38. CW1

also complained to Chery and Grandi in writing that STM's salesforce had created an inventory glut at the customer level after pulling sales forward from future periods, thereby creating a bubble that would ultimately leave STM with significant revenue shortfalls in the future. ¶¶39, 41. Additional CWs corroborate the fact that STM was facing a decline in demand and that business had already begun to deteriorate in 2023, well before many of the contradictory misrepresentations were made. *See* ¶¶46-57.[2]

A clear contradiction exists between Chery's public statements about Automotive demand and the internal information he was receiving from STM's President of ADG; Chery told investors it was "solid," not showing "deterioration" like the Industrial segment towards the end of the Class Period, and that they had not detected any "excess inventory" when, in truth, demand had already contracted and was already incapable of supporting the forecasts he was providing to the market. Plaintiffs' "complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the [demand and inventory] situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true. Assuming, as [the Court] must at this stage, the accuracy of [Plaintiffs'] allegations about [semiconductor demand], these statements were plainly false and misleading." *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000).

Indeed, courts in this Circuit have repeatedly sustained similar claims with similar allegations. *See*, *e.g.*, *In re Solaredge Techs., Inc. Sec. Litig.*, No. 1:23-cv-9748-GHW, 2025 U.S.

---

[2] Defendants take issue with CWs 2, 4, 5, and 7 because they either ended their employment with STM before the Class Period ended or rely on hearsay. Defs.' Br. at 23. Defendants mistake the relevance of these witness allegations. They are corroborative in nature and serve to bolster CW1's reliability. In any event, confidential witness allegations relating to pre- or post-class period events are commonly accepted. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 72 (holding that both pre- and post-Class Period information can be relevant to whether a defendant committed fraud). *See also City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020) (ruling that CW accounts are assessed based on a "liberal standard," and even hearsay can be appropriately considered at the pleading stage).

Dist. LEXIS 65381, at *22-23 (S.D.N.Y. Apr. 6, 2025) (finding that "Defendants' statements regarding 'strong' demand in Europe were false" where confidential witnesses alleged that "demand in Europe was weak"); *Guozhang Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 229 (S.D.N.Y. 2023) (statements about "strength and loyalty of [defendant's] existing customer base" found misleading where defendant omitted decline in customer retention); *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 283 (E.D.N.Y. 2023) (concluding that defendants misled investors when stating "[r]evenues benefited primarily from strong demand" while "omitting to state that sales were driven by the minimum purchase requirements, not end-user market demand"); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 32-33 (S.D.N.Y. 2019) (statements attributing revenue growth to "strong end-user demand" were misleading because they concealed that growth was instead due to sales to distributors). Plaintiffs' allegations here likewise show that Defendants made material misrepresentations about the demand for STM's chips that contradicted contemporaneous material nonpublic information. Nothing more is required to plead "falsity" at this preliminary stage. *See Altimeo*, 19 F.4th at 150-51 (observing that "even securities plaintiffs need not prove their entire case within the confines of the complaint").

Unable to squarely address well-pleaded Complaint allegations, Defendants instead seek to impermissibly reframe the actual allegations as if Plaintiffs had pled "fraud-by-hindsight." Defs.' Br. at 1, 11-12. Plaintiffs do not. Plaintiffs allege that Defendants are liable for making materially misleading statements about the then-existing demand for STM's chips and not, for example, the failure to meet future projections. *Compare*, *e.g.*, ¶¶58-77 (alleged false and misleading statements) *with* ¶30 (background allegations). Moreover, Plaintiffs allege falsity not by pointing to STM's lowered guidance at the end of the Class Period and asserting that fact must

10

have rendered the projection false when made, but instead by describing specific, then-known adverse information repeatedly provided by CW1 (President of ADG) to Chery and Grandi during monthly staff meetings and in writing during 2023. *See*, *e.g.*, ¶¶63, 65, 67, 73. Such "specific facts that [Plaintiffs] allege were known to Defendants at the time they [made their public statements] that rendered their [public statements] unreasonable" is the opposite of "fraud-by-hindsight." *See In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d at 288.

Plaintiffs' specific allegations also remove this case from the line of cases cited by Defendants concerning puffery and immaterial opinions. Defs.' Br. at 17-19. The statements at issue contain false statements and material omissions of concrete facts involving demand for STM's products. *E.g.*, ¶72 ("We continued to see stable end-demand in Automotive . . ."); ¶76 (Yeah. Yeah. Exactly. No. We absolutely don't see on Automotive what we are seeing on Industrial."); *Compare also* ¶92 ("***Of course, we have a pretty good visibility on backlog in automotive, personal electronics and computer equipment and computer peripheral***.") *with In re Salix Pharms., Ltd.*, No. 14-CV-8925 (KMW), 2016 U.S. Dist. LEXIS 54202, at *32-33 (S.D.N.Y. Apr. 22, 2016) (representation concerning "visibility in the inventories" ruled false "because it led investors to believe that Defendants' future projections were based on accurate knowledge of current inventory levels.").

