**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE STMICROELECTRONICS N.V. SECURITIES LITIGATION | Case No.: 1:24-cv-06370-AKH |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ORAL ARGUMENT REQUESTED |

**REPLY IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Robert J. Giuffra, Jr.
David M.J. Rein
Julia A. Malkina
Maxwell F. Gottschall
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
giuffrar@sullcrom.com
reind@sullcrom.com
malkinaj@sullcrom.com
gottschallm@sullcrom.com

*Counsel for Defendants*

June 20, 2025

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT .............................................................................................................................3

I.   PLAINTIFFS' OPPOSITION CONFIRMS THAT THEY HAVE NOT PLED *ANY* ACTIONABLE MISSTATEMENTS ...........................................................3

    A.   ST's Statements Regarding Demand Are Not Actionable......................................3

    B.   Plaintiffs Cannot Save Their Conclusory Assertions Of "Channel Stuffing"............................................................................................................9

    C.   Plaintiffs' Occasional References To Fraud In ST's Industrial Segment Are Without Merit..............................................................................................14

II.  PLAINTIFFS' OPPOSITION ALSO CONFIRMS THAT THEY HAVE NOT PLED FRAUDULENT INTENT ..........................................................................15

    A.   Plaintiffs Offer Little Defense Of Their Flawed Motive Allegations...................15

    B.   Plaintiffs Do Not Allege Intentional Misconduct Or Severe Recklessness...........17

CONCLUSION .......................................................................................................................20

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Acito* v. *IMCERA Group, Inc.*,
47 F.3d 47 (2d Cir. 1995)...................................................................................16

*Arazie* v. *Mullane*,
2 F.3d 1456 (7th Cir. 1993) ...............................................................................17

*Binn* v. *Bernstein*,
2020 WL 4550312 (S.D.N.Y. July 13, 2020) ......................................................4

*Chapman* v. *Mueller Water Products, Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)..................................................................5

*City of Omaha Police & Fire Retirement System* v. *Evoqua Water
Technologies Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020)..................................................................4

*City of Sterling Heights Police & Fire Retirement System* v. *Reckitt Benckiser
Group PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022).................................................................8, 9

*Das* v. *Rio Tinto PLC*,
332 F. Supp. 3d 786 (S.D.N.Y. 2018).............................................................3, 17

*Finger* v. *Pearson PLC*,
2019 WL 10632904 (S.D.N.Y. Sept. 16, 2019)...................................................6

*Gamm* v. *Sanderson Farms*,
944 F.3d 455 (2d Cir. 2019)..........................................................................10, 11

*Gissin* v. *Endres*,
739 F. Supp. 2d 488 (S.D.N.Y. 2010)...................................................................4

*Hou Liu* v. *Intercept Pharmaceuticals, Inc.*,
2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020) ......................................................5

*In re AppHarvest Securities Litigation*,
684 F. Supp. 3d 201 (S.D.N.Y. 2023)...............................................................5, 6

*In re Avon Securities Litigation*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019).....................................................20

*In re Axis Cap. Holdings Ltd. Securities Litigation*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006)................................................................12

*In re Canopy Growth Securities Litigation*,
　2024 WL 3445436 (S.D.N.Y. July 17, 2024) ................................................................14

*In re Dentsply Sirona, Inc. Securities Litigation*,
　665 F. Supp. 3d 255 (S.D.N.Y. 2023)..................................................................8, 18

*In re DraftKings Inc. Securities Litigation*,
　650 F. Supp. 3d 120 (S.D.N.Y. 2023)................................................................12, 13

*In re Dynagas LNG Partners LP Securities Litigation*,
　504 F. Supp. 3d 289 (S.D.N.Y. 2020)....................................................................6

*In re Gildan Activewear, Inc. Securities Litigation*,
　636 F. Supp. 2d 261 (S.D.N.Y. 2009)...................................................................16

*In re Gilead Sciences Securities Litigation,*
　2009 WL 1561584 (N.D. Cal. June 3, 2009) ....................................................13, 14

*In re Lehman Bros Securities & Erisa Litigation*,
　2013 WL 3989066 (S.D.N.Y. July 31, 2013) .........................................................14

*In re Mobileye Global Securities Litigation*,
　2025 WL 1126967 (S.D.N.Y. Apr. 15, 2025)....................................................1, 5, 6

*In re Philip Morris International Inc. Securities Litigation*,
　89 F.4th 408 (2d Cir. 2023) ............................................................................2, 7

*In re Salix Pharmaceuticals, Ltd.*,
　2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016).......................................................5, 9

*In re Scholastic Corp. Securities Litigation*,
　252 F.3d 63 (2d Cir. 2001)................................................................................16

*In re SolarEdge Techs., Inc. Securities Litigation*,
　2025 WL 1031154 (S.D.N.Y. Apr. 6, 2025).......................................................2, 8, 12, 18

*In Re Synchrony Financial Securities Litigation*,
　988 F.3d 157 (2d Cir. 2021)..............................................................................12

*Jackson* v. *Abernathy*,
　960 F.3d 94 (2d Cir. 2020).............................................................................19, 20

*Kalnit* v. *Eichler*,
　264 F.3d 131 (2d Cir. 2001)...........................................................................15, 16

*Lattanzio* v. *Deloitte & Touche LLP*,
　476 F.3d 147 (2d Cir. 2007).............................................................................15

*Lewis* v. *YRC Worldwide Inc.*,
   2020 WL 1493915 (N.D.N.Y. Mar. 27, 2020) ........................................................12

*Lipow* v. *Net1 UEPS Technologies, Inc.*,
   131 F. Supp. 3d 144 (S.D.N.Y. 2015)....................................................................20

*Long Miao* v. *Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020).....................................................................12

*New England Carpenters Guaranteed Annuity & Pension Funds* v. *DeCarlo*,
   122 F.4th 28 (2d Cir. 2023) ............................................................................2, 6, 7

*Novak* v. *Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..................................................................2, 7, 8, 10, 13

*Oklahoma Firefighters Pension & Retirement System* v. *Lexmark*
   *Intenational, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019)......................................................................18

*Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*,
   575 U.S. 175 (2015).............................................................................1, 6, 7, 8

