## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE STMICROELECTRONICS N.V. SECURITIES LITIGATION** | **No. 1:24-cv-06370-AKH** |
| | <u>**CLASS ACTION**</u> |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | **CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | <u>**JURY TRIAL DEMANDED**</u> |

# TABLE OF CONTENTS

TABLE OF DEFINITIONS.................................................................................................iii

NATURE OF THE ACTION ............................................................................................. 1

JURISDICTION AND VENUE ......................................................................................... 5

PARTIES ............................................................................................................................ 6

SUBSTANTIVE ALLEGATIONS .................................................................................... 8

    I.      Background ............................................................................................... 8

        A. The Company and its Product Offerings ........................................... 8

        B. 2019-2022: Semiconductor Demand Plummets as the Pandemic Starts and Rallies When it Recedes ................................................... 11

        C. Late 2022-2023: The Semiconductor Industry Cools Down, but STM Claims to be the Exception to the Norm ...................................... 12

        D. CWs Confirm a State of Affairs at Odds with Defendants' False Representations and Expose STM's Financial Performance as a Mirage that Began to Disappear Toward the End of the Class Period ................................................................................................. 14

    II.     Materially False and Misleading Statements Issued During the Class Period.... 23

        A. The March 14, 2023 Citi TMT Conference..................................... 23

        B. April 27, 2023 Earnings Conference Call ....................................... 24

        C. June 6, 2023 Exane BNP Paribas 25th European CEO Conference ............... 25

        D. September 6, 2023 Citi Global Technology Conference................................ 28

        E. October 26, 2023 Earnings Conference Call.................................... 28

        F. January 25, 2024 Press Release and Earnings Conference Call....................... 31

        G. The 2023 Form 20-F Filed on February 22, 2024 .......................... 34

        H. March 12, 2024 Citi TMT conference.............................................. 37

        I. April 25, 2024 Earnings Conference Call ....................................... 40

        J. July 25, 2024 Earnings Conference Call ......................................... 41

        K. October 31, 2024 Form 6-K Announcing Third Quarter Financial Results.... 42

L. November 7, 2024 Form 6-K on Operating and Financial Review and Prospects .................................................................................................... 42

M. November 22, 2024 Morgan Stanley European TMT Conference ................. 43

III.    The Truth Begins to Gradually Emerge ................................................. 44

IV.    Additional Allegations of Scienter ....................................................... 49

A. Defendants' Admissions .................................................................. 49

B. Defendants' Own Statements Support an Inference of Scienter .................... 50

C. The Core Operations Doctrine Bolsters an Inference of Scienter ................. 51

D. Suspicious Stock Sales Enhance an Inference of Fraud ............................... 52

E. Chery's Personal Motive to Commit Fraud Raises an Additional Inference of Scienter .................................................................................................. 52

PLAINTIFFS' CLASS ACTION ALLEGATIONS ...................................................... 54

COUNT I  (VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS) ..................... 57

COUNT II  (VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS) ..................................................................... 60

PRAYER FOR RELIEF ...................................................................................... 61

DEMAND FOR TRIAL BY JURY ......................................................................... 61

**TABLE OF DEFINITIONS**

| Term or Acronym | Definition |
|---|---|
| 2023 20-F | The Annual Report for Fiscal Year 2023 that STM filed with the SEC on Form 20-F on February 22, 2024 |
| ADAS | Advanced Driver Assistance Systems |
| ADG | The Automotive & Discrete Group |
| AM&S | The Analog products, MEMS Sensors segment |
| AMS | The Analog, MEMS & Sensors Group |
| APMS | The Analog, Power & Discrete, MEMS and Sensors products group |
| Automotive end market | One of the four key end markets that STMicroelectronics N.V. targets. Automotive end market covers customers in the car manufacturing supply chain |
| Capacity Reservation Fee | A fee that customers paid to ensure that the desired quantity of chips ordered would be delivered as expected, guaranteeing access to manufacturing slots even when demand is high |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Channel stuffing | The practice of shipping more goods to distributors and retailers along the distribution channel than end-users are likely to buy in a reasonable time period |
| Chery | Jean-Marc Chery |
| Class | All persons and entities that purchased or otherwise acquired STM common stock on the NYSE or another United States trading venue between March 14, 2023 and January 29, 2025, both dates inclusive, and were damaged thereby |
| Class Period | March 14, 2023 to January 29, 2025, both dates inclusive |
| Company | STMicroelectronics N.V. |
| Communications Equipment & Computer Peripherals end market | An STM end market covering customers that manufacture telecommunications infrastructure, (*e.g.*, mobile base stations), as well as external devices that connect to a computer to expand its capabilities, such as keyboards, mice, and printers |
| CW | Confidential Witness |

| Term or Acronym | Definition |
| --- | --- |
| D&RF | The Digital ICs and Radio Frequency Products segment |
| Defendants | Jean-Marc Chery, Lorenzo Grandi, and STMicroelectronics N.V. |
| Distributor Channel | The market channel that STM uses to sell semiconductors directly to distributors |
| EMEA | Europe, Middle East & Africa |
| Exchange Act | Securities Exchange Act of 1934 |
| Grandi | Lorenzo Grandi |
| Individual Defendants | Jean-Marc Chery and Lorenzo Grandi |
| Industrial end market | One of the four key end markets that STMicroelectronics N.V. targets. Industrial end market covers customers that manufacture products for industrial applications, including robots, sensors, and power management applications |
| Lead Plaintiffs | Faith Close, Hassan Ibrahim, and Aya Zalat |
| MCU | The Microcontrollers segment |
| MDG | The Microcontrollers & Digital ICs Group |
| MDRF | The Microcontrollers, Digital ICs and Radio Frequency products group |
| MEMS | Micro-Electromechanical System |
| Mobileye | Mobileye Global Inc. |
| NYSE | New York Stock Exchange |
| OEM Channel | The market channel that STM uses to sell semiconductors directly to original equipment manufacturers |
| Personal Electronics end market | STM's end market consisting of devices for personal use, such as smartphones, tablets, chargers, smart TVs, and gaming consoles |
| P&D | The Power and Discrete products segment |
| Plaintiffs | Lead Plaintiffs Faith Close, Hassan Ibrahim, and Aya Zalat, together with additional plaintiff Ferdinando Garbuglio |
| POP | Point of Purchase |

| Term or Acronym | Definition |
|---|---|
| POS | Point of Sale |
| SEC | United States Securities and Exchange Commission |
| STM | STMicroelectronics N.V. |

Lead Plaintiffs Faith Close, Hassan Ibrahim, and Aya Zalat ("Lead Plaintiffs") together with additional plaintiff Ferdinando Garbuglio (hereafter the "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Third Amended Complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of Defendants' public documents; conference calls and announcements made by Defendants; United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding STMicroelectronics N.V. ("STM" or the "Company"); analysts' reports and advisories about the Company; information obtained from interviews with knowledgeable former employees of the Company; and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired STM common stock or sold put options for such stock on the NYSE or another United States trading venue between March 14, 2023 and January 29, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

1

representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

2.    STM is a manufacturer of semiconductor chips and other electronics used in automotive, industrial and other applications. Throughout the Class Period, as detailed herein, STM and the Individual Defendants misrepresented to investors the deterioration in the Company's business and operations, including demand for STM's products, as corroborated by multiple Confidential Witnesses ("CWs").

3.    The CWs confirm that the internal state of affairs at the Company during the Class Period contrasted sharply with the false and misleading statements made to investors by Defendant Jean-Marc Chery ("Chery"), STM's Chief Executive Officer ("CEO") at all relevant times, and Defendant Lorenzo Grandi ("Grandi"), STM's Chief Financial Officer ("CFO") at all relevant times:

- According to CW1, Defendants knew or recklessly disregarded that demand for semiconductor chips declined throughout 2023 because of reduced customer orders observed for future quarters in the Class Period, and that STM was not an anomalous standout in an industry, but instead experienced a strong decline in demand, revenues and profits throughout the Class Period. CW1 also states facts to suggest that Defendants engaged in channel stuffing by providing excessive discounts in order to give the misleading appearance of better financial results in 2023. However, while pulling forward sales with these discounts allowed STM to report meeting short-term quarterly targets in 2023, it created an inventory glut at distributors and end users that hampered demand going forward;

2

- CW2 reports that demand for semiconductor chips declined, excess inventory increased, and lead times provided by customers decreased in early to mid-2023, thwarting Defendants' ability to accurately forecast sales;

- CW3 confirms that demand for semiconductor chips in the automotive industry declined in some cases by up to 50% in 2023 because of excess inventory;

- CW4 states that sales personnel at STM failed to meet targets by the middle of 2023 at the latest because of a decline in demand;

- CW5 corroborates that the market generally slowed significantly in 2023, and Defendants were slow to adjust prices as competitors chased after less business, and the Company's projections did not match the negative trend in demand that sales personnel observed on the ground;

- CW6 reports that the Company instituted a hiring freeze that was in effect throughout 2024 as STM's financial condition worsened; and

- CW7 states that the demand whiplash in 2023 was unsurprising given that customers in the automotive industry ordered more than what was required during the pandemic-related economic shocks of 2021 and 2022.

Additional detailed information describing the role and responsibilities of each of these CWs and their access to the information reported is set forth herein at ¶¶38-60.

4.      These facts, however, were concealed from STM's investors. Instead, throughout 2023, Chery stated that demand was strong and "solid," the Company's "backlog," *i.e.*, orders placed for the future, was sufficient to cover the next six quarters or all of 2024, giving Defendants "very clear" "visibility" into the Company's performance. Chery and Grandi both signed false filings with the SEC that omitted to disclose that multiple risks to STM's business and operations

3

had either already materialized or had a high risk of materialization during the Class Period. In addition, Defendants failed to disclose that, following a short bounce back from pandemic related economic shocks in 2021 and 2022, demand for STM's chips started to decline in early 2023, and increasingly worsened in late 2023 and early 2024. Instead, during the Class Period, Defendants touted an image of strength that was inconsistent with adverse facts that Defendants knew or recklessly disregarded.

5.      On April 25, 2024, Defendants began to announce poor financial results, guiding down a years-long goal of generating over $20 billion a year to a range of $14 to $15 billion, acknowledging that demand for chips in the automotive and industrial sectors significantly declined. Upon this partial disclosure and the materialization of concealed risk thereof, the Company's stock price declined by nearly 3%. Nevertheless, Chery tried to blunt the negative impact, minimized the severity of the downturn, blamed the fall in revenue and growth to a series of one-offs, and misled investors to believe that recovery was around the corner.

6.      But, on July 25, 2024, the Company yet again announced poor financial results, and revised the guidance for total revenues in 2024 to a range of $13.2 billion to $13.7 billion. This caused the price of STM's common stock to plunge by over 15%. Analysts expressed surprise at the magnitude of the deterioration, and the Company's inability to clear inventory despite all the false statements made about that subject during the Class Period.

7.      On October 31, 2024, the Company continued to announce poor financial results and signaled that the deterioration in the business and the industry would continue through the fourth quarter of 2024 and the beginning of 2025. The market again reacted negatively to this news and the price of STM's common stock declined by almost 6% over the next few trading days.

8.      Nevertheless, Chery continued to make similarly misleading statements about visibility at an investor conference held on November 22, 2024. Defendants also continued to make the same misleading disclosures concerning risks to STM that were made earlier in the Class Period.

9.      However, on January 30, 2025, Defendants yet again announced poor financial results for the full Fiscal Year 2024. On an earnings conference call held on January 30, 2025, Chery admitted that 2024 "turned out to be one of the worst years" in both the Industrial and Automotive end markets. Chery also disclosed that the Company could not even provide a revenue outlook for Fiscal Year 2025 because of "extremely low" visibility in both the Industrial and Automotive end markets. On the same conference call, Grandi also told investors that there was "excess inventory in distribution."

10.     On this partial disclosure or the materialization of concealed risk thereof, the Company's stock price plunged by nearly 9% from its previous day closing price of $24.74 to close at $22.52 on January 30, 2025.

11.     As a result of Defendants' wrongful acts and omissions and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). STM's common stock trades on the NYSE, which is located in this District, and Defendants targeted investors, who reside in this District, with materially false and misleading statements throughout the Class Period.

