**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE STMICROELECTRONICS N.V.
SECURITIES LITIGATION

Case No.: 1:24-cv-06370-AKH

THIS DOCUMENT RELATES TO:
ALL ACTIONS

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION FOR RECONSIDERATION AND MOTION TO DISMISS**
**THE THIRD AMENDED COMPLAINT**

Robert J. Giuffra, Jr.
David M.J. Rein
Julia A. Malkina
Alexandra Bodo
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
giuffrar@sullcrom.com
reind@sullcrom.com
malkinaj@sullcrom.com
bodoa@sullcrom.com

*Counsel for Defendants*

March 6, 2026

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT ..........................................................................................1

BACKGROUND ............................................................................................................5

    1.    ST's Semiconductor Business......................................................................5

    2.    The COVID-19 Pandemic Disrupts the Semiconductor Industry, Causing Uncertainty..................................................................................6

    3.    Plaintiffs File This Action.........................................................................8

    4.    ST Further Refines Its 2024 Revenue Guidance.......................................8

    5.    Plaintiffs File an Amended Complaint Centered on "CW1" ....................8

    6.    Defendants Move to Dismiss, and Plaintiffs Again Amend Their Complaint Based on "Further Conferring With CW1"....................................10

    7.    Defendants Again Move to Dismiss, and Plaintiffs Rely Principally on "CW1" in Opposing......................................................................................10

    8.    Relying on "CW1," the Court Denies Defendants' Motion to Dismiss ..........12

    9.    Plaintiffs Resist Discovery of Whether the Confidential Witnesses Reviewed or Approved the Complaint Allegations Attributed to Them .........14

    10.    Plaintiffs File a Third Amended Complaint.......................................................14

    11.    Mr. Monti—Plaintiffs' Purported "CW1"—Disclaims the Allegations That Plaintiffs Attributed to Him....................................................................15

ARGUMENT ................................................................................................................20

I.     MR. MONTI'S DECLARATION REQUIRES RECONSIDERATION OF THE COURT'S MOTION-TO-DISMISS DECISION UNDER RULE 54(B)..........20

    A.    This Is a Quintessential Case Requiring Reconsideration .............................20

    B.    Without Plaintiffs' Baseless "CW1" Allegations, the Complaint Must Be Dismissed................................................................................................24

        1.    Without the "CW1" Allegations, Plaintiffs Have Not Pled Any Actionable Misstatement ...................................................................25

        2.    Plaintiffs' Remaining Scienter Allegations Fall Far Short of the PSLRA's Strict Pleading Requirements .........................................29

**II.**     **THE THIRD AMENDED COMPLAINT FAILS TO PLEAD LOSS CAUSATION**.............................................................................................................36

**CONCLUSION** ............................................................................................................39

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Acito* v. *IMCERA Group, Inc.*,
47 F.3d 47 (2d Cir. 1995)......................................................................................................34

*ASH Group of Florida, Inc.* v. *Flora Growth Corp.*,
2025 WL 934845 (S.D.N.Y. Mar. 27, 2025) ..........................................................................33

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)................................................................................................................5

*ATSI Communications, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)......................................................................................................29

*Bell Atlantic Corp.* v. *Twombly*,
550 U.S. 544 (2007)................................................................................................................5

*Belmont Holdings Corp.* v. *SunTrust Banks, Inc.*,
896 F. Supp. 2d 1210 (N.D. Ga. 2012)..............................................................................4, 23

*Building Trades Pension Fund of Western Pennsylvania* v. *Insperity, Inc.*,
2022 WL 784017 (S.D.N.Y. Mar. 15, 2022) ..........................................................................26

*Campo* v. *Sears Holdings Corp.*,
371 F. App'x 212 (2d Cir. 2010) .............................................................................................22

*Chapman* v. *Mueller Water Products*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020) ....................................................................................35

*City of Livonia Employees' Retirement System* v. *The Boeing Company*,
2011 WL 824604 (N.D. Ill. Mar. 7, 2011)..............................................................4, 22, 23, 24

*Credit Suisse Securities (USA) LLC* v. *Billing*,
551 U.S. 264 (2007)................................................................................................................25

*Damri* v. *LivePerson, Inc.*,
772 F. Supp. 3d 430 (S.D.N.Y. 2025).....................................................................................35

*Das* v. *Rio Tinto PLC*,
332 F. Supp. 3d 786 (S.D.N.Y. 2018).....................................................................................31

*Decker* v. *Massey-Ferguson, Ltd.*,
681 F.2d 111 (2d Cir. 1982)....................................................................................................24

*Diabat* v. *Credit Suisse Group AG*,
2024 WL 4252502 (S.D.N.Y. Sep. 19, 2024)........................................................36

*DoubleLine Capital LP* v. *Odebrecht Finance, Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018)..................................................................38

*Duncan* v. *Pencer*,
1996 WL 19043 (S.D.N.Y. Jan. 18, 1996) .................................................... 3-4, 31

*Fernandes* v. *Centessa Pharmaceuticals PLC*,
2024 WL 3638254 (S.D.N.Y. Aug. 2, 2024)........................................................27

*Gamm* v. *Sanderson Farms*,
944 F.3d 455 (2d Cir. 2019)................................................................................29

*Green* v. *Maldonado*,
2018 WL 3302590 (D. Conn. July 5, 2018) ...........................................................5

*Hills* v. *BioXcel Therapeutics, Inc.*,
2025 WL 2777129 (D. Conn. Sep. 29, 2025) .......................................................39

*In re Aratana Therapeutics Inc. Securities Litigation*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018)..................................................................35

*In re BISYS Securities Litigation*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005)..................................................................34

*In re Diebold Nixdorf, Inc., Securities Litigation*,
2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ......................................................36

*In re DraftKings Inc. Securities Litigation*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023)..................................................................35

*In re eSpeed, Inc. Securities Litigation*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006)..................................................................24

*In re Gildan Activewear, Inc. Securities Litigation*,
636 F. Supp. 2d 261 (S.D.N.Y. 2009)........................................................4, 34, 35

*In re IAC/InterActiveCorp Securities Litigation*,
478 F. Supp. 2d 574 (S.D.N.Y. 2007)..................................................................37

*In re Impac Mortgage Holdings Inc. Securities Litigation*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) ...............................................................26

*In re Merrill Lynch & Co.*,
273 F. Supp. 2d 351 (S.D.N.Y. 2003)....................................................................5

*In re Millennial Media, Inc. Securities Litigation*,
   2015 WL 3443918 (S.D.N.Y. May 29, 2015) ........................................................................31

*In re Mobileye Global Securities Litigation*,
   2025 WL 1126967 (S.D.N.Y. Apr. 15, 2025) .........................................................................24

*In re Mylan N.V. Securities Litigation*,
   666 F. Supp. 3d 266 (S.D.N.Y. 2023).....................................................................................37

*In re Omnicom Group, Inc. Securities Litigation*,
   597 F.3d 501 (2d Cir. 2010)..............................................................................................5, 37

*In re Pfizer Inc. Securities Litigation*,
   2012 WL 983554 (S.D.N.Y. Mar. 22, 2012) ..........................................................................22

*In re Philip Morris International Inc. Securities Litigation*,
   89 F.4th 408 (2d Cir. 2023) ...................................................................................................27

*In re Plug Power, Inc. Securities Litigation*,
   2023 WL 5577276 (S.D.N.Y. Aug. 29, 2023).........................................................................32

*In re Pretium Resources Inc. Securities Litigation*,
   2020 WL 953609 (S.D.N.Y. Feb. 27, 2020)...........................................................................27

*In re Sina Corp. Securities Litigation*,
   2006 WL 2742048 (S.D.N.Y. Sep. 26, 2006)..........................................................................34

*In re Splash Tech. Holdings, Inc. Securities Litigation*,
   160 F. Supp. 2d 1059 (N.D. Cal. 2001) ..................................................................................26

*In re STMicroelectronics N.V. Securities Litigation*,
   2025 WL 2644241 (S.D.N.Y. Sep. 15, 2025)................................................................. *passim*

*In re SunPower Corp. Securities Litigation*,
   2018 WL 4904904 (N.D. Cal. Oct. 9, 2018)...........................................................................26

*In re Synovis Life Technologies, Inc. Securities Litigation*,
   2005 WL 2063870 (D. Minn. Aug. 25, 2005) ........................................................................29

*In re Vivendi Universal, S.A. Securities Litigation*,
   765 F. Supp. 2d 512 (S.D.N.Y. 2011).................................................................................36, 39

*Jackson* v. *Abernathy*,
   960 F.3d 94 (2d Cir. 2020)................................................................................................29, 32

*Janbay* v. *Canadian Solar, Inc.*,
   2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ........................................................................36

-vi-

*Johnson* v. *Sable Offshore Corp.*,
  No. 25-cv-6869, ECF No. 67 (C.D. Cal. Oct. 31, 2025) ..........................................................21

*Kalnit* v. *Eichler*,
  264 F.3d 131 (2d Cir. 2009)...........................................................................................4, 33

*Kingsepp* v. *Wesleyan University*,
  142 F.R.D. 597 (S.D.N.Y. 1992) .........................................................................................21

*Kolel Beth Yechiel Mechil of Tartikov, Inc.* v. *YLL Irrevocable Trust*,
  729 F.3d 99 (2d Cir. 2013)...........................................................................................2, 22

*Leadersel Innotech ESG* v. *Teladoc Health, Inc.*,
  2024 WL 4274362 (2d Cir. Sep. 24, 2024)............................................................................26

*Lentell* v. *Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005).................................................................................................36

*Lew* v. *ON Semiconductor Corp.*,
  2025 WL 1918543 (D. Ariz. July 11, 2025) ....................................................................24, 25

*Lipow* v. *Net1 UEPS Technologies, Inc.*,
  131 F. Supp. 3d 144 (S.D.N.Y. 2015).....................................................................................32

*Long Miao* v. *Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020)....................................................................................31

*M&M Hart Living Trust* v. *Global Eagle Entertainment Inc.*,
  No. 17-cv-1479, ECF No. 50 (C.D. Cal. July 10, 2017)..........................................................21

*Menora Mivtachim Insurance Ltd.* v. *Meta Platforms, Inc.*,
  2026 WL 508834 (9th Cir. Feb. 24, 2026) .............................................................................39

*New England Carpenters Guaranty Annuity & Pension Funds* v. *DeCarlo*,
  122 F.4th 28 (2d Cir. 2023) ...........................................................................................3, 27

*Oklahoma Law Enforcement Retirement System* v. *Telefonaktiebolaget LM Ericsson*,
  2020 WL 127546 (S.D.N.Y. Jan. 10, 2020) ...........................................................................32

*Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*,
  575 U.S. 175 (2015)..................................................................................................... 26-27

*Rombach* v. *Chang*,
  355 F.3d 164 (2d Cir. 2004)..........................................................................2-3, 13, 25-26

*South Cherry Street, LLC* v. *Hennessee Group LLC*,
  573 F.3d 98 (2d Cir. 2009)...................................................................................................33

*Schiro* v. *Cemex, S.A.B. de C.V.*,
438 F. Supp. 3d 194 (S.D.N.Y. 2020)..................................................................................29

*Slayton* v. *American Express Company*,
604 F.3d 758 (2d Cir. 2010)..................................................................................................28

