## DECLARATION OF MARCO MARIA MONTI

I, Marco Maria Monti, declare as follows:

1.      I am a citizen of Italy and reside in Geneva, Switzerland.

2.      I am a native Italian speaker and have regularly used English in business communications. This declaration was reviewed with me by Marina Fracchia, who interpreted the contents from English to Italian. I had the opportunity to ask questions and I understood the declaration before signing.

3.      For almost 40 years, I worked at the STMicroelectronics, N.V. group of companies ("ST," or the "Company").

4.      From 2012 until leaving the Company in January 2024, I served as President of the Automotive and Discrete Group ("ADG") at ST, residing in Geneva, Switzerland. In mid-December 2023, I was dismissed from ST by Jean-Marc Chery, the Company's CEO. I was distressed by the circumstances because I was provided no prior notification, given no reasons for this action and removed from the Company premises that day. I was also upset because the ADG group that I headed had achieved record financial results.

5.      In July or August 2024, soon after information was published about a potential lawsuit asserting claims by shareholders in the United States, I received a call from Carlo Ferro. Mr. Ferro was the former Chief Financial Officer of ST who left ST several years before me. Mr. Ferro suggested that we should assist in the lawsuit against the Company. Mr. Ferro also sent me a complaint that had been filed against ST in a U.S. court.

6.      At Mr. Ferro's suggestion, I sent an email on 24 August 2024 to Adam Apton of Levi & Korsinsky LLP, one of the lawyers representing shareholders in the lawsuit. At this time I was still upset at Mr. Chery. I offered to speak to assist with the lawsuit. I also said that the reason I was terminated was because I refused to participate in the matters described in the complaint. In fact, I felt angry about how I was unfairly treated and I did not know the reasons for my termination.

7. Mr. Apton sent a brief response expressing interest in speaking and proposing a call. We did not schedule a call.

8. At some point in approximately September or October 2024, I received a telephone call from someone working with a law firm involved in asserting the claims in the lawsuit. I believe the call was likely from Mr. Apton, although I do not recall specifically.

9. The person asked me how ST was organized and I generally described the different product groups at ST, as well as the types of regular meetings that were held. The person also asked me about the responsibilities of different individuals at ST, which I described.

10. The person stated that he knew that there had been disputes among executives at ST. I informed him that I could not speak about that or any other confidential internal matters at ST. The person asked me if I could provide the names of other people who could provide information to help with the case. I declined to do so. I do not recall exactly how long the call was, but it was likely less than 10 minutes.

11. On 3 January 2025, I received a call from Adam Apton. By this time, as my professional life was moving forward and time had passed, my negative sentiment towards Mr. Chery was receding. Mr. Apton asked me if I would take part in the lawsuit as a witness to assist with their claims. Mr. Apton told me that he thought that they had a good case, that there were many other current and former ST employees who would be assisting as witnesses, and that I could be an important witness given my position at the Company, responsibilities and participation in meetings.

12. Mr. Apton told me that, if I agreed to participate, they would cover my legal costs, expenses and provide a lawyer.

13. I told Mr. Apton that I did not want to participate in the lawsuit in any respect. I told him that I did not want them to use my name in the lawsuit. Mr. Apton told me that he understood and to let him know if I changed my mind. The call lasted about five minutes.

14. Immediately following the call, Mr. Apton sent me an email proposing the name of a lawyer. He stated "we would retain the attorney for you and agree to complete indemnification

if the need should arise." I responded on 6 January 2025, stating again that I did not wish to be involved, have my name used, or have our conversation reported in the lawsuit.

15.    In early February 2025, Carlo Ferro sent me a new version of the shareholder complaint that had been filed in the lawsuit. I was shocked and upset to see the allegations attributed to me as the person identified as "CW1" in the complaint. Many were untrue and were statements that I never said or suggested during my two short telephone calls with the plaintiffs' law firm.

16.    The plaintiffs' law firm never asked me to review any draft of the complaint, including the allegations that they attributed to me. Had they done so, I would have told them that their allegations about me are untrue or inaccurate and that they should not use me as a "confidential witness" in their lawsuit.

17.    Within days of receiving the new version of the shareholder complaint from Carlo Ferro, news of the complaint started appearing in international media, and I started receiving telephone calls about it. This was very distressing as the allegations attributed to me were false or inaccurate and I had never authorized them.