In any event, even opinions can be actionable where they "omit[] material facts about [each] speaker's inquiry into or knowledge of facts that would support the stated opinion." *Fresno Cnty. Emples. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 547 (S.D.N.Y. 2017) (quoting *In re Salix Pharms., Ltd.*, 2016 U.S. Dist. LEXIS 54202, at *38 n.10). "If the real facts are otherwise, but not provided, the opinion statement will mislead." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188 (2015).

11

To illustrate, Chery's statement that "[w]e absolutely don't see [weakness] on Automotive what we are seeing on Industrial" purported to describe facts (what he and STM observed) later in the Class Period, but omitted that Chery was expressly warned that demand was declining and that his public statements were misleading. *See* ¶¶76-77 (alleging CW1 told Chery about the very facts that contradicted his misrepresentations). Each of the alleged misrepresentations was tethered to specific facts about demand and the Company's backlog. They were intentionally concrete, not "so vague, broad, and non-specific that a reasonable investor would not rely on [them]." *See In re MF Glob. Holdings Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013) (rejecting puffery defense); *see also Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 392-93 (S.D.N.Y. 2022) (rejecting puffery argument where statements contradicted true state of internal affairs); *accord In re Vivendi Universal, S.A.*, 381 F. Supp. 2d at 182 (puffery thus is "generally not an appropriate basis" for dismissal).

Nor is Defendants' deceit immunized by the PSLRA's safe harbor for forward-looking statements. Defs.' Br. at 11-17. The statements at issue were not "forward-looking," were not accompanied by "meaningful" cautionary language, and were known by Defendants to be false when made. Defendants mischaracterize Plaintiffs' allegations by presenting this case as concerning only future demand for ADG, and assuming that CW accounts about early deterioration in other segments should be read out of the Complaint. *See* Defs.' Br. at 11-12. Not so. The Complaint instead focuses on material misrepresentations of concrete facts about present market conditions. *See, e.g.*, ¶¶64, 72, 76 ("we are [not] facing a bad market condition," "[w]e continued to see stable end-demand," and "[w]e absolutely don't see on Automotive what we are seeing on Industrial"). Indeed, Plaintiffs' theory of falsity rests heavily on CW1, an individual who Defendants admitted in SEC filings was one of the most senior executives at STM, who speaks to

12

then-present market conditions, including but not limited to the orders STM had already received and the elevated inventory that STM already knew about before misrepresentations to investors were made. *See* ¶¶37-41.

Given the "present" focus of Defendants' statements, they are not entitled to protection under the safe harbor. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) (holding that statements about "strong growth prospects and a very strong balance sheet" were not protected by safe harbor); *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("When Tellabs told the world that sales of its 5500 system were 'still going strong,' it was saying both that current sales were strong and that they would continue to be so, at least for a time, since the statement would be misleading if Tellabs knew that its sales were about to collapse.").

Defendants wrongly cite *Evoqua Water*, Defs.' Br. at 12-13, which actually cuts against them. *Evoqua Water* involved a corporate defendant that acquired another company. The plaintiffs argued that the defendants misrepresented their ability to increase and/or maintain sales after downsizing their sales force. While the district court dismissed a handful of statements for being forward-looking or non-actionable puffery, it sustained most statements over arguments similar to those Defendants raise here. The sustained allegations included statements such as "[i]n order to maintain and enhance our customer relationships, we intend to continue to invest in our sales force" and "[we] [c]ontinue to evaluate and pursue accretive tuck-in acquisitions." *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 397, 405, 410 (S.D.N.Y. 2020). By contrast, the few dismissed statements (unlike here) did not involve then-present conditions or facts. *See id.* at 397.

Plaintiffs' case turns on the fact that the semiconductor market had ***already*** started to decline long before Defendants publicly acknowledged any deterioration, thereby rendering, as

13

alleged, statements about then-current demand and market conditions false and/or materially misleading. *See*, *e.g.*, ¶¶72-73, 76-77 (Chery stating that STM "absolutely" did not see decline in "Automotive"). Plaintiffs do ***not*** use these facts to try to attack STM's future projections and do not allege Defendants' July 27, 2023 revenue projection as a false statement. *See* ¶30 (STM announcing $17.4 billion revenue projection for 2023). This distinction differentiates this Action from Defendants' cited authorities. *See* Defs.' Br. at 12-13 & n.8 (citing *Lopez v. CTPartners Exec. Search, Inc.*, 173 F. Supp. 3d 12, 39 (S.D.N.Y. 2016) (dismissing claims against "preliminary earnings" that were "explicitly identified" as forward-looking) and *Robeco Capital Growth Funds v. Peloton Interactive, Inc.*, No. 21-cv-9582 (ALC)(OTW), 2024 U.S. Dist. LEXIS 180065, at *13, 27 (S.D.N.Y. Sept. 30, 2024) (finding statement that "we expect total revenue of $5.4 billion" was forward-looking).