*Police & Fire Retiremement System City of Detroit* v. *Argo Group*
   *International Holdings, Ltd.*,
   2024 WL 5089970 (S.D.N.Y. Dec. 12, 2024) ........................................................13

*Robeco Capital Growth Funds* v. *Peloton Interactive, Inc.*,
   2024 WL 4362747 (S.D.N.Y. Sept. 30, 2024)...........................................................4

*San Leandro Emergency Medical Group Profit Sharing Plan* v. *Philip*
   *Morris Cos.*,
   75 F.3d 801 (2d Cir. 1996).............................................................................1, 17

*Schiro* v. *Cemex, S.A.B. de C.V.*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019).....................................................................12

*Schiro* v. *Cemex, S.A.B. de C.V.*,
   438 F. Supp. 3d 194 (S.D.N.Y. 2020)................................................................10, 11

*Setzer* v. *Omega Healthcare Investors, Inc.*,
   968 F.3d 204 (2d Cir. 2020)...................................................................................7

*Tongue* v. *Sanofi*,
   816 F.3d 199 (2d Cir. 2016)...................................................................................7

**Statutes and Rules**

15 U.S.C. § 78u-4 ...............................................................................................................17

15 U.S.C. § 78u-5 .................................................................................................................6

Fed. R. Civ. P. 9.................................................................................................9, 10, 11, 12

## PRELIMINARY STATEMENT

The time has come to end this case once and for all.  Now on their third complaint, Plaintiffs remain unable to spin a plausible, let alone cogent and compelling, narrative of securities fraud out of fluctuations in demand for ST's products in the wake of the unprecedented COVID-19 pandemic.  As in *In re Mobileye Global Securities Litigation*, 2025 WL 1126967 (S.D.N.Y. Apr. 15, 2025)—where Judge Cote rejected a similar effort to recharacterize post-pandemic declines in demand for semiconductor chips in the automotive sector as securities fraud—this Court should dismiss Plaintiffs' Second Amended Complaint ("SAC") with prejudice.

*First*, none of the challenged statements about ST's expectations of future demand is actionable.  Virtually all statements were projections "adequately tinged with caution," *San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996), making them both inactionable and protected by the Private Securities Litigation Reform Act ("PSLRA") safe harbor.  (*See* MTD Br. 11-17.[1])  Many other statements were protected opinions, providing ST's "inherently subjective and uncertain assessment" of demand following the unprecedented pandemic.  *Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015); *see* MTD Br. 17-18.  And nearly all statements were only vague expressions of optimism—describing demand or visibility as "solid," "strong," or "stable"—on which no reasonable investor could rely as a matter of law.  (*See* MTD Br. 18-19.)

In response, Plaintiffs ignore the controlling authority directly undermining their claims and rest on CW1's vague allegations.  But, as Defendants explained in their opening brief (at 3, 10, 21), CW1's claims are both uncorroborated and directly *contradicted* by the other CWs, who claim that ST was keeping prices too high—the polar opposite of "channel stuffing," which is

---

[1]    Citations to Defendants' motion to dismiss or "MTD" refer to Defendants' motion to dismiss the SAC filed on May 13, 2025 (Dkt. 43, 44).

keeping prices *too low* to induce artificial demand.  Plaintiffs studiously avoid any response.  Likewise, Plaintiffs never explain their conspicuous amendment to CW1's already threadbare assertions, swapping in ST CFO Lorenzo Grandi as the recipient of CW1's "warnings" only *after* Defendants pointed out that the supposed original recipient retired from ST over a decade ago.  (MTD Br. 21.)  Plaintiffs invoke CW1's former executive position to try to avoid providing the required particularity, but no CW, no matter how senior, can drag a securities-fraud complaint past a motion to dismiss by "parrot[ing] . . . conclusory allegations."  *In re SolarEdge Techs., Inc. Sec. Litig.*, 2025 WL 1031154, at *11 (S.D.N.Y. Apr. 6, 2025).

Regardless, even crediting CW1's assertions as far as they go does not help Plaintiffs.  Multiple Second Circuit cases (ignored in Plaintiffs' Opposition) squarely hold that senior executives do not commit fraud when they choose among "reasonable alternative views" in making opinion statements, *including assessments about demand*, "even if most of the existing facts" could support a more negative outlook.  *New Eng. Carpenters Guar. Annuity & Pension Funds* v. *DeCarlo*, 122 F.4th 28, 41 (2d Cir. 2023).  Nor do the securities laws require companies to reveal internal dissent or "contrary opinions."  *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 420 (2d Cir. 2023).  Thus, even if CW1 told CEO Jean-Marc Chery that, in CW1's opinion, future demand for ST's products would be lower than Mr. Chery was publicly predicting, Mr. Chery was not required to publicly disclose that contrary prediction so long as his own assessment of demand was "consistent with reasonably available data."  *Novak* v. *Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).  The handful of cases that Plaintiffs cite involved statements by executives that were clearly unreasonable in light of concrete, objective facts known to them.  Plaintiffs have pled no particularized facts that Mr. Chery was aware of objective information contradicting his expectations about future demand.

*Second*, Plaintiffs' Opposition similarly confirms their failure to plead the necessary compelling inference of fraudulent intent, which is a separate and independent ground for dismissal.  Plaintiffs all but concede that the SAC raises no inference that Mr. Chery or Mr. Grandi had any motive to commit securities fraud.  So again, they rest on CW1.  But CW1 never explains what "*specific* contradictory information" he provided to either Mr. Chery or Mr. Grandi that would support the cogent and compelling inference that any of their statements was knowingly false, as opposed to a failure of clairvoyance about post-pandemic market demand.  *Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 813 (S.D.N.Y. 2018).  As for their handful of other arguments in support of scienter (such as the so-called "core operations doctrine"), Plaintiffs again repeatedly ignore Defendants' counterpoints.