15.     In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

16.     Plaintiffs Faith Close, Hassan Ibrahim, and Aya Zalat purchased STM's common stock during the Class Period, and suffered damages as a result of the federal securities laws violations alleged herein. Additional Plaintiff Ferdinando Garbuglio sold puts and acquired STM common stock in connection with those positions during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein. Plaintiffs' Class Period transactions in STM's securities are identified in their previously signed certifications filed with the Court at ECF Nos. 13-1-2 and 19-1.

17.     Defendant STM is organized under the laws of the Netherlands with its principal place of business in Geneva, Switzerland. The Company's common stock trades in an efficient market on the NYSE, Euronext Paris, and the Borsa Italiana. The Company's common stock trades on the NYSE under the ticker symbol "STM."

18.     Defendant Chery has served as STM's CEO, President, and Sole Member of the Company's Managing Board at all relevant times.

6

19. Defendant Grandi has served as STM's CFO and President of Finance, Purchasing, Enterprise Risk Management and Resilience at all relevant times.

20. Defendants Chery and Grandi are sometimes referred to collectively herein as the "Individual Defendants," and together with STM sometimes referred to collectively as the "Defendants."

21. The Individual Defendants possessed the power and authority to control, and in practice did control, the contents of STM's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of STM's SEC filings, scripts for investor conferences, and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. They also participated directly in earnings calls with investors and analysts. Because of their roles and responsibilities at STM, and their access to material information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements and omissions alleged herein. The Individual Defendants signed the SEC filings and/or certified that the material facts alleged therein were true and accurate, oversaw the promulgation of the Company's financial press releases filed on SEC Forms 6-K and 20-F, and, throughout the Class Period, utilized the facilities of the NYSE.

7

## SUBSTANTIVE ALLEGATIONS

I.    **Background**

A.  **The Company and its Product Offerings**

22.    STM was founded in 1987. The Company went public in 1994 and began to trade on the NYSE. It designs, develops, manufactures, and sells semiconductor integrated circuits and discrete devices. The Company's products are used in the automotive, telecommunications, consumer electronics, and industrial sectors. STM divides its customers into three geographic regions: the Americas, Europe, Middle East & Africa ("EMEA"), and Asia Pacific. The Americas region generated the highest amount of revenue throughout the Class Period.

23.    Semiconductors, otherwise known as "chips," are complex integrated circuits that form the foundation for most electronic devices. Semiconductors are used in advanced technologies in the healthcare, communications, consumer electronics, and transportation sectors of the global economy. The global semiconductor market size was valued at $611.35 billion in 2023 and is projected to grow to over $1 trillion by 2030.

24.    STM sells semiconductors via two market channels: (1) directly to original equipment manufacturers ("OEM Channel"), the end-customers to which the Company provides direct marketing application and engineering support, and (2) to distributors ("Distributor Channel"), the third-party representatives that purchase semiconductors from STM before selling them to end customers.

25.    The Company targets four key end markets: Automotive, Industrial, Personal Electronics, and Communications Equipment & Computer Peripherals. Automotive covers customers in the car manufacturing supply chain. Industrial covers customers that manufacture products for industrial applications, including robots, sensors, and power management applications. Personal Electronics covers customers that manufacture devices for personal use,

8

such as smartphones, tablets, chargers, smart TVs, and gaming consoles. Communications Equipment & Computer Peripherals covers customers that manufacture telecommunications infrastructure, (*e.g.*, mobile base stations), and computer peripherals (*e.g.*, keyboards, mice, and printers).

26.     The Automotive end market drives the Company's revenues, bringing in 41% of total revenue in Fiscal Year 2023, and 46% of total revenue in the first three quarters of 2024. Major customers for the Company's automotive chips include: (1) OEMs that manufacture vehicles such as Tesla, Inc., Hyundai Motor Company, General Motors Company, and Zhejiang Geely Holding Group Co., Ltd.; and (2) major suppliers to vehicle manufacturer OEMs such as Robert Bosch GmbH, Continental AG, Mobileye Global Inc. ("Mobileye"), and Vitesco Technologies Group AG. The Company's largest distributors include Avnet, Inc., WT Microelectronics Co., Ltd., and Arrow Electronics, Inc.

27.     Up and until the end of Fiscal Year 2023, the Company operated through three product groups, which were the Automotive & Discrete Group, the Analog, MEMS & Sensors Group, and the Microcontrollers & Digital ICs Group. The Automotive & Discrete Group ("ADG") provided chips for key Automotive applications such as Powertrain, Chassis, Advanced Driver Assistance Systems ("ADAS"), Body Electronics, Telematics, Infotainment and Connectivity. ADG also supplied discrete and power transistor products for various end markets, but most of the revenue was generated from the Company's Automotive clients. The Analog, MEMS & Sensors Groups ("AMS") mainly provided chips to the Company's Industrial and Personal Electronic clients and some to the Automotive clients. Analog chips help control motors and manage power. MEMS are miniature mechanical devices often found in smartphones,

watches, and industrial robots. AMS also provided optical sensing solutions such as driver monitoring devices (to detect if the driver is focusing on driving the vehicle).

28.  The Microcontrollers & Digital ICs Group ("MDG") provided chips for general-purpose microcontrollers and microprocessors. It focused on non-Automotive clients. Microcontrollers act as the "brain" of electronic devices that controls all the other elements in the devices. STM's main product in this product group was its STM32 microcontroller offering.

29.  In Fiscal Year 2024, the Company reorganized the three product groups into two product groups and four reportable segments ("Product Group Reorganization"):

- Analog, Power & Discrete, MEMS and Sensors ("APMS") products group that focused on:

  - The Analog products, MEMS Sensors ("AM&S") segment, comprised of analog products, MEMS sensors and actuators, and optical sensing solutions.

  - The Power and Discrete products ("P&D") segment comprised of discrete and power transistor products.

- Microcontrollers, Digital ICs and Radio Frequency ("MDRF") products group that focused on:

  - The Microcontrollers ("MCU") segment, comprised of general-purpose and automotive microcontrollers, microprocessors and continued security products.

  - The Digital ICs and Radio Frequency Products ("D&RF") segment, comprised of automotive ADAS, infotainment, Radio Frequency and communication products.

30.  This product reorganization spread automotive chips to all segments, making it difficult to segregate the erstwhile ADG-related product revenues, which had made up 45% of the

Company's 2023 revenues, arguably the most important product segment for revenue prediction, from the revenues generated by the Company's other products. As CW1 confirms, this was done to mask the scale and extent of the deterioration in the Company's business by mixing profitable offerings with unprofitable ones.

### B. 2019-2022: Semiconductor Demand Plummets as the Pandemic Starts and Rallies When it Recedes

31.     At the start of the COVID pandemic in 2020, demand for chips dropped precipitously. STM's customers delayed and canceled orders because they did not want to sit on extra inventory. The Company then experienced a drastic increase in semiconductor sales because of low interest rates set by central banks around the world to stimulate the world economy, and the electric vehicle boom, as electric vehicles require vastly more semiconductor chips than traditional vehicles to operate. As economies began to reopen following the COVID-related shutdowns, the Company's manufacturing plants were at full utilization. Total consolidated revenues of the Company grew from $10.2 billion in 2020 to $12.8 billion in 2021 and $16.1 billion in 2022. Instead of candidly telling investors that demand in 2022 was artificial from distributors ordering in excess to avoid supply chain disruptions, and that demand in 2023 was juiced by excessive discounting that pulled forward even more sales from future periods, Defendants told investors that the Company would reach or exceed $20 billion in revenue by 2027, which became a focal point of investor and analyst communications, and the backdrop for the materially false and misleading statements made during the Class Period.

32.     In 2022, faced with increased demand as distributors who previously experienced supply chain disruptions began to place orders aggressively, STM enacted two measures to better allocate capacity among its customers. The first was called Capacity Reservation Fee, a fee that customers paid to ensure that the desired quantity of chips ordered would be delivered as expected,

11

guaranteeing access to manufacturing slots even when demand was high. The second was Non-Cancellable Orders that prioritized orders that could not be canceled after they were placed. Non-Cancellable Orders prevented a customer from double ordering to protect against potential shortages in the future, then canceling if they later chose not to carry the excess inventory. Non-Cancellable Orders increased starting in 2022. In the second half of 2024, Chery told investors that the Non-Cancellable Orders operated to protect STM's backlog until March 2023, but not thereafter.

### C. Late 2022-2023: The Semiconductor Industry Cools Down, but STM Claims to be the Exception to the Norm

33.     The global market for semiconductors declined by 9% in 2023.[1] On April 20, 2023, Nordic Semiconductor ASA, a major automotive supplier, withdrew a positive revenue outlook for the second half of 2023 due to these conditions. On April 27, 2023, Samsung Electronics Co., Ltd., another major semiconductor manufacturer and a major client of STM, announced that its first-quarter profit fell 87% from a year earlier. But STM cast itself as the exception. On July 27, 2023, the Company announced during its second-quarter earnings call that it would generate $17.4 billion in revenue for 2023. The earnings announcement reported that ADG revenues increased 34.4% year-over-year, experiencing quarter-over-quarter increases of 8% in the Automotive end market, a 3% increase in the Industrial end market, and a 5% increase in Communications Equipment & Computer Peripherals. On October 26, 2023, the Company reported its third-quarter earnings, experiencing a quarter-over-quarter increase of 4% in the Automotive end market, and a 25% increase in Personal Electronics.

---

[1]   https://www.eetimes.eu/semiconductor-market-rebound-expected-in-2024-but-challenges-lie-ahead/#:~:text=The%20semiconductor%20market%20faced%20a,markets%20have%20remained%20relatively%20flat.

34.     During a conference call held to announce the financial results for the third quarter of 2023, Chery continued to tell investors that Automotive end market sales would grow significantly in 2024. Defendants predicted a continued decline in inventory days in the fourth quarter of 2023. Inventory days are a key metric for investors, measuring how many days' worth of inventory STM retained, so investors could assess whether its product was rapidly selling or gathering in warehouses. A higher figure signaled more inventory relative to sales, and therefore was negative, whereas a lower figure signaled that inventory was being sold rapidly, and was positive.

35.     Industry groups and other semiconductor manufacturers were far more candid than STM about the deteriorating demand picture. The Semiconductor Industry Association reported in November that global chip sales in September 2023 fell 4.5% year-over-year.[2] That made for the fourteenth straight month of a year-over-year decline in sales – a streak not seen in more than a decade.[3] Faced with waning demand from carmakers, NXP Semiconductors N.V., a major chip supplier that derived most of its revenue from the automotive sector, announced a less than 5% year-over-year growth rate in its automotive segment in the third quarter,[4] a stark contrast to STM ADG's 30% year-over-year growth.

36.     Oversupply of automotive chips started to come to light. On January 4, 2024, Mobileye, one of STM's largest customers and a major automotive sector supplier, predicted a

---

[2]   https://www.semiconductors.org/global-semiconductor-sales-increase-1-9-month-to-month-in-september/

[3] https://www.wsj.com/business/autos/auto-chip-makers-try-to-avoid-a-pileup-c8ec7afa

[4] *Id.*

13

50% drop in its first-quarter revenue year-over-year due to excess inventories at the customer level.[5] The Company's shares fell by 4.5% following Mobileye's announcement.

37.    Nevertheless, by surreptitiously pulling demand forward from future periods by larger-than-normal discounting, in Fiscal Year 2023, STM reported a record $17.3 billion in net revenue, with ADG making up $7.8 billion, or 45% of the total net revenue. The Company also reported a year-over-year increase of 33.5% in the Automotive end market, and an 11.4% increase in Industrial.

**D.  CWs Confirm a State of Affairs at Odds with Defendants' False Representations and Expose STM's Financial Performance as a Mirage that Began to Disappear Toward the End of the Class Period**

38.    CW1 was the President of the Company's ADG group from 2012 through the end of 2023 and served on the Company's Executive Committee. In STM's Annual Report filed with the SEC on Form 20-F for the Fiscal Year that ended on December 31, 2023, nine higher-level executives are identified as members of the Executive Committee. Chery and Grandi served on the Executive Committee throughout the Class Period. STM's 2023 Annual Report defines members of the Executive Committee as the Company's "senior management."