*Tasini* v. *AOL, Inc.*,
851 F. Supp. 2d 734 (S.D.N.Y. 2012)..................................................................................39

*Teamsters Local 445 Freight Division Pension Fund* v. *Bombardier Inc.*,
546 F.3d 196 (2d Cir. 2008)..................................................................................................38

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..................................................................................................3, 22, 29, 30

*Woolgar* v. *Kingstone Cos.*,
477 F. Supp. 3d 193 (S.D.N.Y. 2010)........................................................................... 31-32

**Statutes and Rules**

15 U.S.C. § 78u-4(b)(1)(B)....................................................................................................25

15 U.S.C. § 78u-4(b)(4) ........................................................................................................36

15 U.S.C. § 78u-4(c)(3)(A)....................................................................................................39

Fed. R. Civ. P. 9(b) ..............................................................................................................25

Fed. R. Civ. P. 54(b) ....................................................................................................... 21-22

## PRELIMINARY STATEMENT

Plaintiffs' claims are built on fabricated evidence. Relying on the allegations of Plaintiffs' star "confidential witness"—"CW1"—the Court denied Defendants' motion to dismiss Plaintiffs' securities fraud claims against STMicroelectronics N.V. ("ST" or the "Company"), its Chief Executive Officer Jean-Marc Chery, and its Chief Financial Officer Lorenzo Grandi. "CW1" is Marco Monti, a former President of ST's Automotive & Discrete Group ("ADG"). The Court concluded that Plaintiffs' complaint satisfied the Private Securities Litigation Reform Act's ("PSLRA") heightened pleading standards for a material misstatement and scienter because it "alleges plausibly various statements Defendants made to the public concerning internal developments and growth at ST[], which would have misled a reasonable investor, and which were made with knowledge of their falsity, vis-à-vis *internal warnings from the president of ST[]'s automotive division* [Mr. Monti] that the forecasts Defendants were providing to investors contradicted what was actually occurring at the company and in the broader industry." *In re STMicroelectronics N.V. Sec. Litig.*, 2025 WL 2644241, at *3 (S.D.N.Y. Sep. 15, 2025) (emphasis added). As to scienter, the Court emphasized that the complaint "avers that a confidential witness [Mr. Monti] called out [CEO] Chery in senior staff meetings for misleading investors" and "objected to Defendants' channel-stuffing conduct in writing." *Id.*

None of those allegations is true. Mr. Monti has signed a declaration under penalty of perjury stating that he did not make the statements that Plaintiffs attributed to him and that those statements are false and inaccurate ("Monti Declaration"). Mr. Monti attests that he told Plaintiffs' counsel that he "did not want to participate in the lawsuit in any respect," and that Plaintiffs' counsel "never asked me to review any draft of the complaint, including the allegations that they attributed to me. Had they done so, I would have told them that their allegations about me are untrue or inaccurate[.]" (Monti Decl. ¶¶ 13, 16.)

In his Declaration, Mr. Monti details why "many of the allegations about me in the complaint are false or inaccurate." (*Id.* ¶ 24.) He states that "[a]t least during the time I was at ST, I was not aware of any attempt to mislead ST's investors in any respect. As far as I was aware, ST and its senior executives' statements to investors were truthful, accurate and made in good faith based on the available information." (*Id.* ¶ 25.) Mr. Monti explains, for example, that "I … never 'warned' Mr. Chery 'not to misrepresent' ST's business forecasts to investors in 2023." (*Id.* ¶ 44.) And Mr. Monti expressly denies making any claim that ST engaged in "channel stuffing" or inflated sales through excessive discounts: "I do not believe that ST inflated sales or 'stuff[ed] the Company's distribution channels.' I also do not believe that ST took any steps to 'conceal' a 'decline in demand.' Nor do I believe that ST 'created a bubble' or portrayed 'the false appearance of better financial performance during 2023.'" (*Id.* ¶ 58.)

Under Second Circuit law, the Court may reconsider its motion-to-dismiss ruling based on "the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc.* v. *YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013). All apply here. Plaintiffs' "CW1" allegations are the centerpiece of their last three complaints, and Plaintiffs relied heavily on them in opposing dismissal. As a result, the Court relied on the "CW1" allegations throughout its motion-to-dismiss decision to hold that Plaintiffs had pled a material misstatement and scienter. But those allegations were a charade, and the Court should reconsider its prior decision and dismiss Plaintiffs' now-third amended complaint ("Third Amended Complaint" or "TAC") in full and with prejudice for at least two independent reasons.

*First*, without the "CW1" allegations, Plaintiffs fail to plead an actionable misstatement with the required particularity. The challenged statements are all either "expressions of puffery and corporate optimism" that cannot "give rise to securities violations," inactionable

-2-

opinion statements, or protected forward-looking statements. *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004). Plaintiffs' claims survived Defendants' motion to dismiss only because "an optimistic statement made with the requisite inference of knowledge of its falsity is actionable," and, according to "CW1," Defendants knew the statements were false. *STMicroelectronics*, 2025 WL 2644241, at *3. Removing the "CW1" allegations, Defendants' vague statements that ST's future order pipeline was "very solid," "pretty good," and "stable" are textbook inactionable puffery. (*See, e.g.*, TAC ¶¶ 61, 75, 95.) And absent "CW1," Defendants' opinions about future customer demand are nothing more than the kind of "exercise[s] of subjective judgment" that cannot support securities fraud liability unless truly "baseless" given the "information in [their] possession at the time." *New England Carpenters Guar. Annuity & Pension Funds* v. *DeCarlo*, 122 F.4th 28, 41 (2d Cir. 2024). Similarly, the Court's determination that Defendants' forward-looking statements were not protected by the PSLRA's safe harbor rested on "CW1's" purported allegations that Defendants had "actual knowledge" of their falsity. *STMicroelectronics*, 2025 WL 2644241, at *4. Nor can Plaintiffs' channel-stuffing allegations survive without "CW1," as that theory rests entirely on their made-up "CW1" allegations. *See id.* at *3-4.

*Second*, without Plaintiffs' untrue "CW1" allegations about Defendants' knowledge of their statements' purported falsity, Plaintiffs do not plead the required "strong inference" that either CEO Chery or CFO Grandi acted with an "intent to deceive, manipulate, or defraud" investors. *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 321 (2007). All that now remains are insufficient allegations of ordinary business conduct. For example, if the Court were to credit Plaintiffs' vague theory that Messrs. Chery and Grandi paid attention to ST's performance, "virtually every company … that experiences a downturn in stock price could be forced to defend securities fraud actions" past the pleading stage. *Duncan* v. *Pencer*, 1996 WL

19043, at *14 (S.D.N.Y. Jan. 18, 1996). Similarly, Plaintiffs' assertion (TAC ¶¶ 128-33) that Mr. Chery had a motive to commit fraud because he "needed to report positive results" to "keep his position" as CEO fares no better, because that "executives aim to prolong the benefits of the positions they hold" is "too generalized to demonstrate scienter." *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). As for Messrs. Chery's and Grandi's alleged stock sales, Plaintiffs do not plead that they were either "out of line with [their ] prior trading practices" or that they were timed "to maximize personal benefit from undisclosed inside information," and the law requires both. *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009). In light of how Plaintiffs fabricated Mr. Monti's purported allegations, the Court should not credit Plaintiffs' other supposed confidential witness ("CW") allegations. In any event, no other "CW" is alleged to have had any contact whatsoever with Mr. Chery or Mr. Grandi during the proposed class period, much less know what information they had. In sum, without their fictional "CW1" allegations, Plaintiffs come nowhere close to pleading the required "strong inference" of scienter.

For each of those independent reasons, this action should be dismissed in full and with prejudice, like other securities cases where supposed confidential witnesses submitted declarations directly refuting what plaintiffs claimed they had said in their complaints. *See, e.g.*, *Livonia Emps.' Ret. Sys.* v. *Boeing Co.*, 2011 WL 824604, at *1 (N.D. Ill. Mar. 7, 2011) (granting reconsideration of denial of motion to dismiss and dismissing with prejudice where key confidential witness in a declaration "denie[d] the information attributed to him in plaintiffs' pleadings"), *aff'd in relevant part*, 711 F.3d 754 (7th Cir. 2013); *Belmont Holdings Corp.* v. *SunTrust Banks, Inc.*, 896 F. Supp. 2d 1210, 1224 (N.D. Ga. 2012) (granting reconsideration of denial of motion to dismiss and dismissing with prejudice where CW "filed declarations that clearly demonstrate that he did not have personal knowledge" of falsity or scienter).

Separate and apart from the elimination of Plaintiffs' invented "CW1" allegations, Plaintiffs fail to plead loss causation for two purported "partial disclosures" alleged in their now-fourth complaint.   Second Circuit law is clear that a corrective disclosure must reveal new, corrective information and that "a negative characterization of already-public information … does not constitute a corrective disclosure." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010).   But according to Plaintiffs' own allegations, the supposedly corrective information—declining automotive demand, inventory corrections, reduced guidance, and even Plaintiffs' own allegations of securities fraud—was disclosed to the market well before those purported "partial disclosures" on October 31, 2024 and January 30, 2025.  (TAC ¶¶ 107-15.)  As a result, Plaintiffs fail to plead loss causation for at least their October 31, 2024 and January 30, 2025 "partial disclosures," and claims based on them should also be dismissed.

## BACKGROUND

### 1.      ST's Semiconductor Business.

Defendant STMicroelectronics is organized under the laws of the Netherlands and has its corporate legal seat in the Netherlands.  (Ex. L at 26.)[1]  The company's headquarters and operational offices are managed through its wholly owned subsidiary, STMicroelectronics International N.V., located in Switzerland.  (Ex. L at 38.)  ST designs, develops, manufactures,

---

[1]      "Ex." refers to exhibits to the Declarations of David M.J. Rein, dated May 13, 2025 (ECF No. 45), and March 6, 2026.  On a motion to dismiss, the Court may accept as true only Plaintiffs' "well-pleaded facts," *Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009), and should not credit "naked assertion[s]" of wrongdoing, *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 557 (2007).  The Court may also consider "facts of which judicial notice may properly be taken," documents "incorporated in [the complaint] by reference," and documents "filed with the [SEC]." *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003).  On a motion for reconsideration, as discussed in Section I.A below, the Court may consider a declaration from a complaint's purported "confidential witness," as well as "documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings." *Green* v. *Maldonado*, 2018 WL 3302590, at *2 n.1 (D. Conn. July 5, 2018).

and markets semiconductors, sometimes called "chips."[2]  (TAC ¶¶ 22-23.)  ST's stock trades on the New York Stock Exchange, Euronext Paris, and Borsa Italiana.  (TAC ¶ 17.)

ST has three types of customers:  (i) original equipment manufacturers ("OEMs"), who manufacture devices that use chips; (ii) tier-1 distributors, who supply OEMs with component parts; and (iii) tier-2 distributors, who supply tier-1 distributors.  (TAC ¶ 24.)  ST's more than 200,000 customers are in four key end-markets:  automotive; industrial; personal electronics; and communications equipment, computers, and peripherals.  (TAC ¶ 25; Ex. Q at 30.)  Until year-end 2023, ST was organized into three product groups, including ADG, which, during its existence, primarily served automotive industry customers.  (TAC ¶ 27.)  ST reorganized into two product groups in 2024, both of which produce chips for automotive and other customers.  (Ex. L at 28.)