18.    On 5 February 2025, I sent a message to Paolo Visca, a board member of ST. I told Mr. Visca that I was astonished by the complaint. In addition to containing statements that were wrong and untrue they had attributed statements to me that I did not make. I informed Mr. Visca that I had spoken with the plaintiffs' lawyer for less than ten minutes and that I stopped the conversation when I felt that he was putting words in my mouth. I wrote that it was evident that they were seeking to use my title and the fact that I had left the Company. I informed Mr. Visca that he should feel free to inform others in the Company about what I had told him. I stated that I would be available to publicly state what I had told him if that would be of assistance.

19.    Mr. Visca acknowledged my message. On 7 February 2025, I offered to travel to Rome to meet Mr. Visca. Mr. Visca suggested to wait until after an upcoming ST Board meeting. I did not hear anything further.

20.     On 5 December 2025, I received another phone call from Mr. Apton. He told me that ST's lawyers were seeking that I testify in the case. Mr. Apton suggested that I could hide from having to testify by staying in a country outside the United States. He said that, if I remained outside the United States, the court would not be able to force me to testify, and I could escape giving testimony. He said that if I received a call from the defendants' lawyer, I would have the option to drop the call, to answer or to refer the caller to a lawyer that Mr. Apton would provide.

21.     I never asked Mr. Apton or anyone else how to evade providing testimony in the lawsuit. If required to testify, I would do so truthfully and accurately.

22.     I have reviewed a revised version of the complaint that I was informed was filed on 6 February 2026.

23.     Based on the employment history contained in paragraphs 38 and 39 of the complaint, I understand that the complaint's references to "Confidential Witness 1" or "CW1" are intended to refer to me.

24.     As described below, many of the allegations about me in the complaint are false or inaccurate.

25.     At least during the time I was at ST, I was not aware of any attempt to mislead ST's investors in any respect. As far as I was aware, ST and its senior executives' statements to investors were truthful, accurate and made in good faith based on the available information.

26.     Paragraph 3 of the complaint states that: "CW1 also states facts to suggest that Defendants engaged in channel stuffing by providing excessive discounts in order to give the misleading appearance of better financial results in 2023."

27.     I did not make this statement, or a similar statement, to the representative of the plaintiffs' law firms.

28.     I had left ST before the financial results for 2023 were published. However, this statement in paragraph 3 makes no sense to me. "Excessive discounts" would more likely reduce the revenues reported in financial results, not improve them. In any event, I do not believe that

-4-

ST, its CEO Jean-Marc Chery or its CFO Lorenzo Grandi provided or attempted to provide any misleading financial results or information to investors during my time at the Company.

29.     I did have a disagreement with other senior executives about discounts in late 2023, but this had nothing to do with the complaint's allegations of "channel stuffing" or misleading financial reporting.  ST's head of European sales wanted to agree to a supplier of automotive components' request for a discount for 2024 shipments despite the customer having previously agreed to pricing terms in its contract.  This discount would not impact 2023 revenues or financial results.  I disagreed because my colleagues and I in ADG had worked hard to build a reasonable margin with this customer on relatively low-margin products.  I felt that the sales group's approach was undermining my team's efforts and the customer relationship we had built and would make it more challenging to re-establish the same margin levels with this customer in the future.

30.     In my experience in the semiconductor industry it is a common practice for manufacturers to negotiate pricing and volume with distributors, with which the manufacturers have no contract setting the pricing and volume.  This benefits the manufacturers which can use this mechanism to avoid unused capacity which has significant costs for manufacturers and benefits the distributors which can negotiate favorable pricing conditions.  These are ordinary business practices and are not misleading to the financial community.

31.     Paragraph 3 of the complaint also states:  "However, while pulling forward sales with these discounts allowed STM to report meeting short-term quarterly targets in 2023, it created an inventory glut at distributors and end users that hampered demand going forward."

32.     I did not make this statement, or a similar statement, to the representatives of the plaintiffs' law firms.

33.     This statement in paragraph 3 is not accurate.  As far as I am aware, ST did not take any actions for the purpose of creating excess inventory at distributors or end customers.  Instead, ST engaged in the normal business practice of negotiating price and volume in the manner that I have described above.