Besides the fact that the statements in this case were not forward-looking, Defendants' safe harbor argument also fails because they were not accompanied by "meaningful" cautionary language and because Defendants knew the statements were false when made. *See Vivendi*, 838 F.3d at 246-47 (rejecting "miscellany of disclaimers peppered throughout its required SEC filings" because "[v]ague disclaimers are inadequate"). Defendants point to generic, boilerplate statements, including the one they used at the start of all their earnings calls: "This call will include forward-looking statements that involve risk factors that could cause [STM] results to differ materially . . ." Defs.' Br. at 13-14. However, such "kitchen-sink disclaimer[s], listing garden-variety business concerns that could affect any company's financial well-being" ***do not constitute*** "meaningful cautionary language." *Vivendi*, 838 F.3d at 247; *see also In re Salix Pharms., Ltd.*, 2016 U.S. Dist. LEXIS 54202, at *35-36 (rejecting safe harbor argument premised on "cautionary statements included at the beginning of each conference call" because warnings were "brief and generic").

14

Additionally, because the referenced risks had already materialized and the alleged warnings themselves are pled as false here, the safe harbor provides no protection. "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

Defendants' reliance on *In re Mobileye Global Securities Litigation* is misplaced. Defs.' Br. at 2, 15-16. The defendants there expressly disclosed that 70% of revenue came from customers who already contracted for lower quantities for the current and upcoming year, thereby alerting investors about specific facts claims to be omitted. *See In re Mobileye Glob. Sec. Litig.*, No. 24cv310 (DLC), 2025 U.S. Dist. LEXIS 71923, at *24-27 (S.D.N.Y. Apr. 15, 2025). Thus, unlike here, those defendants "warn[ed] explicitly against drawing the very 'impression' identified by the lead plaintiff," namely the "risk" that customers would "utilize accrued inventory on hand before placing new orders." *Id*. at *25 (internal quotations omitted). Defendants here were not so candid. Their boilerplate "warning" that future sales "***might*** not be sustainable" falls woefully short of telling investors that STM was ***already*** experiencing declining demand, and Defendants ***already*** were told the problems were worsening, but concealed the extent of the damage from investors throughout the Class Period. *Compare* Defs.' Br. at 15-16 (listing generic risk warnings) *with* ¶¶37-41 (CW1 telling Chery and Grandi that Automotive demand had already started to decline and that public statements were misleading investors).

Finally, CW1's allegations show that Defendants knew their statements were false when made, thereby confirming that the safe harbor has no role in this Action. *See Vivendi*, 838 F.3d at 247-49. Plaintiffs' allegations resemble the allegations at issue in *Vivendi*, where a jury concluded that an internal email questioning the validity of EBITDA growth targets was sufficient to demonstrate that the defendants knew their statements were "misleading to a reasonable investor .

15

. . who is not as well-versed at making sense of [defendant's] disclosures as a financial analyst." *Id*. at 248-49. CW1's stark warnings to Chery that Chery was misleading investors strongly resembles the facts in *Vivendi*, where the CFO objected in an email to discussing "free cash flow" in future years, considering that "there [wouldn't] be any this year." *Id*. at 249; *see also In re Axsome Therapeutics, Inc. Sec. Litig.*, No. 22 Civ. 3925 (LGS), 2025 U.S. Dist. LEXIS 61068, at *19-20 (S.D.N.Y. Mar. 31, 2025) ("actual knowledge" standard met where plaintiffs adequately alleged inference of scienter). That Plaintiffs already pled similar facts the Second Circuit has held are sufficient to sustain a jury verdict only highlights how Defendants' attempt to dismiss this Action utterly lacks merit.

### 2. STM's FY 2023 Annual Report Concealed Declining Demand and Excess Inventory

STM's 2023 Annual Report filed on February 22, 2024, signed by Chery, and certified by both Chery and Grandi, falsely portrayed as merely hypothetical risks to demand that had already been observed. ¶¶78-79. A "company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516-17 (S.D.N.Y. 2013) (collecting cases). For example, it characterized downturns, reduced demand, and reduced orders as potential future risks, with no mention that they were already occurring:

- "Downturns are typically characterized by *reduction in overall demand*, accelerated erosion of selling prices, reduced revenues and *high inventory levels*, any of which *could result in a significant deterioration of our results of operations*. ¶80.

- "*There can be no assurance that our customers or distributors will continue to book the same level of sales with us that they have in the past*." ¶82.

- "A *market decline* in any of these industries [automotive], our inability to retain and attract customers, or *customer demand* for our products which differs from our projections, *could have a material adverse effect on our results of operations*." ¶84.