## ARGUMENT

**I.    PLAINTIFFS' OPPOSITION CONFIRMS THAT THEY HAVE NOT PLED *ANY* ACTIONABLE MISSTATEMENTS.**

To try to stave off dismissal, Plaintiffs offer two theories for why Defendants' statements constituted actionable misrepresentations.  *First*, Plaintiffs say that the statements referenced the strength of ST's "Automotive demand" when, in Plaintiffs' telling, ST was "facing a decline in demand."  (Opp. 8-9.)  *Second*, Plaintiffs assert that ST engaged in "channel stuffing" while "omitt[ing] this known drag on demand in their statements to investors."  (Opp. 19-20.)  Neither theory saves the SAC.

### A.    ST's Statements Regarding Demand Are Not Actionable.

Each challenged statement is not actionable because it is either (i) a protected projection of future demand and/or forward-looking statement under the PSLRA; (ii) an inherently subjective statement of opinion; (iii) an inactionable expression of puffery or general optimism; or (iv) some

combination of the three.  (*See* Ex. A (chart summarizing challenged statements).[2])

***The Challenged Statements Are Prospective***.  Virtually all of Defendants' challenged statements concerned ST's anticipated future demand post-pandemic and thus were both non-actionable projections and protected forward-looking statements.  (MTD Br. 12.)  Plaintiffs claim that the "statements in this case were not forward-looking" because of their "'present' focus." (Opp. 13-14.)  But Plaintiffs never actually explain why that is true for such obviously forward-looking projections as "Auto will be clearly the growth driver of ST *next year*."  (SAC ¶ 66 (emphasis added).)

Instead, Plaintiffs point to only three statements:  Statement 4 ("We are [not] facing a bad market condition" (SAC ¶ 64));  Statement 8 ("We continued to see stable end-demand in Automotive" (SAC ¶ 72));  and Statement 10 ("We absolutely don't see on Automotive what we are seeing on Industrial" (SAC ¶ 76)).  (*See* Opp. 12, 14.)  But Defendants do not argue that Statement 8 is forward-looking.  (*See* MTD Br. 12 n.7.)[3]  And Statements 4 and 10, in context, were prospective.  In Statement 10, Mr. Chery explained ST's prediction for "the first half of 2024" for the Automotive segment.  (Ex. K at 7 (emphasis added).)  And in Statement 4, Mr. Chery explained why he believed that customers would not soon be reducing future orders.  (*See* Ex. G at 11-12.)  Again, "context is everything," and in context, Mr. Chery was "not making guarantees about the present"; rather, he was "stating [an] educated guess about . . . the Company's future." *Gissin* v. *Endres*, 739 F. Supp. 2d 488, 506 (S.D.N.Y. 2010).[4]

---

[2]    Exhibit letters refer to exhibits appended to the Declaration of David M.J. Rein (Dkt. 45).

[3]    Statement 8 is, however, both a non-actionable opinion statement and immaterial puffery.

[4]    Plaintiffs claim that statements in *City of Omaha Police & Fire Retirement System* v. *Evoqua Water Technologies Corp.* were not forward-looking (Opp. 13), but Judge Nathan squarely held that they *were* forward-looking.  450 F. Supp. 3d 379, 397-98 (S.D.N.Y. 2020); *see Binn* v. *Bernstein*, 2020 WL 4550312, at *30 (S.D.N.Y. July 13, 2020) (reading *Evoqua Water* Defendants' way).  Plaintiffs also purport to distinguish *Robeco Capital Growth Funds* v. *Peloton*

***Extensive Risks Warnings Accompanied Each Prospective Statement***.  Plaintiffs next contend that ST's forward-looking projections are actionable because ST offered only "boilerplate," "kitchen-sink disclaimer[s]" instead of the necessary "meaningful cautionary language." (Opp. 14.)  Not true.  Plaintiffs ignore the ample detailed and specific warnings of ST's exposure to "cancellation due to changes in customer needs or industry conditions" (Ex. D at 14, 16, 32-33; Ex. L at 17, 19, 37-38), and the real-time demand updates that Mr. Chery provided on earnings calls.  (*See* MTD Br. 14-15.)  This is nothing like the single case that Plaintiffs cite, *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016), where the relevant risk was mentioned "only once" in a "limited" and off-point way.  Instead, this case is exactly like Judge Cote's decision in *Mobileye*.  ST "warn[ed] explicitly against" the "very risk" that came to pass, 2015 WL 1126967, at *9:  that its order backlog might not always match future demand because customers could generally cancel or modify such orders as industry conditions changed.

Indeed, Plaintiffs later admit that ST issued relevant warnings, claiming that some of the warnings were misleading.  (Opp. 16-19.)  Specifically, Plaintiffs claim that ST's February 2024 cautions about the "negative effects that could ***potentially*** arise from a 'reduction in overall demand' and 'high inventory levels'" were misleading because such problems "were already occurring."  (Opp. 16-17.)  But as Defendants explained (at 16), "not every . . . risk disclosure[] necessarily implies that the event which could create a risk has not occurred to any extent."  *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 267 (S.D.N.Y. 2023) (statement that "there is no guarantee that we will be able to retain [] employees" does not "signify that [company] had been able to retain all of its employees"); *see, e.g.*, *Chapman* v. *Mueller Water Prods., Inc.*, 466 F. Supp.

---

*Interactive, Inc*., but ignore (at 14) the most analogous statement found to be forward-looking: "We are entering fiscal 2022 with a normalized backlog and guidance reflects our expectation of continued strong demand."  2024 WL 4362747, at *4, *9 (S.D.N.Y. Sept. 30, 2024).

3d 382, 405-06 (S.D.N.Y. 2020) (warning about risks of product defects did not "warrant[] that every" new product "was defect-free"); *Hou Liu* v. *Intercept Pharms., Inc.*, 2020 WL 1489831, at *12 (S.D.N.Y. Mar. 26, 2020) (warning that "input prices may rise next quarter" does not impliedly represent that "the prices of *all* inputs had remained flat or declined in the previous quarter").[5] Plaintiffs ignore these on-point cases, just as they "ignore" ST's many "detailed" statements about "the pandemic-era pressures on the automotive industry" in favor of "cherry pick[ing]" a handful of more general statements. *Mobileye*, 2025 WL 1126967, at *9. Taking all of ST's disclosures "together and in context," as Judge Cote did in *Mobileye*, *id.* at *8, no reasonable investor could have been misled by ST's warning that changes in customer demand might harm the business.