39.    CW1 worked at the Company for nearly 40 years and reported directly to Chery during the Class Period until CW1 left STM on January 10, 2024. As President of the ADG group and a member of the Executive Committee, CW1 had extensive knowledge of company-wide order and demand data.

40.    CW1 stated that the market for semiconductors started to change in early to middle of 2023 and business was expected to decline. CW1 reported that the market decline was apparent because orders for the second half of 2023 began to soften. CW1 explained that STM created

---

[5]      https://www.businesswire.com/news/home/20240104756151/en/Mobileye-Releases-Preliminary-FY2023-Financial-Results-and-Initial-2024-Outlook

forecasts based on existing orders in hand for future quarters, and these forecasts were used to issue guidance to investors.

41.     Throughout 2023, CW1 attended monthly staff meetings with approximately 25 high-level managers, including Chery, who chaired the meetings. According to CW1, participants at these meetings discussed forecasts, demand visibility, public reporting, and disclosures. At these meetings, CW1 told Chery that STM should publicly report forecasts that were consistent with the semiconductor market at large, *i.e.*, the Company expected a significant slowdown in 2023 in line with the industry. Specifically, CW1 warned Chery not to misrepresent that the Company was immune from the overall decline in the market. CW1 also told Chery that the commitments STM publicly made to investors in the third and fourth quarters of 2023 could not be kept based on the information known to the Company at that time. CW1 confirms that after the market for semiconductors changed in the second half of 2023, the outlook for the rest of 2023 and for 2024 also demonstrated a downward trend.

42.     CW1 further stated that the level of channel inventory was known and knowable the entire time, and inventory levels for customers were known and visible to the Company. CW1 complained to CEO Chery and CFO Grandi in writing after CW1 discovered that STM's salesforce offered excessive discounts to ADG's customers to drive sales, without CW1's approval.[6] CW1 explained further that the excessive discounts were offered to inflate sales, and stuff the Company's distribution channels to conceal the decline in demand. According to CW1, this

---

[6] Plaintiffs previously identified Defendant Chery and STM's former Chief Operating Officer Alain Dutheil as the recipients of CW1's communications. In response to Defendants' motion to dismiss and upon further conferring with CW1, Plaintiffs' prior Complaint should have identified Defendants Chery and Grandi as the recipients of CW1's communications.

channel-stuffing scheme created a bubble that created the false appearance of better financial performance during 2023.

43.     "Channel stuffing" refers to the practice of shipping more goods to distributors and retailers along the distribution channel than end-users are likely to buy in a reasonable time period. This is often achieved by offering incentives, including favorable payment terms, to persuade distributors and retailers to buy quantities in excess of their needs. While not always unlawful, the practices distort demand by pulling forward future period sales into the current period. Usually, channel stuffing comes to light either due to actions of whistle-blowers or through observed performance reversals in future periods, as the excess inventory previously pushed into the channel gets sold off. CW1's account and the negative reversal of sales-trends that Defendants were forced to disclose starting in 2024 are consistent with this practice.

44.     CW1 elaborated that the excessive sales incentives were offered to direct OEM customers as well as distributors to hide the declining financial performance in 2023. According to CW1, internal reports showed day-to-day the number of products shipped and how much product was bought and sold by distributors. The Company tracked how much product was sold in its distribution channel through these reports. CW1 confirmed that even though by the second half of 2023, the Company experienced a downward trend in demand, Defendant Chery hid the downturn and claimed that STM was not as vulnerable as the rest of the industry.

45.     CW1 states that the Company fired CW1 in December 2023 effective January 10, 2024 because CW1 objected to STM's artificial financing reporting, channel stuffing scheme, and sales tactics designed to conceal the Company's true exposure to a decline in demand.

46.     CW1's account of channel stuffing is corroborated by objective data that STM itself released. The most obvious indicator of channel stuffing is an unusual increase in inventory

16

levels at the distributors' end. Academic studies suggest that a stark decline in sales, an increase in returns, and a decrease in production in the subsequent four quarters are *ex post* indicators that channel stuffing has occurred.[7]

47.     As the market kept deteriorating into 2024, STM had no choice but to report the massive decrease in revenue from the Distributor Channel that was the direct result of demand pulled forward in prior periods. In the third quarter of 2024, revenue from the Distributor Channel imploded 50% year-over-year while revenue from the OEM Channel decreased by about 20% year-over-year. The fact that the revenue from the Distributor Channel decreased so dramatically and so disproportionately to the OEM Channel is a clear indication that there was a Distributor Channel inventory glut that was known and knowable to the Company since March 2023:[8]



48.     CW2 served as a Global Account Manager at STM from January 2020 to July 2023. CW2 was based in STM's Boston, Massachusetts office. CW2 reported to Luca DiFalco, the Industrial Vice President at STM. CW2 primarily managed Industrial customer accounts based

---

[7] *See, e.g.*, Somnath Das, et al., *Detection of Channel Stuffing*, Forensics Accounting eJournal (May 2011), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1836742.
[8] Defendants did not disclose the information in these stark terms, and these facts may not be apparent to a reasonable investor. This illustration was prepared by Plaintiffs' counsel based on a study of STM's financial reports.

in the United States, planned sales growth opportunities, created quarterly and monthly forecasts, negotiated prices, and dealt with issues related to the supply chain. CW2 also provided quarterly and monthly forecasts for regional leads, who presented the data to Defendants Chery and Grandi. CW2 stated that demand rapidly increased during 2021 following the onset of the COVID pandemic. According to CW2, manufacturing plants operated at full capacity during this time and through the end of 2022.

49.    CW2 reported that as a result of increased demand, customers ordered excess inventory to hedge against any potential shortage of supply. According to CW2, this trend of ordering products beyond a customer's need dipped in 2023, and customers faced a glut of inventory because of the excessive product purchased in 2022. CW2 confirms that demand was artificially elevated in 2022 for this reason across the entire semiconductor industry, including in the Industrial and Automotive end markets for STM. CW2 explained that throughout 2022, customers placed orders a year in advance, allowing STM to create accurate forecasts. However, by early 2023, CW2 states that customers could no longer provide accurate estimates, and only forecasted 8 to 12 weeks in advance when a product was needed. In addition, CW2 confirms that customer orders declined in early 2023, in part because of excess inventory built in previous years, demand dropped in some cases by 50%, and competitive pressure increased because waning demand resulted in price cuts from competitors. CW2 confirms further that customers canceled orders at the last minute.

50.    CW3 is a former Global Account Manager at STM, based in Michigan, and worked at the Company's Automotive end market from November 2017 to April 2024. CW3 oversaw accounts with Tier 1 Automotive suppliers, including but not limited to Veoneer HoldCo, LLC, Aptiv PLC, and Magna International Inc., and directly reported to a senior executive in

Germany responsible for at least a dozen important customer accounts. CW3 provided price quotes, negotiated contracts, developed business for new programs, and addressed supply chain concerns. According to CW3, STM received weekly reports from Automotive clients, and CW3 and other sales personnel relied on those weekly reports to forecast revenue throughout the Fiscal Year. CW3 states that the Company's Tier 1 Automotive suppliers updated information for each component needed on a weekly basis for up to 52 weeks in advance. CW3 asserts that the Electronic Data Interchange ("EDI") generated weekly reports on supplies required for each customer. CW3 states that the EDI showed billable material required by OEMs, which Tier 1 Automotive suppliers used to order components from STM. CW3 viewed these reports at least once a month. CW3 explains that the EDI reports allowed STM to forecast demand, and CW3 used a forecasting function to provide specifics about customer demand to the business operations group.

51.     According to CW3, semiconductor manufacturers increased capacity in 2022 as the pandemic began to recede, but demand began to decrease in 2023 as sales of automobiles, including electric vehicles, started to decline. CW3 explains that this reduction in demand, in turn, caused STM's Tier 1 suppliers to reduce estimates from the ones provided 52 weeks before.

52.     CW3 states that Automotive demand decreased by 50% in the first quarter of 2023 as a result of the accumulation of excess inventory in 2022 when demand had surged following the pandemic-related shocks. Specifically, during 2023, CW3 observed a decline in demand for electric vehicles because excess inventory in 2023 caused a drop in customer orders. CW3 observed in the EDI reports that deliveries were getting pushed out at this time.

53.     CW4 served as Manager for the Americas - Sales and Marketing Commissions and Incentives from 2018 to June 2023. Before that, CW4 had various roles in sales and accounts

19

receivable for twenty years at STM. As Manager for the Americas - Sales and Marketing Commissions and Incentives, CW4 was based in Coppell, Texas. CW4 kept track of all sales and marketing commissions for approximately 540 STM employees in an Excel spreadsheet. CW4 observed that while 2020-2022 were strong years, there was a downturn in STM's finances in 2023. CW4 confirms that sales personnel failed to meet their targets in 2023. Further, after CW4 left the Company, CW4 was informed by coworkers that the Company struggled in sales because the Defendants over-anticipated demand. According to CW4, upper management at STM met to set quarterly sales targets, and sales commissions and incentives were derived from those targets.

54.     CW5 worked at STM in Market Development in Santa Clara, California from July 2021 through July 2023, and reported to Lee Bell, director of Marketing for Automotive Smart Power and Discrete Products. CW5 also previously worked at STM in Market Development out of Detroit, Michigan from July 2017 until January 2020. CW5 interfaced with customers and product lines in connection with a subset of STM's products within the Automotive end market. CW5 also responded to requests for quotations, monthly and quarterly forecasts provided by customers, as well as weekly reports, pricing and quotes.

55.     CW5 traveled to meet with customers, including at Tesla, Inc., Bose Corporation, Ford Motor Company, General Motors Company, Continental AG, and Robert Bosch GmbH, to pitch onboarding, timelines and roadmaps. CW5 states that CW5 served as the eyes and ears of the Company's business units in Italy and the United States.

56.     CW5 corroborated the accounts of other CWs, and stated that between 2020 and 2022, customers experienced difficulty in receiving parts, and therefore customers were willing to pay a premium to meet demand. However, according to CW5, in 2023, the market contracted, and STM was much slower than its competitors in adjusting prices downwards. Because of this, CW5

20

states that STM's competitors, including Texas Instruments Incorporated, were better prepared for the inevitable whiplash following the increase in demand and sales in 2021 and 2022.

57.    CW5 provided monthly marketing forecasts that were presented to executives. CW5's superiors would then combine a marketing forecast with the sales forecast and an operational forecast, which then made up the overall consensus forecast. In making the marketing forecast, CW5 was asked to provide product line updates, input and sales updates, backlog history, and requests for quote histories. CW5 said that there was a monthly regional budget meeting that took place with Vice Presidents and senior management above their level in which these forecasts were discussed. CW5 prepared slides for presentations presented at these meetings, which would include highlights, low points, and data about forecasts, backlog, book to billing, inventory, and distribution. According to CW5, Defendants Grandi and Chery attended these meetings. When CW5 left the Company, in 2023, CW5 anticipated a significant reduction in sales as the Company's forecasts did not match the downward trends that sales personnel on the ground had observed. For example, CW5 recalled that the Company lost business with a power supply company in 2023 because STM's quoted price was too high. This was part of a general trend CW5 observed in 2023 with STM outbid by competitors on price, and slow to adjust to the shift in market dynamics. CW5 recalled that customers paid hundreds of millions of dollars in Capacity Reservation Fees during the supply chain crunch, but CW5 observed that in a changing market, these were no longer necessary.

58.    CW6 served as a layout designer who focused on Automotive from June 1980 through December 2024 out of STM's Coppell, Texas office. According to CW6, STM instituted a hiring freeze for employees in the Texas office for all of 2024. CW6 was told that the reason for the hiring freeze was that the Automotive market was struggling. According to CW6, most of the

21

employees in the Coppell, Texas office did not believe reports that the Company was performing well. CW6 reported that the hiring freeze was expected to last a couple of years.