### 2.  The COVID-19 Pandemic Disrupts the Semiconductor Industry, Causing Uncertainty.

At the start of the pandemic in 2020, semiconductor demand dropped, with many customers delaying or canceling orders.  (TAC ¶ 31.)  But as the pandemic receded in 2021 and 2022, low interest rates spiked consumer demand for cars, particularly electric vehicles ("EVs"), which require more chips than gas cars.  (TAC ¶ 31.)  Without the chips needed to meet the demand surge, car makers and suppliers scrambled to buy up inventory.  (TAC ¶ 31.)  ST faced such high demand that its "fabrication capacity" was "not sufficient to meet" it.  (Ex. D at 10; *see* TAC ¶ 32.)

ST relies on frame contracts—"annual contracts with customers setting forth quantities and prices on specific products that may be ordered in the future"—as well as "standard purchase orders … booked from one to twelve months in advance."  (Ex. L at 37.)  Frame contracts are "subject to a high degree of volatility," including "price reduction, order cancellation and modifications as to quantities," and standard purchase orders "are subject to variations between

---

[2]     This brief uses "ST" to refer to the parent and subsidiaries.

booking and delivery and, in some cases, to cancellation." (Ex. L at 37-38.) To ensure its manufacturing capacity was best deployed for the unprecedented demand, ST implemented two new measures: a capacity reservation fee, payable up front to guarantee a customer's chips; and a non-cancelable order policy, allowing customers to pay for priority over cancelable orders. (TAC ¶ 32.) ST nonetheless warned that the "high level of profitability and gross margins" from the post-pandemic "supply imbalance" "may not be sustainable." (Ex. L at 13.)

In early 2023, in response to requests from customers, ST ended its non-cancelable order policy. (Ex. O at 7.) On ST's April 27, 2023, earnings call, CEO Chery stated that ST's automotive "backlog" represented "about 6 quarters of revenue," but the backlog was declining in other products. (Ex. F at 13.) A few months later, Mr. Chery reported that the automotive backlog was full through 2024, but warned that customers could "adjust." (Ex. G at 1, 12.)

In early 2024, Mobileye, one of ST's biggest customers (TAC ¶ 26; Ex. L at 32), reported decreased revenues due to customers' "excess inventories" (TAC ¶ 36; Ex. K at 6). On its January 25, 2024, earnings call, ST reported a "very solid backlog" in automotive, but that this business would "grow mid-single digit" and not match 2023's results given the lack of "boost" from "inventory replenishment or capacity fee reservation." (Ex. K at 6-7, 12.) On March 12, 2024, after noting reduced EV demand, ST projected slightly lower annual revenue. (Ex. M at 2.) Mr. Chery reported that there was still "no inventory replenishment" from customers and that automotive customers were "start[ing] to adjust" their buying "behavior." (Ex. M at 9.) On its April 25, 2024 earnings call, ST reported a "lead silicon carbide customer" (an EV maker) had announced a significant production decrease. (Ex. N at 5.) As a result, and because of a broader "mix change" between gas cars and EVs, Mr. Chery forecast automotive would decrease by 5%. (Ex. N at 5-6.) The next day, the company's stock price fell from $42.60 to $41.33. (TAC ¶ 108.)

On July 25, 2024, ST reported a 15% decline in automotive revenue.  (Ex. O at 3.)  Mr. Chery attributed the decline to lower overall demand, gas car manufacturers moving from long-term frame contracts to short-term orders of consignment stock, and continued reduced demand from Mobileye.  (Ex. O at 8.)  ST lowered its 2024 revenue projection to $13.2 to $13.7 billion.  (TAC ¶ 109.)  The next day, ST's stock price fell from $39.54 to $33.47.  (TAC ¶ 110.)

### 3.    Plaintiffs File This Action.

On August 23, 2024, Plaintiffs initiated this action, alleging that, until "[t]he truth emerged" on July 25, 2024, Defendants had "artificially inflated" ST's stock price by making "materially false and misleading statements" about ST's "forecasting ability."  (ECF No. 1 ¶¶ 3-4.)  The lawsuit was reported in media and law firm press releases.  (Exs. BB, CC, DD, EE, FF.)

### 4.    ST Further Refines Its 2024 Revenue Guidance.

On October 31, ST reported 2024 revenue guidance of $13.27 billion.  (TAC ¶ 112.)  This was within "the range disclosed on July 25," but at the "lower end."  (TAC ¶ 112.)  ST's stock price fell that day from $27.55 to $27.14, and reached $25.96 by November 4.  (TAC ¶ 113.)

### 5.    Plaintiffs File an Amended Complaint Centered on "CW1."

On January 22, 2025, Plaintiffs filed an amended complaint ("Amended Complaint" or "AC").  (ECF No. 34.)  The Amended Complaint included allegations from eight purported "CWs" who supposedly "confirm[ed] that the internal state of affairs at the Company … contrasted sharply" with Defendants' public statements.  (AC ¶ 3.)  The centerpiece of those allegations was "CW1," "the President of the Company's ADG group from 2012 through the end of 2023 and [who] served on the Company's Executive Committee."  (AC ¶ 35.)  The Amended Complaint discussed "CW1" at least *sixty-five times*.  (AC ¶¶ 3, 27, 35-43, 59-77, 89-95.)

Plaintiffs pled that "CW1 … states facts to suggest that Defendants engaged in channel stuffing by providing excessive discounts in order to give the misleading appearance of

better financial results in 2023." (AC ¶ 3.) Plaintiffs alleged that "CW1 confirms" that a 2024 reorganization at ST "was done to mask the scale and extent of the deterioration in the Company's business." (AC ¶ 27.) And they averred that "CW1 warned [CEO] Chery not to misrepresent that the Company was immune from the overall decline in the market." (AC ¶ 41.) "CW1" also "told Chery that the commitments ST[] publicly made to investors in the third and fourth quarters of 2023 could not be kept based on the information known to the Company at that time." (AC ¶ 41.)

The Amended Complaint alleged that "CW1 further stated that the level of channel inventory was known and knowable the entire time, and inventory levels for customers were known and visible to the Company." (AC ¶ 39.) Plaintiffs asserted that:

> CW1 complained to CEO Chery and Chief Operating Officer Alain Dutheil in writing after CW1 discovered that ST[]'s salesforce offered excessive discounts to ADG's customers to drive sales, without CW1's approval. CW1 explained further that the excessive discounts were offered to inflate sales, and stuff the Company's distribution channels to conceal the decline in demand. According to CW1, this channel-stuffing scheme created a bubble that created the false appearance of better financial performance during 2023.

(AC ¶ 39.) According to Plaintiffs, "CW1 elaborated that the excessive sales incentives were offered to direct OEM customers as well as distributors to hide the declining financial performance in 2023" and that "CW1 confirmed that … Defendant Chery hid the downturn." (AC ¶ 41.) Plaintiffs claimed that "CW1 state[d] that the Company fired CW1 in December 2023 … because CW1 objected to ST[]'s artificial financing reporting, channel stuffing scheme, and sales tactics designed to conceal the Company's true exposure to a decline in demand." (AC ¶ 42.)

According to Plaintiffs, the first "partial disclosure and materialization of the concealed risk" occurred on "April 25, 2024," when ST "disclosed poor financial results." (AC ¶¶ 96-97.) A further "partial disclosure" occurred on "July 25, 2024," when "the Company again

announced lower than expected revenue in Automotive." (AC ¶¶ 98-99.) And another "partial disclosure" allegedly occurred on "October 31, 2024"—two months *after* Plaintiffs filed their initial complaint—when ST reported that its 2024 revenues would be "on the lower end of the range disclosed on July 25, 2024." (AC ¶¶ 101-02.)

International news media promptly reported the allegations against ST, including speculating about "CW1's" identity. (Exs. GG, HH, II.)

### 6. Defendants Move to Dismiss, and Plaintiffs Again Amend Their Complaint Based on "Further Conferring With CW1."

On March 24, 2025, Defendants moved to dismiss the Amended Complaint. (ECF No. 38.) Defendants pointed out that the Amended Complaint alleged that "CW1" had "complained to … Chief Operating Officer Alain Dutheil" in 2023 about "channel-stuffing" (AC ¶ 39), but Mr. Dutheil had retired from ST thirteen years earlier in 2010. (ECF No. 38 at 20.)

Plaintiffs responded by amending their complaint again on April 30, 2025 ("Second Amended Complaint" or "SAC"). (ECF No. 42.) In this version, Plaintiffs changed the reference to "Chief Operating Officer Alain Dutheil" to "CFO Grandi." (SAC ¶ 39.) They represented that "upon further conferring with CW1, Plaintiffs' prior Complaint should have identified Defendants Chery and Grandi as the recipients of CW1's communications." (SAC ¶ 39 & n.6.)

### 7. Defendants Again Move to Dismiss, and Plaintiffs Rely Principally on "CW1" in Opposing.

Plaintiffs made "CW1" the lynchpin of their opposition to Defendants' motion to dismiss the Second Amended Complaint. Starting on page one, Plaintiffs' opposition asserted that dismissal should be denied because "the most senior executive in [ST's] Automotive segment directly and repeatedly told [Defendants] that investors were being misled." (ECF No. 46 at 1-2.) Plaintiffs urged the Court to reject Defendants' arguments because "Plaintiffs' allegations are well-sourced from … former ST[] employees including the President of ST[]'s Automotive division …

who explicitly told Defendant Chery … that Chery was misleading public investors." (*Id.* at 2.)

Plaintiffs went on to reference "CW1" at least *forty-one* times in their opposition, vastly more than any other purported "CW," and about triple the times they mentioned Defendant Mr. Grandi.  Plaintiffs asserted that "CW1 … repeatedly told [CEO] Chery in monthly staff meetings that his public forecasts were materially misleading" and that "CW1 told Chery that … the commitments he had made to shareholders publicly were contradicted by the information in hand at that time." (*Id.* at 4.)  Plaintiffs claimed that "CW1's account" included that "CW1 complained in writing to Chery and Grandi … that … excessive discounts were causing an inventory glut [that] … created a false appearance of positive financial performance." (*Id.* at 4-5.)

Plaintiffs stated that their "theory of falsity rests heavily on CW1." (*Id.* at 12.) Their opposition contended that "Plaintiffs allege falsity … by describing specific, then-known adverse information repeatedly provided by CW1 (President of ADG) to Chery and Grandi." (*Id.* at 10-11.)  Plaintiffs argued that these "specific allegations also remove this case from the line of cases cited by Defendants concerning puffery and immaterial opinions." (*Id.* at 11.)  Plaintiffs contended that "CW1's allegations show that Defendants knew their statements were false when made." (*Id.* at 15.)  Plaintiffs rejected Defendants' argument they had failed to plead any specifics of channel stuffing because that is "unnecessary when the Complaint relies on an extremely high-level executive who confirms both the existence of channel stuffing and the Individual Defendants' knowledge of that scheme." (*Id.* at 20.)