34. In my experience, ST could not force distributors, end users or any other customers to buy products that they did not want. For automotive products, the role of distributors is relatively limited. Typically, automotive customers do not hold inventories substantially beyond their needs, including because of the specialized storage facility space needed to store semiconductors. When I was at ST, we had no way to measure inventory at automotive customers unless they shared that information with us. Distributors set their inventory levels according to their own judgments and interests. Distributors that are public companies and issue financial reporting disclose their total inventory, but do not break that down by manufacturer. When I was at ST, the Company published quarterly ST's inventory levels, measured in days sales.

35. I also disagree with the allegations in paragraph 3 about pulling forward demand for another reason. As described in paragraph 37 of the complaint, I do not agree that ST "reported a year-over-year increase of 33.5% in the Automotive end market" because ST was "surreptitiously pulling forward demand" as stated in paragraph 37 of the complaint. This is incorrect. In fact, this growth was mainly driven by the products ST had developed to service electric vehicle mobility, some of which were unique, including silicon carbide.

36. Paragraph 29 of the complaint states that: "In Fiscal Year 2024, the Company reorganized the three product groups into two product groups and four reportable segments." Paragraph 30 states: "This product reorganization spread automotive chips to all segments, making it difficult to segregate the erstwhile ADG-related product revenues, which had made up 45% of the Company's 2023 revenues, arguably the most important product segment for revenue prediction, from the revenues generated by the Company's other products. As CW1 confirms, this was done to mask the scale and extent of the deterioration in the Company's business by mixing profitable offerings with unprofitable ones."

37. I did not make this statement, or a similar statement, to the representatives of the plaintiffs' law firms.

38. This statement in paragraph 30 is not accurate. I was no longer working for the Company in 2024 when the reorganization was announced. I have never stated or suggested that

the reason for the reorganization was to "mask" information from investors. I was not involved in the reorganization and I was not aware of it until it was announced.

39. Paragraph 41 of the complaint states: "Throughout 2023, CW1 attended monthly staff meetings with approximately 25 high-level managers, including Chery, who chaired the meetings. According to CW1, participants at these meetings discussed forecasts, demand visibility, public reporting, and disclosures. At these meetings, CW1 told Chery that STM should publicly report forecasts that were consistent with the semiconductor market at large, *i.e.*, the Company expected a significant slowdown in 2023 in line with the industry. Specifically, CW1 warned Chery not to misrepresent that the Company was immune from the overall decline in the market."

40. I did not make this statement, or a similar statement, to the representatives of the plaintiffs' law firms. It is possible that I generally described the format of the monthly meetings described in paragraph 41 during the first call with plaintiffs' lawyers, but I did not make the statements attributed to me.

41. The statements in paragraph 41 are not accurate. For example, we did not discuss "public reporting" and "disclosures" at the monthly staff meetings; the public reporting and disclosure cycle occurred quarterly.

42. The forecasting process benefitted from debate and discussion among the different groups and leaders within ST. A key feature of that process is that everyone's views were not identical. When I was at ST, I managed three product lines: automotive, power components and discrete. The three product lines had different market dynamics. Automotive historically was more stable, discrete was more impacted by market cycles, and power components was somewhere in between. These product lines were helpful to me in forming a view on market dynamics. In the second half of 2023, automotive demand remained relatively strong, power components had good demand mainly due to silicon carbide products, and discrete demand had significantly deteriorated, especially from Asia.

-7-

43.    During the monthly meetings, the participants discussed their views on market dynamics and their possible evolution. The participants raised different datapoints, including those I identify above, and some had more optimistic or pessimistic views of the market dynamics. Ultimately, the forecasts were created by forming a consensus among the participants which was then turned into a detailed action plan for all the participants.

44.    I also never "warned" Mr. Chery "not to misrepresent" ST's business forecasts to investors in 2023. During the time I headed ADG, the Company's public forecasts resulted from the detailed and thorough process that I have described, with input from and participation of ST's products groups, its sales team and another team providing market and economic information. The process was coordinated by a centralized team in supply chain management.

45.    The final forecasts were the result of consensus achieved among ST's senior management, including me. I agreed with the forecasts issued by ST while I headed ADG and was comfortable that they were appropriate good-faith estimates resulting from this process.