- "***Our operating results are affected by a wide variety of factors that could materially and adversely affect revenues and profitability*** or lead to significant variability of our operating results from one period to the next. These factors include ***changes in demand*** from our key customers, capital requirements, ***inventory management*** . . ." ¶86.

Alleged warnings like the statements above are materially misleading where, as here, the risks are portrayed as hypothetical even though they were then materializing or have already materialized. "[T]o caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005); *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 647 (S.D.N.Y. 2012) (rejecting "boilerplate disclosures" because "generic risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks"); *In re Prudential Secs. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

Here, for example, Defendants warned of negative effects that could ***potentially*** arise from a "reduction in overall demand" and "high inventory levels" when, in reality, demand had already contracted and inventory was already at excessive levels. *See* ¶¶35-57 (including CW1's allegations about Automotive demand and inventory); ¶46 (CW2 explains that orders in Industrial declined in early 2023 because of excess inventory, and demand dropped in some cases by 50%); ¶¶48-49 (CW3 provides a similar account); ¶50 (CW4 states that STM struggled with sales after CW4 left in June 2023 because Defendants over-anticipated demand); ¶54 (CW5 states that forecasts did not match the downward trend observed by sales personnel); ¶56 (CW7 describes how STM faced a demand whiplash starting in 2023).

17

Thus, Defendants' 2023 Annual Report gives rise to liability. *See Guozhang Wang*, 661 F. Supp. 3d at 228 (registration statement's cautionary disclosure misled investors by portraying risk about customer retention as "prospective or hypothetical" despite having already occurred); *Evoqua*, 450 F. Supp. 3d at 409 (holding cautionary language misleading where defendants warned of "hypothetical" risk even though "changes to its sales force were guaranteed to have a negative effect on sales"); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d at 516-17 (risk warned that increased mobile usage and product decisions may negatively impact Facebook's revenue but calls between defendants and analysts showed they already had).

The falsity of such hypothetical framing is further supported by SEC Rule 10b-5(b), which requires defendants to speak accurately and not in half-truths. *See* 17 C.F.R. §240.10b-5(b). "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (citing *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)). Once Defendants chose to speak to investors about the demand for chips and its role as the "growth driver," they were obligated to "speak truthfully [and] . . . accurate[ly]," *See Caiola*, 295 F.3d at 331; *see also Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020) ("[B]y putting Orianna's rental payments in play, Defendants were required to speak accurately and completely"). Having put the demand and inventory levels for chips in play, Defendants were obligated to inform investors what CW1 had already warned internally concerning flagging demand in order to make the statements they made not misleading.

Curiously, to attempt to sidestep their clear liability for such misleading hypothetical warnings, Defendants take the opposite position that they did only pages earlier, stating that the warning language "lack[ed] specificity." Defs.' Br. at 16 (internal quotations omitted). Plaintiffs

18

agree that the statements are vague, which is one reason they did not provide the meaningful cautionary language necessary for safe harbor protection.[3] But that does not allow Defendants to make sweeping generalizations about the hypothetical nature of risks to "demand" and "market decline" concealing problems that were already materializing. *See*, *e.g.*, ¶¶80, 84. The cases cited by Defendants are inapposite. *See In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 268-69 (S.D.N.Y. 2023) (dismissing statement that discussed "risks inherent to businesses similar to [defendant]"), *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 405-06 (S.D.N.Y. 2020) (language about risk of product defects inherent in all products was too generic to be relied on), and *Liu v. Intercept Pharms., Inc.*, No. 17-cv-7371 (LAK), 2020 U.S. Dist. LEXIS 53252, at *30-31 (S.D.N.Y. Mar. 26, 2020) (language that drugs generally could have "unexpected" side effects was too generic to be relied on). If anything, these decisions only emphasize that STM's alleged cautionary language was anything but meaningful.

Defendants also mischaracterize the impact of their "channel stuffing" practices on this point. Defs.' Br. at 19-22. Warning investors only in a sweeping, hypothetical manner about the risks of declining demand and excess inventory was materially misleading because Defendants omitted that STM was then overloading customer channels with inventory, knowing that the Company was pulling forward future demand that could not be recognized in future quarters. *See* ¶¶39-41 (CW1 told Chery and Grandi about the sales team using customer discounts to pull sales forward).

Plaintiffs' case is not premised on the existence of an illicit "channel stuffing" scheme but

---

[3] Defendants' argument on this point contradicts their earlier safe harbor arguments where they claimed that STM's cautionary language effectively immaterialized the alleged false statements. STM's risk warnings cannot be both specific and meaningful while at the same time too vague and lacking in specificity for investors to rely upon.