***The Challenged Statements Are Protected Opinion Statements***. Nearly all of Defendants' challenged statements were also inactionable statements of opinion. As Defendants explained (at 17-18), under binding Second Circuit law, any statement that "turns on the exercise of subjective judgment" is an opinion, which includes Defendants' assessments of Automotive demand. *DeCarlo*, 122 F.4th at 41 ("estimates of goodwill and loan loss reserves" are opinions because they "inherently requir[e] a substantial exercise of judgment"); *see Finger* v. *Pearson PLC*, 2019 WL 10632904, at *9-10 (S.D.N.Y. Sept. 16, 2019) (statements about "demand," "growth," and market "access" assessed under *Omnicare* opinion standard). In response, Plaintiffs insist that ST's

---

[5]    Plaintiffs are wrong to argue that if risk disclosures are too unspecific for investors to rely upon, then they cannot be "meaningful" enough for application of the PSLRA safe harbor. (Opp. 19 n.3.) To satisfy the safe harbor's requirement, a risk disclosure must merely "identify[] [the] important factors," 15 U.S.C. § 78u-5(c)(1)(A)(i), and "adequately convey the risks," *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 319 (S.D.N.Y. 2020). By contrast, for a risk disclosure to itself become a basis for misstatement liability, the warning must make a specific "implied representation of fact." *AppHarvest*, 684 F. Supp. 3d at 267-68. Here, ST's warnings more than adequately disclosed the risks associated with its backlog of long-term contracts, but made no implied representations of specific fact. Regardless, irrespective of the specificity of the risk disclosures Plaintiffs cite (at 17-19), Defendants issued plenty of other specific, meaningful warnings that Plaintiffs ignore (*see* MTD Br. 13-16).

statements contained "false statements . . . of concrete facts" (Opp. 11), but they never explain why the company's overall assessments of "end demand in Automotive" (*id.*) are not subjective determinations—indeed, they do not acknowledge *DeCarlo* at all.

Nevertheless, Plaintiffs maintain that ST's opinion statements are actionable under *Omnicare* because ST never disclosed that Mr. Chery "was expressly warned" that CW1 thought "that demand was declining." (Opp. 12.) But opinions inherently are based on inconclusive and varying information. As the Second Circuit has held, an opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way," because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts." *Tongue* v. *Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016); *see* MTD Br. 17-18. Even if CW1's view of Automotive demand was more pessimistic than Mr. Chery's—and even if "*most of the existing facts cut*" in favor of CW1's prognosis—that alone does not allege that Mr. Chery's statements were false, or that he did not believe them. *DeCarlo*, 122 F.4th at 41 (emphasis added). The point of *Omnicare*'s protection for opinions is that a speaker may "choose among" "reasonable alternative views . . . without running afoul of the federal securities" laws. *Id.*; *see Novak*, 216 F.3d at 309 ("[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects.").[6]

That principle of law is critical here. Plaintiffs' central theory of the case is that Mr. Chery communicated a largely positive outlook on overall Automotive demand, "even though he was

---

[6]  For this reason, Plaintiffs are wrong to suggest (Opp. 18) that the general rule that "once a company speaks on an issue or topic, there is a duty to tell the whole truth" requires disclosure of *all* competing information received by an executive before expressing an opinion. That is just one way of "describ[ing] [the] duty not to omit material facts whose omission, in the light of what was stated, would be misleading." *Setzer* v. *Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020). By definition, *opinion* statements are not misleading "merely" because "other reasonable alternative views exist," since "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts." *DeCarlo*, 122 F.4th at 41.

being told internally" that CW1 believed that some data supported a more negative picture.  (Opp. 8; *see* Opp. 18.)  But again, Mr. Chery is not liable for any "failure to mention [CW1's ostensibly] contrary opinions," *Philip Morris*, 89 F.4th at 420, so long as Mr. Chery's own assessment of demand was "consistent with reasonably available data," *Novak*, 216 F.3d at 309.  And as explained *infra* at pp. 17-18, Plaintiffs' allegations about CW1's vague supposed "warn[ing]" to Mr. Chery do not "identif[y] specific facts . . . known to [him] . . . that rendered [his opinions] unreasonable." *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 288 (E.D.N.Y. 2023).  Nor do the other, lower-level CWs' allegations render Mr. Chery's opinions unreasonable, as Defendants have explained (MTD Br. 23-25), without any meaningful response from Plaintiffs.

The complete absence of specific factual allegations in Plaintiffs' third complaint distinguishes the handful of cases Plaintiffs cite.  (*See* Opp. 9-11.)  In *Novak*, the defendants' statements that "the inventory situation was 'in good shape' or 'under control'" were actionable because the plaintiffs had pled specific facts showing that the defendants "*knew* the contrary was true."  216 F.3d at 304, 315 (emphasis added).  In *Dentsply Sirona*, the SEC had already made detailed findings that the defendants "knew" of inventory problems contradicting their statements. 665 F. Supp. 3d at 272-73.  In *Guozhang Wang* v. *Cloopen Grp. Holding Ltd.*, defendants' descriptions of customer retention as "stable" and "relatively high" were contradicted by the undisputed (and undisclosed) fact that the retention rate had declined by 30 percent.  661 F. Supp. 3d 208, 220, 229-30 (S.D.N.Y. 2023).  And in *SolarEdge*, the court did not even apply the *Omnicare* framework, presumably because the defendants did not argue that point.  *See* Dkt. 77, Def. Mem. of Law in Support of Mot. to Dismiss, *In re SolarEdge Techs., Inc. Sec. Litig.*, No. 1:23-cv-9748 (S.D.N.Y. Feb. 10, 2025).