59.    CW7 served as a Product Marketing Senior Advisor at STM from 2016 through 2022 out of the Tours Area and the Central Val De Loire region of France. In this role, CW7 studied the market dynamics for semiconductors in North and South America, France, Spain, Belgium, and Italy. CW7 also kept abreast of product development at the customer level, including budget, pricing, timelines, and forecasting. While CW7 left the Company in March 2022, CW7 was informed by former colleagues afterward that STM faced a whiplash in demand starting in 2023. CW7 was unsurprised by this development because STM conducted market studies to determine how many cars were being produced in a given year, and thus knew that purchase orders in 2022 exceeded what was actually needed.

60.    Additional accounts from former employees further confirm that the Company experienced a glut of inventory. For example, a former Global Account Manager at STM from January to August 2022, who was responsible for managing customers in healthcare in the Industrial end market out of Wisconsin said in an October 7, 2024 interview with Tegus by Alphasense that in 2022 "everybody was ordering a little bit more than what they actually needed thinking they want to have buffer stock." What made it worse, as this former employee explained, was that at the distributor level, routinely, "three different distributors" would "place orders for the same customer," which was artificially "amplifying how much demand was actually out there." This, the former Global Account Manager explained, was "inflat[ing] demand" and causing the Company to "lose a lot of visibility" about what was needed to sell to customers.

22

## II.    Materially False and Misleading Statements Issued During the Class Period

### A.  The March 14, 2023 Citi TMT Conference

61.    At the Citi TMT Conference on March 14, 2023, Defendant Chery made the following misleading statement about the Company's backlog of customer orders in response to a question about softness in the market:

> **Q - Andrew Gardiner**
> It's our pleasure. Perhaps we could start on the broader cycle, if we think of how you guys frame things with results back in January, you're acknowledging softness in certain parts of the market, continued strength in other parts of the market. Can you just give us a bit of a high-level update as to where things stand at the moment in terms of perhaps the broader cycle and the different end markets?
>
> **A - Jean-Marc Chery**
> *No, I can, I can confirm exactly what I said at the end of January, early February. Now with some additional visibility because, of course we visited customers, both in Asia and in U.S. It is clear that the automotive market and what we call the industrial B2B, so power energy, robotics, automation, healthcare, this kind of stuff is very solid. This is confirming by our backlog, which is still representing 6 to 8.25 of revenue and capacity.*

62.    The statements identified in Paragraph 61 were materially false and misleading when made because they omitted to disclose that: (a) demand was poised to decline as orders for the second half of 2023 had already softened and an inventory glut developed as confirmed by CW1, CW2, CW3, CW5, and CW7; (b) Defendants had pulled forward demand by channel stuffing, including by providing discounts to drive bookings and inflate sales in the short term as described by CW1; (c) orders had softened or were canceled by customers as CW1, CW2, CW3, CW5, and CW7 confirm; (d) sales personnel failed to meet targets because of a decline in demand as confirmed by CW4; and as result (e) Automotive and Industrial were not "solid," and the "backlog" did not "confirm" that they were "solid."

23

### B. April 27, 2023 Earnings Conference Call

63.      On April 27, 2023 Defendants held a conference call to announce the financial results for the first quarter of 2023, and Chery made the following misleading statements in response to a question about the Company's backlog:

**Q - Lee Simpson**
Thanks. Thanks so much for taking my question. Just trying to sort of tease out a little bit more the pricing headwinds, you're talking about going into second half of the year. So I think as others have suggested we are seeing some signs of slowing demand in MOSFETs lack of tightness being seen in various areas and power semis and at the same time the foundries are talking about slowing order book for autos. I'm just trying to understand, which side of the fence or both perhaps are impacting in the second half and what that means for order book momentum, particularly Q3 of this year and maybe if I could just come back to the overall backlog, I mean you've been very good in previous quarters to talk about the relative size of the backlog to  the outgoing business over the next few quarters. Could you maybe just update us and give us the relative size of backlog? Thanks.

**A - Jean-Marc Chery**
*So, I will start with the backlog. So today the total backlog we have in our hand requested by customers represents about six quarters of revenue. I would like to say that it is, pretty on balance, versus the end market we are in. Again on automotive overall on power energy and professional B2B industrial the backlog coverage we have are well above the six quarters and the order entry we are seeing now are loading smoothly year 2024.* Why? *Because the lead time we can provide to these customers are still well above one year. So moving forward quarter after quarter, they are losing our backlog consistently with the end demand, which is very strong and the lead time we can offer.*

**\*\*\***

*Then you have some markets where clearly there is a weak end demand. There is clearly inventory correction and then, okay, the backlog we have is reducing and the order we have are low. It is typically the computer peripherals, computer-related and the personal electronics.*

64.      The statements identified in Paragraph 63 were materially false and misleading when made because they omitted to disclose that: (a) demand began to soften, inventory increased, and lead times began to decline before these false statements were made as confirmed by CW1, CW2, CW3, and CW5; (b) signs of an inventory correction were not limited to Computer-

24

Peripherals and Personal Electronics, but also included Industrial and Automotive as confirmed

by the accounts of CW1, CW2, CW3, CW5, and CW7; and (c) Defendants had pulled forward

demand by channel stuffing, including by providing discounts to drive bookings and inflate sales

in the short term as confirmed by CW1.

### C.  June 6, 2023 Exane BNP Paribas 25th European CEO Conference

65.    On June 6, 2023, Chery attended the 25th Exane BNP Paribas European CEO

Conference, and continued to make misleading statements about the backlog and excess inventory:

> **Q - Analyst**
> So maybe we can start right away with question, Jean-Marc. And feel free to ask any questions as I can we see here on the -- on the iPad. So maybe to address the year short-term, recently, one of your peers surprised a little bit the market with a comment about a slowdown in China namely for EVs. So, could you update us on what you see on the end market you are exposed to so automotive, industrial, and personal electronics compared to what you talked about at the end of Q1 with us?
>
> **A - Jean-Marc Chery**
> (Foreign Language) I will comment mainly automotive and industrial. Why? Well because of our strategies to be really a world leader addressing this market and we have -- during the past few years we accelerated our product to keep quite gradually.
>
> I would like to repeat okay that we have changed radically the company between 2019 to 2023, because now, okay I see we move on 55% of our whole new automotive industrial, now 72%. Okay clearly Okay. We grew our revenue from 9.5 basically this year 17.4. So, we can speak about automotive and industrial and we can speak widely.
>
> Also, as I mentioned, I can mention that the mix of automotive and the mix of industrial market changed a lot. In automotive now, it is clear that we have seen two dynamics, the dynamics of smart mobility, so more electrificatous – more electrification more content digital driven by the headers and even okay by the new architecture in the car. And clearly, also, the legacy, the content of electronics and the legacy which has been squeezed during the shortage of semiconductor now is exploding again.
>
> ***So if you address this automotive market very broadly with all the components, okay all the bit of material, I can confirm to you that today the situation is the following backlog are full up to 2024. Clearly, customer want to give us visibility. We do not detect, okay overall excess inventory in the supply chain.***
>
> We can detect on some very specific general purpose products or make sense of

25

inventory. Why? Because during the shortage, okay the supply chain manager, they didn't purchase okay very accurately. So, they massively supply product and now they are just seeing a little bit.

*But overall, okay on automotive, the market dynamic is very, very solid. I have to say we are still opportunity to increase price and we are still opportunity to negotiate, okay we scale maker some deal between volume and capacity warranty.* What did you see on market is basically the same. The industrial market is very complex. Why? Because you address -- so what we classify heavy industry, so power energy, so generation, convention, transportation, shop and storage, then you address, okay automation, robotics, automatic handling system. So, all the automation, okay for productivity improvement.

66.    The statements identified in Paragraph 65 were materially false and misleading when made because they omitted to disclose that: (a) Defendants had pulled forward demand by channel stuffing, including by providing discounts to drive bookings and inflate sales in the short term as explained by CW1; (b) Chery was warned by CW1 that STM was not protected by a general decline in the market for semiconductors; (c) excess inventory existed in the supply chain and STM was slow to adjust the change in pricing dynamics as confirmed by CW1, CW2, CW3, CW5, and CW7; and as a result (d) Chery misled investors by stating that the backlog was "full up to 2024," opportunities to increase prices remained, and the Automotive market was "very, very solid" with no "excess inventory" detected.

67.    At this same June 6, 2023 BNP Paribas Conference, Chery doubled down on the strength of the Company's order backlog and said it was not the result of double booking:

**Q - Analyst**
Thank you, Remi. Don't have that much time anymore. But one more question may be on the short-term. The question were, yes, you talked about your backlog visibility for automotive, which is up to the end of 2024.

So the question is, do you think that the backlog is due to double ordering? Are you seeing -- see any volumes decline?

**A - Jean-Marc Chery**
*No. The backlog is related to the fact that our automotive customer, they want to have the warranty to achieve their transformation. So the reason why they give*

*us visibility up to end of 2024, and no, okay well, I'm discussing about 2025, and it is very good for automotive I see. It is valid for headers. It is very the – for microcontroller and it is very difficult for power IGBT and silicon carbide. The driver which are either in BCD9 and BCD8 technology.*

So no, it's purely related to the capacity availability. To the fact that engaging themselves in a massive transformation that they don't want to be in difficulties by – if you read the newspaper yesterday I think it's (foreign language) the electrical car has been stopped by semiconductor. It's a moment of time where the demand on the car -- electrical car is very important.

*So the customer, they don't want to be taken by surprise on their transformation. So, no, the backlog is not a question of double ordering, it's a question to simply support their demand. We have the same, again on power and on energy transformation. And we have the same on robotics, we have the same on automation.* We are lucky to have our main customer Apple. They give us the visibility up to ahead of '24, yes, they have the capability to adjust. This is what they have done in Q1 definitively, but now, it's quite stable.

\*\*\*

*So today the visibility ST has in terms of backlog is very clear, okay. We start to put order on '24. The book to bill is below one. Why? Because, okay we are reducing the lead time, not because, okay we are facing a bad market condition, it's exactly what we have predicted.*

68.    The statements identified in Paragraph 67 were materially false and misleading when made because they omitted to disclose that: (a) Defendants had pulled forward demand by channel stuffing, including by providing discounts to drive bookings and inflate sales in the short term as explained by CW1; (b) Chery was warned by CW1 that STM was not protected by a general decline in the market for semiconductors; (c) excess inventory existed in the supply chain and STM was slow to adjust to the change in pricing dynamics as confirmed by CW1, CW2, CW3, CW5, and CW7; (d) lead times had decreased based on CW2's account, diminishing customers' ability to provide accurate estimates; and as a result (e) Chery misled investors by stating that the backlog was driven by customer demand, and provided STM with "visibility up to [the] end of 2024."

**D.  September 6, 2023 Citi Global Technology Conference**

69.    On September 6, 2023, at Citi's Global Technology Conference, Chery made the following false statement about the Company's 2024 bookings:

> **Q - Chris Danely**
> Okay. So let's transition into 2024 and your thoughts on the various big end markets for SD, maybe start with auto, what are you most positive about for auto in 2024, do you think it can grow in 2024 for the automotive market?
>
> **A - Jean-Marc Chery**
> *Yes. Okay. Auto will be clearly the growth driver of ST next year. Yes.*

70.    The statements identified in Paragraph 69 were materially false and misleading when made because they omitted to disclose that: (a) Chery knew that Defendants had pulled forward demand by channel stuffing, including by providing discounts to drive bookings and inflate sales in the short term as explained by CW1; (b) Chery was warned by CW1 that the market was poised to decline no later than the second half of 2023 because orders had softened; (c) CW1 warned Chery not to publicly commit to promises that STM could not keep; and (d) the Automotive market had already declined as confirmed by CW3 and CW5.

**E.  October 26, 2023 Earnings Conference Call**

71.    On October 26, 2023, STM held a conference call to announce the financial results for the third quarter of 2023, and Chery made the following misrepresentations about demand and "visibility":

> **Q - Didier Scemama**
> Good morning, everyone. Thanks for letting me on. Maybe just a couple of questions. Jean-Marc, if I may, on Q4, if you could give us a sense of, the various end markets we're hearing, obviously weakening demand in industrial. I think in a conference earlier this year, you mentioned that you were fully booked for autos for 2024. So I wondered whether you could, maybe talk also about the rest of the business next year, any sort of early indication on revenue growth and also gross margins? Thank you.
>
> **A - Jean-Marc Chery**
> Well, for Q4, I repeat, clearly we have seen an industrial market, especially in

28

China, Asia-China that the order booking, entering in the lead time window were not materializing at our expectation. And it has mainly impacted the general purpose microcontroller.