As to scienter, Plaintiffs argued that "CW1's" purported "'smoking gun' allegations" satisfied their pleading obligations. (*Id.* at 22.)  Plaintiffs asserted that "CW1 was in the best position to know whether [CEO] Chery's characterizations of demand and backlog to investors were accurate or misleading" and that "CW1's account must be accepted as true." (*Id.*)

-11-

This included that "CW1 told Chery directly in monthly staff meetings … that Chery was misleading investors." (*Id.*)  Plaintiffs argued that "CW1's" allegations meant that "Plaintiffs' allegations of scienter are considerably stronger than in most securities fraud cases." (*Id.* at 23.)  In fact, Plaintiffs maintained that "[t]he information provided by CW1 is more than sufficient to establish for the purposes of pleading claims that [Defendants] … acted with scienter." (*Id.* at 24.)

Plaintiffs faulted Defendants' arguments about "CW1" as "a desperate attempt to avoid the clear impact of CW1's account." (*Id.*)  Defendants had pointed out that the "CW1" allegations were dubious, given that the Amended Complaint alleged that "CW1" complained to "Chief Operating Officer Alain Dutheil" about "channel-stuffing" in 2023, even though Mr. Dutheil had retired thirteen years earlier.  (ECF No. 44 at 21.)  Plaintiffs responded that their amendment to reference Mr. Grandi instead of Mr. Dutheil should be disregarded because "CW1 did not do an about-face that completely contradicted an earlier account."  (ECF No. 46 at 25.)

### 8.    Relying on "CW1," the Court Denies Defendants' Motion to Dismiss.

On September 15, 2025, the Court denied Defendants' motion to dismiss.  The Court explained that "[t]he automotive market drives the plurality of ST[]'s revenue, but according to a confidential witness … Defendants reorganized ST[] … in an effort to conceal the extent of the deterioration of ST[]'s business." *STMicroelectronics*, 2025 WL 2644241, at *1.  The Court stated that "[a]s a common pattern throughout [the complaint], Chery repeatedly affirmed ST[]'s increasing revenue and sales targets, and projected ST[]'s continued growth, spurred by the automotive sector, notwithstanding evidence to the contrary, including warnings that such information was wrong, provided by the now-former president of ST[]'s automotive division." *Id.* Further, Mr. Chery "assured investors that he had strong visibility that ST[] would enjoy moderate growth when, according to a confidential witness, Chery was advised of the contrary." *Id.*

The Court emphasized that "[o]ne confidential witness, who served as president of

ST[]'s automotive division …, reported that he warned Chery that the semiconductor market was slowing down globally, that ST[] was not immune from this trend, and not to misrepresent information to the contrary to investors." *Id.* at \*2. The Court stated that "[h]e also reported that ST[] engaged in 'channel stuffing' in that it provided excessive discounts to customers in an effort to artificially inflate sales, decrease inventory and conceal the decline that ST[] was experiencing, and that he was ultimately fired in December 2023 for objecting to such conduct." *Id.*

As to falsity, the Court explained that although "[m]ere 'expressions of puffery and corporate optimism do not give rise to securities violations,'" "an optimistic statement made with the requisite inference of knowledge of its falsity is actionable." *Id.* at \*3 (quoting *Rombach*, 355 F.3d at 174). The Court concluded that the Second Amended Complaint "meets these strictures" because it "alleges plausibly various statements Defendants made to the public concerning internal developments and growth at ST[], which would have misled a reasonable investor, and which were made with knowledge of their falsity, vis-à-vis internal warnings from the president of ST[]'s automotive division that the forecasts Defendants were providing to investors contradicted what was actually occurring at the company and in the broader industry." *Id.*

The Court concluded that the Second Amended Complaint also pled scienter, explaining that it "avers that a confidential witness called out Chery in senior staff meetings for misleading investors" and "objected to Defendants' channel-stuffing conduct in writing." *Id.*

Finally, the Court distinguished this case from "two recent district court decisions granting motions to dismiss private securities actions against similar companies," *Mobileye* and *ON Semiconductor*, because "[n]either case involved, as here, a confidential witness who contemporaneously served as a high-ranking official at the defendant company and attested to the falsity and scienter of the company's statements to investors." *Id.* at \*4.

-13-

### 9.    Plaintiffs Resist Discovery of Whether the Confidential Witnesses Reviewed or Approved the Complaint Allegations Attributed to Them.

On November 24, 2025, Defendants served requests for admission asking Plaintiffs to admit that the CWs "reviewed" Plaintiffs' complaints or "provided written or oral confirmation … that the allegations about [the CWs] … are accurate." (*See, e.g.*, ECF No. 65-2 at 4-8, 12-15.) Plaintiffs responded that they would "neither admit nor deny" these requests. (*See, e.g., id.*) After unsuccessful efforts to resolve the matter, on February 25, 2026, Defendants sought the Court's intervention.[3]  (ECF No. 65.) On March 2, 2026, the Court ordered Plaintiffs to "identify whether, and when, the confidential witnesses reviewed the complaint or reaffirmed that the allegations attributed to them are accurate." (ECF No. 67.) The Court explained that: "The complaint states that its allegations are based on information provided by confidential witnesses.  Whether the confidential witnesses reviewed those allegations, and when they did so, is relevant." (*Id.*) As of this filing, Plaintiffs have yet to comply with the Court's order.

Defendants further served interrogatories on January 21, 2026, asking that, for "each instance in which [Plaintiffs] have communicated with any CW," Plaintiffs "provide a description of the communication, including the date, identity of the individual, other parties to the communication, communication method, and the subject matter or topic." (Ex. JJ at 4.) Plaintiffs again refused to respond and have provided no information regarding their communications with any of the CWs. (Ex. KK at 6-7.)

### 10.    Plaintiffs File a Third Amended Complaint.

On February 6, 2026, Plaintiffs filed a Third Amended Complaint. (ECF No. 58.) That complaint repeated the same CW allegations found in the Amended and Second Amended

---

[3]    On February 19, 2026, Plaintiffs amended their responses to admit the CWs' identities, including that "CW1" is Mr. Monti, and that Plaintiffs never had an attorney-client relationship with any CW. (*See, e.g.*, ECF No. 65-2 at 4, 8-11.)

-14-

Complaints, including those about "CW1."  It also alleged that a fourth "partial disclosure and materialization of the concealed risk" occurred on January 30, 2025, when ST disclosed "poor financial results" and that it "could not provide a revenue outlook for 2025 because the 'visibility' for 2025 was 'extremely low' in both Industrial and Automotive."  (TAC ¶¶ 115, 119.)  ST's stock price declined that day from $24.74 to $22.52.  (TAC ¶ 119.)

As a result, Plaintiffs now allege that purported "partial disclosures" of securities fraud occurred over a full year's cycle of ST's quarterly earnings reports.  The last of these "partial disclosures" occurred on January 30, 2025, more than a week after Plaintiffs publicly filed their Amended Complaint on January 22, 2025, and months after their August 23, 2024 initial complaint.  According to Plaintiffs, Defendants made statements in October and November 2024 that were "false and misleading for the same reasons identified" in their prior pleadings, including the CW allegations.  (TAC ¶¶ 99-106.)  Although their January 22, 2025 Amended Complaint made public these alleged "reasons," Plaintiffs claim that the "partial disclosure" of this information to investors did not occur until January 30, 2025.  (TAC ¶ 119.)

### 11.    Mr. Monti—Plaintiffs' Purported "CW1"—Disclaims the Allegations That Plaintiffs Attributed to Him.

On February 12, 2026, Plaintiffs' so-called "CW1"—Marco Monti—signed a declaration "under penalty of perjury" rejecting the allegations Plaintiffs' complaints attributed to him. (Monti Decl. at 11.)  Mr. Monti states that Plaintiffs' counsel "never asked me to review any draft of the complaint, including the allegations that they attributed to me.  Had they done so, I would have told them that their allegations about me are untrue or inaccurate[.]"  (*Id.* ¶¶ 15-16.)

Mr. Monti reports having only two short conversations before Plaintiffs filed their Amended Complaint.  The first was a "telephone call" "in approximately September or October 2024 … from someone working with a law firm involved in asserting the claims," which "was

likely less than 10 minutes." (*Id.* ¶¶ 8, 10.) Mr. Monti "generally described the different product groups at ST," "the types of regular meetings that were held," and "the responsibilities of different individuals." (*Id.* ¶ 9.) When asked about "disputes among executives at ST," Mr. Monti stated that he "could not speak about that or any other confidential internal matters at ST."[4] (*Id.* ¶ 10.)

The second was a January 3, 2025, call "from Adam Apton" of Levi & Korsinsky that "lasted about five minutes." (*Id.* ¶¶ 11, 13.) Mr. Apton asked Mr. Monti to "take part in the lawsuit as a witness." (*Id.* ¶ 11.) Mr. Apton offered to "cover [Mr. Monti's] legal costs, expenses and provide a lawyer." (*Id.* ¶ 12.) Mr. Monti "told Mr. Apton that [he] did not wish to participate in the lawsuit in any respect." (*Id.* ¶ 13.) Mr. Apton responded that "he understood and to let him know if [Mr. Monti] changed [his] mind." (*Id.*) Following the call, Mr. Apton sent Mr. Monti an email "proposing the name of a lawyer" and stating that "we … agree to complete indemnification if the need should arise." (*Id.* ¶ 14.) Mr. Monti responded, "stating again that I did not wish to be involved, have my name used, or have our conversation reported in the lawsuit." (*Id.*)

In "early February 2025," after Plaintiffs filed their Amended Complaint, a former colleague of Mr. Monti "sent [him] a new version of the shareholder complaint." (*Id.* ¶ 15.) Mr. Monti reports, "I was shocked and upset to see the allegations attributed to me as the person identified as 'CW1' in the complaint. Many were untrue and were statements that I never said or suggested during my two short telephone calls with the plaintiffs' law firm." (*Id.*)

Mr. Monti states that, "[w]ithin days … news of the complaint started appearing in international media, and I started receiving telephone calls about it. This was very distressing as

---

[4]    Mr. Monti states that he initially emailed Adam Apton of Levi & Korsinsky LLP on August 24, 2024, when "I was still upset with Mr. Chery" about the termination of his employment. (Monti Decl. ¶ 6; *see id.* ¶ 4.) He explains: "I offered to speak to assist with the lawsuit. I also said that the reason I was terminated was because I refused to participate in the matters described in the [initial] complaint. In fact, I felt angry about how I was unfairly treated and I did not know the reasons for my termination." (*Id.* ¶ 6.)

the allegations attributed to me were false or inaccurate and I had never authorized them." (*Id.*

¶ 17.) On February 5, 2025, Mr. Monti contacted an ST board member:

> I told [the director] that I was astonished by the complaint. In addition to containing statements that were wrong and untrue they had attributed statements to me that I did not make. I informed [the director] that I had spoken with the plaintiffs' lawyer for less than ten minutes and that I stopped the conversation when I felt that he was putting words in my mouth. I wrote that it was evident that they were seeking to use my title and the fact that I had left the Company.

(*Id.* ¶ 18.) Mr. Monti next "received another phone call from Mr. Apton" on December 5, 2025,

the day after the initial status conference in this case. (*Id.* ¶ 20; *see* ECF No. 55.) Mr. Monti

reports that:

> He told me that ST's lawyers were seeking that I testify in the case. Mr. Apton suggested that I could hide from having to testify by staying in a country outside the United States. He said that, if I remained outside the United States, the court would not be able to force me to testify…. I never asked Mr. Apton or anyone else how to evade providing testimony in the lawsuit.