46.    Paragraph 41 of the complaint also states that: "CW1 also told Chery that the commitments STM publicly made to investors in the third and fourth quarters of 2023 could not be kept based on the information known to the Company at that time."

47.    I did not make this statement, or a similar statement, to the representatives of the plaintiffs' law firms.

48.    I do not know what "commitments" in paragraph 41 refers to. To the extent "commitments" is intended to mean forecasts, those are estimates, not commitments. As explained above, I believed ST's forecasts to be reasonable based on the process and consensus-building approach I have described above.

49.    Paragraph 42 of the complaint states: "CW1 further stated that the level of channel inventory was known and knowable the entire time, and inventory levels for customers were known and visible to the Company."

50.    I did not make this statement, or a similar statement, to the representatives of the plaintiffs' law firms.

51.    This statement in paragraph 42 does not accurately describe ST's knowledge of, or visibility into, customer inventory levels.

52.    As I have explained above, during my time at the Company, ST had visibility into inventory levels for distributors, whose inventory information is publicly available, but typically not automotive customers.

53.    Paragraph 42 of the complaint also states: "CW1 complained to CEO Chery and CFO Grandi in writing after CW1 discovered that STM's salesforce offered excessive discounts to ADG's customers to drive sales, without CW1's approval."

54.    I did not make this statement, or a similar statement, to the representatives of the plaintiffs' law firms.

55.    As I have described above, I objected to particular discounts being offered to a specific automotive customer for the reasons that I explained above.  While it is possible that I exchanged emails about this subject with colleagues in senior management, I did not send a letter or issue any other kind of formal complaint.

56.    Paragraph 42 of the complaint also states:  "CW1 explained further that the excessive discounts were offered to inflate sales, and stuff the Company's distribution channels to conceal the decline in demand.  According to CW1, this channel-stuffing scheme created a bubble that created the false appearance of better financial performance during 2023."

57.    I did not make this statement, or a similar statement, to the representatives of the plaintiffs' law firms.

58.    This statement in paragraph 42 is not accurate.  I do not believe that ST inflated sales or "stuff[ed] the Company's distribution channels."  I also do not believe that ST took any steps to "conceal" a "decline in demand."  Nor do I believe that ST "created a bubble" or portrayed "the false appearance of better financial performance during 2023."  As I describe above, the semiconductor industry has established practices for negotiating pricing and volume with distributors.

59.     Paragraph 44 of the complaint states: "CW1 elaborated that the excessive sales incentives were offered to direct OEM customers as well as distributors to hide the declining financial performance in 2023."

60.     I did not make this statement, or a similar statement, to the representatives of the plaintiffs' law firms.

61.     This statement in paragraph 44 is not accurate.  To my knowledge, ST did not provide sales incentives to automotive customers in 2023.  I am also not aware that ST provided any sales incentives, or took any other steps, "to hide declining financial performance in 2023."

62.     Paragraph 44 of the complaint states: "CW1 confirmed that even though by the second half of 2023, the Company experienced a downward trend in demand, Defendant Chery hid the downturn and claimed that STM was not as vulnerable as the rest of the industry."

63.     I did not make this statement, or a similar statement, to the representatives of the plaintiffs' law firms.

64.     This statement in paragraph 44 is not accurate.  I do not believe that Mr. Chery or anyone at ST "hid" any known downward trend in demand.  As explained above, ST's forecasts resulted from a consensus reached among the different business areas and senior leaders of the Company.

65.     Paragraph 45 of the complaint states: "CW1 states that the Company fired CW1 in December 2023 effective January 10, 2024 because CW1 objected to STM's artificial financing reporting, channel stuffing scheme, and sales tactics designed to conceal the Company's true exposure to a decline in demand."

66.     I did not make this statement, or a similar statement, to the representatives of the plaintiffs' law firms.

67.     Paragraph 45 is not accurate.  I did not "object[] to STM's artificial financing reporting, channel stuffing scheme, and sales tactics designed to conceal the Company's true exposure to a decline in demand."  In fact, I do not believe that ST engaged in that conduct during

-10-

my time at the Company.  I do not know the reasons for my dismissal from the Company, but I do not believe that it was for that reason.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 12 February 2026 in Milan, Italy.

_____

Marco Maria Monti