19

instead on the fact that Defendants omitted this known drag on demand in their statements to investors. "[A]ttributing [STM's] high sales volume to strong consumer demand, while omitting to state that . . . high sales volume was achieved in significant part by the offer of unsustainable channel stuffing incentives" is, and always has been, a viable theory of liability. *See In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137 (2d Cir. 2021); *see also In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d at 283 (defendants misled investors when stating "[r]evenues benefited primarily from strong demand . . . while omitting to state that sales were driven by the minimum purchase requirements, not end-user market demand"); *Lexmark Int'l, Inc.*, 367 F. Supp. 3d at 32-33 (defendants misled investors by claiming that strong "end-user demand" was driving the company's revenue growth where revenue was increasing due to channel stuffing because forces increasing sales "fundamentally differ[ed] in sustainability").[4]

Relying entirely on out-of-Circuit, nonbinding authority, Defs.' Br. at 20-21, Defendants demand dismissal because the Complaint allegedly does not plead evidentiary details of their channel stuffing scheme. This argument directly contravenes Circuit precedent. *See, e.g.*, *Ganino*, 228 F.3d at 169 (holding that the PSLRA does not require plaintiffs to plead with "great specificity"). It is also nonsensical. "Exact dates" and "amounts" are unnecessary when the Complaint relies on an extremely high-level executive who confirms both the existence of channel stuffing and the Individual Defendants' knowledge of that scheme. Defs.' Br. at 20-21. Defendants' bald assertion that the Complaint pleads no facts to support a claim of fraud with respect to the Industrial segment, Defs.' Br. at 22 n.2, is contradicted by Complaint allegations.

---

[4] Defendants incorrectly argue that CW1 is Plaintiffs' sole source of support for the "channel stuffing" allegations. Defs.' Br. at 20. Plaintiffs' other CWs discuss excess inventory orders. *See*, *e.g.*, ¶¶46-49 (allegations from CW2 and CW3). Moreover, Plaintiffs also rely on STM's own SEC filings to show that sales declined starkly, which serves as an *ex post* indicator of channel stuffing. *See* ¶¶43-44.

¶46 (CW2, who worked in the Industrial segment explains that orders declined because of excess inventory in early 2023, or before Defendants started to acknowledge the severity of the issue in that segment, and demand dropped by 50% in some cases). Nor can Defendants' fact-based critique of Plaintiffs' "economic analysis" support dismissal. Defs.' Br. at 22-23. The Court cannot assume that disputed facts in STM's SEC filings are true, especially when Plaintiffs allege the very same filing Defendants cite contains false statements. *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 245-46 (S.D.N.Y. 2020) (collecting cases to observe that facts contained in a defendant's SEC filings cannot be presumed true at the pleading stage). Nevertheless, the Annual Report Defendants cite does not state that STM made custom products for Original Equipment Manufacturers, and entirely different types of products for each and every distributor. Defs.' Br. at 22-23 (citing Ex. L at 32-33, 61). No page cited in Defendants' Exhibit L supports this concoction.

### B. The Complaint Pleads a Strong Inference of Scienter

To plead scienter, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Novak*, 216 F.3d at 315. Courts must conduct the scienter analysis "holistically" to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). Plaintiffs can satisfy this requirement by alleging facts showing motive and opportunity to commit the fraud or constituting strong circumstantial evidence of conscious misbehavior or recklessness. *See Setzer*, 968 F.3d 204 at 212. Scienter is alleged if a "reasonable person would deem the inference of scienter . . . at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324-26. The inference "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences;" rather, the inference of scienter need only be ***equally plausible*** as any non-culpable

21

inference. *Id*. at 324. If the inferences for and against scienter are in "equipoise," the complaint survives. *Id.* at 331.

Plaintiffs allege strong circumstantial evidence of conscious misbehavior or recklessness by showing that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Blanford*, 794 F.3d at 306. "These allegations alone are enough to satisfy the pleading requirement for scienter." *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 622 (S.D.N.Y. 2008). Plaintiffs satisfy that standard here, where the allegations show that Defendants knew demand was declining and were already facing excessive inventory build-up at the customer level. *See* ¶¶35-57.

*CW Accounts Indicative of Scienter*. Although the Supreme Court has expressly held that a strong inference of scienter need not include "smoking-gun" allegations, the Complaint here does just that. *See Tellabs*, 551 U.S. at 323-24. CW1 worked for STM for nearly 40 years, most recently serving as STM's President of ADG from 2012 through the end of 2023 (when CW1 was fired in retaliation for trying to stop him from misleading investors). ¶¶35-36, 42. CW1 was a member of STM's Executive Committee, which consisted of the most senior executive-level managers throughout the entire Company, including Chery and Grandi. ¶35. As President of ADG, CW1 was in the best position to know whether Chery's characterizations of demand and backlog to investors were accurate or misleading. ¶36. CW1 obviously is "a person in the position occupied by [CW1 who] would possess the information alleged." *Novak*, 216 F.3d at 314. Thus, CW1's account must be accepted as true. *Id.*

CW1 told Chery directly in monthly staff meetings (attended by approximately 25 other high-level managers) that Chery was misleading investors when discussing Automotive demand and the supposed revenue targets it was driving. ¶¶37-38. CW1 also complained in writing to

Chery and Grandi that while the Company's excessive sales discounts had effectively pulled sales forward from future periods and increased revenues, it put STM at significant risk by creating an inevitable bubble that would harm the Company when new sales would not materialize. ¶¶39-41.