***The Challenged Statements Are Inactionable Vague and Optimistic Statements***.  Finally, many of Defendants' statements were "broad statements of optimism" and thus "non-actionable puffery."  *City of Sterling Heights Police & Fire Ret. Sys.* v. *Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 89 (S.D.N.Y. 2022).  "Unlike specific, factual statements, vague descriptions that offer only generally optimistic" assessments are "too general to cause a reasonable investor to rely upon them."  *Id.*  ST's statements fall into that category, as confirmed by six cases dismissing claims based on nearly identically worded descriptions of "visibility," "pipeline," and "demand." (MTD Br. 19 & n.12.)  At most, Plaintiffs say that ST's statements about demand were "*tethered to* specific facts."  (Opp. 12.)  But all inactionable optimistic statements are "tethered to" a factual context; the question is whether the *statements themselves* "presented detail too concrete for the statements to be classified as mere puffery."  *Reckitt Benckiser*, 587 F. Supp. 3d at 90.  Plaintiffs do not, and cannot, explain how ST's general statements calling demand "solid," "strong," or "good" provided concrete information on which reasonable investors would rely.[7]

## B.    Plaintiffs Cannot Save Their Conclusory Assertions Of "Channel Stuffing."

Plaintiffs say that some of the challenged statements were "materially misleading because Defendants omitted that ST[] was . . . pulling forward future demand that could not be recognized in future quarters."  (Opp. 19.)  But Plaintiffs' vague channel-stuffing allegations are devoid of any specifics, let alone the particularity required by the PSLRA and Rule 9(b).  (MTD Br. 19-23.)

---

[7]    Plaintiffs quote the statement in *Salix* about "visibility in the inventories" (Opp. 11), but omit the unusual facts that made that statement misleading.  Salix had previously "established an expectation among investors and analysts that [relevant] inventory" levels were "generally in the 10-to 12-week range."  2016 WL 1629341, at *10 n.8.  In the challenged statement at issue, the company declined to provide specific inventory level figures, but assured investors that such levels would "'normalize' in the following quarter" to "approximately eight weeks."  *Id.* at *10.  The court found that this misleadingly "led analysts to believe that inventory levels were merely slightly outside of the" previous 10- to 12-week range, "even though inventory levels were, in fact, at or around nine months" (or 38 weeks), reflecting a huge decline in demand.  *Id.* at *8, 10.

***Plaintiffs Must Plead Alleged "Channel Stuffing" With Particularity***.   As Defendants'
opening brief explained (at 20), binding precedent in this Circuit requires that "when a securities
fraud complaint claims that statements were rendered false or misleading through the
nondisclosure of illegal activity" or other "underlying" conduct, "the facts of the underlying . . .
acts must be pleaded with particularity."   *Gamm* v. *Sanderson Farms*, 944 F.3d 455, 466-67 (2d
Cir. 2019); *see Novak*, 216 F.3d at 312 ("[T]he complaint must state with particularity sufficient
facts to support the belief that [relevant] inventory was of limited value," as plaintiffs' theory
depended on that fact); *Schiro* v. *Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 198 (S.D.N.Y. 2020)
("[T]o allege an underlying illegal act, . . . Plaintiffs must plead the 'who, what, when, where, and
how' of the alleged improper transaction."); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp.
3d 600, 643 (S.D.N.Y. 2017) ("Because the gravamen of the amended complaint is that a series of
unlawful bribery schemes . . . rendered the challenged statements false," "the Court must
determine . . . whether Plaintiff has adequately alleged any or all of those schemes.").   Plaintiffs
claim they need not plead channel stuffing with "great specificity" (Opp. 20), but the PSLRA and
Rule 9(b) do require Plaintiffs to "plead sufficient—though not exhaustive—facts describing the
essential elements of th[e] underlying conduct," *Gamm*, 944 F.3d at 464.

***The SAC Lacks Particularized "Channel-Stuffing" Allegations***.   Here, Plaintiffs have
pled zero "facts describing the essential elements" of ST's supposed channel stuffing.  Plaintiffs'
channel-stuffing allegations boil down to the following two statements:  (i) "CW1 discovered that
[ST's] salesforce offered excessive discounts to [Automotive] customers to drive sales . . . . and
stuff the Company's distribution channels" (SAC ¶ 39); and (ii) "CW1 elaborated that excessive

sales incentives were offered to direct OEM customers as well as distributors" (SAC ¶ 41.[8])  It is hard to imagine less particularized allegations.  Fatally, Plaintiffs do not allege "who" in "[ST's] salesforce" (SAC ¶ 39) was involved in this activity; "what" specific products were being sold to "what" "customers" in "what" amounts at "what" discount levels; "when" this happened (other than "during 2023"); or "where" it occurred, even though ST sells semiconductor chips to more than 200,000 customers across the globe.  (Ex. Q at 30; Ex. L at 32.)  And Plaintiffs say nothing at all about the "how" of the supposed channel stuffing—the amounts of the discounts, the volume of discounted sales, the impact on ST's financials or inventory metrics, and so on.

*Gamm* shows why Plaintiffs' conclusory allegations fall short.  There, the Second Circuit held that plaintiffs had "failed to plead" the "underlying" "antitrust conspiracy at even a basic level, much less with particularity," because they had "merely use[d] stock phrases such as 'worked in concert' or 'coordinated'" while providing "no explanation as to how that collusive conduct occurred."  944 F.3d at 465.  The plaintiffs in *Gamm* had alleged no facts about "*when* [defendant] decided on its course of supply reduction, *which* industry peers were a part of that decision, *how* specific supply reductions were performed," and "*what* information [defendant] knew about its peers' supply reductions, if any."  *Id.*  The exact same reasoning requires dismissal here.  Plaintiffs "merely use [a] stock phrase"—channel stuffing—while offering no actual

---

[8]     In footnote 4 of their Opposition, Plaintiffs try to argue that CW1 is not the "sole source of support" for their channel-stuffing allegations, but their arguments are self-refuting.  Plaintiffs suggest that CW2 and CW3 support their allegations because both "discuss excess inventory orders."  (Opp. 20 n.4.)  But "excess inventory" often piles up whenever there is an unexpected demand downturn; that says nothing about the cause.  Indeed, CW2 provides an entirely different, innocuous explanation for that phenomenon: "demand was artificially elevated" because "customers ordered excess inventory" "to hedge against any potential shortage of supply" coming out of the pandemic.  (SAC ¶¶ 45-46.)  Plaintiffs also note that ST's "sales declined starkly" in 2024, which purportedly "serves as an *ex post* indicator of channel stuffing."  (Opp. 20 n.4.)  But the fact that a company's sales decreased cannot be enough to corroborate otherwise conclusory allegations of channel stuffing, since it is equally consistent with any number of other explanations.