Well, this is for Q4. But now, we have to acknowledge all together that we went back to normal in terms of lead time and capacity utilization for this kind of device and for semiconductor industry, except very few product lines like Silicon Carbide as well. ***But about 2024, clearly, we have a very good visibility for 2024 for automotive.*** And for whole, I have to say, the engaged customer program with our global strategic key account everywhere we have, let's say, a custom-designed product or where we have proliferated our product.

Then for, let's say, industrial market, both mass market distribution and OEM, now the visibility is limited and for sure customers, let's say, went to the habit to put order when they are in the lead-time window. So, we have to monitor very carefully the order entry in Q4 to understand, okay, how it will be, let's say, next year for mass market industrial, both for OEM and distribution. ***Well, if you want to classify next year very, very simply, we are convinced that automotive will go, definitively, because we have the visibility.***

***And again, okay, the demand will be driven by the key mobility, by the digitalization, by the pervasion of, let's say, the electronic and legacy application. Well, it is based on the production volume that will remain around 85 million, 90 million vehicles.*** We do believe that for personal electronic, we touch down some bottom in Q4. And next year, like-for-like, because, okay, again, we have to remove the optical modules still present in '23.

72.    The statements identified in Paragraph 71 were materially false and misleading when made because they omitted to disclose that: (a) Defendants had pulled forward demand by channel stuffing, including by providing discounts to drive bookings and inflate sales in the short term as explained by CW1; (b) Chery was warned by CW1 that demand would decline in the second half of 2023, and he should not make commitments publicly that he could not keep; (c) Chery was told by CW1 that STM was not protected from market headwinds, rendering Chery's statements about "good visibility" into Automotive demand and key drivers of momentum for that demand materially false and misleading when made; and (d) the "visibility" into Automotive demand had already diminished as confirmed by CW3 and CW5.

29

73.     At the earnings conference call held to announce the financial results for the third quarter of 2023, Chery also made the following materially misleading statements about STM's superiority to competitors, feedback from customers, demand, and overall trends in the market:

**Q - Francois-Xavier Bouvignies**
Thank you very much. So, I wanted to follow-up on Alex's question on automotive. I mean, this quarter, you delivered 30% growth. I mean, if you look at TSMC, it was down 11% year-over-year, calling that the industry is going through an inventory correction. And also, I'm sure you saw as well the macro data with OEMs, orders for auto is coming down significantly, especially in Europe. We also saw GM and Honda with push-outs of EVs. So, it seems to be very different than what you report and also what you say into next year, what you just said. So, I'm just wondering, do you see anything or is your guidance factoring some maybe EV penetration slowdown into next year? Because I guess, it's something that you would see that happening, or is just your lead times so long that basically you don't see it yet? I'm just trying to reconcile basically what we see on the ground and what you are delivering and how it can be disconnected, do you see what I mean.

**A - Jean-Marc Chery**
No, no. Perfectly. I see there is no disconnection. Now, if your question is this year basically at 17.3 the automotive segment we support, basically will grow 36%. Well, clearly also embedded in this fantastic growth, now there is a specific item, which are related to the period of shortage that ST has benefited in 2023 was the capacity fee reservation, and which is quite material.

However, even if you remove this effect on our growth performance, our automotive segment in 2023, okay, basically will grow 28%. So next year, I have to say that this capacity fee reservation will be still present but in a, let's say, less order of magnitude than 2023. And it's normal because, okay, except few product line, now we have the capability to better support the carmaker through the Tier l or directly. But then the Tier l and the carmaker, they are acknowledging as well that we are reducing our lead time and reducing our lead time by step after step. Okay, we could see booking order with a book to build below l on automotive simply the fact that they will stop to load 18 months in advance or 24 in advance.

*And we could anticipate that in 2025, instead to have 100% backlog coverage, we will be maybe 80% backlog coverage. So this is the trend we are seeing, point number one. Point number two, well, I'm sorry again, with all the respect I have with TSMC, they have a partial view of automotive. Okay, we have the full spectrum of product portfolio to see what is happening in automotive. And I confirm to you that except for like-for-like results in the Silicon Carbide, we will grow. For sure, we will not grow at 28%. We will grow significantly, but not at 28%. This I can confirm to you.*

30

So, as a takeaway, I can tell you that, yes, next year we will have a little bit benefit less on capacity fee reservation. *We will see our customer acknowledging our capability in '24 to better deliver with shorter lead time. So normally, their booking will, let's say, decline in order to adjust themselves to this fact. So we would expect to enter in 2025 with 80% coverage on automotive, so this is the point number two.*

*Point number three, we will grow overall in 2024, and it is based on stable production car volume, that we consider around 85%. Yes, the feedback we have from our customers and the feedback that is from analysts is next year is more than 90 million vehicles produced. This is not the base of our forecast.*

*Then point number three, I repeat, this year is 11 million to 12 million of battery-based electrical vehicles. Next year, we can expect to go well above 15 million again, so this will call for a big demand for power electronics and micro, but then you have the change of architecture that are coming for the old, definitively, And then the customer, having acknowledged that we can better supply, they come back to better sophistication of the legacy, so there is more and more semiconductor and electronic legacy applications. So all in all, this is building a scenario for next year of growth for automotive, for ST, taking into account the portfolio we have.*

74.    The statements identified in Paragraph 73 were materially false and misleading when made because they omitted to disclose that: (a) Defendants had pulled forward demand by channel stuffing, including by providing discounts to drive bookings and inflate sales in the short term as explained by CW1; (b) "feedback" from customers on demand, inventory and the future was not encouraging as CW1, CW2, CW3, CW4, CW5, and CW7 confirm; and (c) Chery was told by CW1 that demand would decline in the second half of 2023, and STM was not protected by market headwinds that impacted its competitors and the industry generally.

**F.  January 25, 2024 Press Release and Earnings Conference Call**

75.    On January 25, 2024, the Company announced its financial results for the full fiscal year 2023 by issuing a press release that was filed with the SEC on Form 6-K. In the press release, Chery said as follows:

"In Q4, our customer order bookings decreased compared to Q3. *We continued to see stable end-demand in Automotive, no significant increase in Personal Electronics, and further deterioration in Industrial.*"

31

76.     The statements identified in Paragraph 75 were materially false and misleading when made because (a) Chery was told months earlier that demand was on a downward trajectory in Automotive, a fact corroborated by CW1, CW2, CW3, CW4, CW5, and CW7; and (b) Defendants had pulled forward demand by channel stuffing, including by providing discounts to drive bookings and inflate sales in the short term bookings without CW1's approval.

77.     At the Company's earnings call to announce the results for the full Fiscal Year 2023, Chery blamed the declining growth rate in Automotive to the withdrawal of Capacity Reservation Fees and inventory problems experienced by one customer:

> \*\*\*
> As mentioned earlier, the first half of 2024 will be impacted by a significant inventory correction in Industrial. In the second half of the year, we expect significant sequential revenue growth, driven by a strong rebound in Industrial and Computer Peripherals, continued growth in Automotive and Communication Equipment, and the usual seasonality in Personal Electronics.
>
> At the midpoint of our full -year 2024 revenue indications, we expect mid-single-digit year-over-year growth in Automotive. ***Excluding the impact of capacity reservation fees and a specific customer 2023 inventory replenishment effect, this will correspond to low-double-digit year-over-year[ph] growth.*** We expect Industrial to return to high-single-digit year-over-year growth in the second half of 2024 after a significant decline in the first half.

78.     The statements in Paragraph 77 were materially false and misleading when made because: (a) Chery was already aware for months that the decline in Automotive was not caused by a series of one-offs, but was systemic and impacted the whole industry, including STM, a fact corroborated by CW1 and supported by the accounts by CW2, CW3, CW4, CW5, CW6, and CW7; (b) Defendants had pulled forward demand by channel stuffing, including by providing discounts to drive bookings and inflate sales in the short term as explained by CW1; and as a result (c) it was misleading to extrapolate better growth by blaming the decline to a series of one-offs as Chery did here and throughout 2024.

32

79.     Later on the same call, Chery specifically denied that Automotive was subject to the same kind of deterioration as Industrial, including inventory correction:

**Q - Francois-Xavier Bouvignies**
That's great, Jean-Marc. But just a quick follow-up from me on the --you know, when you laid out the underlying growth of the Automotive, which is really well understood. But isn't it like -- don't you think to have an inventory correction buffer would make sense at this point of time? You know, I'm talking about inventory correction at the semiconductor level, for example, because, obviously, last year, they all wanted to increase inventory significantly from a low base. So, obviously, it makes the base effect technically negative from a semiconductor inventory point of view. Do you see what I mean?

**A - Jean-Marc Chery**
*Yeah, yeah, exactly. No. We absolutely don't see on Automotive what we are seeing on Industrial, because on Industrial, this is what is happening*. Again on Automotive, where we see a pocket of inventory corrected is on ADAS. That has been pretty well communicated.

Q - **Francois-Xavier Bouvignies**
Great. Thank you, Jean-Marc.

**A - Jean-Marc Chery**
*And I have to confirm to you that we have a very solid backlog covering the plan I mentioned to you on Automotive.*

**Q - Francois-Xavier Bouvignies**
Very helpful. Thank you.

80.     The statements identified in Paragraph 79 were materially false and misleading when made because: (a) Defendants had pulled forward demand by channel stuffing, including by providing discounts to drive bookings and inflate sales in the short term as explained by CW1; (b) softening conditions across all end markets, including Automotive, caused price pressure and lowered profit margins as supported by the accounts of CW2, CW3, CW5, and CW7; (c) weakening demand and increasing inventory in Automotive was not limited to ADAS [Advanced Driver Assistance Systems] as confirmed by the accounts of CW2, CW3, CW5, and CW7; and as

33

a result (d) the backlog for Automotive was not "very solid," and the Company experienced inventory challenges with Automotive as well.

### G. The 2023 Form 20-F Filed on February 22, 2024

81.     On February 22, 2024, STM filed with the SEC its Annual Report for Fiscal Year 2023 on Form 20-F ("2023 20-F"). The 2023 20-F was signed by Chery. Chery and Grandi each certified that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that the financial information contained in the report "fairly present[s] in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report."

82.     In addition, appended to the 2023 20-F as an exhibit was a signed certification pursuant to the Sarbanes-Oxley Act of 2002 of both Individual Defendants, attesting that "[t]he information contained in the [2023 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

83.     The 2023 20-F misleadingly described risks associated with downturns and the nature of STM's cyclical business:

> ***The semiconductor industry is cyclical and downturns in the semiconductor industry can negatively affect our results of operations and financial condition.***
>
> The semiconductor industry is cyclical and has been subject to significant downturns from time to time, as a result of global economic conditions, as well as industry-specific factors, such as built-in excess capacity, fluctuations in product supply, product obsolescence and changes in end-customer preferences. See "Item 3. Key Information — Risk Factors — Risks Related to the Semiconductor Industry which Impact Us — We, and the semiconductor industry as a whole, ***may be impacted*** by changes in, or uncertainty about, global, regional and local economic, political, legal, regulatory and social environments as well as climate change."

Downturns are typically characterized by reduction in overall demand, accelerated erosion of selling prices, reduced revenues and high inventory levels, *any of which could result* in a significant deterioration of our results of operations. Such macroeconomic trends typically relate to the semiconductor industry as a whole rather than to the individual semiconductor markets to which we sell our products. To the extent that industry downturns are concurrent with the timing of new increases in production capacity or introduction of new advanced technologies in our industry, the negative effects on our business from such industry downturns may also be more severe. We have experienced revenue volatility and market downturns in the past and expect to experience them in the future, which could have a material adverse impact on our results of operations and financial condition.

84.     The statements identified in Paragraph 83 were materially false and misleading when made because the risks portrayed as hypothetical were then actually occurring—the Company was at the time exposed to a downturn that reduced overall demand, reduced prices, increased inventory, and reduced revenue that negatively affected the Company's operations and financial condition.