(Monti Decl. ¶¶ 20-21.)

In his Declaration, Mr. Monti details why "many of the allegations about me in the

complaint are false or inaccurate." (*Id.* ¶ 24.) He states that "[a]t least during the time I was at

ST, I was not aware of any attempt to mislead ST's investors in any respect. As far as I was aware,

ST and its senior executives' statements to investors were truthful, accurate and made in good faith

based on the available information." (*Id.* ¶¶ 25.) Mr. Monti states, for example, that "I … never

'warned' Mr. Chery 'not to misrepresent' ST's business forecasts to investors in 2023." (*Id.* ¶ 44.)

He explains that "the Company's public forecasts resulted from" a "detailed and thorough process

… with input from and participation of ST's product groups, its sales team and another team

providing market and economic information." (*Id.*) "The participants raised different datapoints

… and some had more optimistic or pessimistic views of the market dynamics." (*Id.* ¶ 43.) "The final forecasts were the result of consensus achieved among ST's senior management, including me. I agreed with the forecasts issued by ST … and was comfortable that they were appropriate good-faith estimates resulting from this process." (*Id.* ¶ 45.)

Similarly, Mr. Monti disagrees with the complaint allegation that "'CW1 confirmed that even though by the second half of 2023, the Company experienced a downward trend in demand, Defendant Chery hid the downturn and claimed that ST[] was not as vulnerable as the rest of the industry.'" (*Id.* ¶ 62 (quoting TAC ¶ 44).) He states that "I did not make this statement … to the representatives of the plaintiffs' law firms," which "is not accurate. I do not believe that Mr. Chery or anyone at ST 'hid' any known downward trend in demand…. ST's forecasts resulted from a consensus reached among the different business areas and senior leaders[.]" (*Id.* ¶¶ 63-64.)

Mr. Monti also states that he "did not make" the complaint statements attributed to him that "excessive discounts were offered to inflate sales, and stuff the Company's distribution channels to conceal the decline in demand" and that "this channel-stuffing scheme created a bubble that created the false appearance of better financial performance during 2023." (*Id.* ¶¶ 56-57.) Mr. Monti instead explains: "I do not believe that ST inflated sales or 'stuff[ed] the Company's distribution channels.' I also do not believe that ST took any steps to 'conceal' a 'decline in demand.' Nor do I believe that ST 'created a bubble' or portrayed 'the false appearance of better financial performance during 2023.'" (*Id.* ¶ 58.)

As to the allegations that "'CW1 complained to CEO Chery and CFO Grandi in writing" about "excessive discounts to ADG's customers to drive sales,'" Mr. Monti states he "did not make this statement … to the representatives of the plaintiffs' law firms." (*Id.* ¶¶ 53-54 (quoting TAC ¶ 42).) Mr. Monti reports: "I objected to particular discounts being offered to *a*

*specific* automotive customer" (emphasis added), so "[w]hile it is possible that I exchanged emails about this subject with colleagues in senior management," "this had nothing to do with the complaint's allegations of 'channel stuffing' or misleading financial reporting." (*Id.* ¶¶ 29, 55.) Mr. Monti felt the discount proposed by the sales group for this specific automotive customer "was undermining my team's efforts and the customer relationship we had built." (*Id.* ¶ 29.)

Mr. Monti also rejects Plaintiffs' assertion that "'CW1 further stated that the level of channel inventory was known and knowable the entire time, and inventory levels for customers were known and visible to the Company.'" (*Id.* ¶ 49 (quoting TAC ¶ 42).) Mr. Monti states that "I did not make this statement … to the representatives of the plaintiffs' law firms" and that it "does not accurately describe ST's knowledge of, or visibility into, customer inventory levels." (*Id.* ¶¶ 50-51.) In fact, "we had no way to measure inventory at automotive customers unless they shared that information with us." (*Id.* ¶ 34.)

Mr. Monti further disagrees with the complaint allegation that the reorganization in 2024, "'[a]s CW1 confirms, … was done to mask the scale and extent of the deterioration in the Company's business by mixing profitable offerings with unprofitable ones.'" (*Id.* ¶ 36 (quoting TAC ¶ 30).) Mr. Monti again states that he "did not make this statement … to the representatives of the plaintiffs' law firms," which "is not accurate." (*Id.* ¶¶ 37-38.) Mr. Monti "was not involved in the reorganization," "was not aware of it until it was announced," and declares, "I have never stated or suggested that the reason for the reorganization was to 'mask' information from investors." (*Id.* ¶ 38.)

Mr. Monti also disagrees with the complaint allegation that "'CW1 states that the Company fired CW1 in December 2023 … because CW1 objected to ST[]'s artificial financing reporting, channel stuffing scheme, and sales tactics designed to conceal the Company's true

-19-

exposure to a decline in demand.'" (*Id.* ¶ 65 (quoting TAC ¶ 45).)  Mr. Monti once again states

he "did not make this statement … to the representatives of the plaintiffs' law firms," which "is

not accurate." (*Id.* ¶¶ 66-67.)  He declares, "I do not believe that ST engaged in that conduct during

my time at the Company.  I do not know the reasons for my dismissal from the Company, but I do

not believe it was for that reason." (*Id.* ¶ 67.)

## ARGUMENT

### I.    MR. MONTI'S DECLARATION REQUIRES RECONSIDERATION OF THE COURT'S MOTION-TO-DISMISS DECISION UNDER RULE 54(B).

#### A.    This Is a Quintessential Case Requiring Reconsideration.

Mr. Monti's Declaration completely upends this case.  The allegations attributed to

Mr. Monti as supposed "CW1" have been the crux of Plaintiffs' complaints.  Plaintiffs also relied

on these "CW1" allegations extensively in opposing dismissal on the material misstatement and

scienter grounds Defendants raised.  And, not surprisingly, the Court centrally relied on the

seemingly well-pled "CW1" allegations in holding that Plaintiffs satisfied the PSLRA's

heightened standards for pleading a material misstatement and scienter.

Mr. Monti's Declaration shows that Plaintiffs' complaints rest on a sham

foundation.  Mr. Monti was never a "confidential witness."  He spoke with Plaintiffs' counsel on

two occasions for barely 15 minutes total.  He told Plaintiffs' counsel he did not want to be a

witness in this case.  He was never given an opportunity to review or approve anything that

Plaintiffs' complaints attribute to him.  He was "astonished" to read what Plaintiffs claimed he had

said. (Monti Decl. ¶ 18.)  Far from being a "confidential witness" *supporting* Plaintiffs' claims,

Mr. Monti fundamentally *rejects* Plaintiffs' core allegations and theories.  As he states, under

penalty of perjury, "[a]t least during the time I was at ST, I was not aware of any attempt to mislead

ST's investors in any respect.  As far as I was aware, ST and its senior executives' statements to

investors were truthful, accurate and made in good faith based on the available information." (*Id.* ¶ 25.) And Mr. Monti has now provided a detailed point-by-point refutation of the allegations Plaintiffs attributed to him, confirming that "many of the allegations about me in the complaint are false or inaccurate" (*id.* ¶ 24), and detailing the reasons why they are wrong (*id.* ¶¶ 26-67).

As if that were not enough, Plaintiffs' counsel's conduct further warrants rejecting the "CW1" allegations. Mr. Monti reported that Plaintiffs' counsel "was putting words in my mouth." (*Id.* ¶ 18.) Plaintiffs' complaints never disclosed that Mr. Monti stated he "did not want to participate in the lawsuit in any respect" or that he had not reviewed or approved any allegations Plaintiffs attributed to him. (*Id.* ¶¶ 13, 16.) Plaintiffs' counsel's suggestion that Mr. Monti "could hide from having to testify by staying in a country outside the United States" (*id.* ¶ 20) is improper, even more so for counsel appointed by the Court as fiduciaries for a putative class. *See* N.Y. R. Pro. Conduct 3.4(a)(2) ("A lawyer shall not … advise … a person to hide or leave the jurisdiction of a tribunal for the purpose of making the person unavailable as a witness therein …."); *Kingsepp* v. *Wesleyan Univ.*, 142 F.R.D. 597, 599 (S.D.N.Y. 1992) ("The role of class counsel is akin to that of a fiduciary for the class members."). And Plaintiffs' vociferous refusal to answer any discovery about whether the CWs reviewed or approved the complaint allegations attributed to them or about their communications with Plaintiffs is now very telling.[5] (*See* ECF No. 65; Ex. KK.)

This Court is fully empowered to reconsider its motion-to-dismiss ruling under Rule 54(b), as well as under the Court's "inherent power to correct an interlocutory ruling at any

---

[5]    Mr. Monti is not the first purported "confidential witness" to dispute Plaintiffs' counsel's characterizations of his supposed statements. *See, e.g.*, *M&M Hart Living Tr.* v. *Global Eagle Ent. Inc.*, No. 17-cv-1479, ECF No. 50 at 11 (C.D. Cal. July 10, 2017) (CW signed declaration stating "a significant number of the statements attributed to me in the Complaint are inaccurate and do not reflect what I stated to Levi & Korsinsky LLP"). Mr. Apton and his firm were also recently disqualified from serving as lead counsel in a proposed investor class action because Levi & Korsinsky issued press releases incorrectly claiming the firm had filed lawsuits that it had not. *See* *Johnson* v. *Sable Offshore Corp.*, No. 25-cv-6869, ECF No. 67 (C.D. Cal. Oct. 31, 2025).

time prior to the entry of final judgment." *In re Pfizer Inc. Sec. Litig.*, 2012 WL 983554, at *4 (S.D.N.Y. Mar. 22, 2012); *see* Fed. R. Civ. P. 54(b) ("[A]ny order … that adjudicates fewer than all the claims … may be revised at any time before the entry of a judgment adjudicating all the claims."). The Second Circuit explains that a motion for reconsideration may be granted upon "the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel*, 729 F.3d at 104. "Under Rule 54(b), the court may consider evidence of manifest factual errors for the limited purpose of determining whether its dismissal orders were procured by fraud, carelessness by counsel, or by the court's own misperception of the facts." *Livonia*, 2011 WL 824604, at *4. "Any of these possibilities warrant reconsideration of the [dismissal] order[]." *Id.*

Consideration of declarations denying complaint allegations about CWs is particularly important in securities cases because "[t]he anonymity of the sources of plaintiffs' factual allegations concerning scienter frustrates the requirement, announced in *Tellabs*, that a court weigh competing inferences to determine whether a complaint gives rise to an inference of scienter that is 'cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Campo* v. *Sears Holdings Corp.*, 371 F. App'x 212, 216 n.4 (2d Cir. 2010) (quoting *Tellabs*, 551 U.S. at 314). In *Campo*, the Second Circuit affirmed the district court's dismissal on a renewed motion to dismiss based on such denials, explaining that "[b]ecause Fed. R. Civ. P. 11 requires that there be a good faith basis for the factual and legal contentions contained in a pleading, the district court's use of the confidential witness's testimony to test the good faith basis of plaintiffs' compliance with *Tellabs* was permissible." *Id.*

This action should be dismissed, like other securities cases where post-decision statements from purported confidential witnesses demonstrate that the claims had no valid basis to begin with. In *Livonia*, the district court granted reconsideration of denial of a motion to dismiss

and dismissed the action with prejudice.  2011 WL 824604, at *5, *aff'd in relevant part*, 711 F.3d 754 (7th Cir. 2013) (affirming dismissal and remanding for consideration of sanctions).  There, in a declaration, a key "confidential witness" "denie[d] the information attributed to him in plaintiffs' pleadings."  *Id.* at *1.  As here, the "confidential source allegations … were critical to the survival of the second amended complaint," *id.* at *4, and the court had "expressly relied" on the CW allegations to hold that plaintiffs had adequately pled scienter, *id.* at *2.  Because "[m]aterial facts concerning the confidential source's position and personal knowledge were misrepresented by plaintiffs," the court's prior "orders denying dismissal relied on false information," which the court concluded was "manifest factual error" requiring dismissal with prejudice.  *Id.* at *5.  The court granted sanctions against plaintiffs' counsel for "asserting and defending factual contentions that lacked evidentiary support."  306 F.R.D. 175, 182 (N.D. Ill. 2014).