Plaintiffs' allegations of scienter are considerably stronger than in most securities fraud cases. Indeed, the cases cited above at pp. 9-10 found allegations of scienter sufficient based on facts significantly weaker than those alleged here. *See In re Solaredge Techs., Inc. Sec. Litig.*, 2025 U.S. Dist. LEXIS 65381, at \*35-36 (scienter adequately alleged for statements about market demand by describing topics generally discussed at meetings with defendants and then drawing "reasonable inference" that meetings involved discussion of declining demand); *Guozhang Wang*, 661 F. Supp. 3d at 236 (inferring scienter for statements about customer retention from general allegations about "customer support infrastructure" and "closely monitor[ing]" accounts receivables); *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d at 290-91 (scienter adequately alleged for "excess inventory allegations" where "Exclusive Distribution Agreements required detailed monthly information to be relayed" to defendants thereby giving rise to inference that defendants received adverse information); *Lexmark Int'l, Inc.*, 367 F. Supp. 3d at 37 (plaintiffs pleaded scienter by alleging "Individual Defendants attended meetings where estimated rising EMEA levels were discussed" and therefore "Individual Defendants had information belying the accuracy of their public statements about 'flat' channel inventory levels").

Here, Plaintiffs go even further and allege specifically that Defendants actually received the adverse information, not just that they were in circumstances suggesting receipt. Plaintiffs allege what was said by CW1 directly to Defendants in the meetings and state with particularity the materially adverse information Defendants had in their possession at the time of their false and misleading statements. *See* ¶¶37-41. Plaintiffs' allegations therefore easily meet the pleading

23

standard for scienter. *See Novak*, 216 F.3d at 311-12 (holding "no doubt" that complaint satisfied standard for scienter where defendants "knew at all relevant times that the Company had serious inventory problems that they sought to disguise by adopting the 'Box and Hold' scheme"); *see also Blanford*, 794 F.3d at 308 (holding that "efforts to conceal inventory from auditors demonstrate their intent to deceive or defraud").

Defendants impermissibly delve into disputed factual issues in a desperate attempt to avoid the clear impact of CW1's account. Defs.' Br. at 34. Although they cannot dispute that the Complaint identifies the precise nature of CW1's warning to the Individual Defendants, the contexts in which it was repeatedly delivered, and the recipients of the warning, Defendants complain that full evidentiary context should be provided. Defendants are wrong. Plaintiffs do not need to prove their case at the pleading stage. *See Altimeo*, 19 F.4th at 151. The information provided by CW1 is more than sufficient to establish for the purposes of pleading claims that Chery and Grandi had contemporaneous knowledge of falsity and, therefore, acted with scienter. "The inference that the defendant acted with scienter need not be irrefutable." *Tellabs*, 551 U.S. at 324. Plaintiffs need only allege facts that make the "the inference of scienter cogent and at least as compelling as any opposing inference one could draw." *Id*. CW1's account (especially when bolstered by other Complaint allegations) easily satisfies this balancing test.

Defendants' attempt to attack CW1 and the other CWs misses the mark. Ignoring the well-established rule that an amended complaint renders a previous complaint a legal nullity, Defendants ask the Court to discredit CW1's account based on one fact that changed in the SAC though Defendants do not, and cannot, dispute numerous other facts CW1 recounts that are enough to plead fraud without the change made in the SAC. *Compare* Defs.' Br. at 21 *with In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 169 (2d Cir. 2021) (holding that it is improper to test whether a CW

24

is credible or percipient at the pleading stage). Defendants' reliance on *In re Gilead Sciences Securities Litigation* is misplaced. No. C 03-4999 SI, 2009 U.S. Dist. LEXIS 46751, at *7-9 (N.D. Cal. June 3, 2009). Here, CW1 did not do an about-face that completely contradicted an earlier account to suspiciously survive dismissal of an already dismissed action. *Id.* In fact, CW1 is alleged to have told Chery about the channel stuffing scheme in both complaints, ¶39, which is alone sufficient to plead scienter as to Chery, and only demonstrates the futility of Defendants' credibility attacks, assuming those attacks can even be considered at this stage in violation of Circuit precedent.

Defendants' remaining arguments concerning CW1 simply invite the Court to commit other reversible errors. *Compare e.g.*, Defs.' Br. at 34 (complaining that Complaint does not allege that Chery was warned about demand in the Automotive segment, but conceding that he was warned about the "semiconductor market at large," and undercutting Defendants' own assumption that fraud did not relate to any segments other than Automotive) *with In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 161 (holding that courts "must be careful not to mistake heightened pleading standards for impossible ones.").