"explanation as to how that [supposed] conduct occurred." *Id.* Such "conclusory allegations are insufficient to satisfy the heightened pleading requirement under Rule 9(b)" and the PSLRA. *Schiro*, 438 F. Supp. 3d at 199 ("[T]he SAC repeatedly asserts that 'top executives . . . paid bribes' . . . but includes no factual allegations of exactly who made the payments, to whom the payments were made, when the payments were made, or how the payments were made.").[9]

***CW1's Conclusory Assertions Do Not Satisfy the PSLRA and Rule 9(b)'s Particularity Requirements.*** Plaintiffs respond that no details are needed because the SAC "relies on an extremely high-level executive," CW1, "who confirms . . . the existence of channel stuffing." (Opp. 20.) But CW1's former position does not exempt his allegations from the PSLRA and Rule 9(b)'s pleading requirements. As courts have explained, "allegations by CWs that are insufficiently particular are apt to be discounted or disregarded." *Long Miao* v. *Fanhua, Inc.*, 442 F. Supp. 3d 774, 800 & n.21 (S.D.N.Y. 2020) (collecting cases).[10] Indeed, one of Plaintiffs' own cases ruled that a CW's claim that "[t]he whole board knew" about channel stuffing was "merely parrot[ing] the conclusory allegations contained in the complaint" and thus "failed to allege [the directors'] scienter." *SolarEdge*, 2025 WL 1031154, at *11.

Citing *In Re Synchrony Financial Securities Litigation*, 988 F.3d 157, 169 (2d Cir. 2021),

---

[9]    *See also In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 158 (S.D.N.Y. 2023) ("[A]lthough the SAC's allegations of material falsehoods center on SBTech's activities, its factual allegations about SBTech are far too loose, general, and hazy."); *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 586 (S.D.N.Y. 2006) ("[P]laintiffs' bald allegations of a scheme to drive other insurance companies from the market are far too conclusory.").

[10]   *See Schiro* v. *Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019) ("Plaintiffs do not allege that CW-1 witnessed money changing hands, that anyone told him that bribes were being paid, or any other facts from which the Court could infer . . . that bribes were paid."); *DraftKings*, 650 F. Supp. 3d at 155 (disregarding "former employee statements quoted in the SAC" because they were "strikingly non-particular" and "lack[ed] details, for example, as to where, when, and how" alleged misconduct occurred); *Lewis* v. *YRC Worldwide Inc.*, 2020 WL 1493915, at *7 (N.D.N.Y. Mar. 27, 2020) ("CW 3's and CW 4's statements are not pled with particularity" and so could not "be used to support an allegation that the overcharge scheme occurred").

-12-

Plaintiffs say that it "is improper to test whether a CW is credible or percipient at the pleading stage" (Opp. 24-25). But *Synchrony* merely restated the black-letter rule that "the *anonymity* of [a] former employee[]" does not *itself* "defeat [the] plausibility" of his claims. 988 F.3d at 169 (emphasis added). Here, Defendants' concern with CW1 is not his anonymity, but rather the "strikingly non-particular" nature of his allegations. *DraftKings*, 650 F. Supp. 3d at 155. Plaintiffs also cite *Novak* (at 22) for the proposition that a CW's "account must be accepted as true" if a person in that CW's position would have "possess[ed] the information alleged." But *Novak* was discussing whether CWs must be *named* to be credited, not whether their position can stand in for the failure to plead particularized facts. 216 F.3d at 314.

Moreover, as Defendants explained in their opening brief (at 21), CW1's vague claims of channel stuffing are not just insufficiently particularized—they "actually are *contradicted* by" Plaintiffs' other allegations. *Police & Fire Ret. Sys. City of Detroit* v. *Argo Grp. Int'l Holdings, Ltd.*, 2024 WL 5089970, at *7 (S.D.N.Y. Dec. 12, 2024) (such "uncorroborated" allegations "carry little to no probative value"); *see DraftKings*, 650 F. Supp. 3d at 154 (same). CW1 claims that ST's "salesforce offered excessive discounts to [Automotive] customers" "during 2023." (SAC ¶ 39.) But CW5, allegedly part of that Automotive salesforce, says *exactly the opposite*: that "in 2023," ST "was much slower than its competitors in adjusting prices downwards" after "the market contracted" (SAC ¶ 53)—in other words, that ST's Automotive prices were *above* the correct market level. Plaintiffs cannot escape this direct contradiction. Nor do Plaintiffs explain why none of their six other CWs says one word about the purported channel stuffing that, on Plaintiffs' theory, inflated the company's annual revenue by billions of dollars. (*See* MTD Br. 21-23.)

Plaintiffs also provide no explanation for why CW1 altered a critical element of his already sparse allegations—changing the purported recipient of his alleged warning from someone who

retired *13 years earlier* to an Individual Defendant in this case. (*See* MTD Br. 21.) Plaintiffs say that, unlike in *In re Gilead Sciences Securities Litigation*, the amendment here came in response to their *receiving* a motion to dismiss an earlier complaint, rather than in response to the court's *granting* of a motion to dismiss an earlier complaint. (Opp. 25.) But that makes no difference to *Gilead*'s logic: that a change in a CW's story that is "material and without explanation" undermines "the reliability of" that CW's allegations. 2009 WL 1561584, at *2 (N.D. Cal. June 3, 2009). If Plaintiffs had a good explanation for the change in CW1's narrative, presumably they would have included it in their amendment.

**C.     Plaintiffs' Occasional References To Fraud In ST's Industrial Segment Are Without Merit.**

Finally, Plaintiffs' occasional suggestions that the SAC sufficiently pleads a "claim of fraud with respect to [ST's] Industrial segment" should be rejected. (Opp. 20-21; *see* Opp. 12, 17, 25.) Only two challenged statements pertain to that part of ST's business. (*See* SAC ¶ 58 (March 2023 statement that "[i]t is clear that the automotive market *and what we call the industrial B2B* . . . this kind of stuff is very solid.") (emphasis added); SAC ¶ 60 (April 2023 statement that "on automotive overall *on power energy and professional B2B industrial* the backlog coverage we have are well above the six quarters and the order entry we are seeing now are loading smoothly year 2024.") (emphasis added).) Neither is actionable for at least three reasons.