85.     The 2023 20-F disclosed the following hypothetical risk concerning customers and distributors:

*Disruptions in our relationships with any one of our key customers or distributors, and/or material changes in their strategy or financial condition or business prospects, could adversely affect our results of operations.*

A substantial portion of our sales is derived from a limited number of customers and distributors. *There can be no assurance that our customers or distributors will continue to book the same level of sales with us that they have in the past*, will continue to succeed in the markets they serve and will not purchase competing products over our products.

86.     The statements identified in Paragraph 85 were materially false and misleading when made because: (a) STM's customers and distributors were already booking orders at decreased rates; (b) STM then faced excess inventory; and (c) demand had declined and pressure on prices had increased.

35

87.     The 2023 20-F stated the following concerning hypothetical discrepancies between customer demand and the Company's projections:

> ***Our business is dependent in large part on continued growth in the industries and segments into which our products are sold and on our ability to retain existing customers and attract new ones. A market decline in any of these industries, our inability to retain and attract customers, or customer demand for our products which differs from our projections, could have a material adverse effect on our results of operations.***
>
> The demand for our products depends significantly on the demand for our customers' end products. Growth of demand in the industries and segments into which our products are sold fluctuates significantly and is driven by a variety of factors, including consumer spending, consumer preferences, the development and acceptance of new technologies and prevailing economic conditions. ***Changes in our customers' markets and in our customers' respective shares in such markets could result in slower growth and a decline in demand for our products.*** In addition, if projected industry growth rates do not materialize as forecasted, our spending on process and product development ahead of market acceptance could have a material adverse effect on our business, financial condition and results of operations.
>
> Our business is dependent upon our ability to retain existing customers. In 2023 our largest customer, Apple, accounted for 12.3% of our total revenues. ***While we do not believe to be dependent on any one customer or group of customers, the loss of key customers or important sockets at key customers could have an adverse effect on our results of operations and financial condition.***
>
> ***Our existing customers' product strategy may change from time to time and/or product specifications may change on short-time product life cycles and we have no certainty that our business, financial position and results of operations will not be affected. Our business is also dependent upon our ability to attract new customers. There can be no assurance that we will be successful in attracting and retaining new customers, or in adequately projecting customer demand for our products. Our failure to do so could materially adversely affect our business, financial condition and results of operations.***

88.     The statements identified in Paragraph 87 were materially false and misleading when made because STM failed to disclose that: (a) in each of the Company's segments, business was declining, not growing; (b) key customers, as later disclosed, were already being lost; (c)

36

inventory was building up, meaning that customers were ordering less product; and (d) expected growth rates had declined.

89.     The Company described the following concerning the hypothetical risk of results differing from expectations and financial guidance in the 2023 20-F:

> ***Our operating results may vary significantly from quarter to quarter and annually and may also differ significantly from our expectations or guidance.***
>
> Our operating results are affected by a wide variety of factors that ***could*** materially and adversely affect revenues and profitability or lead to significant variability of our operating results from one period to the next. ***These factors include changes in demand from our key customers***, capital requirements, ***inventory management***, availability of funding, ***competition***, new product developments, start of adoption of our new products by customers, technological changes, manufacturing or supplier issues and effective tax rates. ***In addition, in periods of industry overcapacity or when our key customers encounter difficulties in their end-markets or product ramps, orders are more exposed to cancellations, reductions, price renegotiation or postponements, which in turn reduce our ability to forecast the next quarter or full year production levels, revenues and margins. As a result, we may not meet our financial targets, which could, in turn, have an impact on our reputation or brand. For these reasons and others that we may not yet have identified, our revenues and operating results may differ materially from our expectations or guidance as visibility is reduced***. See "Item 4. Information on the Company — Backlog".

90.     The statements identified in Paragraph 89 were materially false and misleading when made because STM failed to disclose that: (a) demand decreased, inventory increased, and competition put pressure on prices that STM was slow to reduce; (b) orders were already exposed to cancellation, reduction, and price renegotiation; and as a result (c) STM was already at a high risk of being unable to meet its financial targets.

**H.  March 12, 2024 Citi TMT conference**

91.     On March 12, 2024, Chery attended the Citi TMT conference, and made the following materially false and misleading statements about the Automotive segment:

**Q - Andrew Gardiner**

Could we start then on your 2024 outlook? You've guided the market between $15.9 billion and $16.9 billion in revenue. Can you just walk us again through the different drivers of what's going to get you within that range?

**A - Jean-Marc Chery**

Well I think I have to come back by a vertical view. So first of all, clearly, Automotive that is representing about 41% of ST revenue, so we see in 2024, a growth about a mid-single digit. Well we feel important that we have, let's say to disclose a like-for like growth of Automotive because if you remember what I said during our Q4 earnings announcement that in 2023, we have taken benefits for Automotive revenues, about two points.

*Point number one is what we call capacity reservation fees from a carmaker that touch as a peak in 2023. The second, let's say nonrecurring event was an important inventory buildup, agreed, because contractual inventory buildup from one important customer that will not occur again in 2024. So if we clean from these two elements, so capacity reservation fee and inventory buildups, very specific, the growth we expect on Automotive in 2024 is, I have to say let's say above 10% -slightly above 10%.*

*We have a good confidence level because the coverage we have in terms of backlog is, let's say about 85% and for the time being, we don't see any massive, let's say inventory corrected here and there, for sure. The customers are, let's say tuning their inventory, depending the mix of the end customer demand, but we don't see a massive correction.* So for Automotive we expect like-for-like slightly above 10%.

Everything reported, let's say mid-single-digit growth.
***

92.     The statements identified in Paragraph 91 were materially false and misleading when made because: (a) Defendants had pulled forward demand by channel stuffing, including by providing discounts to drive bookings and inflate sales in the short term as explained by CW1; (b) softening conditions across all end markets, including Automotive, caused price pressure and lowered profit margins as confirmed by the accounts of CW2, CW3, CW5, and CW7; (c) weakened demand and excess inventory in Automotive was not limited to "buildup" at one customer or the reduction of Capacity Reservation Fees as confirmed by the accounts of CW1, CW2, CW3, CW4,

38

CW5, CW6, and CW7; and as a result (d) Chery gave investors the false impression that STM had sufficient backlog coverage, and that there was no "correction" with Automotive inventory.

93.    At the March 12, 2024 Citi TMT conference, Chery also made the following statements regarding Automotive demand and backlog:

**Q - Andrew Gardiner**
Thank you, Jean-Marc. We're sort of -- we're down to the last 10 minutes. Why don't we dive a bit more into some of the end markets, starting with the biggest one, Automotive, as you said, just over 40% of sales now. I think it's arguably the area where the market is most skeptical in terms of the near term. You've told us at a high level, you're expecting mid-single-digit growth. But on a like-for-like basis, given some of the adjustments for last year, you're talking about 10% or more – slightly more than 10%. Can you walk us through some of the building blocks in terms of perhaps sort of different products, different technologies, mix within the market. What is it that's giving you that confidence in another year of growth in Automotive?

**A - Jean-Marc Chery**
No. I mean it's clear that everywhere, the demand is sustained by either – but whatever are, let's say the growth rate, okay? Clearly, if you take e-mobility, if you take, let's say ADAS so the peripheral device not the vision processor. I've already spoken about Mobileye. The legacy where now the carmaker again introduce a lot innovation in the legacy system.

So body control, lighting, airbag control, cockpit and so on and so forth. Everywhere there is an innovation or change. Again for sure, there is no inventory replenishment, but the ***demand is solid and the backlog is solid...***
***

***So this is really where -- what we see. As a matter of fact we have a backlog in our hand. That is covering our sales and operating plan above 85%, I have to say that is making us confident that to grow, let's say about 10% in 2024 versus 2023. Again like for- like removing the effect of capacity reservation fee and Mobileye is a plan that is actionable.***

This is the visibility we have today. So then what scenario could happen that in H2, the end customer demand completely collapsed and so on. So far, for the time being, this is not what customers said.

94.    The statements identified in Paragraph 93 were materially false and misleading when made because: (a) Defendants had pulled forward demand by channel stuffing, including by

providing discounts to drive bookings and inflate sales in the short term as explained by CW1; (b) Automotive demand declined and the backlog was insufficient to cover STM's sales and operating plan as supported by the accounts of CW1, CW2, CW3, CW4, CW5, CW6, and CW7; and as a result (c) weakened demand and excess inventory in Automotive was not limited to issues at Mobileye or the reduction of Capacity Reservation Fees.

## I.    April 25, 2024 Earnings Conference Call

95.    On April 25, 2024, the Company held a conference call to announce the financial results for the first quarter of 2024. During this conference call, Chery continued to mischaracterize correction in inventory as limited to the Industrial segment and falsely assured investors that visibility was "good" because of the Automotive "backlog":

**Q - Joshua Buchalter**
Got it. Thank you. I appreciate the color. As my follow-up, obviously, you understand, again, numbers are coming down and you mentioned that industrial weakness is expected to last into the second half. Maybe you can give us sort of your -- some of the assumptions that are underlying the back half ramp. And firstly, there's some seasonality at your lead customer. Maybe you could help us give us some clues on how much of that is driving sort of the back half ramp. And then also big picture, how's your comfort level with where you expect your industrial customers' inventory levels to be coming out of the second quarter? Thank you.

**A - Jean-Marc Chery**
Well, overall, yes, we believe that Q2 is a bottom point. Within the range we have indicated, clearly, we expect a growth in H2. This growth will, let's say, overall enable ST to come back 2023 revenue run rate between Q4 2024 and Q1. Automotive, let's say, will increase in H2. Personal electronics will increase in H2 related to our engaged customer program. And industrial will start to smoothly increase in Q3 and accelerated in Q4.

***Of course, we have a pretty good visibility on backlog in automotive, personal electronics and computer equipment and computer peripheral. We know that the visibility on industrial is shorter because again, there is an important distortion related to inventory level, both at OEM level and in the channel***. However, we see some, let's say, kind of green spot that make us thinking that order will come back in Q2 for additional billing in Q3 smoothly, and acceleration in Q4. ***The risk is embedded in the range of what we have indicated.***

96.      The statements identified in Paragraph 95 were materially false and misleading when made because: (a) visibility had already declined because of shorter lead times, weakening demand, excess inventory, and pricing pressure as confirmed by CW1, CW2, CW3, CW4, CW5, and CW6; (b) the deteriorating conditions led STM to institute a hiring freeze in 2024 as explained by CW6, and as a result (c) an "important distortion" at the inventory level existed in Automotive because of Defendants' decision to stuff the "channel" based on CW1's account, leaving great risk in the range provided to investors intact.

**J.  July 25, 2024 Earnings Conference Call**

97.      On July 25, 2024, the Company held a conference call to announce the financial results for the second quarter of 2024 where Chery made the following statements about the Automotive market:

**Q - Sandeep Deshpande**
Understood. Thank you. And follow up question is on Automotive. We are hearing from many automotive companies that they are seeing weakness in the market. So, do you think that the orders, more than the revenue now, you gave me this view on the revenue, will continue to be weak in autos for the next few quarters?

**A - Jean-Marc Chery**
We receive from the Tier l what they say, delivery forecast, okay? Now, the delivery forecast they gave to us is encompassing, okay, all the adjustments we have already seen in Ql that has been a bit amplified in Q2. Now, we have our backlog. We, as I said, the Tier l, they are working with two weeks call off from car maker. Of course, okay, this is something that we have to put under strict scrutiny. And we monitor, okay, with all of our customers, okay, the dynamic of the shipment and the order they put on us.

On electrical vehicles, I think it's a different story. Here, now, okay, the adjustment has been done and we do believe that, okay, we will deliver about $1.3 billion on ASIC. But yes, on Automotive, the market is dynamic, it's more an inventory adjustment. ***Well, according to some, let's say, analysts for the Automotive industry, it looks like the production of a vehicle is confirmed around 90 million vehicles. Well, we do believe that if it is confirmed, the inventory adjustment is basically done. So the backlog we have in front of us is valuable.*** However, we have to monitor the situation on a very dynamic way.