Similarly, in *Belmont*, the court granted reconsideration and dismissed the action with prejudice when plaintiff's key confidential witness denied making the statements attributed to him.  896 F. Supp. 2d at 1228, 1230.  As here, in denying the motion to dismiss, the court "relied on … [p]laintiff's assertion that [the witness] had personal knowledge" of falsity and scienter.  *Id.* at 1224.  But when the confidential witness "filed declarations that clearly demonstrate[d] that he did not have personal knowledge," the court concluded the declarations "are new evidence of a manifest factual error" that "present the Court with the opportunity to correct its [order denying dismissal], which was based on its misperception of the facts."  *Id.* at 1224; *see id.* at 1228 ("[I]t would constitute a manifest injustice upon the [defendants] to not reconsider the [dismissal] in light of the new evidence presented to the Court.").

Under these standards, the Monti Declaration is evidence of "manifest factual errors" previously unknown to Defendants and to the Court.  *Livonia*, 2011 WL 824604, at *4.

-23-

Given the central importance of the "CW1" allegations to the pleadings and motion to dismiss, the Court should grant reconsideration and dismiss with prejudice.

### B.    Without Plaintiffs' Baseless "CW1" Allegations, the Complaint Must Be Dismissed.

Absent the "CW1" allegations attributed to Mr. Monti, Plaintiffs' complaint is no different from the type of *pro forma* securities fraud complaints routinely dismissed in this District. Like other flawed complaints, it tries to take the inherently uncertain nature of forecasting and the ordinary ups and downs of business, and characterize them as securities fraud. But the Second Circuit has long recognized that "[e]conomic prognostication, though faulty, does not, without more, amount to fraud." *Decker* v. *Massey-Ferguson, Ltd.*, 681 F.2d 111, 117 (2d Cir. 1982). Any other rule would allow "investors to use the federal securities laws as a 'scheme of investor's insurance.'" *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 269 (S.D.N.Y. 2006).

In declining to dismiss Plaintiffs' complaint last September, this Court recognized that Plaintiffs' "CW1" allegations were the critical difference-maker. Defendants raised two cases dismissing strikingly similar claims. In *In re Mobileye Global Securities Litigation*, an automotive chip supplier (and a large customer of ST's) reduced its revenue projections in the face of the same post-pandemic demand swings at issue here, and its stock price fell. 2025 WL 1126967, at *1-2 (S.D.N.Y. Apr. 15, 2025), *aff'd*, 2025 WL 3640904 (2d Cir. Dec. 16, 2025) (summary order). Judge Cote dismissed those claims because "[f]raud by hindsight is not a recognized basis for liability." *Id.* at *11. And in *Lew* v. *ON Semiconductor Corp.*, a chip-maker made predictions about its post-pandemic outlook, including that demand was "very predictable" and that the company was "in a much better spot." 2025 WL 1918543, at *10 (D. Ariz. July 11, 2025). The court rejected the claims based on those statements because companies may "provide an optimistic view of [their] quarterly outlooks" and the claims relied "on speculation." *Id.* at *10, *14.

-24-

This Court decided not to dismiss on those grounds, explaining that "[n]either case involved, as here, a confidential witness who contemporaneously served as a high-ranking official at the defendant company and attested to the falsity and scienter of the company's statements." *STMicroelectronics*, 2025 WL 2644241, at \*4.  We now know directly from Mr. Monti that there is no "high-ranking" "confidential witness" who "attested to the falsity and scienter" of the challenged statements.  This case should thus be dismissed on both falsity and scienter grounds.

### 1.    Without the "CW1" Allegations, Plaintiffs Have Not Pled Any Actionable Misstatement.

Plaintiffs' allegations that Defendants made material misstatements rest on their allegations about "CW1."  The PSLRA was enacted "in an effort to weed out unmeritorious securities lawsuits." *Credit Suisse Sec. (USA) LLC* v. *Billing*, 551 U.S. 264, 284 (2007).  Plaintiffs are required to plead "each statement alleged to have been misleading" and the "reasons why."  15 U.S.C. § 78u-4(b)(1)(B).  And under Rule 9(b), Plaintiffs must plead "with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  Stripped of their "CW1" allegations, Plaintiffs challenge statements that boil down to forecasts of business trends that, with hindsight, turned out to be too optimistic.  This does not state an actionable claim.

***Inactionable Puffery and Vague Optimistic Statements.***    Plaintiffs challenge Defendants' post-pandemic descriptions of automotive demand and backlog as "very clear" (TAC ¶ 67); "solid" or "very solid" (TAC ¶¶ 61, 65, 79, 93); "very strong" (TAC ¶ 63); "good," "pretty good," or "very good" (TAC ¶¶ 67, 71, 91, 95); "big" (TAC ¶ 73); and "stable" (TAC ¶ 75).[6]  This Court recognized that "[m]ere 'expressions of puffery and corporate optimism do not give rise to securities violations.'" *STMicroelectronics*, 2025 WL 2644241, at \*3 (quoting *Rombach*, 355 F.3d at 174).  But, as the Court explained, "an optimistic statement made with the requisite inference of

---

[6]    Specifically, Statements 1-18 in Exhibit A and Statements 19-24 in Exhibit V.

knowledge of its falsity is actionable." *Id.* The Court thus declined to dismiss because Defendants' statements "were made with knowledge of their falsity, vis-à-vis internal warnings from the *president of ST[]'s automotive division* that the forecasts Defendants were providing to investors contradicted what was actually occurring at the company." *Id.* (emphasis added).

Without "CW1's" untrue assertions that Messrs. Chery and Grandi had "knowledge of their falsity," *id.*, all of those statements are statements of "corporate optimism" that are "too general to cause a reasonable investor to rely upon them." *Leadersel Innotech ESG* v. *Teladoc Health, Inc.*, 2024 WL 4274362, at *2-3 (2d Cir. Sep. 24, 2024). Courts dismiss claims based on such "[v]ague positive statements," because reasonable investors "expect[]" corporate leaders "to be confident about their stewardship and the prospects of the business that they manage." *Id.*; *see, e.g.*, *Bldg. Trades Pension Fund of W. Pa.* v. *Insperity, Inc.*, 2022 WL 784017, at *13 (S.D.N.Y. Mar. 15, 2022) ("biggest pipeline we've had"); *In re SunPower Corp. Sec. Litig.*, 2018 WL 4904904, at *4 (N.D. Cal. Oct. 9, 2018) ("very, very strong demand"); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001) ("strong" and "solid" demand). As those cases make clear, "the word[s] 'solid,'" "robust," "strong," and the like are "vague expression[s] of optimism that … would not have conveyed a misleading impression of the future on which a reasonable investor would rely." *In re Impac Mortg. Holdings Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1097 (C.D. Cal. 2008).

***Inactionable Opinion Statements.*** Many of the statements challenged by Plaintiffs are statements of opinion, not fact.[7] Opinions are "inherently subjective and uncertain assessments," so they are actionable only if the "opinion expressed was not sincerely held" or contains "embedded statements of untrue facts." *Omnicare, Inc.* v. *Laborers Dist. Council Const.*

---

[7]    Specifically, Statements 1-7, 9-11, 13, and 15-18 in Exhibit A, and Statements 19-24 in Exhibit V.

*Indus. Pension Fund*, 575 U.S. 175, 176, 186 (2015).   Absent such allegations, courts dismiss claims based on opinions.  *See, e.g.*, *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 420 (2d Cir. 2023); *Fernandes* v. *Centessa Pharms. PLC*, 2024 WL 3638254, at *19 (S.D.N.Y. Aug. 2, 2024); *In re Pretium Res. Inc. Sec. Litig.*, 2020 WL 953609, at *5 (S.D.N.Y. Feb. 27, 2020).

This Court relied on the made-up "CW1" allegations to deny dismissal of Plaintiffs' claims based on opinion statements.  The Court explained that the complaint "alleges plausibly that Defendants made material misrepresentations of concrete facts, and did not disclose non-publicly available information indicating decreasing demand, increasing inventory and channel-stuffing conduct to artificially manipulate those metrics, to investors."  *STMicroelectronics*, 2025 WL 2644241, at *4.  But the principal "facts" and "information" about that topic in the decision are Plaintiffs' "CW1" allegations.  *Id.* at *1, *4.  This corresponds with Plaintiffs' opposition to Defendants' motion to dismiss, where they argued that the opinion statements were actionable based on "CW1's" allegations.  (*E.g.*, ECF No. 46, at 12 (arguing opinion statements actionable because "CW1 told Chery about the very facts that contradicted his misrepresentations").)

Absent the "CW1" allegations, Plaintiffs merely criticize with hindsight Defendants' subjective judgments about business trends that turned out to be incorrect.  That is not an actionable claim.  "If a statement turns on the exercise of subjective judgment, a plaintiff will be unable to establish that it is false merely by showing that other reasonable alternative views exist…. [T]he speaker making the statement (expressing an opinion) can choose among them," "even if most of the existing facts cut against the statement."  *DeCarlo*, 122 F.4th at 41.

***Forward-Looking Statements.***   Many of Defendants' statements challenged by Plaintiffs concern future demand for ST's products, such as "Auto will clearly be the growth driver of ST next year."  (TAC ¶ 69.)  Plaintiffs' claims based on these statements should be dismissed

under the PSLRA's safe harbor for forward-looking statements.[8]   *See* 15 U.S.C. § 78u-5. Defendants' statements protected by the safe harbor include "statement[s] containing a projection of revenues" and "statement[s] of future economic performance."   15 U.S.C. § 78u-5(i).

A statement is protected by the safe harbor if *either* of two prongs apply:   the statement is "accompanied by meaningful cautionary language *or* … the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."   *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) ("safe harbor is written in the disjunctive").   In opposing dismissal under the actual-knowledge prong, Plaintiffs relied solely on "CW1."   (ECF No. 46 at 15 (arguing "safe harbor has no role" because "CW1's allegations show that Defendants knew their statements were false").)   The Court denied dismissal because the complaint alleged the statements "were made with actual knowledge of their falsity" "based on representations from a confidential witness."   *STMicroelectronics*, 2025 WL 2644241, at *4.   Without "CW1," these claims must now be dismissed.