Defendants' arguments with respect to the other CWs have also been rejected repeatedly. Defs.' Br. at 32. No CW is required to talk to or hear from a Defendant to be credited. *See, e.g.*, *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*, 58 F.4th 195, 216 n.18 (5th Cir. 2023) (holding that a CW does not need to be a "fly on every relevant wall — or directly deliver every relevant presentation — to plead allegations supporting an inference of scienter."); *In re Avon Sec. Litig.*, No. 19 Civ. 01420 (CM), 2019 U.S. Dist. LEXIS 200816, at *64 (S.D.N.Y. Nov. 18, 2019) ("The notion that the CWs cannot be believed because none had direct contact with any individual Defendant is contrary to law."). Nor is any CW required to describe specific

conversations that took place at meetings. *See, e.g.*, *Speakes v. Taro Pharm. Indus.*, No. 16-cv-08318 (ALC), 2018 U.S. Dist. LEXIS 163281, at *22-24 (S.D.N.Y. Sept. 24, 2018).

***Defendants' Own Statements of Knowledge***. The inference of scienter is further bolstered by the Individual Defendants' own statements that they monitored inventory levels "very carefully," and that they were "keeping under control our inventory." ¶¶104-107. Investors are entitled to assume that executives are informed about the topics on which they publicly speak. *See Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 351 (S.D.N.Y. 2015) (finding scienter was adequately pled because defendant "held himself [out] to the public as intimately knowledgeable"); *accord In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010). Where, as here, Defendants hold themselves out as having knowledge on a misrepresented topic, scienter can be readily inferred. *Yannes v. SCWorx Corp.*, No. 20-cv-03349 (JGK), 2021 U.S. Dist. LEXIS 116330, at *17 (S.D.N.Y. June 21, 2021); *see also Dentsply Sirona*, 732 F. Supp. 3d at 318-19 (scienter pleaded where defendants' statements evidenced familiarity with subject matter of alleged misrepresentations). Further, Defendants' repeated communications to investors about demand and inventory levels for chips were intended to, and did, imply that they had informed themselves of the truth: "Actively communicating with the public about [these issues] demonstrates defendants' sensitivity to it." *Gauquie v. Albany Molecular Rsch., Inc.*, No. 14 CV 6637 (FB) (SMG), 2016 U.S. Dist. LEXIS 97295, at *6 (E.D.N.Y. July 26, 2016); *see also Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 133-34 (D. Conn. 2021).

***Defendants' Admissions.*** Defendants also admitted at the July 25, 2024 earnings call that the Company's practice of processing orders whereby the customer had no right to cancel ended in March, 2023. ¶103. Chery explained that the abandonment of this practice led "to an increase [in] the inventory, for sure, that now we have to digest." *Id.* Defendants' claim that Chery had

26

previously disclosed that noncancellable orders had been discontinued is contradicted by his own false statements in the same document they cite. Defs.' Br. at 31. On September 6, 2023, Chery stated that with respect to a "small OEM," *i.e.*, one admittedly insignificant customer, noncancellable orders were discontinued, but he affirmatively said "[a]bsolutely not. No, absolutely not," when directly asked whether any customers had asked to renegotiate any contracts. Defs.' Ex. H at 5-6.

**STM's Core Operations.** Scienter is further bolstered by the core operations doctrine. STM derives substantially all of its revenue from selling chips, with the overwhelming majority of such revenue in the Automotive and Industrial end markets. It is thus absurd to assume that the Individual Defendants were unaware of the massive decline in demand and the inventory glut, both of which were metrics they closely tracked, and of changes in the Company's cancellation policies, which they admittedly discussed with investors specifically. Here, selling semiconductor chips was the "sin[e] qua non" behind the Company's ability to succeed. *See Skiadas v. Acer Therapeutics Inc.*, No. 1:19-cv-6137-GHW, 2020 U.S. Dist. LEXIS 105814, at *32 (S.D.N.Y. June 16, 2020). Even the Automotive segment alone brought in nearly 46% of total revenues in the first three quarters of 2024. ¶23. Contrary to Defendants' misstatements of law, the doctrine does not require the operation to constitute nearly all of the Company's business to be invoked. *Compare* Defs.' Br. at 33 *with In re Avon Sec. Litig.*, 2019 U.S. Dist. LEXIS 200816, at *61 (noting that courts in this District have applied it even if the issue impacts only 18%-20% of revenues).