*First*, beyond being forward-looking, protected opinion, and puffery, the SAC does not plead with particularity that either statement was false. CW2 allegedly saw Industrial "customer orders decline[] in early 2023" (SAC ¶ 46; *see* Opp. 21), but CW2 was an "[a]ccount manager"— that is, a salesperson—who "managed Industrial customer accounts *based in the United States*" (SAC ¶ 45 (emphasis added)). CW2 is not alleged to have been privy to information on ST's *global* Industrial demand. Rather, he was a "lower-level sales . . . employee," "not [an] executive[]

-14-

or manager[] with direct knowledge of the company's financials." *In re Canopy Growth Sec. Litig.*, 2024 WL 3445436, at \*13 (S.D.N.Y. July 17, 2024) (discounting such CW allegations); *see In re Lehman Bros Sec. & Erisa Litig.*, 2013 WL 3989066, at \*4 (S.D.N.Y. July 31, 2013) (same).

*Second*, the SAC does not plead the required strong inference of scienter with respect to the Industrial segment for the reasons below.

*Third*, Plaintiffs "fail[] to allege a sufficient connection between" the March and April 2023 statements "and the losses" Plaintiffs allegedly suffered starting in April 2024.  *Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007).  ST repeatedly disclosed demand weakening in the Industrial segment as early as October 2023.  (*See* Ex. I at 5 ("I repeat, clearly, we have seen on the industrial market" that "the order booking[s] . . . were not materializing at our expectation."); SAC ¶ 72 (statement in January 2024 that ST "continued to see . . . further deterioration in Industrial").)  Given these much earlier disclosures, Plaintiffs have failed to plead any facts to show that the two Industrial-related statements "were the proximate cause of [their alleged] loss," "nor have they alleged facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [the Industrial-related] misstatements." *Lattanzio*, 476 F.3d at 158.

## II. PLAINTIFFS' OPPOSITION ALSO CONFIRMS THAT THEY HAVE NOT PLED FRAUDULENT INTENT.

In their Opposition, Plaintiffs barely try to defend their allegations that Messrs. Chery and Grandi had any motive to commit fraud.  (*See* Opp. 27-29.)  Thus, Plaintiffs must plead "*strong* . . . evidence of conscious misbehavior or recklessness." *Kalnit* v. *Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (emphasis added).  Their allegations do not come close to that demanding requirement.

### A. Plaintiffs Offer Little Defense Of Their Flawed Motive Allegations.

*Stock Sales*.  On motive, Plaintiffs simply repeat the SAC's allegation that Messrs. Chery and Grandi's stock sales were "extraordinary compared to their respective trading histories."

(Opp. 28; *see* SAC ¶ 110.)  But Defendants explained that these purported "histories" relied on an arbitrary and misleading cutoff, and that, based on the same sources on which Plaintiffs rely, there was nothing different about the alleged trading during the Class Period than in the surrounding years.  (*See* MTD Br. 27.)  Plaintiffs' only response is that insider trading allegations raise "factual disputes that are not appropriate at the motion to dismiss stage." (Opp. 28.)  In support, Plaintiffs cite an inapposite case in which the defendant improperly tried to "contest" an allegation of stock sales.  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir. 2001).  Here, by contrast, the question is whether, *taking the allegations as true*, they "establish that" Messrs. Chery and Grandi's "stock sales were 'unusual.'"  *Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). Courts routinely decide at the pleading stage that allegations fall short of that standard.  *See In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009) (collecting cases).

   ***Mr. Chery's Personal Motives.***  Plaintiffs likewise repeat the SAC's allegations that Mr. Chery had a motive to defraud because he "was at risk of being fired."  (Opp. 28; *see* SAC ¶¶ 111-15.)  Again, Plaintiffs entirely ignore Defendants' showing (at 29-31) that (i) Plaintiffs' only support for that claim is hearsay from CW8, who left ST *in 2018*; (ii) CW8's narrative contradicts Plaintiffs'; and (iii) the most CW8 can say regardless is that Mr. Chery had pressure, like all CEOs, to deliver "positive results" (SAC ¶ 114).  Plaintiffs cannot dispute that in this Circuit, alleging that a defendant was motivated to "protect [his] executive position[]" is "too generalized to demonstrate scienter."  *Kalnit*, 264 F.3d at 139.  Plaintiffs also briefly claim that "Defendants tried to conceal [Mr.] Chery's fraudulent conduct and protect his reputation by firing CW1."  (Opp. 28.)  But CW1 does not even say that he was fired as part of a "cover up" (Opp. 29); he claims he was fired "because [he] objected to" ST's "financial reporting, channel stuffing

scheme, and sales tactics." (SAC ¶ 42.) And Plaintiffs never explain how terminating CW1 helped conceal anything; presumably, his termination made it easier for him to criticize the company.

### B.    Plaintiffs Do Not Allege Intentional Misconduct Or Severe Recklessness.

***Confidential Witnesses***.  Plaintiffs lean heavily on CW1's allegations, which they claim provide "smoking-gun" proof that Messrs. Chery and Grandi "actually received [supposedly] adverse information" that rendered their statements false. (Opp. 22-23.) But CW1's claims do not meet the PSLRA's requirement to "state *with particularity* facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). The sum total of CW1's scienter allegations regarding channel stuffing is the claim that he "complained to CEO Chery and CFO Grandi in writing after [he] discovered" the supposed conduct. (SAC ¶ 39; *see* Opp. 22-23.) That allegation fails the particularity pleading standard, which requires allegations of "[1] *specific* contradictory information [that] was available to the defendants [2] *at the same time* they made their misleading statements." *Das*, 332 F. Supp. 3d at 813 (collecting cases). As set forth above, CW1 offers no specifics about the supposed channel stuffing. CW1 fails even to provide any information about his supposed "writing" to Messrs. Chery and Grandi. He does not allege *when* he sent the writing, let alone clarify its timing in relation to any challenged statement. Nor does CW1 even allege *what* he specifically wrote. The Second Circuit has rejected similarly ambiguous allegations, demanding more than a "general claim of the existence of confidential company sales reports that revealed" supposed wrongdoing. *San Leandro*, 75 F.3d at 812; *see Arazie* v. *Mullane*, 2 F.3d 1456, 1467 (7th Cir. 1993) (allegation that "internal documents admitted" cash-flow problems were "missing" the "who, what, where, and when" and thus "failed to plead particular facts" necessary for scienter).