98.     The statements identified in Paragraph 97 were materially false and misleading when made because: (a) STM was then engaged in a channel stuffing scheme that artificially inflated sales through excessive discounts given to drive bookings as explained by CW1; (b) Automotive demand declined in 2023 and 2024, inventory continued to increase and the backlog was insufficient to cover STM's sales and operating plan in 2024 as confirmed or supported by the accounts of CW1, CW2, CW3, CW4, CW5, CW6, and CW7; (c) Chery knew about these facts since at least early 2023 based on CW1's account; and as a result; (d) the backlog's value had already declined, and inventory adjustment was not "basically done."

### K. October 31, 2024 Form 6-K Announcing Third Quarter Financial Results

99.     On October 31, 2024, STM issued a press release that was also filed with the SEC on Form 6-K, announcing the Company's financial results for the third quarter of 2024. Under a sub-heading entitled "Forward-looking information," the Company identified a variety of boilerplate risks, and then directed investors to see additional "risk factors" specifically set forth in the false and misleading Annual Report filed with the SEC on Form 20-F on February 22, 2024 for the Fiscal Year that ended on December 31, 2023.

100.     The risk factors STM directed investors to review were the same false and misleading statements identified in Paragraphs 83, 85, 87 and 89, and were false and misleading for the same reasons identified in Paragraphs 84, 86, 88 and 90.

### L. November 7, 2024 Form 6-K on Operating and Financial Review and Prospects

101.     On November 7, 2024, STM filed another Form 6-K with the SEC that discussed the Company's operating and financial review and prospects, and contained unaudited financial statements for the third quarter of 2024. This SEC filing made repeated references to boilerplate risks, and repeatedly directed investors to see additional "risk factors" specifically set forth in the

42

false and misleading Annual Report filed with the SEC on Form 20-F on February 22, 2024 for the Fiscal Year that ended on December 31, 2023.

102. The risk factors STM directed investors to review were the same false and misleading statements identified in Paragraphs 83, 85, 87 and 89, and were false and misleading for the same reasons identified in Paragraphs 84, 86, 88 and 90.

**M. November 22, 2024 Morgan Stanley European TMT Conference**

103. On November 22, 2024, Chery attended the Morgan Stanley European TMT Conference, and made the following materially false and misleading statements concerning the alleged level of "visibility" into the Automotive end market:

**Jean-Marc Chery**

It is clear that we consider '25, okay, as a still transition year, and we will see '26 and '27 as an acceleration. ***Twenty-five, overall, we have a good visibility on automotive market*** and on personal electronics and computer and communication. Indeed, on automotive, some risks still exist. If there is a, let's say, the competition with a Chinese car maker, maybe in Europe, okay, what is related the famous cafe, so the fine on non-electrical vehicle if the car maker, okay, are not at the minimum point. ***But basically, what we have as a visibility is really appropriate.***

We will operate still in '25 with a low visibility is what -- is related to the industrial market. And I would like to recall very simply that for semiconductor industrial market is power, energy, is automation, robotics. It is -- let's say, why goods? It is a battery operated tool. It is health care and medical. It is a space and military.

Here, the visibility is pretty low. There is two possibilities for '25. There is a bear approach where we see the small market flattish, and there is a more model [ph] view, where moving forward in Q2 and H2, we see an acceleration of the growth, resuming a situation where inventory has been corrected and the demand is going smoothly. Okay. So this is '25 as a transition year acceleration.

104. The statements identified in Paragraph 103 were materially false and misleading when made because: (a) visibility in Automotive was not "good" but in a steady decline, as confirmed by CW1, CW2, CW3, CW4, CW5, and CW6; (b) which was already known to Chery since at least early 2023 based on CW1's account; (c) the deteriorating conditions led STM to

43

institute a hiring freeze in 2024 as explained by CW6; and as a result (d) visibility was not "really appropriate."

105.    Later on the same conference call, Chery repeated similar misrepresentations in response to pointed questions from analysts:

**Q-Lee Simpson**

…

So Jean-Marc, it seemed to us, at least as you guide out to next year on sales, Q1 does seem to have a below seasonality profile and clearly there are inventory corrections out there both industrial and potentially in autos as well. Can you walk us through the dynamics that you're currently seeing, maybe reference distribution and perhaps visibility to end market as well?

**A-Jean-Marc Chery**

…

So clearly, okay, we will have, let's say, a pretty significant Q1 below seasonality. But then moving forward, *I repeat entering in 2025 on automotive, personal electronics and, let's say, communication equipment and computer peripheral, we have a visibility, which is usual one, so means between 70% to 80%.*

Again, we know that an automotive is mainly on frame orders, okay. And that frame order could be adjusted, okay. I repeat, okay, the risk is maybe in Europe, if -- the car makers, they have to adjust their production to avoid the fine.

106.    The statements identified in Paragraph 105 were materially false and misleading when made because: (a) visibility in Automotive was not "usual" but in a steady decline, as confirmed by CW1, CW2, CW3, CW4, CW5, and CW6; (b) which was already known to Chery since at least early 2023 based on CW1's account; and (c) the deteriorating conditions led STM to institute a hiring freeze in 2024 as explained by CW6.

III.    **The Truth Begins to Gradually Emerge**

107.    On April 25, 2024, STM filed a press release on Form 6-K with SEC, in which it disclosed poor financial results for the first quarter of 2024 driven primarily by a decline in

44

revenues and margins in Automotive and Industrial. Quarterly revenue declined year-over-year by over 18% and operating margins decreased to 15.9%. Defendants admitted in the press release that demand for chips declined in Automotive and the negative trends accelerated in Industrial. The Company revised Fiscal Year 2024 guidance downwards from a range of $15.9 billion to $16.9 billion to a range of $14 billion to $15 billion. The revenue estimate for the second quarter of 2024 was $3.2 billion, a year-over-year decline of 26%. Defendants attributed the decline in Automotive to lower production rates for electric vehicles and adjustments in inventory controls.

108.    On this partial disclosure and materialization of the concealed risk thereof, the price of the Company's common stock declined by nearly 3%, falling from its previous day closing price of $42.60 to close at $41.33 on April 26, 2024. The market continued to absorb the news on the next two trading days with STM's stock price closing at $41.18 on April 29, 2024, and falling to $39.56 on April 30, 2024.

109.    Although Defendants told investors that the financial picture in Automotive and Industrial would start to improve as the year progressed, on July 25, 2024, Defendants announced worse news in a press release filed on Form 6-K with the SEC. In the July 25, 2024 press release, the Company again announced lower than expected revenue in Automotive, including a decline in demand, and continued deterioration in Industrial. Fiscal Year total revenue for 2024 was again revised downwards to a new low of $13.2 billion to $13.7 billion. At least a billion dollars in reduction to the Fiscal Year 2024 guidance was attributed by the Defendants to continued deterioration in Automotive and Industrial. Defendants also disclosed that customers were canceling orders to reduce inventories, and that Defendants expected production rates for electric cars to continue to decline.

110.     On this partial disclosure and materialization of the concealed risk thereof, the Company's stock price declined by over 15% from its previous day closing price of $39.54 to close at $33.47 on July 25, 2024.

111.     Expressing surprise, analysts at TD Cowen wrote in a report published on July 25, 2024 that they "did not anticipate the magnitude of impact to order patterns and limited ability to clear inventory in 2Q that we think looks worse than peers . . . [t]his is driving materially worse channel conditions and another painful cut to consistently optimistic 2H24 guides." Analysts at Morgan Stanley observed in a report published on July 26, 2024 that "trough dynamics here are unfolding into the worst we have seen for the [C]ompany in a long time." Analysts at Jeffries cut estimates for both 2024 and 2025 in a report published on July 26, 2024, noting that "automotive supply chain inventories remain[ed] high and the industrial recovery [is] likely to take time."

112.     On October 31, 2024, Defendants filed another press release with the SEC on Form 6-K, in which STM disclosed that it expected to finish Fiscal Year 2024 with $13.27 billion, or on the lower end of the range disclosed on July 25, 2024. The Company initiated cost savings measures, and revenue for the fourth quarter of 2024 was guided down below analyst consensus. In a report published on October 31, 2024, analysts at Morgan Stanley observed that the Company signaled a weak start to 2025, and "[w]ith the already weaker-than-expected performance in autos in Q3 and our view that autos semis decline in 2025, we expect much of this drop will be as a result of deteriorating automotive fundamentals." In a report published on October 31, 2024, analysts at TD Cowen "share[d] investors' frustration following several quarters of guide downs still in search of more definitive signs of the model troughing."

113.     On this partial disclosure and materialization of the concealed risk thereof, the price of STM's common stock declined from its previous day closing price of $27.55 to close at

$27.14 on October 31, 2024, fell again the next day to close at $26.67 on November 1, 2024, and continued to fall to close at $25.96 on November 4, 2024.

114.    On January 30, 2025, Defendants filed another press release with the SEC on Form 6-K, in which STM disclosed that "[STM's] book-to-bill ratio remained below 1 in Q4 [2024] as we continued to face a delayed recovery and inventory correction in Industrial and a slowdown in Automotive" and STM's Fiscal Year 2025 Q1 "business outlook, at the mid-point, is for net revenues of $2.51 billion, decreasing year-over-year by 27.6% and decreasing sequentially by 24.4%."

115.    During the earnings call held on the same day to further discuss the poor financial results, Chery admitted that "weaker end demand and higher level of inventories [] significantly impacted [the Company]" in 2024 and "2024 turned out to be one of the worst years … in [I]ndustrial and in [A]utomotive." Chery also conceded that STM could not provide a revenue outlook for 2025 because the "visibility" for 2025 was "extremely low" in both Industrial and Automotive:

**Q-Francois Bouvignies**

Thanks a lot. So my question would be, I mean, given the outlook that you see in Q1 and the book-to-bill, that doesn't bring a lot of confidence at this stage, especially in terms of visibility, what should we think about the rest of the year? I mean, Jean-Marc, you said at the Capital Markets Day, you were comfortable about the consensus numbers, which has minus 3% at the time following these results. How should we think about the rest of the year and given the book-to-bill? How should see the trend? Thank you very much.

**A-Jean-Marc Chery**

Following the business dynamic of Q4 and specifically on automotive, but we believe it's really too early to communicate our new plan for the full-year 2025. ***Considering again, the visibility we have in industrial, but both in automotive. Well, beyond Q1, the visibility remains extremely low***, but except for the main engaged customer program in which we should grow beyond seasonality in H2 versus H1, but driven by content increase.

116.    On the same conference call, in response to a follow-up question from a UBS analyst, Grandi admitted that there was "excess inventory" in the Distributor Channel:

**Q-Francois Bouvignies**

Yes. Been weakening and the channel has been fairly high. How do you see the level? I mean, do you see any evidence of strong destocking? If you can maybe disclose in the channel where you are versus a normal or if you see any light in the destocking part this quarter in Q1, and of course, Q4 as well.

…

**A-Lorenzo Grandi**

In term of inventory in distribution in the quarter, we have not seen a significant destocking, let's say, still situation, I would say there is some excess of inventory. This excess of inventory stays in the range of one or two months, let's say depending on the product higher in respect of what we consider a normal situation in distribution. *So at the end, still, we see inventory in – excess inventory in distribution.*

117.    Further, Chery explained that the fact that visibility was "extremely low" for 2025 was "amplified" by inventory correction in the Automotive end market:

**Q-Andrew Gardiner**

Thank you very much. It's just slightly a separate one. It was just interested, Jean-Marc, on the comment you made regarding the visibility. I mean on the industrial side, I think that's pretty clear given the weakness you saw in the fourth quarter and what you're seeing in terms of the channel. But in 4Q automotive was, let's say, okay, was in line with your expectations. But you're also pointing out that the visibility there, looking into this year is particularly weak. What has perhaps changed for the worst? Or is it just the customers are so uncertain, they're not giving you visibility on a normal lead time? Just a bit of color around what's happening in automotive would be helpful.