*Channel Stuffing.*   Plaintiffs' "channel stuffing" allegations also rely entirely on their "CW1" allegations.   Plaintiffs contended that ST's statements about demand were "materially false and misleading when made" because "[d]efendants had pulled forward demand by channel stuffing … as explained by CW1."   (*See, e.g.*, TAC ¶ 72.)   The Court relied on the purported "CW1" allegations in allowing Plaintiffs' channel-stuffing allegations to proceed. *STMicroelectronics*, 2025 WL 2644241, at *2 (CW1 "also reported that ST[] engaged in 'channel stuffing'"); *id.* at *3 (CW1 "objected to Defendants' channel-stuffing conduct in writing").   But "CW1" now denies having ever made such allegations.   (*See* Monti Decl. ¶¶ 26-35, 56-58, 65-67.)

---

[8]   Specifically, Statements 1-3, 5-7, 9, and 11-18 in Exhibit A, and Statements 19-24 in Exhibit V.   The Court held that the challenged statements included "present" statements. *STMicroelectronics*, 2025 WL 264424, at *4.   Plaintiffs pointed to only three such statements, which Defendants have omitted from this listing.   (*See* ECF No. 47 at 4.)

Second Circuit law requires that when a "complaint claims that statements were rendered false … through the nondisclosure of illegal activity, the facts of the underlying illegal acts must be pleaded with particularity." *Gamm* v. *Sanderson Farms, Inc.*, 944 F.3d 455, 466-67 (2d Cir. 2019). Plaintiffs were thus required to "plead the 'who, what, when, where and how' of" their channel-stuffing allegations. *Schiro* v. *Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 198 (S.D.N.Y. 2020). Without the "CW1" allegations, Plaintiffs do not come close. For example, they do not "state with particularity when the alleged practice occurred" or "what amount of product was 'stuffed.'" *In re Synovis Life Techs., Inc. Sec. Litig.*, 2005 WL 2063870, at *8 (D. Minn. Aug. 25, 2005). Plaintiffs' channel-stuffing allegations are unparticularized and should be dismissed.

### 2. Plaintiffs' Remaining Scienter Allegations Fall Far Short of the PSLRA's Strict Pleading Requirements.

Without the "CW1" allegations wrongly attributed to Mr. Monti, this case falls far short of meeting the PSLRA's exacting obligations for pleading scienter. The PSLRA requires that Plaintiffs allege a "strong inference" of scienter, *i.e.*, an "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319-20. "Where a defendant is a corporation," Plaintiffs must "plead[] facts that give rise to a 'strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'" *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). Here, Plaintiffs seek to impute scienter to ST based solely on CEO Chery and CFO Grandi.

To allege a strong inference of scienter, Plaintiffs must "state with particularity facts" showing either (i) "both motive and opportunity to commit the fraud," or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). The inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Thus, in evaluating what remains of the

complaint, "the court must take into account plausible opposing inferences" and "consider plausible, nonculpable explanations for the defendant's conduct." *Id.* at 310.

In its motion-to-dismiss decision, the Court relied almost entirely on Plaintiffs' "CW1" allegations to find scienter adequately pled. This was consistent with Plaintiffs' opposition, which relegated scienter allegations other than those based on "CW1" to only a short mention at the end of their brief. (ECF No. 46, at 21-25 (five pages arguing why "CW1" supports scienter before mentioning any other factors).) The Court explained that the complaint "alleges plausibly various statements Defendants made to the public concerning internal developments and growth at ST[] … which were made with knowledge of their falsity, vis-à-vis internal warnings from the president of ST[]'s automotive division ["CW1"] that the forecasts Defendants were providing to investors contradicted what was actually occurring." *STMicroelectronics*, 2025 WL 2644241, at *3. In support of that conclusion, the Court also pointed to the allegations that "CW1" "called out Chery in senior staff meetings for misleading investors," and "CW1" supposedly "objected to Defendants' channel-stuffing conduct in writing." *Id.* Mr. Monti has specifically rejected those allegations attributed to him. (Monti Decl. ¶¶ 26-35, 39-48, 53-61, 67.)

As the Court's motion-to-dismiss decision implicitly recognizes, Plaintiffs' other scienter allegations do not meet the *Tellabs* standard:

***Defendants' Statements Concerning Inventory.*** In its motion-to-dismiss decision, the Court noted that scienter could be "inferred additionally from Defendants' concrete statements regarding inventory visibility, SAC ¶¶ 64, 68, 92, and from their assertions that they were 'monitoring very carefully' their inventory and we 'monitor pretty well inventory,' SAC ¶¶ 104-05." *STMicroelectronics*, 2025 WL 2644241, at *3. Paragraphs 64, 68, and 92, however, concern the "backlog" of orders on ST's own books, not any measure of customer inventory. And

-30-

paragraphs 104 and 105 principally address ST's own inventory and inventory at "distributors" in the "industr[ial] market," not the larger automotive sector.  As Mr. Monti explained in his declaration, "ST had visibility into inventory levels for distributors, whose inventory information is publicly available, but typically not automotive customers."  (Monti Decl. ¶ 52.)

More fundamentally, without the "CW1" allegations, there is nothing about senior executives monitoring ordinary metrics like inventory that suggests fraud.  Executives possess some "knowledge of the details" of a company's operations.  *Long Miao* v. *Fanhua, Inc.*, 442 F. Supp. 3d 774, 806 (S.D.N.Y. 2020).  But "if scienter could be pleaded" based on "access to inside information" alone, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."  *Duncan*, 1996 WL 19043, at *14.

***Other "Confidential Witnesses."***  Given the serious inaccuracies in Plaintiffs' "CW1" allegations, the Court should no longer credit any of Plaintiffs' allegations about purported "CWs" in assessing the pleading.  *See In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918, at *10 (S.D.N.Y. May 29, 2015) ("pervasive" inaccuracies in confidential witness allegations "significantly undermine the integrity" of the complaint).  To the extent the Court considers them at all, none of the other CW allegations supports scienter.  Tellingly, in opposing Defendants' motion to dismiss, Plaintiffs did not describe a single CW besides "CW1" in support of their scienter pleading.  (*See* ECF No. 46 at 21-29.)  In any event, other than the debunked "CW1" account, no CW alleges that Mr. Chery or Mr. Grandi had "knowledge of facts or access to information contradicting their public statements."  *Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 813 (S.D.N.Y. 2018).  And none is "alleged to have had any direct contact with the Individual Defendants at all" during the proposed class period, "let alone know what information they possessed."  *Woolgar* v. *Kingstone Cos.*, 477 F. Supp. 3d 193, 220 (S.D.N.Y. 2010).

***Core Operations.***   Plaintiffs purport to invoke the "core operations" doctrine, asserting that because ST derives "the overwhelming majority of [its] revenue" from the "Automotive and Industrial end markets," Defendants would have known of the "decline in demand and the inventory glut." (TAC ¶ 126.) The Second Circuit rejected this theory in *Jackson* v. *Abernathy*, holding that the "naked assertion" that a "key product" is "of such core importance that [a company's] senior officers must have known that [statements] were false" is "plainly insufficient" to plead scienter.   960 F.3d at 99; *see, e.g.*, *Okla. Law Enf't Ret. Sys.* v. *Telefonaktiebolaget LM Ericsson*, 2020 WL 127546, at \*7 (S.D.N.Y. Jan. 10, 2020) (expressing "considerable doubt" that doctrine survived the PSLRA).   In any event, the doctrine is at most limited to where the cited "operations truly constituted nearly all of the company's business."  *In re Plug Power, Inc. Sec. Litig.*, 2023 WL 5577276, at \*22 (S.D.N.Y. Aug. 29, 2023) (collecting cases).  Here, Plaintiffs allege that the "Automotive end market" generates less than half of ST's total revenues.  (TAC ¶ 26.)  Regardless, because Plaintiffs' "independent bas[e]s for alleging scienter" do not "establish a strong inference of scienter," their core operations argument "also fails." *Lipow* v. *Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015).

***Defendants' Non-Cancellable Order Statements.***   Plaintiffs assert that Defendants did not disclose the March 2023 discontinuance of ST's non-cancellable order policy until July 25, 2024.  (TAC ¶ 120.)  Defendants' motion to dismiss demonstrated that this is plain wrong because Mr. Chery told investors in September 2023, within months of the policy ending in March 2023, that the "noncancelable order approach" was "now normally over." (Ex. H at 5-6; Ex. L at 37-38.) Plaintiffs' opposition scrambled together a new and unpled theory that Mr. Chery supposedly gave an answer to an analyst on a September 2023 call denying that non-cancellable orders were discontinued.  (ECF No. 46 at 26-27.)  But, as Defendants detailed in their reply, this is simply

wrong:  the question and answer said no such thing.  (*See* ECF No. 47 at 19-20; Ex. H at 5-6.)

*Mr. Chery's Position.*  Plaintiffs assert that Mr. Chery had a motive to commit fraud because he "needed to report positive results" to "keep his position" as CEO, as his term "was set to expire following the Company's annual shareholder meeting in 2024." (TAC ¶¶ 128-33.)  But "[m]otives that are generally possessed by most corporate directors and officers do not suffice." *Kalnit*, 264 F.3d at 139.  "[V]irtually all" corporate executives are incentivized to "sustain the appearance of corporate profitability," *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009), and so "a plaintiff must do more than merely charge that executives aim to prolong the benefits they hold," *Kalnit*, 264 F.3d at 139.

In opposing Defendants' motion to dismiss, Plaintiffs argued that Defendants sought to "conceal Chery's fraudulent conduct and protect his reputation by firing CW1." (ECF No. 46 at 28.)  Without their "CW1" allegations, Plaintiffs are left with CW8's opinions about Mr. Chery facing "pressure to retain his position." (TAC ¶ 130.)  Even if the Court does not reject Plaintiffs' remaining CW allegations out of hand, CW8 left ST in "May 2018," years before the relevant events.  (TAC ¶ 130.)  And CW8's hearsay allegations are that Mr. Chery's pressure resulted from "refusal to invest more of the Company's assets in Italy," which is unrelated to revenue forecasts.  (TAC ¶ 130.)  In their most recent amendment, Plaintiffs added an allegation that an Italian minister stated in April 2025 that the Italian government "opposed Chery's continuation." (TAC ¶ 133.)  But "in the Second Circuit, facts occurring after an alleged misstatement are not probative of fraudulent intent at the time the statement was made." *ASH Grp. Fla., Inc.* v. *Flora Growth Corp.*, 2025 WL 934845, at *7 (S.D.N.Y. Mar. 27, 2025).

*Stock Trading.*  Defendants' motion to dismiss detailed why Plaintiffs' scienter theory premised on Messrs. Chery's and Grandi's stock sales during the proposed class period

made no sense.  (ECF No. 44 at 26-29.)  Like many corporate executives, Messrs. Chery and Grandi receive compensation through stock grants and options and sell shares when those awards vest.  Plaintiffs would need to show "*unusual* insider trading activity during the class period," *Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (emphasis added), which is trading both "dramatically out of line with prior trading practices" and "calculated to maximize personal benefit from undisclosed inside information," *Gildan*, 636 F. Supp. 2d at 270.  Plaintiffs alleged neither.

Using the data source the complaint relied on, Defendants showed that the amounts and frequencies of Messrs. Chery's and Grandi's trading were no different during the class period than before it.  (ECF No. 44 at 27.)  *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 444 (S.D.N.Y. 2005) (sales "distributed fairly evenly throughout the Class Period" not suspicious); *In re Sina Corp. Sec. Litig.*, 2006 WL 2742048, at *11-12 (S.D.N.Y. Sep. 26, 2006) (sales "consistent with … sales in prior years" "not at all unusual").