**Motives to Commit Fraud.** While not required, *see City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 371 (S.D.N.Y. 2012), Plaintiffs allege that both Individual Defendants engaged in significant and unusual insider sales, inuring for themselves personal benefits unavailable to Class Members. Chery sold over $4.1 million in stock while

27

Grandi sold just over $3.7 million. *See* ¶110. These sales were extraordinary compared to their respective trading histories, much more than they sold in the same period of time prior to the Class Period. *See id*. Other courts have found similar sales to support a strong inference of scienter. *See*, *e.g.*, *Senn v. Hickey*, No. 03-CV-4372 (DMC), 2005 U.S. Dist. LEXIS 33814, at *16-17 (D.N.J. Dec. 14, 2005) (defendant's sale of 11.8% of holdings for proceeds of $4 million supported inference of scienter); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (sale of 11% of an insider's stock sufficient to establish unusual or suspicious insider trading activity); *In re Guilford Mills, Inc. Sec. Litig.*, No. 98 Civ. 7739 (CLB), 1999 U.S. Dist. LEXIS 21690, at *12-13 (S.D.N.Y. July 21, 1999) (defendant's sale of 10% of his shares for over $1.6 million supported inference of scienter). While Defendants argue their multi-million-dollar sales were not necessarily suspicious (Defs.' Br. at 27-28), their arguments again create factual disputes that are not appropriate at the motion to dismiss stage. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 75 ("Although defendants contest this information, whether plaintiffs can prove their [insider trading] allegations is not to be resolved on a Rule 12(b)(6) motion.")

In addition, Chery had another unique personal motive for concealing material adverse information: he was at risk of being fired as STM's CEO. *See* ¶¶111-15. Defendants wrongly argue that this can never support an inference of scienter. Defs.' Br. at 29-30. However, the case law on this point holds otherwise. *See*, *e.g.*, *Frank v. Dana Corp.*, 646 F.3d 954, 958 n.2 (6th Cir. 2011) (holding that "self-interested motivation of defendants in the form of saving their salaries" is "usually relevant" to scienter); *Serabian v. Amoskeag Bank Shares*, 24 F.3d 357, 368 (1st Cir. 1994) (considering defendants' motive to "save their salaries or jobs"). The facts also undermine Defendants' argument on this point where, as alleged, Defendants tried to conceal Chery's fraudulent conduct and protect his reputation by firing CW1. ¶¶36, 42. *See Baena v. Woori Bank*,

28

515 F. Supp. 2d 414, 421 (S.D.N.Y. 2007) ("The subsequent lies --the cover up--, if proven, would be strong circumstantial evidence of [scienter]."); *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah. 2007) (attempt to "cover-up" information "is strong proof of scienter").

Taken collectively, Plaintiffs' allegations weigh heavily in favor of wrongdoing. The most important business segment in the Company was in an active state of decline. Instead of disclosing the truth, Defendants perpetuated a lie and told investors that Automotive demand was stable and not exhibiting the same deterioration as other segments. Even worse, they repeated this conduct after being warned it was inaccurate and they were misleading investors. Defendants offer no competing nonculpable explanation for their deception.[5]

### C.    Defendants Are Liable as "Control Persons" of STM under Section 20(a) of the Exchange Act

Defendants' only argument for avoiding control person liability is their incorrect assertion that the underlying claims fail. Because, as discussed above, Plaintiffs have adequately pleaded underlying violations by STM, Plaintiffs' "control person" claims should also be sustained. *See Altimeo*, 19 F.4th at 152.

### CONCLUSION

For all these reasons, Plaintiffs respectfully request that the Court deny Defendants' motion in its entirety.[6]

---

[5] Corporate scienter is alleged through the scienter of Chery and Grandi whose scienter could be imputed to STM. *See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

[6] In the event that the Court is inclined to grant any aspect of Defendants' motion, Plaintiffs respectfully request leave to file an amended complaint to address any deficiencies in the current allegations. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015). Defendants ask the Court to dismiss the case with prejudice. Defs.' Br. at 35 n.18. But this argument ignores the reality that Plaintiffs have not yet received "the benefit of a ruling" from

Dated: May 21, 2025

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Omar Jafri*
Omar Jafri
Joshua B. Silverman
Brian P. O'Connell
Diego Martinez-Krippner
Jianan Jiang
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email: ojafri@pomlaw.com
          jbsilverman@pomlaw.com
          boconnell@pomlaw.com
          dmartinezk@pomlaw.com
          ajiang@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
Thomas H. Przybylowski
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:   (212) 661-8665
Email:  jalieberman@pomlaw.com
          ahood@pomlaw.com
          tprzybylowski@pomlaw.com

*Lead Counsel for Plaintiffs*

**LEVI & KORSINSKY, LLP**
Adam M. Apton
33 Whitehall Street, 17th Floor
New York, New York 10004
Telephone:  (212) 363-7500
Facsimile:   (212) 363-7171
Email: aapton@zlk.com
          dglass@zlk.com

---

the Court and therefore should be entitled to amend again to "cur[e] specific deficiencies," if necessary. *Loreley*, 797 F.3d at 190.

30

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**

Eitan Kimelman
60 E 42nd Street, Suite 4600, New York,
New York 10165
Phone: 212-697-6484
Fax:    212-697-7296
Email: eitank@bgandg.com

*Additional Counsel for Plaintiffs*

31