As for Plaintiffs' allegations concerning CW1's purported "warnings" about demand at "monthly staff meetings" in 2023 (SAC ¶ 38), they entirely lack the most important part: the *what*.

Plaintiffs insist that "the Complaint identifies the precise nature of CW1's warning to the Individual Defendants." (Opp. 24.)  But the SAC is not "precise" about that "warning" at all.  It says nothing concrete about what actual "commitments . . . to investors" CW1 thought "could not be kept," what the supposed "market decline" or "downward trend" entailed, which of ST's segments were affected, or what "information known to the Company" at some unspecified date contradicted the company's statements.  (SAC ¶¶ 37-38.)  Plaintiffs offer no response to any of these obvious defects.  Indeed, Plaintiffs seem to concede (at 25) that CW1's warning pertained to the "semiconductor market at large" (SAC ¶ 38), *not* the Automotive segment.  Plaintiffs try to spin that point as supporting their claim that ST made misstatements pertaining to its Industrial segment, *see supra*, Section I.C, but CW1's generic purported warning does not clearly pertain to Industrial either, and ST sells chips to customers in two other "key end markets":  "Personal Electronics, and Communications Equipment & Computer Peripherals."  (*See* SAC ¶¶ 22-23.)

Plaintiffs cite several cases involving what they call alleged "circumstances suggesting receipt" of specific adverse information by corporate executives.  (Opp. 23.)  But as one of Plaintiffs' cases explains, "bare assertions" that corporate executives "had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports, *without any further facts or details* will not suffice to create a strong inference of scienter."  *Okla. Firefighters Pension & Ret. Sys.* v. *Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019) (emphasis added).  The complaints in Plaintiffs' cases alleged those "further facts or details"; Plaintiffs here do not.  *See id.* ("Plaintiffs have pointed to specific numbers in CEO Call slide decks . . . and alleged that Defendants reviewed them"); *SolarEdge*, 2025 WL 1031154, at *12-13 (defendant executives "demonstrated their awareness of the content of [specific] reports by questioning subordinates with specific knowledge" of relevant facts); *Dentsply Sirona*, 665 F.

-18-

Supp. 3d at 291 (identifying specific contracts that required distributor to relay specified "detailed monthly information" on inventory levels to defendants).[11]

***Defendants' Supposed "Admissions."*** Plaintiffs also try to create an inference of scienter by claiming that ST "concealed from investors" until July 2024 that its non-cancelable order practice—a special pandemic-related protection for ST—had ended back in March 2023. (SAC ¶¶ 29, 103.) As Defendants explained (at 31-32), that is incorrect: Mr. Chery informed investors about the end of non-cancelable orders *in September 2023*. Plaintiffs dispute that point (Opp. 26-27), but they misunderstand the relevant statement. Mr. Chery was asked about ST's "backlog coverage for the long-term contracts" in the automotive segment "for 2024." (Ex. H at 5; *see* Ex. L at 37-38 (warning that such contracts are ordinarily subject to "cancellation and modifications as to quantities").) He responded that ST had "basically 15 carmakers" with those kinds of contracts. (Ex. H at 5.) Mr. Chery was then asked whether there had "been any attempt to renegotiate any of these contracts up or down," to which he responded: "No, absolutely not. . . . during the shortage period in 2022 and still in H1 2023 with a small [manufacturer], we have negotiated, okay, noncancelable order approach . . . [b]ut this now is normally over, okay, because we come back normal situation [on demand]." (Ex. H at 5-6.) Plaintiffs somehow interpret this response as Mr. Chery answering "no" to whether "noncancellable orders had been discontinued." (Opp. 27.) But the question was whether carmakers were changing their long-term orders. Far from misleading investors, Mr. Chery was clearly cautioning that the Automotive market was returning to "normal," and that, absent the abnormal protection once provided by ST's post-

---

[11]     As for *Wang*, there the company had not disclosed a "drastic," "30-percent drop" in customer retention in the final quarter before its IPO. 661 F. Supp. 3d at 236-37. The court found it suspicious that the company "was prepared to make th[at] disclosure so soon after the IPO," especially because the SEC had specifically inquired about customer retention before the IPO. *Id.* That is nothing like this case.

pandemic non-cancelable order policy, ST's order "backlog" could again be subject to "variations between booking and delivery," including "cancellation."  (Ex. L at 37.)

*Core Operations*.  Finally, in invoking the so-called "core operations" theory, Plaintiffs ignore *Jackson* v. *Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020).  There, the Second Circuit held that the "naked assertion" that a "key product" is "of such core importance that [a company's] senior officers must have known that [statements] were false" is "plainly insufficient" to plead scienter. Instead, Plaintiffs cite one unreported district court decision, pre-dating *Jackson*, applying the doctrine as "supplemental support for allegations of scienter," and noting that "the Second Circuit ha[d] yet to abrogate the rule."  *In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019).  Regardless, because Plaintiffs' "independent bas[e]s for alleging scienter" do not "establish a strong inference of scienter" on their own, their core operations argument "also fails." *Lipow* v. *Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015).

## CONCLUSION

For the foregoing reasons, the Court should dismiss this case with prejudice.

Respectfully submitted,

/s/ *Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
David M.J. Rein
Julia A. Malkina
Maxwell F. Gottschall
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
giuffrar@sullcrom.com
reind@sullcrom.com
malkinaj@sullcrom.com
gottschallm@sullcrom.com

*Counsel for Defendants*

June 20, 2025

-20-

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of June, 2025, I electronically filed the foregoing brief with the Clerk of the Court using the CM/ECF system.  I certify that service will be accomplished by the CM/ECF system for all participants in this case who are registered CM/ECF users.

/s/ *Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000

June 20, 2025