**A-Jean-Marc Chery**

…

In Q1, okay, we see a phenomena of inventory adjustment. That's the reason why we anticipated and we share, okay, with the market that Q1 will be significantly below the seasonality that generally speaking are only due to personal electronics and China and Asia, okay, because of Chinese New Year, *but this year, amplified by an inventory correction at automotive.*

48

After Q1, okay, we know that some Tier 1 have already adjusted their delivery forecast, but again, which is only a forecast, but the visibility of the pooling from the consignment inventory are very short term. So we are not protected against some fluctuation on this point. That's the reason why we come back on this situation.

118.    In an analyst report published on January 30, 2025, Goldman Sachs analysts noted that "[STM's] 1Q25 revenue/gross profit guidance is -7%/-17% below company-compiled consensus at the midpoint" and "STM has not provided FY25 revenue/gross profit guidance." The report further observed that STM "continued to face a delayed recovery and inventory correction in [I]ndustrial, and a slowdown in [A]utomotive." Also, in a report published on January 30, 2025, a Morgan Stanley analyst commented that the miss in first quarter of 2025 guidance "could be related to device pricing weakness wrought by worsening dynamics in channel inventory." In another January 30, 2025 analyst report, a UBS analyst stated that "[v]isibility remains low in Industrial, with a delayed recovery and continued inventory correction, while demand in Auto[motive] continues to slow."

119.    On this partial disclosure and materialization of the concealed risk thereof, the Company's stock price fell by over 8.9% from its previous day closing price of $24.74 to close at $22.52 on January 30, 2025.

## IV.    Additional Allegations of Scienter

### A.  Defendants' Admissions

120.    Defendants were aware of risks that rendered their false assurances misleading. At the second quarter of 2024 earnings conference call held on July 25, 2024, Chery told investors that the Company's practice of processing orders whereby the customer had no right to cancel ended in March 2023. Defendants did not disclose this fact at any point before July 25, 2024. Chery explained that the abandonment of this practice led "to an increase [in] the inventory, for sure, that now we have to digest." Just a few months later, the Company held a Capital Markets

Day on November 20, 2024. At this investor conference, Chery again explained that the practice of processing orders without a right to cancel was discontinued as early as March 2023: "up to March 2023 from '22 all of the backlog on industrial market was protected by this non-cancellable order. So this was basically where we are, so now we have no more." That Defendants knew facts on the ground had changed, and the risk of inventory buildup increased during the Class Period as protections for themselves fell by the wayside enhances an inference of fraud, particularly when these facts were concealed from investors while Defendants made false, positive statements.

## B. Defendants' Own Statements Support an Inference of Scienter

121.    The Individual Defendants' own statements demonstrate that they paid close attention to detail and information that made them aware of critical facts that rendered their Class Period statements misleading when made. For example, as early as March 14, 2023, Chery attended the Citi TMT Conference, and told investors that: "***we are not detecting excess of inventory. This is something we are monitoring very carefully***. ***That's the reason why we manage our POP, POS to shift to distributors in order to not build excess of inventory. Well then at OEM level on the car industry or industrial level, we have not detected excess inventories at all.***" [9]

122.    Grandi made similar representations in the beginning of the Class Period. At the April 27, 2023 earnings call held to announce the financial results of the first quarter of 2023, Grandi assured investors that: "of course we are also ***keeping under control our inventory.***" On this same April 27, 2023 earnings call, Chery provided more specific assurances asserting that: "***we monitor pretty well inventory at the distribution channel. Yeah, okay. It's clearly following***

---

[9] "POP" and "POS" refer to point of purchase and point of sale, respectively.

*the market dynamic, when you are through distribution addressing mainly okay for us the industry market. We are coming back now to a normal coverage in term[s] of inventory.*"

123.    At a Global Technology Conference hosted by Citibank on September 6, 2023, Grandi again assured that inventory was "put under control." At this same event, Chery told investors that inventory was monitored at a granular level: "[w]e clearly monitor and put under scrutiny in partnership with our distributors or in direct discussion with our customers."

124.    On an earnings conference call held on April 25, 2024 to announce the financial results for the first quarter of 2024, Grandi again repeated that inventory was "controlled, it's the right level."

125.    These specific representations made to investors show: (a) that Defendants were well aware of facts that would show that their statements to investors were false or misleading or could easily check the information necessary to make their statements not misleading; and (b) Defendants sought to portray themselves as knowledgeable to investors and analysts about demand, backlog and distributor/customer inventories.

## C. The Core Operations Doctrine Bolsters an Inference of Scienter

126.    STM derives substantially all of its revenue from selling chips, with the overwhelming majority of such revenue in the Automotive and Industrial end markets. Sales of semiconductor chips touch on all facets of STM's business and the decline in demand affected profitability and revenue of the Company during 2023 and 2024. As such, it would be absurd to assume that the Individual Defendants were unaware of the massive decline in demand and the inventory glut, both of which were metrics they closely tracked, and of changes in the Company's cancellation policies.

51

### D. Suspicious Stock Sales Enhance an Inference of Fraud

127.    During the Class Period, Chery and Grandi took advantage of STM's artificially inflated stock price and investor ignorance of STM's growing demand problem to collectively reap almost $8 million in insider sales. Specifically, Chery sold over $4.1 million in common stock, while Grandi sold just over $3.7 million in common stock. These windfalls from stock sales dwarf Chery's salary of $1.21 million in 2023. In violation of their duty to disclose all material information or refrain from trading during the Class Period when false and misleading representations were made, the Individual Defendants continued to profit from stock sales in a manner that was out of line with their prior trading history over a comparable period in the past.[10] Grandi sold over $2 million more in stock during the Class Period than during the same 19.5-month period prior to the Class Period, while Chery's stock sales increased by more than $1.5 million compared to the same 19.5-month period prior to the Class Period. The disproportionate trading that both Individual Defendants engaged in enhances an inference of fraud.

### E. Chery's Personal Motive to Commit Fraud Raises an Additional Inference of Scienter

128.    Defendant Chery had an additional motive to commit fraud. His position on STM's Managing Board and title as CEO was set to expire following the Company's annual shareholder meeting in 2024. Negative sentiment toward Chery had been growing during the Class Period, especially among Italian members of the Company's Supervisory Board. To keep his position, he needed to report positive results. Chery was able to do this vis-à-vis the fraudulent scheme described above.

---

[10] Trading data available at https://www.tipranks.com/experts/insiders/jean-marc--chery and https://www.tipranks.com/experts/insiders/lorenzo--grandi.

129.    STM's Supervisory Board is largely equivalent to a Board of Directors for a company in the United States. STM described its Supervisory Board as follows: "[o]ur Supervisory Board advises our Managing Board and is responsible for supervising the policies pursued by our Managing Board, the manner in which the Managing Board implements the long-term value creation strategy and the general course of our affairs and business." STM's "Managing Board" consisted solely of Chery.

130.    CW8 served as STM's CFO from May 2003 through May 2018. While he was not employed at STM during the Class Period, he maintained relationships with colleagues at STM and followed the Company in the wake of his departure. According to CW8, Chery faced mounting pressure to retain his position as President and CEO of STM. Chery's opposition came primarily from the Company's Italian constituents, including Italian members of STM's Supervisory Board. The conflict between Chery and STM's Italian constituents arose in response to Chery's refusal to invest more of the Company's assets in Italy and intensified after Chery reorganized STM by eliminating ADG, which was based primarily in Italy.

131.    According to CW8, Chery's term as CEO and sole member of the Managing Board was set to expire after the 2024 annual meeting. Chery wanted to be nominated and reappointed as STM's CEO. Consequently, he needed to provide the Supervisory Board with positive results to justify his reappointment and avoid giving his opposition any reason to object to it. Chery managed to successfully convince the Supervisory Board when, in March 2024, it agreed to support his reappointment for another three-year term. Articles reporting on the Supervisory

53

Board's proposal explained that the nomination came about only after Italy decided to drop its opposition to Chery.[11]

132.    Although STM began to report negative earnings shortly after the Supervisory Board's proposal, it was too late to retract and shareholders ultimately approved Chery for another three-year term at the annual meeting on May 22, 2024. Consequently, Chery benefited in a personal and unique manner as a result of the fraud alleged herein.

133.    On March 19, 2025, Maurizio Tamagnini resigned from STM's Supervisory Board. On April 9, 2025, Italian Economy Minster Giancarlo Giorgetti accused Chery and other STM insiders of insider trading and stated that the Italian government opposed Chery's continuation at STM.[12]

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

134.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities that purchased or otherwise acquired STM common stock or sold put options for such stock on the NYSE or another United States trading venue between March 14, 2023 and January 29, 2025, both dates inclusive, and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

135.    The members of the Class are so numerous that joinder of all members is impracticable. STM had 903,865,763 common shares outstanding as of December 31, 2022.

---

[11] *See, e.g.*, https://www.bloomberg.com/news/articles/2024-03-23/italy-drops-opposition-to-stmicro-ceo-settling-spat-with-france

[12] *See*, https://www.reuters.com/technology/italy-says-it-opposes-ceo-stmicro-2025-04-09/

Throughout the Class Period, STM's common stock actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by STM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

136.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

137.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

138.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of STM;

- whether the Individual Defendants were control persons of STM during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of STM common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

55

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

139.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

140.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- STM common stock traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiffs and members of the Class purchased, acquired, and/or sold STM common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts materialized or were disclosed, without knowledge of the omitted or misrepresented facts.

141.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

142.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of*

56

*Utah v. United States*, 406 U.S. 128 (1972), as the claims asserted herein sound primarily in omission rather than affirmative misrepresentation.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

143. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

144. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

145. During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of STM common stock. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of STM common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire STM common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

146. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the materially misleading statements described above that were designed to influence the market for STM

57

common stock. The statements described above were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about STM's financial results and business prospects.

147.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

148.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior executives of STM, the Individual Defendants had knowledge of the details of STM's internal affairs and its exposure to deteriorating market conditions throughout the Class Period.

149.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of STM's public statements. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to STM's business, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading statements, the market price of STM common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning

STM's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired STM common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

150.    Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of STM's common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of STM common stock declined upon public disclosure or materialization of the concealed risks alleged herein to the injury of Plaintiffs and other Class members.

151.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

152.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's common stock during the Class Period, upon the disclosure or materialization of the concealed risk that the Company had been disseminating misleading statements to the investing public regarding its revenue, backlogged orders, Distributor Channels, and inventory supply.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

153. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

154. During the Class Period, the Individual Defendants not only participated in but dominated the operation and management of STM, and participated, directly and indirectly, in the conduct of STM's business affairs. Because of their roles and responsibilities as STM's two most senior executives, they knew the adverse non-public information that rendered STM's public statements false and misleading.

155. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to STM's business and results of operations, and to correct promptly any public statements issued by STM which had become materially false or misleading.

156. Because of their positions of control and authority as senior officers, and the fact that they exercised such control in the day-to-day conduct of STM's affairs, the Individual Defendants were able to, and did, control the Company's statements which STM disseminated in the marketplace during the Class Period concerning STM's business, financial results and operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause STM to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of STM within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of STM common stock.

157. Each also culpably participated in the misrepresentations to investors as alleged in Count I. Each of the Individual Defendants, therefore, acted as a controlling person of STM. By

60

reason of their senior management positions of STM, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, STM to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of STM and possessed the power to control the specific activities, which comprise the primary violations about which Plaintiffs, and the other members of the Class complain.

158.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by STM.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  February 6, 2026

Respectfully submitted,

*/s/ Omar Jafri*

**POMERANTZ LLP**

61

Omar Jafri
Joshua B. Silverman
Brian O'Connell
Jianan Jiang
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email: ojafri@pomlaw.com
        jbsilverman@pomlaw.com
        boconnell@pomlaw.com
        ajiang@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com

*Lead Counsel for Plaintiffs*

**LEVI & KORSINSKY, LLP**
Adam M. Apton
Devyn Glass
33 Whitehall Street, 17th Floor
New York, New York 10004
Telephone:  (212) 363-7500
Facsimile:  (212) 363-7171
Email: aapton@zlk.com
        dglass@zlk.com

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**

Eitan Kimelman
60 E 42nd Street, Suite 4600, New York,
New York 10165
Phone: 212-697-6484
Fax:    212-697-7296
Email: eitank@bgandg.com

*Additional Counsel for Plaintiffs*

62