Further, Defendants showed that Messrs. Chery's and Grandi's trades were not plausibly "calculated to maximize [their] personal benefit from" the purported fraud.  *Gildan*, 636 F. Supp. 2d at 270.  Five of the seven alleged sales occurred months before most of the challenged statements were made and almost a year before the first alleged "partial disclosure" in April 2024. Sales long before the end of the class period do not support an inference of scienter.  *See BISYS*, 397 F. Supp 2d at 444-45 (sales not "unusual" if "not clustered at [end of class period], when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted").  And stock sales made "weeks before the [alleged] material misstatement" "and many months before the release of any negative information" that allegedly "caused [the defendant company's] stock price" to fall also do not support an inference of scienter.  *Gildan*, 636 F. Supp. 2d at 271.  The other two sales occurred *after* the first stock-price decline, undermining any

inference that they were designed to profit from undisclosed information. *See Chapman* v. *Mueller Water Prods.*, 466 F. Supp. 3d 382, 412 (S.D.N.Y. 2020) ("nothing about" such post-drop "timing" of insider sales "suggests [they] were calculated to maximize the personal benefit from undisclosed inside information"). Moreover, those were "automatic" sell-to-cover trades "made to cover … tax liabilities … upon vesting" (Ex. Q at 100), which "do not support an inference of scienter." *Damri* v. *LivePerson, Inc.*, 772 F. Supp. 3d 430, 468 (S.D.N.Y. 2025) (collecting cases).

Messrs. Chery and Grandi were also subject to ST's insider trading policy, which imposed blackout periods and required pre-clearance even during "open window" periods. (Ex. R at 8-9, 14; *see* Ex. L at F-40; Ex. D at F-39.) Stock trading plans with similar guardrails—like Rule 10b5-1 trading plans—cut against any inference of scienter. *See In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 764 (S.D.N.Y. 2018) ("[T]rades made pursuant to a Rule 10b5-1 trading plan do not give rise to a strong inference of scienter."); *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 176 (S.D.N.Y. 2023) (existence of trading plans cut against inference of scienter when plaintiff "does not plead any facts about the trading plans").

Plaintiffs' opposition hardly bothered to refute any of this, instead asserting merely that Defendants' "arguments … create factual disputes that are not appropriate at the motion to dismiss stage." (ECF No. 46 at 28.) But Defendants did no more than take Plaintiffs' allegations as true. Courts routinely find such allegations insufficient. *See Gildan*, 636 F. Supp. 2d at 271.

\*       \*       \*

When all is said and done, without the concocted "CW1" allegations, Plaintiffs rely on a scattershot of legally insufficient theories to meet their exacting burden of pleading a strong inference of scienter. Even "[t]aken collectively" (ECF No. 46 at 29), Plaintiffs' allegations fall far short. As Judge Preska reaffirmed when dismissing a complaint that similarly tried to plead

scienter by bundling legally insufficient allegations, Plaintiff cannot escape the "elementary arithmetic" that "'zero plus zero' (plus zero plus zero plus zero) 'cannot equal one.'" *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *15 (S.D.N.Y. Mar. 30, 2021).

## II.    THE THIRD AMENDED COMPLAINT FAILS TO PLEAD LOSS CAUSATION.

Plaintiffs' claims based on two of their four "partial disclosures" fail to allege loss causation.  To plead loss causation, Plaintiffs must allege facts showing that the challenged statements "concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005); 15 U.S.C. § 78u-4(b)(4).  A court must dismiss a complaint that does "not adequately [plead] facts which, if proven, would show that [the] loss was caused by the alleged misstatements as opposed to intervening events." *Lentell*, 396 F.3d at 174; *see, e.g.*, *Janbay* v. *Canadian Solar, Inc.*, 2012 WL 1080306, at *14 (S.D.N.Y. Mar. 30, 2012) (dismissing for "fail[ure] to plead loss causation").

Plaintiffs allege that each of four quarterly earnings reports ST issued over a year was a "partial disclosure and materialization of the concealed risk."  (TAC ¶¶ 108, 110, 113, 119.) That is implausible since it assumes that reasonable investors would require four quarterly earnings reports to understand that ST's forecasts were too optimistic.  Where "the truth was already known," Plaintiffs have not pled loss causation.  *Diabat* v. *Credit Suisse Grp. AG*, 2024 WL 4252502, at *150 (S.D.N.Y. Sep. 19, 2024).  Plaintiffs' depiction of ST's quarterly reporting as a "partial disclosure and materialization of the concealed risk" does not help them.  To show loss causation through a "materialization of risk," each event "must reveal new information previously concealed." *In re Vivendi Universal, S.A. Sec. Litig*., 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011). Each of the four quarters here, however, allegedly revealed similar information:  "the deterioration in the Company's business and operations, including demand for ST[]'s products."  (TAC ¶ 2.)

At the very least, Plaintiffs' claims based on the last two of these four quarterly

disclosures should be dismissed:

**October 31, 2024.** On October 31, 2024, ST "disclosed that it expected to finish Fiscal Year 2024 … on the lower end of the range disclosed on July 25, 2024." (TAC ¶ 112.) On its face, this purported "partial disclosure" negates—rather than supports—loss causation. Stating that results are expected to be *within the already-announced range* (TAC ¶ 112) does not "reveal[] 'the falsity' of a challenged misstatement"—it, at most, incrementally refines an estimate already provided to the market. *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 288 (S.D.N.Y. 2023); *see Omnicom*, 597 F.3d at 512 ("negative characterization of already-public information" is not a corrective disclosure); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 587 (S.D.N.Y. 2007) (earnings "within projected range"—albeit on "the low end"—"largely eviscerate[d]" claim that projection was false or misleading).

Further, the revised guidance ST provided on October 31, 2024, followed numerous events informing investors that ST faced weakening demand:

- On an October 26, 2023, earnings call, Mr. Chery stated that "order booking" in the industrial market was "not materializing at our expectation." The same day, Mr. Chery acknowledged that ST's "fantastic growth" in Automotive was "related to the period of shortage that ST has benefited [from] in 2023." (TAC ¶¶ 71-73.)

- ST's January 25, 2024, Form 6-K announced "further deterioration in Industrial." On an earnings call that day, Mr. Chery noted that "the first half of 2024 will be impacted by a significant inventory correction in Industrial." (TAC ¶¶ 75- 77.)

- On April 25, 2024—Plaintiffs' first "partial disclosure"—ST filed a Form 6-K that allegedly "disclosed poor financial results for the first quarter of 2024 driven primarily by a decline in revenues and margins in Automotive and Industrial," and noted that "demand for chips declined in Automotive." (TAC ¶ 107.)

- On July 25, 2024—Plaintiffs' second "partial disclosure"—ST filed a Form 6-K that allegedly "announced lower than expected revenue in Automotive, including a

-37-

decline in demand, and continued deterioration in Industrial," and disclosed that "customers were canceling orders to reduce inventories" and that ST "expected production rates for electric cars to continue to decline." (TAC ¶ 109.)

- On August 23, 2024, a shareholder filed the initial complaint in this action, alleging that, until "[t]he truth emerged" on July 25, 2024, Defendants had "artificially inflated" the price of ST's stock by "disseminating materially false and misleading statements" about "ST[]'s forecasting ability." (ECF No. 1 ¶¶ 3-4.)

By the time ST released its updated guidance on October 31, 2024, all of this information was already available to investors, including the securities fraud allegations. Plaintiffs may not plead loss causation based on events that allegedly "confirm[] what the market already knew." *DoubleLine Cap. LP* v. *Odebrecht Fin. Ltd.*, 323 F. Supp. 3d 393, 459 (S.D.N.Y. 2018).

*January 30, 2025.* Plaintiffs' fourth purported "partial disclosure" is ST's January 30, 2025 Form 6-K, which provided a 2025 outlook of $2.51 billion in revenues, or a 27.6% year-over-year decrease, due largely to "delayed recovery and inventory correction in Industrial and a slowdown in Automotive." (TAC ¶ 114.) At this point, investors were already aware of the information summarized above. Beyond that, Plaintiffs filed their Amended Complaint on January 22, 2025. (ECF No. 34.) That publicly detailed Plaintiffs' allegations of securities fraud. If ST's stock "traded in an efficient market" as Plaintiffs allege (TAC ¶ 140), "the prices of the [stock] incorporate most public information rapidly." *Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 546 F.3d 196, 204 (2d Cir. 2008). In other words, under Plaintiffs' own theory, ST's stock price should have reflected their allegations of securities fraud before the purported January 30 "partial disclosure." Plaintiffs cannot plausibly claim that the January 30, 2025 Form 6-K "reveal[ed] new information to the market" when, by their own telling, the waning semiconductor demand and allegations of securities fraud had been repeatedly disclosed long before January 30, 2025. *See In re Vivendi*, 765 F. Supp. 2d at 555.

Under Second Circuit law, loss causation is not adequately pled by pointing to alleged "partial disclosures" that were cumulative of what the market already knew. For example, *Hills* v. *BioXcel Therapeutics, Inc.* held that loss causation was adequately pled for a June 2023 disclosure, but not for an August 2023 disclosure that was merely "an admission that the concerns [the company] had warned about as part of their June 2023 corrective disclosure had, in fact, materialized." 2025 WL 2777129, at *18 (D. Conn. Sep. 29, 2025). Because "the subject of the fraudulent statement or omission … had already been disclosed," the later update did not "correct[] any prior misleading or omitted statements" and thus was "not properly considered [a] corrective disclosure[] for loss causation." *Id.*; *see Menora Mivtachim Ins. Ltd.* v. *Meta Platforms, Inc.*, 2026 WL 508834, at *1 (9th Cir. Feb. 24, 2026) (no loss causation where defendant "had disclosed multiple times that the iOS changes would reduce its ability to target and measure advertising").

## CONCLUSION

Defendants respectfully request that the Court grant reconsideration of the Court's September 15, 2025 motion-to-dismiss ruling and dismiss Plaintiffs' Third Amended Complaint— their fourth complaint in this case—with prejudice.[9] The PSLRA directs that "upon final adjudication of the action, the court shall include in the record specific findings regarding" Plaintiffs' compliance with Rule 11. 15 U.S.C. § 78u-4(c)(3)(A). Given Plaintiffs' serious misrepresentations in their complaints and motion-to-dismiss opposition regarding their purported confidential witness, the Court should follow the "presumption" in the statute that "the appropriate sanction" "is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation." *Id.*

---

[9]     *See, e.g.*, *Tasini* v. *AOL, Inc.*, 851 F. Supp. 2d 734, 746 n.5 (S.D.N.Y. 2012) ("Because the plaintiffs have failed to state a claim after two opportunities to do so, the Complaint is dismissed with prejudice."), *aff'd*, 505 F. App'x 45 (2d Cir. 2012).

Respectfully submitted,

/s/ *Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
David M.J. Rein
Julia A. Malkina
Alexandra Bodo
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
giuffrar@sullcrom.com
reind@sullcrom.com
malkinaj@sullcrom.com
bodoa@sullcrom.com

*Counsel for Defendants*

March 6, 2026